# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MOHAMMAD JAVAD HAJJAR-NEJAD,

    *Plaintiff*,

    v.

GEORGE WASHINGTON UNIVERSITY,

    *Defendant*.

Civil Action No. 10-00626 (CKK)

## MEMORANDUM OPINION
(August 15, 2011)

Plaintiff Mohammad Javad Hajjar-Nejad ("Hajjar-Nejad") commenced this action against

The George Washington University ("GW") on April 9, 2010, asserting a series of claims in

connection with his dismissal as a medical student from GW's School of Medicine and Health

Sciences (the "Medical School") in July 2007. In the short time that the action has been pending,

Hajjar-Nejad has amended his complaint twice, dropping claims and narrowing the universe of

relied-upon factual allegations. In the operative iteration of his complaint—the [20] Second

Amended Complaint—he asserts a single claim sounding in breach of contract. Specifically,

Hajjar-Nejad claims that the written offer of acceptance provided by GW and executed by him

constitutes a binding agreement between the parties and that GW breached the terms of that

agreement by dismissing him from the Medical School and refusing to provide him with the

contemplated educational services. At present, there are three motions pending before the Court:

GW's [21] Motion to Dismiss Plaintiff's Second Amended Complaint ("Motion to Dismiss");

Hajjar-Nejad's [24] Motion to Reinsert Civil Rights Complaints ("Motion to Amend")[1]; and a

---

[1] Although styled as a "Motion to Reinsert Civil Rights Complaints," like GW, the Court construes the submission as a motion to amend under FED. R. CIV. P. 15(a).

[25] Motion for Leave to Withdraw as Plaintiff's Counsel of Record ("Motion to Withdraw") by

Michael W. Beasley, Esq. ("Beasley").  Upon consideration of the parties' submissions, the

relevant authorities, and the record as a whole, GW's Motion to Dismiss will be granted-in-part

and denied-in-part, Hajjar-Nejad's Motion to Amend will be denied, and Beasley's Motion to

Withdraw will be granted.

## I. BACKGROUND

*A.    Factual Background*

While an undergraduate at GW, Hajjar-Nejad applied to GW's Medical School.  Second

Am. Compl. ("2d Am. Compl."), ECF No. [20], ¶ 9.[2]  On November 5, 2003, the Medical School

presented him with a written Offer of Acceptance, and he executed the document two days

later—on November 7, 2003.  *Id.*

The Offer of Acceptance is a single page.  *See id.* Ex. 1 (Offer of Acceptance) at 1.  It

offers Hajjar-Nejad "admission to the Doctor of Medicine degree program" upon certain terms

and conditions.  *Id.*  By executing the document, Hajjar-Nejad "accept[ed] the conditional offer

of acceptance" for the academic year beginning in 2004.  *Id.*

The Offer of Acceptance identifies several terms and conditions to GW's offer.  Among

other things, Hajjar-Nejad was required to submit additional application materials, complete his

undergraduate studies with a satisfactory level of performance, demonstrate his financial ability

---

[2] This factual background is derived from the well-pleaded factual allegations in Hajjar-Nejad's Second Amended Complaint—the operative iteration of the complaint—which for purposes of the pending motions the Court assumes to be true.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Where appropriate, the Court will also reference documents attached to or incorporated in that document.  *See Equal Empl. Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

to pay tuition and related expenses, and provide a $100 deposit and a $2,900 tuition prepayment.

*Id.* Of particular relevance to this action, Hajjar-Nejad certified the following:

> I understand that I will be subject to the Regulations for M.D. Candidates that are set forth in the [Medical School] Bulletin. As a medical student, I agree to become familiar with the Bulletin and the Regulations and to abide by them.

*Id.* In addition, the Offer of Acceptance includes the following clause:

> I understand that the submission of false or misleading information or material omission in connection with the application process shall be grounds for withdrawing my conditional offer of acceptance to [the Medical School]. I further understand and agree that if any such submissions or omissions are discovered after matriculation in the Doctor of Medicine degree program or award of a degree, [the Medical School] has the right, in its sole discretion, to dismiss me from [the Medical School] and/or revoke my degree.

*Id.* Outside this narrow context, the Offer of Acceptance does not on its face purport to describe the circumstances under which Hajjar-Nejad could be dismissed from the Medical School or the scope of GW's discretion in determining when dismissal is appropriate. Nor does it purport to describe whether Hajjar-Nejad had any continuing right to attend the Medical School.

Hajjar-Nejad began his studies at the Medical School in 2004. He was a "superb" student and "excell[ed]" in his first two years. *Id.* ¶ 14. In April 2006, he was accepted into an honors program for third-year students by a committee of nine faculty members based on its consideration of a written essay, project proposal, mentorship, prior achievements, and strength of academic performance. *Id.* ¶ 15. Hajjar-Nejad participated in the honors program through August 11, 2006 and, in this period, he reported to unspecified individuals his "good faith observations" that included "limited criticisms of hospital practices." *Id.* ¶ 19. Around this same time period, he began to be subjected to "adverse and unwarranted comments" from faculty and

students.  *Id.*  For example, on August 23, 2006, Senior Associate Dean W. Scott Schroth, M.D.

("Schroth") reported to other senior faculty that Hajjar-Nejad had "leveled criticisms" against

them.  *Id.* ¶ 20.  According to Hajjar-Nejad, this act of reporting marked the beginning of a

"pattern of hostility and antagonism" against him.  *Id.*

     In his third year, Hajjar-Nejad began to experience "increasingly hostile treatment" from

the Medical School's faculty, and in particular James L. Scott, M.D. ("Scott"), the Dean of the

Medical School.  *Id.* ¶ 21.  On October 23, 2006, Schroth, acting under Scott's direction,

informed Hajjar-Nejad that he "would have to leave" the honors program and that, if he did not

do so voluntarily, he would be "removed."  *Id.* ¶ 26.  At a meeting with Medical School faculty,

Hajjar-Nejad stated that he believed there was no legitimate basis for the hostile treatment.  *Id.* ¶

29.  Ultimately, however, Hajjar-Nejad left the honors program.  *Id.* ¶ 31.

     Nonetheless, the alleged mistreatment of Hajjar-Nejad continued unabated.  *Id.* ¶ 32.  In

February 2007, he learned that the Subcommittee on Professional Comportment (the

"Subcommittee") within the Medical Student Evaluation Committee (the "MSEC") was

evaluating his academic progress.  *Id.* ¶ 33.  Hajjar-Nejad characterizes the outcome of this

process as "pre-determined."  *Id.*  On May 3, 2007, Hajjar-Nejad attended a Subcommittee

meeting accompanied by legal counsel.  *Id.* ¶ 34.  He contends that the meeting was conducted in

violation of GW's policies and regulations, though he does not specifically identify which

policies or regulations are at issue.  *Id.*  He further contends that he was not permitted to ask

questions, cross-examine witnesses, or to present witnesses or evidence of his own.  *Id.*

     Despite this hostile treatment, Hajjar-Nejad managed to complete the 2006-2007

academic year with passing grades and positive evaluations from his professors.  *Id.* ¶ 35.  But on

June 18, 2007, the Subcommittee issued its recommendations to the MSEC. *Id.* ¶ 37. The contents of those recommendations are not entirely clear, though Hajjar-Nejad contends that they related only to his academic responsibilities and included requiring him to repeat any clerkship in the event he received a "low pass" grade. *Id.* Hajjar-Nejad contends that the recommendations were contrary to GW's "regulations and policies," though again he does not specify which regulations and policies those might be. *Id.*

On June 18, 2007, the MSEC held a meeting concerning Hajjar-Nejad chaired by Jeffrey S. Ackman, M.D. *Id.* ¶¶ 38-40. Hajjar-Nejad was accompanied by counsel but was denied leave to bring an expert witness and legal assistant. *Id.* ¶ 39. He did not receive a copy of the Subcommittee's recommendations until early that morning. *Id.* ¶ 38. Hajjar-Nejad claims that the MSEC was comprised "primarily of white students" and individuals "pre-selected" by GW. *Id.* ¶ 40. He contends that, contrary to the Medical School's "regulations," the MSEC did not issue written recommendations despite his requests. *Id.* ¶ 41.

On July 26, 2007, Hajjar-Nejad received a letter dated two weeks earlier stating that the MSEC had recommended Hajjar-Nejad's dismissal. *Id.* ¶ 42. The letter indicates that the MSEC held meetings on June 18, 2007 and July 9, 2007 to conduct their deliberations, and that in doing so they "review[ed] the relevant aspects of the 'Regulations for MD Candidates.'" Def.'s Mem. Ex. 2 (Ltr. from J. Akman, M.D., to J. Scott, M.D., dated July 12, 2007), ECF No. [21-3], at 1.[3] The letter goes on to provide as follows:

> A motion was made and seconded to accept the Professional Comportment Subcommittee's report and recommendations. Serious

---

[3] The letter is incorporated in the Second Amended Complaint and annexed to GW's opposition papers.

> concerns were raised about Mr. Hajjar-Nejad's professionalism, honesty and integrity, his interpersonal relationships and his capacity to work with others. Of particular concern[] were the following: Mr. Hajjar-Nejad's inability to accept responsibility for his own actions; refusal to accept instructions or constructive feedback from residents, faculty and deans; inability to work and communicate effectively with peers and residents; inadequate understanding of the commitment to and responsibility for patient care; lack of insight into personal weaknesses and areas for improvement; and, inappropriate understanding of the role of a medical student in the medical education hierarchy. In addition, the Committee noted that these concerns were not the result of an isolated incident, but appeared to be a pattern in most interactions with Mr. Hajjar-Nejad.

*Id.* at 2. The letter states that a "motion for dismissal" passed in a "secret ballot vote" with nine votes in favor, none against, and one abstention. *Id.*

Hajjar-Nejad claims that the dismissal determination was unjustified and contrary to policies and regulations to which GW was "obliged to adhere." 2d Am. Compl. ¶ 43. He contends that the MSEC "exceeded the scope of its authority" and committed a number of unspecified "procedural violations" in connection with the dismissal proceedings. *Id.*

On July 26, 2007, Scott adopted the MSEC's recommendation and dismissed Hajjar-Nejad from the Medical School. *Id.* ¶ 45. Hajjar-Nejad claims that this was improper because GW's regulations required the final decision to be made by the Vice President of Academic Affairs. *Id.* Subsequently, Hajjar-Nejad sought to appeal the determination within GW; the determination was ultimately upheld. *Id.* ¶¶ 47, 49.

Hajjar-Nejad claims that the campaign of mistreatment continued even after his dismissal. He contends that GW put an "unlawful and retaliatory 'hold'" on his academic transcripts for a period of eight months to "preclude his subsequent transfer to an alternative medical school" and prevented him from sitting for a national exam to become a physician. *Id.* ¶¶ 51-52.

B.     *Procedural Background*

Hajjar-Nejad, proceeding without legal representation, originally commenced this action in the United States District Court for the District of Maryland—on April 9, 2010. *See* Compl., ECF No. [1-4]. By any reasonable measure, Hajjar-Nejad's original Complaint was sprawling; it spanned 121 color-coded pages, included 193 paragraphs (several with discrete sub-parts), and was accompanied by thousands of pages of exhibits. Although far from clear, Hajjar-Nejad appeared to allege that he was unfairly and unlawfully dismissed from GW based on his race, religion, and perceived national origin[4] in violation of Title VI of Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"); Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq.* (the "DCHRA"); and his constitutional rights to free speech, the free exercise of religion, and equal protection under the law.

On April 19, 2010, the action was transferred to this Court, *see* Mem. (Apr. 19, 2010), ECF No. [1-10], whereupon Hajjar-Nejad secured legal counsel and, with GW's consent, filed an Amended Complaint (the "First Amended Complaint"), *see* Am. Compl., ECF No. [13]. The First Amended Complaint—itself no model of clarity—included three counts. In Count I, Hajjar-Nejad appeared to claim that GW discriminated against him on the basis of his race, religion, and national origin in violation of Title VII; Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); and the DCHRA.[5] *See id.* ¶¶ 72-75. In Count II, Hajjar-Nejad appeared

---

[4] Hajjar-Nejad identifies his race as Arabic or Middle Eastern; his religion as Muslim; and his perceived national origin as Iranian.

[5] The precise legal theories upon which Hajjar-Nejad intended to rely are not entirely clear from the face of his First Amended Complaint.

to claim that GW retaliated against him for engaging in protected activity in violation of Title VII; Section 1981; and the DCHRA. *See id.* ¶¶ 77-79. In Count III, Hajjar-Nejad alleged that GW breached the terms of the Offer of Acceptance by dismissing him from the Medical School. *See id.* ¶¶ 81-83.

On July 26, 2010, GW moved to dismiss Hajjar-Nejad's First Amended Complaint. *See* Def.'s Mot. to Dismiss First Am. Compl., ECF No. [14]. On August 20, 2010, Hajjar-Nejad, acting through counsel, responded by filing a partial opposition and voluntarily dismissing his "civil rights claims"—*i.e.*, Counts I and II of the First Amended Complaint—without prejudice. *See* Pl.'s Partial Opp'n to Def.'s Mot. to Dismiss First Am. Compl., and Voluntary Dismissal of All Pending Civil Rights Claims, ECF No. [17]. By way of explanation, Hajjar-Nejad claimed that some or all of his claims were still pending before the District of Columbia Commission on Human Rights and therefore were yet to be fully exhausted. *See id.* at 3-4. Concurrently, Hajjar-Nejad moved this Court for leave to file a second amended complaint omitting his "civil rights claims" but retaining his claim for breach of contract, *see* Pl.'s Mot. for Leave to File Second Am. Compl., ECF No. [18], which the Court granted, *see* Order (Aug. 24, 2010), ECF No. [19].

On August 24, 2010, Hajjar-Nejad filed his Second Amended Complaint, which remains the operative iteration of the complaint in this action. Despite the sweep of the allegations set forth therein, Hajjar-Nejad's Second Amended Complaint asserts a single cause of action sounding in breach of contract. *See* 2d Am. Compl. ¶¶ 58-60. Specifically, Hajjar-Nejad contends that the Offer of Acceptance constitutes a binding contractual agreement and that GW breached the agreement by dismissing him from the Medical School. *See id.*

On September 17, 2010, GW filed the pending Motion to Dismiss. *See* Def.'s Mem. of P.

& A. in Supp. of its Mot. to Dismiss Pl.'s Second Am. Compl. ("Def.'s MTD Mem."), ECF No. [21-1]. On October 1, 2010, Hajjar-Nejad filed an opposition through counsel. *See* Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss Second Am. Compl. ("Pl.'s MTD Opp'n"), ECF No. [22]. On October 12, 2010, GW filed a reply. *See* Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. to Dismiss Pl.'s Second Am. Compl. ("Def.'s MTD Reply"), ECF No. [23].

On November 9, 2010, Hajjar-Nejad filed his pending Motion to Amend, seeking to amend the complaint to assert claims arising under Title VI, Title VII, and Section 1981. *See* Pl.'s Mem. in Supp. of Pl.'s Mot. to Reinsert Civil Rights Compls. ("Pl.'s MTA Mem."), ECF No. [24]. Hajjar-Nejad filed his Motion to Amend *pro se*, even though he was represented by counsel at the time. *See infra* Part III.C. On November 23, 2010, GW filed an opposition. *See* Def.'s Opp'n to Pl.'s Mot. to Reinsert Civil Rights Compls. ("Def.'s MTA Opp'n"), ECF No. [26]. On November 30, 2010, Hajjar-Nejad filed a *pro se* reply. *See* Pl.'s Reply Mem. ("Pl.'s MTA Reply"), ECF No. [27].

On November 12, 2010, Beasley filed his Motion to Withdraw, wherein Beasley certifies that he served a copy of the motion upon Hajjar-Nejad and informed Hajjar-Nejad of his duty to inform the Clerk of the Court whether he intended to oppose the motion or to proceed *pro se* in this action. *See* Mot. to Withdraw at 2. However, as of the date of this Memorandum Opinion, the public docket reflects that Hajjar-Nejad has not filed an opposition or otherwise responded to Beasley's motion.

## II.  LEGAL STANDARDS

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. (8)(a), "in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Rule 12(b)(6) provides a vehicle for parties to challenge the sufficiency of a complaint on the ground that it "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  When presented with a motion to dismiss for failure to state a claim, the district court must accept as true the well-pleaded factual allegations contained in the complaint. *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 2064 (2010).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557).  Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  The plaintiff must provide more than just "a sheer possibility that a defendant has acted unlawfully." *Id.* at 1950.  When a complaint's well-pleaded facts do not enable a court, "draw[ing] on its judicial experience and common

sense," "to infer more than the mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. *Id.*

Under the Federal Rules of Civil Procedure, a party may amend its pleadings once as a matter of course within a prescribed time period. *See* FED. R. CIV. P. 15(a)(1). Where a party seeks to amend its pleadings outside that time period or for a second time, it may do so only with the opposing party's written consent or the district court's leave. *See* FED. R. CIV. P. 15(a)(2). The decision whether to grant leave to amend a complaint is entrusted to the sound discretion of the district court, but leave "should be freely given unless there is a good reason, such as futility, to the contrary." *Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1003 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1197 (1997). As the Supreme Court has observed:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962). "[A] district court has discretion to deny a motion to amend on grounds of futility where the proposed pleading would not survive a motion to dismiss." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 945 (D.C. Cir. 2004), *cert. denied*, 545 U.S. 1104 (2005). Review for futility is practically "identical to review of a Rule 12(b)(6) dismissal based on the allegations in the amended complaint." *In re Interbank Funding Corp. Secs. Litig.*, 629 F.3d 213, 215-16 (D.C. Cir. 2010) (quotation marks omitted). Because leave to amend should be liberally granted, the party opposing amendment bears the

burden of coming forward with a colorable basis for denying leave to amend. *Abdullah v. Washington*, 530 F. Supp. 2d 112, 115 (D.D.C. 2008).

## III. DISCUSSION

The Court's discussion here proceeds in three parts. The Court will first address GW's Motion to Dismiss. Thereafter, the Court will turn to Hajjar-Nejad's Motion to Amend. Finally, the Court will resolve Beasley's Motion to Withdraw. For the reasons set forth below, the Court will grant-in-part and deny-in-part GW's Motion to Dismiss, deny Hajjar-Nejad's Motion to Amend, and grant Beasley's Motion to Withdraw.

*A.     GW's Motion to Dismiss*

GW tenders only two arguments in favor of dismissal of Hajjar-Nejad's Second Amended Complaint. First, GW contends that Hajjar-Nejad has failed to plead sufficient facts to provide "fair notice" of his breach of contract claim. *See* Def.'s MTD Mem. at 3-4.[6]   Second, GW contends that Hajjar-Nejad's breach of contract claim is time-barred to the extent it is premised on conduct that pre-dates April 9, 2007, three years before he filed his original Complaint in this action. *See id.* at 4-6.

1.     The Sufficiency of Hajjar-Nejad's Allegations

To state a claim for breach of contract under District of Columbia law,[7] a plaintiff must

---

    [6] Because GW's memorandum is not paginated, the Court will refer to the page numbers generated by the Court's CM-ECF System.

    [7] To the extent they address the question, both parties assume that District of Columbia law applies to Hajjar-Nejad's breach of contract claim. The Court need not question this assumption. In any event, based on the present record, it appears that both parties entered into the agreement while in the District of Columbia and contemplated that at least partial performance would occur there.

allege (i) a valid contract between the parties, (ii) an obligation or duty arising out of the contract, (iii) a breach of that duty, and (iv) damages caused by that breach. *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). GW's self-described "core argument" in support of dismissal is this—the "Second Amended Complaint cites to no specific policy, regulation or contractual provision that GW purportedly breached."[8] Def.'s MTD Reply at 1. GW contends that, in the absence of greater specificity, Hajjar-Nejad's allegations are "conclusory," Def.'s MTD Mem. at 2, and fail to provide "fair notice of his claim," Def.'s MTD Reply at 2. The Court agrees, but only to a certain extent. The Court cannot conclude that Hajjar-Nejad has failed to provide "fair notice" of his breach of contract claim altogether.

i.      "Policies" and "Regulations"

The Court agrees that the Second Amended Complaint is deficient in important respects. In the Second Amended Complaint, Hajjar-Nejad periodically refers to "regulations," "policies," "rules," "procedures," and "directives" that GW allegedly contravened during the course of the parties' three-year relationship. However, with one exception that the Court will address shortly, *see infra* Part III.A.1.ii, Hajjar-Nejad's allegations with respect to these "regulations" and "policies" are conclusory. The Second Amended Complaint lacks allegations that would allow this Court to conclude (i) that these "regulations" and "policies" constituted a valid contract between Hajjar-Nejad and GW; (ii) that they imposed specific obligations or duties on GW; and (iii) that GW breached those specific obligations or duties.[9] True, in his opposition to GW's

---

[8] GW contends that Hajjar-Nejad has conceded this argument by failing to address it in his opposition. *See* Def.'s MTD Reply at 1. The contention is without merit.

[9] For example, there is no indication that these "regulations" and "policies" were supported by consideration on both sides or otherwise constituted independent, stand-alone

Motion to Dismiss, Hajjar-Nejad identifies five sets of "regulations" or "policies" that he

contends GW violated: (1) the Medical School's Student Mistreatment Policy and Procedures;

(2) GW's Non-Retaliation Policy; (3) GW's Regulations for M.D. Candidates; (4) GW's Guide

to Student Rights and Responsibilities; and (5) GW's Disruption of University Functions Policy.

*See* Pl.'s MTD Opp'n at 6-10.  However, "[i]t is axiomatic that a complaint may not be amended

by the briefs in opposition to a motion to dismiss.'"  *Arbitraje Casa de Cambio, S.A. de C.V. v.*

*U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) (quoting *Coleman v. Pension Benefit*

*Guar. Corp.*, 94 F. Supp. 2d 18, 24 n.8 (D.D.C. 2000)).  Accordingly, Hajjar-Nejad's belated

identification of these documents in his opposition papers cannot cure the fundamental defects in

his Second Amended Complaint.

Equally troubling, Hajjar-Nejad's claim for breach of contract, as it is framed in the

Second Amended Complaint, is based on one, and only one, alleged breach—namely, that GW

allegedly "rescinded the contract to provide educational services to [Hajjar-Nejad] through its

precipitous and unlawful dismissal of Plaintiff."  2d Am. Compl. ¶ 59.  In his opposition papers,

Hajjar-Nejad confirms this and expressly disclaims that he is alleging that anything "outside of

the ultimate contract termination" constituted "separate actionable" breaches.  Pl.'s MTD Opp'n

at 12.  Nonetheless, several of the "regulations" and "policies" identified by Hajjar-Nejad in his

opposition papers relate to such matters as the prohibition against verbal attacks; the

confidentiality of communications; protections against improper academic evaluations; and free

access to university buildings.  *See id.* at 6-10.  Given Hajjar-Nejad's statement that his breach of

contract claim is limited to his dismissal from the Medical School, it is perplexing why he

_____

contractual agreements.

continues to claim that these "regulations" and "policies" are even relevant.

In any event, the Court agrees with GW that Hajjar-Nejad's Second Amended Complaint fails to provide adequate notice of his breach of contract claim to the extent he intends to base it on an unidentified universe of "regulations," "policies," "rules," "procedures," and "directives." Therefore, the Court will grant GW's Motion to Dismiss to the extent it rests on this basis.

ii.    The Offer of Acceptance

Meanwhile, the Court cannot conclude that Hajjar-Nejad has completely failed to state a claim for breach of contract. GW acknowledges that the Offer of Acceptance is referenced in and attached to the Second Amended Complaint. *See* Def.'s MTD Mem. at 3. Similarly, GW concedes, as it must, that Hajjar-Nejad's Second Amended Complaint specifically alleges that the Offer of Acceptance is a mutually binding agreement supported by consideration on both sides. *See* 2d Am. Compl. ¶ 58. Likewise, it is undisputed that the Second Amended Complaint specifically alleges that GW breached the Offer of Acceptance by dismissing Hajjar-Nejad from the Medical School and that Hajjar-Nejad suffered damages as a result of the alleged breach. *See id.* ¶¶ 56, 59.

These allegations are sufficient to state a claim for breach of the Offer of Acceptance. Significantly, GW's entire argument in favor of dismissal is confined to the question of whether Hajjar-Nejad's allegations provide adequate notice of the basis of his breach of contract claim. GW *never* argues that the Offer of Acceptance does not—as a matter of law—impose any obligations on GW that would preclude it from dismissing Hajjar-Nejad under the facts alleged. This is not an argument that the Court is inclined to reach in the absence of adequate briefing from the parties: the Offer of Acceptance contains no merger clause and determining what the

15

parties' understanding of the agreement was at the time of contract formation may very well require further development of the factual record.

For example, the Offer of Acceptance vests GW with the "sole discretion" to dismiss Hajjar-Nejad from the Medical School if Hajjar-Nejad had submitted "false or misleading information" or made "material omission[s]" in connection with his application for admission. *See* 2d Am. Compl. Ex. 1 (Offer of Acceptance) at 1.  However, outside this narrow context, the Offer of Acceptance does not on its face purport to describe the circumstances under which Hajjar-Nejad could be dismissed from the Medical School or the scope of GW's discretion in determining when dismissal is appropriate.  It does not even say whether or not Hajjar-Nejad had a continuing right to attend Medical School for as long as he paid his tuition and otherwise complied with the terms and conditions of acceptance.

Furthermore, the Offer of Acceptance includes the following language, which Hajjar-Nejad certified in executing the document:

> I understand that I will be subject to the Regulations for M.D.
> Candidates that are set forth in the [Medical School] Bulletin.  As a
> medical student, I agree to become familiar with the Bulletin and the
> Regulations and to abide by them.

*Id.*  While this clause may reasonably be read merely as requiring Hajjar-Nejad to abide by the Regulations for M.D. Candidates and imposing no similar obligation on GW, a colorable argument could be made that the Offer of Acceptance included an implied promise that both parties would abide by the regulations or that the treatment of Hajjar-Nejad would be "subject" to them.[10]  The Court expresses no opinion on the matter, which neither party has addressed in the

---

[10]  The letter of dismissal suggests that the MSEC "review[ed] the relevant aspects of the 'Regulations for MD Candidates'" prior to rendering its decision.  Def.'s Mem. Ex. 2 (Ltr. from

course of briefing GW's Motion to Dismiss. At this point, it suffices to observe that there are sufficient allegations to state a claim for breach of contract based on the Offer of Acceptance, and the Offer of Acceptance incorporates at least to some extent the Regulations for M.D. Candidates. The Regulations for M.D. Candidates, in turn, appear to have some bearing upon when dismissal is appropriate and the procedure for evaluating a student's professional comportment. *See* Pl.'s MTD Opp'n Ex. 3 (Regulations for M.D. Candidates) at E104-107. *If* these regulations were part of the parties' agreement, and *if* these regulations were not followed in the course of dismissing Hajjar-Nejad from the Medical School—both of which are questions that the Court is not in a position to address on the present record—a colorable argument could be made that GW breached the Offer of Acceptance by dismissing Hajjar-Nejad without complying with the regulations.

To be clear, the Court concludes only that Hajjar-Nejad has stated sufficient facts to provide GW with "fair notice" of a claim that GW breached the Offer of Acceptance by dismissing Hajjar-Nejad from the Medical School in July 2007. The Court emphasizes that the purported agreement that must ultimately be shown to have been breached is the Offer of Acceptance, as the Second Amended Complaint only contains sufficient allegations to state a claim for relief in connection with that alleged agreement. Whether or not the Regulations for M.D. Candidates are part of that agreement and relevant to Hajjar-Nejad's claim is a matter that will require further attention by the parties.

For the reasons set forth above, the Court will deny GW's Motion to Dismiss to the extent it seeks dismissal of Hajjar-Nejad's claim that GW breached the Offer of Acceptance by

J. Akman, M.D., to J. Scott, M.D., dated July 12, 2007) at 1.

dismissing Hajjar-Nejad from the Medical School in July 2007.

2.    The Statute of Limitations

In support of its Motion to Dismiss, GW argues in the alternative that Hajjar-Nejad's breach of contract claim is barred in part by the applicable statute of limitations.  Under District of Columbia law, the limitations period for breach of contract claims is three years.  D.C. CODE § 12-301(7).  Hajjar-Nejad filed his original Complaint in this action on April 9, 2010, meaning that he cannot recover for any alleged breach pre-dating April 9, 2007.  Consistent with this, GW argues that Hajjar-Nejad's "numerous allegations" that GW engaged in wrongful conduct before April 9, 2007 are "time-barred."  Def.'s MTD Mem. at 5.  Were this argument not based upon a misunderstanding as to the scope of Hajjar-Nejad's breach of contract claim, it would be meritorious.[11]  However, the Court does not understand Hajjar-Nejad to be pursuing relief in connection with an alleged breach occurring outside the limitations period.  Instead, Hajjar-Nejad's claim for breach of contract, as it is framed in the Second Amended Complaint, is based on one, and only one, alleged breach—namely, that GW allegedly "rescinded the contract to provide educational services to [Hajjar-Nejad] through its precipitous and unlawful dismissal of Plaintiff."  2d Am. Compl. ¶ 59.  Because it is undisputed that these events occurred no earlier than July 26, 2007, within the limitations period, the statute of limitations presents no bar to Hajjar-Nejad's breach of contract claim.

_____

[11]  True, the Second Amended Complaint includes a large number of allegations pertaining to GW's allegedly wrongful conduct before April 9, 2007, but Hajjar-Nejad does not claim that such conduct constitutes an independently actionable breach.  *See* Pl.'s MTD Opp'n at 12 ("All of the matters of 'alleged conduct' . . . that occurred prior to April 9, 2007, may have led up to and contributed towards the decision to breach the contract—but are not alleged to be in and of themselves separate actionable acts outside of the ultimate contract termination").  In other words, these are nothing more than background allegations.

Hajjar-Nejad filed his Motion to Amend on November 9, 2010.[12]  Through this motion,

Hajjar-Nejad seeks to amend his complaint to assert claims arising under Title VI, Title VII, and

Section 1981.  *See* Pl.'s MTA Mem. at 8-9.  Hajjar-Nejad acknowledges that he voluntarily

withdrew his claims based on similar legal theories without prejudice on August 20, 2010, on the

ostensible basis that some or all of his claims were still pending before the District of Columbia

Commission on Human Rights and yet to be fully exhausted, but he now contends that he

received a "right to sue" letter from the U.S. Equal Employment Opportunity Commission on

September 29, 2010 and appears to suggest that this is sufficient to satisfy the exhaustion

doctrine.[13]  *See* Pl.'s MTA Mem. at 2 & Ex. 1 (Notice of Right to Sue).

GW opposes the Motion to Amend on three grounds: first, GW contends that the motion

is procedurally defective because Hajjar-Nejad failed to discuss its contents with GW's counsel

prior to its filing, as required by the Local Rules of this Court; second, GW contends that the

motion is procedurally defective because it is unaccompanied by a proposed amended pleading,

as required by the Local Rules of Court; and third, GW contends that amendment would be

futile.  *See* Def.'s MTA Opp'n at 3-8.  In his reply, Hajjar-Nejad focuses almost exclusively on

GW's futility argument, along with a host of other tangential and immaterial issues.  *See* Pl.'s

MTA Reply at 2-8.  He responds briefly to GW's contention that his Motion to Amend is

procedurally defective because it is unaccompanied by a proposed amended pleading, suggesting

---

[12]  Hajjar-Nejad filed his Motion to Amend *pro se*, even though he was represented by counsel of record at the time.  *See infra* Part III.C.

[13]  In light of the Court's decision today, it has no occasion to address whether this is indeed the case and accordingly expresses no opinion on the matter.

that his "Breach of Contract and civil rights complaints are inseparable," but does not deny that he has failed to submit a proposed amended pleading. *Id.* at 8.

Local Civil Rule 7(m) requires counsel to discuss any anticipated non-dispositive motion with opposing counsel, "in a good faith effort to determine whether there is any opposition to the relief sought and, if there is an opposition, to narrow the areas of disagreement." LCvR 7(m). This rule applies with equal force to "non-incarcerated parties appearing *pro se*." *Id.* As this Court has recognized, the rule serves the important salutary purpose of "promot[ing] the resolution of as many litigation disputes as possible without court intervention, or at least to force the parties to narrow the issues that must be brought to the court." *Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 102 (D.D.C. 2006) (citing *U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 235 F.R.D. 521, 529 (D.D.C. 2006)). Where "a party files a nondispositive motion without certifying its compliance with Rule 7(m), the motion will be denied." *Id.* (citing *Alexander v. Fed. Bureau of Investigation*, 186 F.R.D. 185, 187 (D.D.C. 1999)). In this case, GW asserts that Hajjar-Nejad failed to discharge his obligations under the rule, and this assertion is left uncontested in Hajjar-Nejad's reply papers. On this basis alone, the Court will deny Hajjar-Nejad's Motion to Amend. To the extent Hajjar-Nejad intends to move this Court for leave to amend his complaint (or, for that matter, to file any other non-dispositive motion), he must first meet and confer with GW's counsel in accordance with Local Civil Rule 7(m).

Local Civil Rules 7(i) and 15.1 require that any motion for leave to file an amended pleading be accompanied by an original of the proposed pleading as amended. *See* LCvR 7(i); LCvR 15.1. In the absence of a proposed pleading, neither the opposing party nor the district court is in a position to "determine whether or not [the] proposed amendments would be futile."

*Creecy v. District of Columbia*, Civil Action No. 10-841 (CKK), 2011 WL 1195780, at *11

(D.D.C. Mar. 31, 2011). As such, the failure to include the proposed pleading with a motion to

amend is a sufficient basis for denying the motion. *Id.* In this case, it is undisputed that Hajjar-

Nejad has failed to include an original of what would be his third amended complaint with his

Motion to Amend.[14] On this basis as well, the Court will deny the motion. To the extent Hajjar-

Nejad intends to move this Court for leave to amend his complaint, he must include with his

motion to amend a proposed pleading identifying each any every claim he intends to pursue in

this action and a short and plain statement of the factual basis for those claims.[15]

>    C.    *Beasley's Motion to Withdraw*

When an attorney "agrees to undertake the representation of his client," he is generally

obligated to "see the work through to completion." *Poblete v. Rittenhouse Mortg. Brokers*, 675

F. Supp. 2d 130, 136 (D.D.C. 2009) (citation omitted). That obligation, however, is not absolute,

and under appropriate circumstances an attorney may seek to withdraw as a party's counsel of

record. Where, as here, the party is not represented by another attorney and has not consented to

---

[14] While Hajjar-Nejad's First Amended Complaint asserted claims based on similar legal theories, the Court cannot assume that the legal theories that Hajjar-Nejad now intends to pursue are identical or that they are based on the same set of factual allegations. For instance, whereas Hajjar-Nejad now seeks to pursue a claim under Title VI, no such claim clearly appears in the First Amended Complaint.

[15] Given the basis of the Court's decision today, it has no occasion to address the merits of GW's futility argument. *See* Def.'s MTA Opp'n at 4-8. However, the Court pauses to observe that even though GW's contention that Hajjar-Nejad would be unable to state a plausible claim for relief under Title VII appears, at least at first glance, to be compelling, left entirely unaddressed by GW is the viability of Hajjar-Nejad's proposed claims under Title VI and Section 1981. Furthermore, while GW contends that Hajjar-Nejad would be unable to recover under the DCHRA, it does not appear that Hajjar-Nejad actually intends to pursue relief under that statute in this case. *See* Pl.'s MTA Mem. at 8-9 (identifying only claims under Title VI, Title VII, and Section 1981).

the requested withdraw in writing, the attorney must seek the district court's leave to withdraw and must provide the party a specified form of notice when doing so. *See* LCvR 83.6(c). The decision of whether or not to grant leave to withdraw is committed to the sound discretion of the district court. *Poblete*, 675 F. Supp. 2d at 136 (citation omitted). In exercising its discretion, the court may take into account whether "the withdrawal would unduly delay trial of the case, or be unfairly prejudicial to any party, or otherwise not be in the interest of justice." LCvR 83.6(d).

Beasley filed his Motion to Withdraw on November 12, 2010. In his motion, Beasley certifies that he provided Hajjar-Nejad with the requisite notice—specifically, he represents that he served a copy of his motion on Hajjar-Nejad by both e-mail and regular mail, and informed Hajjar-Nejad of his obligation to inform the Clerk of the Court in writing whether he intended to oppose the motion, secure alternate counsel, or proceed without legal representation. *See* Mot. to Withdraw at 2. Nonetheless, as of the date of this Memorandum Opinion, the public docket reflects that Hajjar-Nejad has failed to file an opposition or otherwise respond to the motion.

As grounds for this motion, Beasley represents that "[s]everal disagreements have arisen" between him and Hajjar-Nejad "with respect to the management of this case," *id.* at 1, and claims that Hajjar-Nejad filed the Motion to Amend with the Clerk of the Court withou his prior review or approval, *id.* at 2. Under these circumstances, and in the absence of any opposition from Hajjar-Nejad, the Court will exercise its discretion to grant Beasley leave to withdraw as counsel of record. Given the present posture of this case, the Court concludes that Beasley's withdrawal would not unduly delay the trial of this case, be unfairly prejudicial to any party, or otherwise conflict with the interest of justice. Accordingly, Beasley's Motion to Withdraw will be granted. In addition, Hajjar-Nejad will be required to file a notice with the Court by no later than August

25, 2011, indicating whether he intends to secure alternate legal counsel or to proceed in this action *pro se*.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant-in-part and deny-in-part GW's Motion to Dismiss. Specifically, the motion will be granted insofar as it seeks dismissal of any breach of contract claim based on an unidentified universe of "regulations," "policies," "rules," "procedures," and "directives," and the motion will be denied insofar as it seeks dismissal of Hajjar-Nejad's claim that GW breached the Offer of Acceptance by dismissing Hajjar-Nejad from the Medical School in July 2007. In addition, Hajjar-Nejad's Motion to Amend will be denied and Beasley's Motion to Withdraw will be granted. An appropriate Order accompanies this Memorandum Opinion.

Date:   August 15, 2011

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge
