

RECEIVED

SEP - 7 2011

Clerk, U S District & Bankruptcy
Courts for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMAD JAVAD HAJJAR-NEJAD, )<br>)<br>    **Plaintiff,** )<br>)<br>**v.** )<br>)<br>GEORGE WASHINGTON UNIVERSITY, )<br>)<br>)<br>    **Defendant.** )<br>) | Civil Action No. 10-cv-626<br>(CKK) |

## THIRD AMENDED COMPLAINT

(UNLAWFUL DISCRIMINATION BASED UPON RACE, RELIGION AND
NATIONAL ORIGIN; UNLAWFUL RETALIATION FOR PRIOR PROTECTED
ACTIVITIES; RETALIATION BASED ON § 1981; BREACH OF CONTRACT)

COMES NOW the Plaintiff in this proceeding, Mr. Mohammad Javad Hajjar-Nejad, appearing *Pro Se*, to respectfully present an Amended Complaint regarding his facts and claims to this Honorable Court.  In furtherance thereof, the following information and claims are submitted:

## JURISDICTION

1.  Jurisdiction in this matter is based upon

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. ("Title VI"); Section 1 of the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981");          and the Civil Rights Attorney's Award Act, as amended, codified at 42 U.S.C.A. Section 1988, *et seq*.; in that Plaintiff Hajjar-Nejad was unlawfully discriminated against by an educational institution

1

on the bases of race (Arabic or Middle Eastern), Religion (Muslim) and National Origin (Iranian), and subsequently was subject to unlawful retaliation for prior protected EEO activities, when he was wrongfully refused certain educational entitlements and privileges which he had properly and rightfully earned, as further set forth and described herein.

     2.

     3.  Furthermore, the Plaintiff in this Amended Complaint respectfully asserts relation back of amendments for his civil rights claims outlined above based on FED. R. CIV. P. 15(c).

     4.

5.  Further jurisdiction in this matter for the contract claims cited herein is based upon the United States Constitution, Article III, Section 2, Diversity Jurisdiction, also codified in the Judiciary Act of 1978 and currently cited at 28 U.S.C.A. Section 1332. Such diversity jurisdiction is based upon Plaintiff Hajjar-Nejad being a resident of the State of Maryland; Defendant George Washington University being an educational institution located in Washington, D. C., and the amount in dispute and resulting claim for relief by Plaintiff being in excess of $75,000.00, as required by 28 U.S.C.A. Section 1332(a).

### VENUE

6.  Venue in this matter properly lies with the United States District Court for the District of Columbia insofar as the Defendant George Washington University and its School of Medicine are located at 2300 Eye Street, N. W., Washington, D. C. 20037; the acts complained of herein occurred or were directed primarily within the geographical boundaries of the District of Columbia; and pursuant to 28 U.S.C. Section 1391 and 42 U.S.C. Section 2000e5(f). Moreover, the contract described below was executed by the parties and concluded in the District of Columbia.

### PARTIES

7.  Plaintiff Mohammad Javad Hajjar-Nejad is a resident of Gaithersburg, Maryland, and is an adult male who in the relevant time periods hereof was an enrolled student at the George Washington University Medical School. Plaintiff Hajjar-Nejad is Arabic or Middle Eastern by race, is Muslim by religion, and is identified as Iranian by National Origin because that is the nationality of his parents -- in fact, Plaintiff Hajjar-Nejad was born in Gaithersburg, Maryland.

8.  Defendant George Washington University is a non-profit entity and a recognized educational institution located at 2300 Eye Street, N.W., Washington, D. C. 20037.  The George Washington University Medical School and Center, also known as the George Washington University School of Medicine and Health Sciences, is a subordinate entity of George Washington University and is largely integrated onto the campus of George Washington University.  The below-named officials, supervisors and employees of Defendant George Washington University committed the acts described herein as employees and agents of the Defendant while acting in furtherance of the business and non-profit goals and objectives of the Defendant, and those acts are ascribed to Defendant George Washington University under the theories of agency and *respondeat superior.*

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.  To the extent that it is determined that the unlawful discrimination and retaliation claims made herein are subject to a requirement for exhaustion of administrative remedies, the matters addressed herein involving allegations of unlawful discrimination and retaliation were presented to and heard by the District of Columbia Office of Human Rights (OHR) pursuant to provisions of the District of Columbia Human Rights Act (HRA).  Such matter was initiated by Plaintiff Hajjar-Nejad on August 24, 2007.

10.  On or about September 4, 2007, Plaintiff Hajjar-Nejad also filed a complaint of unlawful discrimination with the U. S. Department of Education (DOE), which was docketed as EEO Complaint No. 11-07-2098.  The Department of Education refused to follow up or investigate the complaint, however, citing an alleged requirement that

Plaintiff deal exclusively with the District of Columbia Office of Human Rights in pursuing a remedy.

11. Following an extensive period of investigation by the DC OHR, including the conduct of hearings, on June 22, 2009, a Letter of Determination (LOD) was issued by DC OHR which found that George Washington University Medical School had unlawfully retaliated against Plaintiff Hajjar-Nejad in the following manner:  (1) by improperly performing adverse evaluations of Plaintiff based upon Plaintiff's assertions of civil rights; (2) by the Dean of the Medical School improperly directing the Director of Surgery to not give Plaintiff a passing grade in a critical course required for graduation; (3) by improperly removing Plaintiff from the Medical School Honors Program; (4) by the dean of the Medical School improperly directing Plaintiff to take an academic leave of absence, and if such leave would not be taken, refusing to permit Plaintiff to transfer to another medical school; (5) by dismissing Plaintiff from the Medical School; and, (6) by improperly refusing to issue transcripts to Plaintiff for use in continuing his medical education.

12. Following an application for reconsideration regarding the initial DC OHR findings filed by both  Plaintiff (on July 20, 2009) and Defendant George Washington University (on July 22, 2009), OHR subsequently issued on January 12, 2010, a Final Decision affirming its prior "Probable Cause" determination regarding Plaintiff's claims of unlawful retaliation.  This Final Decision also affirmed findings of "No Probable Cause" regarding Plaintiff's claims against Defendant of disparate treatment and a hostile educational environment.

13. Following receipt of the DC OHR Final Decision, Plaintiff Hajjar-Nejad re-approached the U. S. Department of Education regarding his earlier complaint, and seeking enforcement assistance against Defendant George Washington University.  He was initially informed that DOE had no record of his initial complaint, and following a later reversal of that position, stated that DOE had closed the record of the complaint with no action taken.

14. Subsequently, on April 9, 2010, Plaintiff Hajjar-Nejad timely filed on his own behalf a United States District Court Complaint with the District Court of Maryland in Baltimore (the Northern Division of Maryland), which was subsequently and properly transferred to this Court pursuant to 28 U.S.C. Section 1406(a) by Order of United States District Judge Catherine C. Blake dated April 19, 2010.

15. On September 29, 2010 the Plaintiff, received a Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission (EEOC) based on Title VII of the Civil Rights Act of 1964 (**Exhibit 1**).  The EEOC, because the matter was already before the Honorable Court and had been filed on April 9, 2010, readily provided a Notice of Right to Sue upon request.  The Honorable Court expressed in its August 15, 2011 Memorandum:

> "Hajjar-Nejad acknowledges that he voluntarily withdrew his claims based on similar legal theories without prejudice on August 20, 2010, on the ostensible basis that some or all of his claims were still pending before the District of Columbia Commission on Human Rights and yet to be fully exhausted, but he now contends that he received a "right to sue" letter from the U.S. Equal Employment Opportunity Commission on September 29, 2010 and appears to suggest that this is sufficient to satisfy the exhaustion doctrine. *See* Pl.'s MTA Mem. at 2 & Ex. 1 (Notice of Right to Sue)."

While Plaintiff had notified the DC OHR on April 9, 2010 that he had filed his case with the United States District Court, on June 9, 2011, Plaintiff's former counsel emailed him regarding a June 8, 2011 "Order Scheduling a Status Conference" from the Chief Judge of the DC Commission on Human Rights (CHR) David Simmons to resume the procedural schedule based on the request of Plaintiff's counsel **(Exhibit 2)**. This was approximately two (2) years after the June 22, 2009 Letter of Determination and after the matter had been closed.

16. On June 15, 2011, Plaintiff filed an -8- page *Reply Memorandum* with the Chief Administrative Law Judge informing him that he had a Right to Sue Notice and his case was pending in federal court before a federal judge with Civil Case No. 10-CV-626 **(Exhibit 3)**.

17. The Chief Law Judge David Simmons ordered and explained on June 16, 2011, in contradiction to all of GW's wrongful assertions in its first Motion to Dismiss regarding filing of civil rights claims in federal court and the DC HRA (See Def.'s Mot. to Dismiss First Am. Compl., ECF No. [14]), that per the DC Municipal Regulations (DCMR § 416.1, DCMR § 416.3, DCMR § 416.4, DCMR § 426.1) and DC OHR guidelines and the DCHRA, that Plaintiff had the right to go to federal court because he had a Right to Sue Notice in hand (*See* **Exhibit 4, Proposed Decision and Final Order and Exhibit 5, Notice of Final Decision and Order**).

18. The DC Commission on Human Rights formally closed this matter on June 24, 2011. The Plaintiff had requested by electronic mail that they close this matter on April 9, 2010.

## **LEGAL THEORIES**

19.

The Plaintiff was in his fourth and final year of medical school when he was

wrongfully terminated based on retaliatory and discriminatory practices. He was

preparing for the start of his residency in July of 2008 which was a discrete employment

opportunity.  In preparation for entering a US residency, Plaintiff had to register with the

Electronic Residency Application Service (ERAS), take the Step 2 National Board

Exams, and complete acting internships (AIs) in his field of choice, amongst other tasks.

Fourth year medical students are termed Acting Interns, akin to actual first year

residency interns because in preparation for the internship they perform those *similar jobs*

**and** *functions* as an intern. Importantly, the Defendant wrongfully **blocked** Plaintiff from

starting his acting internship in medicine after he had received a schedule from the

Defendant and was planned to start the AI (*see Exhibit 1, pages 57-64, pg. 146, and pgs.*

*55-56).* What's more, after Defendant dismissed Plaintiff, it went out of its way to place a hold on his academic transcripts for approximately 8 months denying him the ability to transfer elsewhere, complete his degree and start his residency.

Plaintiff was discriminated against with respect to the residency process and did not start his residency as planned in July of 2008 because of the Defendant's "discriminatory animus" and "discriminatory behavior". Plaintiff was deprived of employment opportunities                                    and the Defendant's retaliatory and discriminatory actions adversely affected Plaintiffs' status to become an employee, or surgical resident. Therefore, Plaintiffs' status as a student was intertwined and inseparable from his employment status as a resident, literally, months away.

In addition, the discriminatory and retaliatory acts of the Defendant prevented and prohibited the Plaintiff from taking part in the 2008 National Residency Matching Program (NRMP) and the Electronic Residency Application Service (ERAS) to file applications for residency programs. Indeed, the Defendant prohibited Plaintiff from receiving a "token" to start the application process, which it had provided to all other students.

On November 20, 2007, the Defendant in retaliation for Plaintiff's filing of the Charge of Discrimination on November 1, 2007, contacted the National Board of Medical Examiners (NBME) and blocked him from taking the test—or Step 2 National Board exam. Again, this was done in order to stop Plaintiff from entering a residency position. This was truly an action to deny access to Plaintiff to enter a position based on merits and academic consideration and is a simple and plain form of discrimination.

Essentially, all of the wrongful actions taken by Defendant, including the hold placed on September 26, 2007 denying access to academic transcripts from seven years of study, show that the Defendant did not and does not wish to allow Plaintiff to become a resident physician by committing such actions and "**deprived him of employment opportunities and adversely affected his status as a physician**]" . This includes taking the necessary exams, attaining the necessary licensure requirements and starting a residency position.  The Plaintiff acted wrongfully and illegally by blocking the Plaintiff from acquiring his academic transcripts in order to seek to further his education in any regard and attain employment.

Also, Defendant has not provided Plaintiff all of his grades and credits for research on academic projects as were spelled out in the detailed Original Complaint. ·

. . .

"Title VI"

20.  Title VI prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving Federal financial assistance. Specifically, Title VI provides that

> [n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Apart from the provisions common to Title VI, Title IX, and Section 504, courts also have held that Title VI adopts or follows the Fourteenth Amendment's standard of proof for intentional discrimination, and Title VII's standard of proof for disparate impact. See Elston v. Talladega County Bd. of Educ., 997 F.2d 1394, 1405 n.11, 1407

n.14 (11th Cir.), reh'g denied, 7 F.3d 242 (11th Cir. 1993); (see Chapter VIII).

Accordingly, cases under these constitutional and statutory provisions may shed light on

an analysis concerning the applicability of Title VI to a given situation.

§ 1981

21.  Plaintiff had already included in his First Amended Complaint 42 USC §1981

(See Am Comp, par. 1), a post-Civil War statute prohibiting race discrimination and

authorizing retaliation claims.

§1981 provides equal protection to "[a]ll persons within the jurisdiction of the

United States…to make and enforce contracts, to sue, be parties, give evidence, and to

the full and equal benefit of all laws and proceedings for the security of persons and

property." 42 U.S.C. §1981.

To state a claim for racial discrimination under Section 1981, a plaintiff must

allege that (1) the plaintiff is a member of a racial minority; (2) the defendant intended to

discriminate against the plaintiff on the basis of race; and (3) the discrimination

concerned an activity enumerated in §1981." Mazloum v. Dist. Of Columbia Metro.

Police Dep't, 522, F. Supp. 2d 24, 37 (D.D.C. 2007) (quotations omitted).  Section 1981

"can be violated only by purposeful discrimination." (Gen. Bldg. Contractors Ass'n v.

Pennsylvania, 458 U.S. 375, 391 (1982). To plead intentional discrimination, "plaintiff…

must allege some facts that demonstrate that race was the reason for the defendant's

actions."  Bray v. RHT, Inc., 748 F. Supp. 3, 5 (D.D.C. 1990); see also Alexander v.

Wash. Gas Light Co., 481 F. Supp. 2d 16, 31 (D.D.C. 2006) (quoting Bray).

-11-

22.

**Retaliation**

Complainant establishes *a prima facie* case for retaliation. He claims to have engaged in protected activity when he submitted the "good faith reports" in July 26, 2007, September 2006 and the Brief of Case Findings in April of 2007.

**Protected Activity**

As noted *supra,* protected activity includes opposition and participation in a discrimination proceeding. Opposition to a practice believed to be unlawful discrimination includes, but is not limited to, informing an entity that you believe that he/she is engaging in prohibited discrimination. Opposition is protected from retaliation as long as it is based on a reasonable, good-faith belief that the complained of practice violates anti-discrimination law; and the manner of the opposition is reasonable. Examples of protected opposition include: 1) Complaining to anyone about alleged discrimination against oneself or others; threatening to file a charge of discrimination; picketing in opposition to discrimination; or refusing to obey an order reasonably believed to be discriminatory. Participation in a discrimination proceeding means taking part in a discrimination proceeding. Participation is protected activity even if the proceeding involved claims that ultimately were found to be invalid. Examples of participation include: filing a charge of discrimination; cooperating with an internal investigation of alleged discriminatory practices; or serving as a witness in an investigation or litigation; or requesting a reasonable accommodation based on religion or

-15-

disability. It can also include simply making the comment that certain actions by students may result in retaliation, as Complainant did in his "good faith reports."

On July 25, 2006, Complainant reported a "difficulty" that he had had with a Resident. Although this communication does not make allegations of discrimination, the September 22, 2006 [good faith report] does make such a claim. On September 22, 2006, Complainant submitted a "Motion for Injunctive Relief of Incorrect/Wrong Evaluation and for Development of an Active [Task] Force Committee." In this report, Complainant criticized Respondent's programs complaining of Respondent's teaching methods and procedures and he gave suggestions for improvement. But he also makes statements regarding retaliation. On page 2, of the document, he states, "To ignore our weaknesses and to appease voices for change by retaliation is wrong as history has shown over the years." He also states, "I embraced these ideas and regretfully was subject to retaliation, but I stand up for what I did and believe that I acted correctly and with the highest levels of integrity and honesty." In this document he also quotes *University Policy,* "The current university policy within the student mistreatment policy is that when a student brings a matter, whatever it might be, to the attention of a superior, retaliation is not tolerated and is fully prohibited at all levels. Further, a resident that retaliates against a medical student for having informed a higher authority of wrongdoings is not to evaluate that medical student...I have already given feedback to the Department of Medicine which they have used against me and incriminated me on the basis of what I have said, which was in good intention."

Finally, Complainant continued to allege retaliation in the statement, "This discrepancy and tactic of retaliation by the Department of Medicine that raises the

question of outright student mistreatment." Therefore, although one could argue that some of the retaliation Complainant cites is a more general, instead of discriminatory, his citation of the University's *Anti-Discrimination Policy,* which cites all forms of discrimination, provides Complainant protection

Complainant's Brief of Case Findings of Aprilof2007 also amounts to protected activity. In his Brief of Case Findings, Complainant claimed discrimination based on the following facts:

- His case lasted ten (10) months precluding him from academic research,

- He should have been entitled to a grievance procedure, that the professional comportment subcommittee was against Respondent's policies,

- The Dean removed him from the Honor's Program without MSEC approval, that his allegations of mistreatment were not investigated,

- The professional comportment charges were manifestations of retaliation for his questioning how Respondent's hospital works, and

- His evaluations from Surgery and Medicine were not based on his ability or performance.

**Materially Adverse Employment Actions**

After the submission of "the good faith reports," Complainant suffered an educational adverse action when he received an unfavorable evaluation in medicine, was not given a passing grade in surgery, and was removed from the Honors curriculum in October 2006. After the submission of his Brief of Case Findings in April 2007, Complainant was dismissed from school in July 2007 and denied a copy of his transcript in April 2008.

**Temporal Proximity**

The temporal proximity between the claimed protected activity and the adverse action is very close and infers discriminatory behavior. The protected activities of September 2006 and April of 2007 were followed by materially adverse educational actions of October 2006 through the denial of his transcript of 2008. All actions were close enough to Complainant's claims of discrimination to create the inference of a causal connection. Since Respondent was aware of Complainant's activity, Complainant establishes a *prima facie* case.

**Conclusion**

Although the OHR acknowledges a medical school's discretionary authority to assess the academic and professional/ethical demeanor of its students, it cannot do so in retaliation of protected activity. Although this Office reviewed many factors in this case, one thing is clear. After Complainant waged complaints against senior residents and the program in general, his stellar career took a precipitous turn for the worse. Although Complainant demonstrates a number of inconsistencies, the OHR finds a number of factors compelling.

Specifically, the one of the initial emails from the Senior Associate Dean for Academic Affairs to Chief of Medicine [Clerkship Director of Surgery] is troubling. On Friday, September 22, 2006, he states, "I would urge you and residents to strongly consider whether his performance is indeed "passing or not." Technically, a low pass is still a pass, and he will move on through the curriculum [the Honors Program[4]]. If you really think he as serious clinical performance deficiencies [there were no clinical

---

[4] Plaintiff was one of ten students accepted into the Third Year Honors Program by a nine (9) member faculty committee

deficiencies as described below], a below pass grade (e.g., conditional or fail) will bring this to a clear "head" and allow us to work with him on remediation efforts."

Although Respondent attempts to explain this correspondence as the school's attempt to confront Complainant's difficulties, Complainant, at the very least, offers enough evidence for this Office to question Respondent's reasoning.

Moreover, Complainant provides enough credible evidence to demonstrate pretext through the questionable e-mails from the Dean, the possible irregularities of the comportment process and the transcript issues [the Dean placed a hold on my transcripts for 8 months

In sum, Complainant has established his burden and sustained his prima facie case for retaliation; and the case moves forward to the adjudicatory phase of the administrative process.

## FACTUAL BACKGROUND

23.  Paragraphs 1 through 22 are herein incorporated by reference.

24.  Plaintiff Hajjar-Nejad graduated from the George Washington University in May 2004 *Summa Cum Laude*, with a Grade-Point Average of 3.98, and as a top 2% member of his graduating class.

25.  While an undergraduate, Plaintiff Hajjar-Nejad was the Teaching Assistant (TA) for the GWU Histology Course, where he was responsible for teaching medical students in the Early Selection, Integrated BA/MD course regarding microscopic anatomy.  Plaintiff further performed research in microscopic anatomy, publishing an abstract study based on electron microscopy in a well-recognized medical field journal.

26.  Plaintiff Hajjar-Nejad applied for and was presented with an Offer of

Acceptance to the George Washington University School of Medicine and Health

Sciences on November 5, 2003, prior to his graduation from GWU.  Plaintiff executed

this Offer of Acceptance on November 7, 2003, and subsequently completed all terms

and conditions of his contract for matriculating at the GWU Medical School, including

payment of tuition and fees.

27.  Following his initial enrollment at the GWU School of Medicine and Health

Sciences, Plaintiff Hajjar-Nejad was a superb medical school student, excelling in all

academic disciplines during the period of the academic years 2004-2005 and 2005-2006.

28.  In 2004, Plaintiff Hajjar-Nejad received the Katzen Medical Education

Award for exemplary level academic achievement.

29.  On April 22, 2006, Plaintiff Hajjar-Nejad was accepted into the Third-Year

Medical School Honors Curriculum by a committee of nine faculty members.  This

selection was based upon enunciated criteria including strength of Plaintiff's written

essay, the rigor of his Honors project proposal, the strength of Plaintiff's mentorship,

evidence of Plaintiff's prior achievement and the strength of his academic performance.

30.  Plaintiff Hajjar-Nejad's primary medical school research project addressed

cardiovascular disease and the development of a serum "inflammatory marker" that could

detect with 80% specificity those patients who would face a future heart attack; a critical

area of research possibly resulting in saving 100,000 lives per year.  This project was

deemed noteworthy by the GWU medical and teaching staff.

31.  Plaintiff Hajjar-Nejad also received very high marks in the Practice of

Medicine (P.O.M.) Course, which spans the entire four years of medical school.  The

POM Course evaluates communication, character and compassion of medical students. Plaintiff completed the third year of this course with Clinical Honors and high grades.

32. The POM Course also included a Clinical Apprenticeship Program, Problem-Based Learning, and Doctor Patient Society; with Plaintiff excelling in each area of study and practice.

33. On several occasions while a medical student, Plaintiff Hajjar-Nejad became known among the academic and medical leaders at Defendant George Washington University for his race, religion, and family's national origin.  These occasions included the following:

a.  The presentation of a speech by Plaintiff at the close of the first academic year of medical school, in approximately April or May 2005, at an anatomy ceremony honoring donors of human cadavers and their families.  Plaintiff's comments included citations to an Iranian poet, Muslim religious texts, and Islamic teachings, with a theme of equality and the human elements of working with patients and colleagues. Attending this event were Senior Associate Dean Scott Schroth and Associate Dean Rhonda Goldberg, with anatomy and other faculty members, including Plaintiff's entire medical school class (the Class of 2008).

b.  Further, at the end of his second academic year of medical school, in approximately April or May 2006, Plaintiff gave a speech at a scholarship ceremony attended by Medical School Dean Dr. James Scott.  Plaintiff spoke from the Holy Quran. Following the speech, Dean Scott stated to guests at the ceremony that he "didn't teach [Plaintiff] anything [he] said."

34.  Numerous subsequent communications generated by senior personnel at Defendant George Washington University also reflect the common knowledge of Plaintiff's race, religion and national origin.

35.  Plaintiff commenced medical rotations in internal medicine as an Honors student on July 7, 2006, continuing through August 11, 2006.  During this period, in the course of making and reporting good faith observations, including certain limited criticisms of hospital practices which had been invited in the course of rotations, Plaintiff Hajjar-Nejad began experiencing adverse comments from certain members of the faculty and students.

36.  On August 23, 2006, Senior Associate Dean Scott Schroth, apparently in violation of the university's academic confidentiality policy, reported to the Director of Medicine that Plaintiff Hajjar-Nejad had leveled criticisms at the Director of Medicine and Clerkship Director.  The result of this report was the commencement of a pattern of hostility and antagonism against Plaintiff based on both unlawful discrimination and the failure of the Defendant's senior personnel to abide by school policies and guidelines.

37.  Subsequent to the start of the academic year 2006-2007, Plaintiff's third year of medical school, he began to experience increasingly hostile treatment from members of the faculty, particularly Medical School Dean Dr. James Scott.

38.  Without any legitimate foundation from either Plaintiff Hajjar-Nejad's academic performance or progress as a medical school student, or Plaintiff's conduct or behavior within the University community, Dean Scott and his subordinates, particularly Dean Schroth, began a series of actions to penalize and adversely affect the academic progress of Plaintiff.

39.  For example, Plaintiff's surgery rotation at GWU began on August 14, 2006. On September 22, 2006, with no apparent justification, Senior Associate Dean Schroth told the course director of surgery, Dr. Juliet Lee, not to give Plaintiff Hajjar-Nejad a passing grade-- so that he would be removed from the Honors Curriculum.  Dean Schroth had no association whatsoever with the surgery rotation, and he directly violated University regulations when he interfered in this manner with the University grading process.  On information and belief, Dr. Schroth's actions were directed by Dean Scott. This effort occurred only one day after Dean Schroth was told by Dr. Lee that Plaintiff would pass the surgery rotation based on exams given.[6]

40.  Such actions included the generation in September and October of 2006 of false and contrived student evaluations against Plaintiff Hajjar-Nejad, which were unfairly and improperly critical of aspects of his academic progress and performance.

41.  On September 22, 2006, Plaintiff Hajjar-Nejad submitted a written report to Senior Associate Dean Schroth and to Dr. Williams, Provost and Vice President of GWU for Health Affairs.  This report, which was styled by Plaintiff as a "good faith" report, incorporated Plaintiff's observations with respect to problems regarding hospital organization, resident teaching, and patient care.  This report was prepared at the specific request of Dean Schroth.

---

[6] The specific regulations that he violated in this instance included Article B:  Evaluation of Academic Performance, Sections 1-2, 7 (Regulations for MD Candidates); Article II, Section B:  Protection Against Improper Academic Evaluation (Guide to Student Rights and Responsibilities 2006-2007).  The specific details of what each regulation entails, the method of violation, and the actions not taken by University administrators as spelled out by the Regulations have all been explained by Plaintiff in his Exhibit 1, Appeal to the Vice President for Academic Affairs submitted on August 7, 2007.  The detail and nature of all of these violations can be itemized during discovery and brought forward during trial.

42.  Plaintiff's report specifically stated that he had been personally subjected to degrading, dehumanizing and humiliating treatment, and that such treatment had escalated after he had reported the types of problems cited in report to supervisors. There was a clear understanding that Plaintiff's complaints of personal degrading, dehumanizing and humiliating treatment were directly tied to his race, religion and perceptions of his national origin. Following the submission of the report, Plaintiff saw further escalation of his adverse treatment.

43.  On October 23, 2006, Plaintiff was directed by Senior Associate Dean Schroth, without legitimate cause or reason, to stop all of his ongoing medical research. This directive was in direct contravention of the Liaison Committee on Medical Education (LCME) Standards for Accreditation of Medical Education Programs and University policy regarding Disruption of University Functions **(Exhibit 12)**.  University policy in this regard unambiguously states that "no member of the University shall:  a) engage in conduct that obstructs teaching, research or learning."  On information and belief, and as supported by an e-mail communication, this action had been directed by Medical School Dean Scott.

44.  On this same day, October 23, 2006, Plaintiff was improperly and without cause told by Senior Associate Dean Schroth that he would not permit Plaintiff to transfer from the George Washington Medical School to another medical school, and that he would block such transfer by placing the demonstrably false performance appraisals into his academic records.  Again, on information and belief, such action had been directed by Medical School Dean Scott.

45. On this same day, October 23, 2006, Plaintiff was informed by Senior Associate Dean Schroth that he would have to leave, and was being removed, from the Medical School Honors Program, and had to return to the traditional curriculum. If Plaintiff would not voluntarily leave the Honors Program, he was threatened with being forced to take a "leave of absence" from medical school. Senior Associate Dean Schroth also stated to Plaintiff that he "had never used this [threat of a student being forced to take a leave of absence] before," but "I will if I have to."

46. These statements were later repeated to Plaintiff Hajjar-Nejad by Senior Associate Dean Schroth and Medical School Dean Scott in a subsequent (second) meeting also on October 23, 2006, attended by Plaintiff and his parents. Plaintiff was told at this meeting that if he would not "step down" from the Honors Program, he would be forced to take a leave of absence.

47. After Plaintiff explained to Dean Scott that being removed from an ability to conduct research as a student would be detrimental to the school's stated goals of performing research, Dean Scott responded, "You're making me angry," and "not to say that." Upon being queried by Plaintiff's father as to why he was acting so angry, Dean Scott responded that Plaintiff was "moving up too fast," and that he doesn't "want [Plaintiff] to move so fast."

48. Additionally at this second meeting on October 23, 2006, Medical School Dean Scott told Plaintiff that he "did not want" Plaintiff Hajjar-Nejad to go into surgery as a profession, which had been a stated and known educational objective of Plaintiff. On information and belief, Dean Scott simply did not want Plaintiff, an American

Muslim, to become a cardiovascular surgeon in his medical school program, and had no legitimate reasons for barring Plaintiff from this academic and professional program.

49. In the course of the meetings, Plaintiff Hajjar-Nejad clearly stated that he believed that there was no legitimate bases for the actions being taken against him, and inferred such actions to be based upon discriminatory motives.

50. Because of the various inappropriate and discriminatory threats to terminate his long-sought medical career, Plaintiff Hajjar-Nejad was forced to leave the Medical School Honors Program, and enter the general medical school academic community.

51. Despite a return to the general medical school community and a curtailment of his research efforts, Plaintiff Hajjar-Nejad continued to suffer periodic discrimination and retaliation. In late 2006 and early 2007, false allegations were included in the performance evaluations of Plaintiff for his Obstetrics and Gynecology Course of Instruction and Rotation, and such allegations were inserted into other course evaluations of Plaintiff.

52. On December 27, 2006, Dean Schroth notified Plaintiff in writing that the Defendant was initiating a committee review on Plaintiff's "professional comportment" allegedly based on Plaintiff's evaluations in the Medicine, Surgery, and Obstetrics and Gynecology rotations. No further information was provided by Dr. Schroth, but Plaintiff was aware of the inclusion of false information in such evaluations that Plaintiff had challenged when he received the evaluations.

53. In February 2007, Plaintiff was notified of an improperly formed and constituted committee evaluation of his professional comportment. Such reminder

occurred just prior to an examination period and was intended to disrupt Plaintiff's examination preparations.

54. On March 2, 2007, Plaintiff provided an elaborate response to the false allegations of professional comportment to be given to the subcommittee. Despite such efforts, the process moved forward to an apparent pre-determined destination.

55. The referenced committee meeting still was not scheduled until a date finally was set in April 2007. Following the Virginia Tech school tragedy of April 16, 2007, the committee meeting was scheduled for May 3, 2007. The reason given for the delayed committee meeting was "security considerations," an obvious reference to Plaintiff Hajjar-Nejad's Islamic and Middle Eastern background.

56. On May 3, 2007, the committee (named the Subcommittee on Professional Comportment of the Medical Student Evaluation Committee, or MSEC) meeting occurred. The Chairman announced at the meeting that its purpose was to investigate Plaintiff's "veracity," and stated that grades and evaluations would not be discussed.

57. The meeting, as convened and conducted, violated numerous specific University policies and regulations, and Plaintiff and his counsel were not permitted to ask questions, cross examine witnesses, name additional witnesses for testimony, or present substantial evidence. The specific GW policies and regulations that were violated in the initiation and conduct of the subcommittee are itemized below:

- Rule-Article E: Evaluation of Professional Comportment, Section 6 (Regulations for M.D. Candidates) (Exhibit 1, pg. 41)

- Rule-Article E: Evaluation of Professional Comportment, Section 7 (Regulations for M.D. Candidates) (Exhibit 1, pg. 41)

- Rule-Article E:  Evaluation of Professional Comportment, Section 10 (Regulations for M.D. Candidates) (Exhibit 1, pg. 42)

- Rule-Article E:  Evaluation of Professional Comportment, Section 13 (Regulations for M.D. Candidates) (Exhibit 1, pg. 42)

- Rule-Article E:  Evaluation of Professional Comportment, Section 14 (Regulations for M.D. Candidates) (Exhibit 1, pg. 43)

- Rule-Article E:  Evaluation of Professional Comportment, Sections 15-16 (Regulations for M.D. Candidates) (Exhibit 1, pg. 44)

- Rule-Article V:  Regulations Concerning Student Life on Campus, Sections A (The Enactment of Regulations) and B (Standards of Fairness and Student Rights in Disciplinary Cases) The Guide to Student Rights and Responsibilities 2006-2007 (Exhibit 1, pg. 45)

- Rule-Article V, Regulations Concerning Student Life on Campus, Section B, Points 1-8 The Guide to Student Rights and Responsibilities 2006-2007(Exhibit 1, pg. 46)

58.  The contents of the recommendations of the Subcommittee were basically that Plaintiff (i) repeat any clerkship for which he **receives a grade of low pass or below,** (ii) even if Plaintiff receives passing grades subsequently, the Subcommittee Chair must review his clerkship evaluations when he has completed all clerkships to look for comportment-related issues, and if less than satisfactory will refer to the Medical Student Evaluation Committee for investigation, (iii) following completion of all third year clerkships, Plaintiff must complete an acting internship in internal medicine at GW

Hospital, (iv) that the Subcommittee recommendations be permanently made a part of the Plaintiff's file and record, and (v) for Plaintiff to take a leave of absence.

59. Moreover, Dean Goldberg informed the Plaintiff on June 17, 2007 that he would have to repeat the Obstetrics and Gynecology clerkship even though he received a grade of High Pass from the Clerkship Director Dr. Charles Macri. Plaintiff's final evaluation in the obstetrics and gynecology rotation was a high pass—Dr. Macri writes that Plaintiff's cognitive skills are excellent...[He is] very well read...[clinically] Plaintiff is competent and has excellent exam skills...[and] in the categories of information presentation, professional behavior and work habits he provides strong marks..." The actions of GW again in this regard reveal how the interactions and directives to and with Plaintiff were tainted by discriminatory animus.

60. Additionally, as the affidavit by Mr. Sarsour (Plaintiff's Emergency Counsel for MSEC) reveals, the Subcommittee was unable throughout the investigation to find any evidence or proof that Plaintiff had been untruthful **(Exhibit 17)**. This should have led to closure after no evidence was found but it didn't because of discrimination. There was a big gap between the subcommittee recommendations for remedial action and the MSEC's decision for dismissal.

61. Despite these ongoing and unrelenting efforts of Defendant to dissuade Plaintiff from completing medical school, Plaintiff remained steadfast and somehow finished the 2006-2007 academic school year (Plaintiff's third year of the four-year medical school curriculum) with passing grades in all of his graded courses, completing several courses with "High Pass" and "Honors" grade results. This was despite Plaintiff having been removed from the Honors Academic Program.

62.   The evaluations of his individual professors, to the apparent consternation of senior Medical School officials, and particularly Medical School Dean Scott and Senior Associate Dean Schroth, were continuously high and full of praise for Plaintiff's academic accomplishments and class comportment.

63.   In certain instances, however, including the Obstetrics and Gynecology Rotation related duties performed by Plaintiff at Inova Fairfax Hospital (IFH) in early 2007, Plaintiff's highly favorable review and evaluation was not placed into his transcript for several months.  No explanation has ever been presented for such delays.

64.   The Subcommittee issued recommendations on June 18, 2007, which again failed to meet numerous University standards and guidelines.  After finding no evidence or proof of any untruthfulness by Plaintiff in his academic efforts, the Subcommittee still recommended changes affecting only Plaintiff Hajjar-Nejad's grades and academic requirements.  Such recommendations were abjectly discriminatory and retaliatory, and contrary to University regulations and policies.  For example, the Subcommittee recommended that Plaintiff Hajjar-Nejad be forced to repeat any clerkship (an academic form of apprenticeship) if he were to receive a "Low Pass" grade.  That grade, however, is a passing grade, and is a successful grade and recognized for full credit under University regulations and policies.

65.   The Subcommittee presented its recommendations to the Medical Student Evaluation Committee (MSEC) on or about June 18, 2007, the same day that the MSEC was scheduled to meet regarding Plaintiff Hajjar-Nejad.  Plaintiff himself did not receive the recommendations of the Subcommittee until 12:03 a.m. on June 18, 2007, the same day as the scheduled MSEC meeting.

66. Dean Goldberg sat as an apparent of the MSEC meeting conducted on June 18, 2007. She denied the presence at the meeting of an expert witness and legal assistant for Plaintiff, and stated that neither Plaintiff nor his counsel could speak or ask questions at the hearing, except for an oral statement which Plaintiff could make.

67. The MSEC membership consisted primarily of white students and individuals pre-selected and appointed by senior member of the GWU administration. The Chairman was Dr. Jeffrey Akman. The names and positions of the members were requested by Plaintiff, but never provided. There was no apparent certification, authentication or verification of the hearing process, and contrary to the regulations of the Medical School the MSEC did not present a written recommendation. Plaintiff had no ability to challenge any MSEC member for cause.

68. Plaintiff requested in writing from Medical School Dean Scott a copy of any recommendations made by the MSEC regarding his "hearing" of June 18, 2007. On July 13, 2007, Dean Scott denied this request. A further request for the MSEC determinations was made on July 17, 2007, by Plaintiff. Again, Dean Scott denied Plaintiff's request.

69. On July 26, 2007, Plaintiff Hajjar-Nejad received from Dean Scott a letter from the Chairman of the MSEC (Dr. Akman) addressed to Dean Scott. The letter was dated July 12, 2007, and stated that the MSEC had decided by "motions" and "secret ballot voting" to dismiss Plaintiff Hajjar-Nejad from GWU Medical School. There were no **valid** explanations or bases for such decision provided.

70. This determination was totally unjustified, without substantial bases in fact, contrary to the apparent findings and recommendations of the cited Subcommittee, and a furtherance of the acts of discrimination and retaliation fostered by Medical School Dean

Scott since at least mid-2006.  Numerous specific violations of University policy and

regulations were apparent.  The MSEC greatly exceeded its scope of authority, and its

numerous procedural violations constituted an egregious denial of Plaintiff's fundamental

procedural rights.  Plaintiff's emergency counsel for the MSEC, Mr. Jad Sarsour,

provided an Affidavit verifying the discriminatory nature of the MSEC proceeding and

expressed regulations violated by the MSEC **(Exhibit 17)**.

71.  By not providing a mechanism for Plaintiff to identify and disqualify

members for conflicts of interest, the MSEC proceeding created a clear opportunity to

achieve a biased and perverted objective, to serve as a mere rubber stamp to whatever the

administration, and Dean Scott, wanted to achieve.  Dean Scott had clearly used the

MSEC process as a veneer to accomplish a pre-determined course of action to ensure the

dismissal of Plaintiff Hajjar-Nejad from school that had been substantially stated in the

October 23, 2006, meetings cited previously.

72.  Dean Scott apparently adopted the recommendations of the MSEC for the

dismissal of Plaintiff Hajjar-Nejad from medical school, and dismissed Plaintiff

summarily on or about July 26, 2007.  Dean Scott stated to Plaintiff that he was the "final

arbiter" of the matter.  As stated by University regulations, however, the final decision

regarding a dismissal is to be made by the University Vice President for Academic

Affairs.  The specific guiding regulation in this instance is Regulations for MD

Candidates, Article E, Evaluation of Professional Comportment, Sections 17-18.

73.  Even though Plaintiff had received his fourth year medical school schedule

from Assistant Dean Haywood on April 18, 2007, and Plaintiff was authorized to begin

an acting internship (AI) in medicine despite the pendency of the MSEC proceedings,

there was a unilateral modification of Plaintiff's schedule to substitute the AI in medicine with a research elective. Clearly, this was done because the decision on dismissal already had been made by University senior personnel.

74.   Prior to his dismissal from the medical program, Plaintiff worked for four weeks to attain Institutional Review Board (IRB) approval for his research on human arteries. He arranged collaboration between the Department of Biochemistry and heart/vascular surgeons at the hospital, under his mentor, Dr. McCaffrey. The IRB approval was received on July 23, 2007; but all progress on this project was terminated with Plaintiff's dismissal on July 26, 2007.

75.   Because Dean Scott actually did not have the authority to dismiss Plaintiff Hajjar-Nejad on July 26, 2007, even though Dean Scott did improperly and immediately terminate Plaintiff's participation in the academic process, Plaintiff subsequently filed an appeal regarding his dismissal to the Executive Vice President for Academic Affairs (EVPAA). Plaintiff's appeal, submitted on August 7, 2007, contained a detailed account of clear and definite violations of rules and regulations by the Defendant in taking its various adverse and discriminatory actions.

76.   On August 9, 2007, Plaintiff spoke with former President of GWU Mr. Stephen J. Trachtenberg. He told Plaintiff to "return back to Iran to complete medical studies," and that the Executive Vice President for Academic Affairs would uphold Dean Scott's decision.

77.   Formal dismissal is exactly the result that occurred, although not in the manner prescribed by GWU regulations. On September 13, 2007, a designee of the Vice President for Academic Affairs (VPAA), Ms. Carol K. Sigelman, Associate Vice

President, upheld the decision of Dean Scott to dismiss Plaintiff Hajjar-Nejad from the medical school.

78. The threats of senior Defendant academic leaders, including Medical School Dean Scott and Senior Associate Dean Schroth, to withhold Plaintiff's academic transcripts to preclude his subsequent transfer to an alternative medical school were subsequently enacted. These threats, made initially on October 23, 2006, were always planned for enactment once the Defendant's objective of obtaining Plaintiff's dismissal was achieved. Specifically, on September 26, 2007, there was an eight (8) month hold put on Plaintiff's transcripts by the Dean of the School of Medicine and Health Sciences (Dr. Scott); thereby prohibiting Plaintiff's efforts to continue his medical studies at an alternative medical school.

79. The unlawful and retaliatory "hold" on Plaintiff's transcripts was removed, after several requests, on April 8, 2008; with an apology rendered to Plaintiff Hajjar-Nejad by the University Office of the Registrar. On April 7, 2008 the Defendant provided a letter to Plaintiff stating that "the hold was placed by the Dean of the School of Medicine and Health Sciences" **(Exhibit 15)**. On April 14, 2008, a Letter of Record Status was provided to Plaintiff that states, "This is to certify that the academic hold (SMHS Dean's Office) preventing the above student from obtaining his transcript was erroneously placed. The hold was intended to prevent future registration, but unwittingly additionally prevented transcript production" **(Exhibit 16)**. This is a blatantly pretextual excuse, however, for the conduct of the cited pattern of abject discrimination and retaliation against Plaintiff Hajjar-Nejad.

80. On November 1, 2007, Dean Scott e-mailed the National Board of Medical Examiners (NBME) and instructed them to not let Plaintiff Hajjar-Nejad sit for the Step 2 National Exam to be a physician. Had Dean Scott not placed an improper and unwarranted hold on Plaintiff's medical school transcripts, however, Plaintiff would have been able to enroll elsewhere, and would have been permitted to take this examination in his fourth year.

81. Further, because Plaintiff already had completed his third year in May 2007 by passing the end of third-year examination, with a score/grade above the class average, and he had completed twenty-eight (28) research credits towards his fourth year academic requirements, Plaintiff would have graduated on time in 2008 for the commencement of a residency program. Such residency program would have represented the culmination of over eight years of hard work, study and dedication.

82. From August 4, 2008, to the current date, Plaintiff Hajjar-Nejad has performed an independent clerkship in urology with Dr. Parvez I. Shah. He has successfully performed all of his job-related duties in this position.

83. On October 15, 2008, reflecting many of the same problems that had been surfaced by Plaintiff Hajjar-Nejad in mid-2006 and which triggered the wave of discrimination and retaliation against him by Dr. Scott and his subordinates, GWU Medical School was placed on probation by the Liaison Committee on Medical Education (LCME). LCME is recognized by the US Department of Education to accredit all medical schools in the United States. GWU was placed on probation for "reasons seriously compromising the quality of the MD program." On information and belief,

GWU was the only medical school in the United States to be placed on probation during this time frame.

84. The unlawful discriminatory and retaliatory actions of Defendant George Washington University and its senior officials, employees and agents, have caused the following damages and injuries to Plaintiff Hajjar-Nejad:

a. The denial by Defendant of the rightful and timely graduation of Plaintiff from GW Medical School, scheduled for May 2008, has resulted in significant financial loss to Plaintiff resulting in the denial of income as a practicing medical resident and as a fully licensed medical doctor from the period May 2008 to the present, in the amount of not less than One Million Dollars ($1,000,000.00), plus interest.

b. The denial by Defendant of the rightful graduation of Plaintiff from the GW Medical School will result in future earnings and lost income from the date of judgment to Plaintiff's anticipated life span in an amount of not less than Fifty Million Dollars ($50,000,000.00).

c. The unlawful and premature dismissal of Plaintiff from the GW Medical School by Defendant resulted in the loss of all investment costs of such education, including education costs, living expenses and deferred or missed income from alternative employment during the period June 2004 through August 2007, in an amount not less than Eight Hundred Thousand Dollars ($800,000.00).

d. Because of the aforestated unlawful and retaliatory acts of Defendant GWU, Plaintiff Hajjar-Nejad  has experienced significant mental pain and suffering, stress, depression and other physical and mental ailments.

e.  Because of the aforestated unlawful and retaliatory acts of Defendant GWU, Plaintiff Hajjar-Nejad has suffered significant loss of personal esteem and reputation in the professional and academic communities, and among his family and personal friends.

85.  The blatantly deliberate and unlawful acts of discrimination and retaliation conducted by Medical School Dean Scott and Senior Associate Dean Schroth, both senior officials of Defendant's institution, constitute egregious violations of Plaintiff Hajjar-Nejad's                          civil rights.  These reprehensible acts are directly attributable to employer Defendant GW University, which refused to correct the blatant acts of discrimination and retaliation, refused to discipline the responsible individuals, and furthered their actions with independent corroboration and support.  Such conduct warrants the award in this case of punitive damages.

## COUNT I:

### UNLAWFUL DISCRIMINATION BASED UPON
### RACE, RELIGION AND NATIONAL ORIGIN

86.  Paragraphs 1-85 are herein incorporated by reference.

87.  The above-described acts reflect discrete and continuing unlawful discrimination against Plaintiff Hajjar-Nejad based upon Plaintiff's race (Arabic or Middle Eastern), religion (Muslim), and apparent family-related National Origin (Iranian), conducted by senior officials and employees of Defendant George Washington University and the George Washington University School of Medicine and Health Services.

88.  The actions of Defendant George Washington University, through its senior officers, employees and agents, have caused the damages and injuries cited in paragraphs 84 and 85 of this Amended Complaint, cited above.

89.  As a result of Defendant's unlawful discriminatory conduct, Plaintiff Hajjar-Nejad demands the relief set forth below:

a.  Payment of an amount not less than $51,800,000 for monetary compensation for loss of income and loss of future income, plus appropriate interest on past lost income;

b.  Compensatory damages in an amount of at least $2,000,000;

c.  Punitive damages in an amount of at least $10,000,000;

d.  Removal of all references to Plaintiff's dismissal from medical school from all records and documents maintained by the Defendant (ie, transcript, etc);

e.  The provision of favorable recommendations and Dean's Letter by Defendant to locations at which Plaintiff can perform intern and residency requirements following medical school graduation;

f.  Complete access to Plaintiff's undergraduate and medical school transcripts at all times;

g.  The Defendant will not convey any disparaging information (ie, including any harmful acts, communications, reports, records, transcripts, statements, documents, recommendations or disclosures) regarding or against Plaintiff to any residency program, licensing authority, including state medical board, credentials verification service, hospital, etc.

h. Payment of all reasonable attorney's fees and costs associated with this litigation and all administrative proceedings which occurred prior to the initiation of this litigation; and,

i. Such other relief as this Honorable Court may direct.

## COUNT II:

### UNLAWFUL RETALIATION FOR PRIOR PROTECTED EEO ACTIVITIES

90. Paragraphs 1-85 are herein incorporated by reference.

91. The above-described acts reflect discrete and continuing unlawful retaliation against Plaintiff Hajjar-Nejad based upon Plaintiff's prior protected activities of complaining of adverse treatment based on race (Arabic or Middle Eastern), religion (Muslim), and apparent family-related National Origin (Iranian), conducted by senior officials and employees of Defendant George Washington University and the George Washington University School of Medicine and Health Sciences.

92. The actions of Defendant George Washington University, through its senior officers, employees and agents, have caused the damages and injuries cited in paragraphs 84 and 85 of this Amended Complaint, cited above.

93. As a result of Defendant's unlawful retaliatory conduct, Plaintiff Hajjar-Nejad demands the relief set forth below:

a. Payment of an amount not less than $51,800,000 for monetary compensation for loss of income and loss of future income, plus appropriate interest on past lost income;

b. Compensatory damages in an amount of at least $2,000,000;

c.  Punitive damages in an amount of at least $10,000,000;

d.  Removal of all references to Plaintiff's dismissal from medical school from all records and documents maintained by the Defendant;

e.  The provision of favorable recommendations and Dean's Letter by Defendant to locations at which Plaintiff can perform intern and residency requirements following medical school graduation;

f.  Complete access to Plaintiff's undergraduate and medical school transcripts at all times;

g.  The Defendant will not convey any disparaging information (ie, including any harmful acts, communications, reports, records, transcripts, statements, documents, recommendations or disclosures) regarding or against Plaintiff to any residency program, licensing authority, including state medical board, credentials verification service, hospital, etc.

h.  Payment of all reasonable attorney's fees and costs associated with this litigation and all administrative proceedings which occurred prior to the initiation of this litigation; and,

i.  Such other relief as this Honorable Court may direct.

## COUNT III:

## BREACH OF CONTRACT

94.  Paragraphs 1-85 are herein incorporated by reference.

95.  The Offer of Acceptance issued by Defendant GW University to Plaintiff Hajjar-Nejad on November 5, 2003, and signed and accepted by Plaintiff on November 7,

2003, constitutes a contractual agreement with mutually binding promises, obligations and responsibilities established by and between Defendant and Plaintiff **(Exhibit 19)**. Such Agreement was supplemented in turn by a reasonably promulgated set of rules, regulations, directives and policies implemented by the Defendant and relied upon by the Plaintiff.  Plaintiff in this proceeding complied in every reasonable manner with every provision of this Agreement, including making in a timely manner all required payments and obligations.

The Honorable Judge explains in her August 15, 2011 Memorandum that in order:

> "To state a claim for breach of contract under District of Columbia law, a plaintiff must allege (i) a valid contract between the parties, (ii) an obligation or duty arising out of the contract, (iii) a breach of that duty, and (iv) damages caused by that breach. *Tsintolas Realty Co. v. Mendez,* 984 A.2d 181, 187 (D.C. 2009).

The Plaintiff herein incorporates into this Third Amendment Complaint the following documents, a number of which were formerly attached to Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss Second Am. Compl. ("Pl.'s MTD Opp'n"), ECF No. [22]:

- GWU School of Medicine and Health Sciences Student Mistreatment Policy and Procedures **(Exhibit 7)**

- GWU Non-Retaliation Policy **(Exhibit 8)**

- GW School of Medicine and Health Sciences Regulations for MD Candidates **(Exhibit 9)**

- GWU Guide to Student Rights and Responsibilities **(Exhibit 10)**

- Email Communication by Dean to Trigger Professional Comportment Review **(Exhibit 11)**

- GWU Disruption of University Functions Policy **(Exhibit 12)**

- Correspondence and E-Mail Communications re Professional Comportment Subcommittee Review **(Exhibit 13)**

- Twenty One (21) Questions Presented to Subcommittee on Professional Comportment and Never Answered Against MD Candidate Regulations **(Exhibit 14)**

- Letter from University Registrar re Transcript-Letter of No Transcript **(Exhibit 15)**

- Letter from University Registrar re Transcript-Letter of Record Status **(Exhibit 16)**

- Affidavit of Mr. Jad Sarsour, Plaintiff's Emergency Counsel for MSEC **(Exhibit 17)**

- Mr. Syed H. Zaidi Affidavit, Plaintiff's Counsel for Subcommittee **(Exhibit 18)**

96. The Honorable Judge discusses that GW's motion is "GRANTED" insofar as it seeks dismissal of any breach of contract claim based on an **unidentified** universe of "regulations," "policies," "rules," "procedures," "directives," and the like (See Order, Honorable Judge Kollar-Kotelly, August 15, 2011 at 1). The Honorable Judge explains

-42-

"'that Hajjar-Nejad's Second Amended Complaint fails to provide adequate notice of his breach of contract claim to the extent he intends to base it on an **unidentified** universe of "regulations," "policies," "rules," "procedures," and "directives.'"  In order to address this concern, the Plaintiff is including in this Third Amendment specific regulations violated within the Regulations for MD Candidates Guide to Student Rights and Responsibilities.

97.  Here follows a non-exhaustive list of the specific regulation violations in those documents with reference to specific provision(s) and if an e-mail or letter, a citation of the specific regulation or policy that it addresses, with location precisely spelled out:

- Student Mistreatment Policy and Procedures **(Exhibit 7)**
  - Mistreatment (Student Mistreatment Policy and Procedures), pgs. 1-5
  - Confidentiality (Student Mistreatment Policy and Procedures), Policy Objectives, p. 1; Confidentiality, p. 4
- Non-Retaliation Policy **(Exhibit 8)**
  - Violated in its entirety, specifically, p. 1 policy statement; p. 1 reason for policy/purpose; p. 2 Policy/procedures ("…retaliation against a member of the university community for making a good faith report of potential university-related…violations is prohibited…")
- Regulation for MD Candidates **(Exhibit 9)**
  - Article B:  Evaluation of Academic Performance, Article B, Sections 1-2, 7
  - Article B:  Evaluation of Academic Performance, Sections 5 and 6;

- Article E. Evaluation of Professional Comportment, Section 1

- Article E. Evaluation of Professional Comportment, Section 3

- Article E, Evaluation of Professional Comportment, Section 6 (Regulation Violations for Committee Review)

- Article E: Evaluation of Professional Comportment, Section 7 (Regulation Violations for Committee Review)

- Article E: Evaluation of Professional Comportment, Section 10 (Regulation Violations for Committee Review)

- Article E: Evaluation of Professional Comportment, Section 13(Regulation Violations for Committee Review)

- Article E: Evaluation of Professional Comportment, Section 14 (Regulation Violations for Committee Review)

- Article E: Evaluation of Professional Comportment, Sections 15-16 (Regulation Violations for Committee Review)

- Guide to Student Rights and Responsibilities 2006-2007 **(Exhibit 10)**

  - Article II Section C:  Protection Against Disclosure, Page 1

  - Article II, Section B:  Protection Against Improper Academic Evaluation, Page 1

  - Article V:  Regulations Concerning Student Life on Campus, Sections A (The Enactment of Regulations) and B (Standards of Fairness and Student Rights in Disciplinary Cases, Points 1-8), Page 3

- Email from Dr. Schroth to "trigger" a comportment hearing **(Exhibit 11)**

- o   Article B:  Evaluation of Academic Performance, Article B, Sections 1-2, 7 (Regulations for MD Candidates)

- o   Article II, Section B:  Protection Against Improper Academic Evaluation, Page 1 (Guide)

- o   This email is connected to two other emails and shows that Senior Associate Dean Schroth orchestrated Hajjar-Nejad's removal from Honors and the formation the subcommittee.

- o   This email, along with Exhibit 1[7], page 95 and 97 show that the Senior Associate Dean interfered in the grading process in the surgery rotation against school grading regulations.

- o   Exhibit 1 page 95 shows that the Dean told the course director not to pass Hajjar-Nejad in surgery after she said he would pass **(Exhibit 6)**.  Then, in Exhibit 1, page 97 it lucidly shows that the same dean moved to cement a conditional grade in surgery for Hajjar-Nejad and include the false and misleading evaluations to "trigger" a comportment proceeding against him **(Exhibit 11)**.  This is in violation of the MD Candidate Regulations and the Guide.

- Disruption of University Functions **(Exhibit 12)**
  - o   Violated in its entirety, specifically, Policy statement, Page 1 and Policy/Procedures, Page 2.  Clearly violated when Hajjar-Nejad was ordered to stop research and was removed from the Honors Program.

- Subcommittee emails for irregular process **(Exhibit 13)**

---

[7] Original Exhibit 1, Appeal to EVPAA, Dr. Donald Lehman

- o   Article E, Sections 1-19, Regulations for MD Candidates
- Twenty one questions presented to and for the subcommittee and left unanswered by GW **(Exhibit 14)**
  - o   As above and broad in scope, however, to be specific includes:
    - Article B:  Evaluation of Academic Performance, Article B, Sections 1-2, 7 (Regulations for MD Candidates)
    - Article B:  Evaluation of Academic Performance, Sections 5 and 6;
    - Article E. Evaluation of Professional Comportment, Section 1
    - Article E. Evaluation of Professional Comportment, Section 3
    - Article II, Section B:  Protection Against Improper Academic Evaluation, Page 1 (Guide)
    - Article V:  Regulations Concerning Student Life on Campus, Sections A (The Enactment of Regulations) and B (Standards of Fairness and Student Rights in Disciplinary Cases, Points 1-8), Page 3
    - Article E, Sections 1-19, Regulations for MD Candidates
- Letter of No Transcript and Letter of Record Status (**Exhibits 15 and 16 respectively**).   Deal with Hold on Hajjar-Nejad's transcript for 8 months.
  - o   Violates Non-retaliation policy, disruption of university functions policy, Guide, Regulations, and
  - o
          The University issued an apology after placing the hold for

eight months which prohibited access to my transcripts to continue my

education.

    o   Article V:  Regulations Concerning Student Life on Campus, Sections A

        (The Enactment of Regulations) and B (Standards of Fairness and Student

        Rights in Disciplinary Cases, Points 1-8), Page 3

98.  How specifically each regulation was violated is present within the record.

For example, the subcommittee recommendations were discriminatory as they distinctly

changed the grading policy and requirement for the Plaintiff only.

"The recommendation that [Plaintiff] must repeat any clerkship he received a low

pass [in] is not cohesive with policy.  A low pass is a passing grade" (See exhibit 3[8], p.

95, bottom), however, the subcommittee states that "[he] must repeat any clerkship for

which [he] receive[s] a grade of low pass or below" (See Exhibit 1, page 133, last

paragraph, point 1).  The students of the medical center are not upheld to such a policy.

That GW violated its own policy is clear and the specific policy that was violated is

crystal clear—Regulations for MD Candidates, Articles A and B.

The Defendant's treatment of Plaintiff was not uniform (See U.S. D.O.E

complaint, pages 63-64).  Also, "when Dean Schroth told Dr. Lee to give [Plaintiff] a

conditional grade, he tells her a low pass is still a pass and that would keep [him] in the

honors curriculum," so the subcommittee's ruling was purely and simply discriminatory

(**Exhibit 6, Give a CN or Failing Grade Email**).  In this Exhibit, it clearly shows the

Senior Associate Dean for Academic Affairs stating that a low pass is a passing grade.

Therefore, the subcommittee recommendation which states that Plaintiff must repeat any

---

[8] Original Exhibit 3, Filed with Federal Court Complaint on April 9, 2010

clerkship for which he receives a low pass grade or below is purely discriminatory.  As

the affidavit from Mr. Sarsour (Plaintiff's emergency counsel for MSEC) explains, "the

administration of the dean's office changed the school's regulations specifically for Mr.

Hajjar-Nejad by changing grading policies" **(Exhibit 17)**.

     99. `

     100.  More specifically, a glimpse of Exhibit 1 (Green Cover), the Appeal to the

Vice President for Academic Affairs Dr. Donald R. Lehman, shows a detailed and

extensive list of regulation violations by GW, a definition of the specific regulation at-

hand, how GW violated that regulation, and actions not taken by GW as required by the

regulations.

     101.  To illustrate, the Plaintiff will review a series of violations (adapted from

Exhibit 1, pages 41-46) that reveal imposed duty on GW and breach of that duty.  These

were all brought to the attention of GW in a timely manner:

    i.     The Senior Associate Dean, Scott Schroth, emails the Course Director of

          Surgery and tells her not to give the Plaintiff a passing grade in the surgery

          rotation after she emails him that the Plaintiff will pass even with the higher

          grading requirements of the honors program.  The Dean's interference in the

          grading process violated the Regulations for MD Candidates.  *This is directly*

          *against school regulation*s, one of which state "the faculty is responsible for

          evaluation of the performance of students in a meaningful, useful, and timely

manner" (Evaluation of Academic Performance, Sections 1-2, 7, See Regulations for MD Candidates). The faculty is responsible for giving evaluations, and authority for giving grades lies with the Department of Surgery, not Dean Schroth or the Dean's office. Article B, Section 7 of the Regulations for MD Candidates was violated because an appeal was sent to Dr. Lee (Clerkship Director of Surgery) on November 17, 2006 and no response was ever provided in line with regulation. The Guide to Student Rights and Responsibilities also clearly provides "protection against improper academic evaluation" under Article II, Section B: Protection against Improper Academic Evaluation. The evaluations in surgery were based on violation of a protected activity and therefore the DC OHR ruled for discriminatory retaliation. The MSEC was informed of Dean Schroth's violation and did nothing about it. Dr. Lee obstructed Plaintiff's right to appeal the surgery grade and he was not permitted to move through the process in accord with the regulations. The Deans committed an act of retaliation by giving Plaintiff a conditional grade in surgery as a direct result of the good-faith report made by him on September 22, 2006.

ii. A second example of black and white discrimination and concomitant violation of MD Candidate Regulations of the Defendants' institution is when the Dean emails the Clerkship Director of Medicine telling him that Plaintiff has leveled criticism at him and the level of the Department of Medicine, *thus directly leading to a retaliatory and capricious evaluation*, and violating

school confidentiality policies that exist to protect students (Exhibit 2[9], pg.

15).  Dean Schroth writes in an electronic message that Plaintiff was "fairly

dismissive of his meetings with Robert [Clerkship Director of Medicine],

implying that you were contradictory in your advice and poorly informed

about his fund of knowledge and work habits." Dean Schroth revealed good

faith reports made in confidence solely for the improvement of the University

to the Department of Medicine, however, he did so in a way that distorted and

misrepresented Plaintiff's report, and turned the Director against him.  The

Director of the Medicine Clerkship goes from seeing Plaintiff as "very

conscientious, enthusiastic, and disciplined student" with valid concerns of

"experiences not conducive to learning" to characterizing him as someone

"defensive," "resistant," and "closed to constructive feedback" (See Exhibit 2,

p. 17)  after meddling by Dean Schroth.  The medicine evaluation was

appealed in line with the article above.  The appeal process was blocked also

against Article B Section 7.  This all led to a retaliatory medicine evaluation.

This shows clearly direct and proximate cause of damages as a result of the

Defendant's violating regulations and guidelines.

iii.    The Plaintiff's removal from the Honors Academic Program and the

prohibition of his performing research also violated specific identified rules of

the university.  Specifically, GW had certain duties imposed on it by Article

B: Evaluation of Academic Performance, Sections 5 and 6 (Regulations for

MD Candidates) and Article II, Section B:  Protection Against Improper

---

[9] Original Exhibit 2, Brief to the Medical Student Evaluation Committee (MSEC)

Academic Evaluation (Guide to Student Rights and Responsibilities 2006-2007).  They completely and obviously breached that duty.  Dean Schroth first removed Plaintiff from Honors based on a pretext reason, and then he choreographed the forming of a subcommittee on professional comportment to further discriminate against Plaintiff and dismiss him from medical school.  To illustrate, as his first action Dean Schroth writes on October 18, 2006 "so I assume this means he will receive at least a conditional (if not a fail) grade for the surgery clerkship?  If so, I need to know ASAP because it will mean that we must pull him out of the Honors curriculum (!) (See Original Exhibit 1, page 97, email 1 [10]) **(Exhibit 11)**.  In his second action, he writes, "will Reza's (the general surgery resident) evaluation be submitted as part of his formal surgery evaluation?  I think it should be, and it may trigger a professional comportment committee review.  I will go over it with the other deans (See also Original Exhibit 1, page 97).  The dean's purpose was to "bring this case to his own committees to move for [Plaintiff's] dismissal" (See exhibit 1, p. 16, paragraph 2). **(Exhibit 11)**

a.  These regulations and guidelines clearly spell out that "All departments should submit F and CN grades to the Office of the Dean as soon as possible after the student has completed a course or clerkship…a definition of work required to convert an F or CN shall be developed by the department, reviewed by the Medical Student Evaluation Committee, or MSEC, and approved by the dean…a grade of CN may be converted by

---

[10] Appeal to EVPAA, Dr. Donald Lehman

a program of more limited work, as developed by the responsible department and approved by the MSEC...The dean will inform the MSEC of the names of...students receiving grades F or CN and submit their records to the Committee for evaluation and recommendations."

    i.   GW's breach of duty was that Plaintiff was removed prematurely from his academic program before the appropriate review in accordance with regulations. He was accepted into Honors by three committees of three professors.  Plaintiff should have been taken out by a committee process.  While surgery ended in September, the grade was not submitted until November.  No definition of how to convert the grade was given by the Surgery department.  There was no recommendation (s) for remediation and no review by the MSEC.  The Plaintiff was told by Dean Schroth he must be removed from Honors because he had to remediate the surgery clerkship in its entirety and that was not compatible with Honors. However, he did not follow the required process to arrive at that decision and it later became apparent that the Dean had actually interfered in the grading process.  The dean failed to inform the MSEC of the CN grade in Surgery.  Basically, the basis for removing Plaintiff from the Honors Academic Program was improper and against the Regulations for MD Candidates.

iv.   The eight month hold placed on September 26, 2007 on the academic undergraduate and medical transcripts of the Plaintiff violated GW's own

*pgs. 19-20*

regulations (ie, GWU Non-Retaliation Policy, GWU Disruption of University

Functions Policy, the Guide to Student Rights and Responsibilities, and the

Regulations for MD Candidates)

v.   GW violated its Regulations for MD Candidates and Guide to Student Rights

and Responsibilities during the Subcommittee on Professional Comportment

and Medical Student Evaluation Committee.  GW had certain duties imposed

on it and GW completely and obviously breached that duty. Specifically,

Article E, Evaluation of Professional Comportment, Section 1 of the

Regulations for MD Candidates.

a.   This regulation precisely states "When a problem with professional

comportment…regarding a student is perceived, the observer will

communicate this concern to the dean.  If the communication is verbal, it

must be confirmed immediately by a signed written statement or else it

will not be pursued further."

i.   GW's breach of duty was that the resident of general surgery did

not provide a written report falsely questioning Plaintiff's integrity

until November 3, 2006.  This is the day the surgery evaluation

was given to Plaintiff by the Dean. The report was almost two

months after the surgery clerkship ended.  Therefore, it was not
immediate.  Second, it was not signed as the regulations require.
Third, it was submitted as an effort to justify the CN grade ordered
by the Dean.  Fourth, the Dean in his email writes that the report
should be included in a formal evaluation to trigger a comportment
proceeding **(Exhibit 11)**.

vi.   GW violated its Disruption of University Functions Policy.  GW had certain
duties imposed on it and GW completely and obviously breached that duty.

a.   This policy clearly states "No member of the University shall:  a) Engage
in conduct that obstructs teaching, research or learning; or b) engage in
conduct that obstructs free access to members of the University or to
University buildings; or c) disobey general regulations of the
University..."

i.   GW's breach of duty was that Dean Schroth writes in his private
memo that he told Plaintiff point blank to stop doing research.  On
October 23, 2006 Deans Dr. Scott Schroth and Jim Scott ordered
Plaintiff to leave Honors or else he would be forced to take a leave
of absence and to stop doing research.  The Dean also obstructed
teaching and learning by emailing Plaintiff every time he had an
exam.  The first email was on October 18, 2006 by Dean Schroth
about removing Plaintiff from honors.  The Obstetrics Shelf exam
was on October 20, 2006.  This same pattern was repeated for
Psychiatry and Pediatrics exactly the same week of Plaintiff's

exam.  Plaintiff informed the Subcommittee Chairman during the

hearing and no action was taken for redress.

vii.   GW violated its Regulations for MD Candidates and Guide to Student Rights

and Responsibilities during the Subcommittee on Professional Comportment

and Medical Student Evaluation Committee.  GW had certain duties imposed

on it and GW completely and obviously breached that duty. Specifically,

Article E: Evaluation of Professional Comportment, Section 6 of the

Regulations for MD Candidates.

a.   This regulation precisely states "A Subcommittee on Professional

Comportment and its Chair will be named by the <u>Chair of the MSEC</u>.  The

Subcommittee will consist of two students....and two faculty...at least one

of whom shall be a member of the MSEC."

i.   GW's breach of duty was that Dean Goldberg writes in her email

on February 20, 2007 that she appointed the Subcommittee

(**Exhibit 13**).  That is against the regulations clearly.  Plaintiff

objected and informed her that she is not abiding by the

regulations.  She disregarded his objections entirely.  Also in line

with regulations she never identified who of the two faculty was a

member of MSEC.

viii.   GW violated its Regulations for MD Candidates and Guide to Student Rights

and Responsibilities during the Subcommittee on Professional Comportment

and Medical Student Evaluation Committee.  GW had certain duties imposed

on it and GW completely and obviously breached that duty. Specifically,

-55-

Article E, Evaluation of Professional Comportment, Section 7 of the Regulations for MD Candidates.

a.  This regulation states exactly "The student will be allowed ten calendar days from the mailing of …notice to object to any person's appointment to the Subcommittee."

   i.  GW's breach of duty was that Plaintiff clearly made an objection to the dean as shown in the emails **(Exhibit 13)**.  Plaintiff's objection was completely and totally ignored by Dean Goldberg. On March 8, 2007, Dean Goldberg, or GW, formed and confirmed its own committee members unfairly and unjustly against the regulations by stating "since you did not object in your email, I will assume that all are approved…" After proposing subcommittee members, the Dean changed them again without Plaintiff's confirmation as outlined as being required per the Regulations.  Further, this was not addressed by the Subcommittee as Dean Goldberg said it would be in her emails **(Exhibit 13)**.  On March 30, 2007, Plaintiff responded to Dean Goldberg once more stating his reasons of objection clearly and concisely by re-summarizing the March 2nd email.  She failed to respond within the ten (10) day time frame that she set herself for filing a response. She emailed Plaintiff again about seventeen (17) days later on April 17, 2007 stating she would <u>be setting a date</u> for the Subcommittee on Professional Comportment information

gathering session. Her lack of response until that date was an acceptance of Plaintiff's objections given the <u>lack of filing within the necessary time limit set by the Dean.</u>

This all happened during the same week of the Virginia Tech tragedy (April 16, 2007) that caused our nation grief and sadness. GW left the matter alone, and then after this tragic event, picked it back up again. On April 18, 2007, Plaintiff responded reciting his objections that were previously ignored.  The objection was that a committee was not formed at the time Plaintiff was stepped down from the Honors Academic Program and that he was denied a fair and just response and the dean unilaterally proceeded to form and confirm its own chosen committee members without his input placing its own people in the committee.  As a result, GW did not receive Plaintiff's objections and this led to the formation of a subcommittee without his input and notice of his objections. The Plaintiff clearly wrote in his April 18, 2007 email "the policy and rules of our University are a right to its students.  In effect, this is our constitution that we respect.  The right that our constitution at GW has given me I have not been allowed to use.  The Dean's office unilateral decision making without following University procedures is unjust" **(Exhibit 13)**.

ix.   GW violated its Regulations for MD Candidates and Guide to Student Rights and Responsibilities during the Subcommittee on Professional Comportment

and Medical Student Evaluation Committee. GW had certain duties imposed on it and GW completely and obviously breached that duty. Specifically, Article E, Evaluation of Professional Comportment, Section 10 of the Regulations for MD Candidates.

a. This regulation states exactly "…the student and/or his or her attorney or advisor may submit questions to be answered by persons interviewed by the Subcommittee…the student may speak on his/her behalf and may submit other material…the student may suggest that the Subcommittee interview such persons…"

   i. GW's breach of duty was that during the subcommittee hearing his counsel (Mr. Zaidi, Esquire) and he asked a question of Dean Schroth. The question was presented to the Subcommittee chairman and never asked of Dean Schroth. Plaintiff was denied his right to ask questions **(Exhibit 18)**. Also, 21 questions were presented to and for the subcommittee **(Exhibit 14)**. However, none of the questions were answered. Plaintiff requested floor time to speak to the Subcommittee, but after the questioning was over the Subcommittee and Dean Goldberg did not allow him time to speak. Finally, Plaintiff was not allowed to speak freely and to present a list of people to interview. The subcommittee was concerned with covering its own agenda and gathering the information it required. As a result, it did not hear fully Plaintiff's side of the story and did not give him an opportunity to speak

openly and freely. The questions that he submitted by the 5:00

P.M. deadline on May 4, 2007 were not answered. This is a clear

and distinct breach of duty that led to damages to the Plaintiff as a

result.

102. These facts are poised to be heard at trial after a thorough deposition and

discovery process. The Plaintiff is prepared to list with ample reasoning and supporting

documentation in itemized format all remaining regulation violations by GW if the

Honorable Court deems as necessary, however, Plaintiff has not done so here because of

judicial economy and efficiency.

103. The Defendant was informed countless times of the gross and bold

violations of its own regulations, and completely ignored those objections. GW's claims

regarding "fair notice" are bogus in that at each step throughout this matter they have

been repeatedly informed of the violations and wrongdoing that they have committed

through these documents already provided to the Court and to GW multiple times:

- Exhibit 1 (Green), **Appeal to the Vice President for Academic Affairs** Dr.
  Donald R. Lehman.

- Exhibit 2 (White background with Blue), **Written statement to the Medical
  Student Evaluation Committee (MSEC), <u>delivered to the office of the dean
  (GW, defendant)</u>**, fourteen (14) pages body of the brief, two-hundred eighty-
  eight (288) pages in total including evidentiary documents, plus twenty-one (21)
  pages MSEC hearing transcript, submitted on July 6, 2007 to GW.

- Exhibit 3 (Blue Cover), **to former President Trachtenberg**, one-hundred sixteen
  (116) pages in total with evidentiary documents, **<u>submitted on March 5, 2007 to</u>**

**GW**.  The first fifteen (15) pages are the body of the brief, which included table of citations, synopsis, statement of the case, statement of the facts, statement of the questions presented, argument and conclusion with exhibits.

- Exhibit 4 (Yellow cover), **Brief of Case Findings, to Senior Associate Dean of Students of the University, Ms. Linda Donnels**, sixteen (16) pages body of the brief, sixty-one (61) pages in total with evidentiary documents, **submitted on April 23, 2007 to GW**.

- Exhibit 5 (Tan cover), Academic Portfolio (old version), **submitted to** Executive Vice President for Academic Affairs (EVPAA) in Appeal on August 7, 2007 and to the current President, Dr. Steve Knapp on August 9, 2007.[11]

- DC Office of Human Rights (OHR) **Complaint Form (brief)** (light blue cover), on August 24, 2007 Plaintiff initiated and filed a complaint of discrimination with the D.C. Office of Human Rights (O.H.R.) against the Defendant.

- U.S. Department of Education (DOE) **Complaint brief** (white cover); on September 4, 2007 Plaintiff electronically filed a discrimination complaint with the **U.S. Department of Education (DOE)**.  The complaint form/brief is seventy-eight (78) pages long, cites four (4) discriminatory actions and five (5) retaliatory actions, and has a list of witnesses.

- Complainant's Response to the Respondent's position statement, on January 3, 2008 Plaintiff filed Complainant's response to the Defendant's position statement **with the DC Office of Human Rights**.  It is in a timeline format, sixty (60) pages long, and has thirty (30) attachments.

---

[11] Updated version is referred to as "Academic Portfolio" in the Complaint

- Complainant's Response to Position Statement based on Amendment, on May 7, 2008 Plaintiff **submitted to the D.C. O.H.R** Complainant's Response to Position Statement based on Amendment.  The response is thirty-one (31) pages long with thirty-one (31) attachments.
- Academic Portfolio (updated version—dark grey cover)
- **Master Case Binder, Sections 1-32**
- Application for Reconsideration of Decision for Disparate Treatment and Hostile Environment **Brief (Green Edge and White)**, filed with the DC OHR on July 20, 2009, a copy was sent to the Defendant by the DC OHR.  **Appendix contains DC OHR June 22, 2009 Decision**
- Application for Reconsideration of Decision for Disparate Treatment and Hostile Environment **Record Extract** (Sun Yellow), filed with the DC OHR on July 20, 2009, a copy was sent to the Defendant by DC OHR.  Contains all LCME materials in **Supporting Document No. 13**, including **LCME Accreditation Standards** at the very end referred to in the Initial Complaint.
- Hajjar-Nejad placed the LCME Accreditation Standards in his Initial Complaint because the violations of those standards were concomitant with violations of the Medical School's regulations and policies, and the Medical School was the only school in the United States to be placed on probation by the LCME for "reasons seriously compromising the quality of its medical education program."

104.  The actions of Defendant George Washington University, through its senior officers, employees and agents, have caused the established contract between Plaintiff and Defendant to be breached, as Defendant unilaterally and without just reason

rescinded the contract to provide educational services to Plaintiff through its precipitous and unlawful dismissal of Plaintiff.

**Statute of Limitations**

The contract between the parties was entered into effect on November 7, 2003, for a duration of four (4) years during the Plaintiff's medical education tenure at the Defendant's medical school.  As the contract specifically states Plaintiff's admission was to begin with the commencement of the "Doctor of Medicine program for the academic year beginning with mandatory orientation on August 18, 2004." As the MD program is a four year program, the contract was binding and into effect until approximately May 18, 2008, the end of the four year doctor of medicine degree program and hence graduation. This was the duration of applicability of the terms of the contract.  The Plaintiff was dismissed on July 26, 2007, during the contract period. As a result, the Defendant's claims as they pertain to timing are null and void.

As stated this contract, and the regulations which it is based on, is binding on both parties in the District of Columbia

Numerous additional violations exist that have been referred to within this, the Third Amended Complaint.

105. The breach of contract by Defendant caused the following damages and injuries to Plaintiff Hajjar-Nejad:

a. The denial by Defendant of the rightful and timely graduation of Plaintiff from GW Medical School, scheduled for May 2008, has resulted in significant financial loss to Plaintiff resulting in the denial of income as a practicing medical resident and as a fully licensed medical doctor from the period May 2008 to the present, in the amount of not less than One Million Dollars ($1,000,000.00), plus interest.

b. The unlawful and premature dismissal of Plaintiff from the GW Medical School by Defendant resulted in the loss of all investment costs of such education, including education costs, living expenses and deferred or missed income from alternative employment during the period June 2004 through August 2007, in an amount not less than Eight Hundred Thousand Dollars ($800,000.00).

c. The denial by the Defendant of complying with its contract to graduate and present Plaintiff with a medical degree upon successful completion of medical school denied the Plaintiff of a material asset worth no less than Twenty Million Dollars ($20,000,000).

106. As a result of Defendant's conduct in breaching its contract with Plaintiff, Plaintiff Hajjar-Nejad demands the relief set forth below:

a. Payment of an amount not less than $29,800,000 for monetary compensation for loss of income and loss of future income, plus appropriate interest on past lost income;

b. Removal of all references to Plaintiff's dismissal from medical school from all records and documents maintained by the Defendant;

c. The provision of favorable recommendations and Dean's Letter by Defendant to locations at which Plaintiff can perform intern and residency requirements following medical school graduation;

d. Complete access to Plaintiff's undergraduate and medical school transcripts at all times;

e. The Defendant will not convey any disparaging information (ie, including any harmful acts, communications, reports, records, transcripts, statements, documents, recommendations or disclosures) regarding or against Plaintiff to any residency program, licensing authority, including state medical board, credentials verification service, hospital, etc.

f. Payment of all reasonable attorney's fees and costs associated with this litigation and all administrative proceedings which occurred prior to the initiation of this litigation; and,

g. Such other relief as this Honorable Court may direct.


For the foregoing reasons, demand is made by Plaintiff for such damages and injuries suffered by Plaintiff as attributed to Defendant's discriminatory and retaliatory actions, civil rights violations, and breach of contract, and should include any further relief as this Honorable Court may grant.


Respectfully submitted,

**MOHAMMAD JAVAD HAJJAR-NEJAD**

By:   Mohammad   Hajjar  Nejad
        Mohammad Javad Hajjar-Nejad
*Pro Se*
9920 Shelburne Terrace, Apt. 308
Gaithersburg, M.D.  20878

Enclosures:

Exhibit 1:  Right to Sue Notice

Exhibit 2:  DC Commission on Human Rights Order Scheduling a Status Conference

Exhibit 3:  Plaintiff's -8- page *Reply Memorandum* to the Chief Administrative Law
Judge of the DC HRC

Exhibit 4: Proposed Decision and Final Order of DC HRC

Exhibit 5: Notice of Final Decision and Order of DC HRC

Exhibit 6:  Dean Schroth's email to give Plaintiff a Conditional or Failing Grade in the
Surgery Clerkship against MD Candidate Regulations

Exhibit 7:  GWU School of Medicine and Health Sciences Student Mistreatment Policy
and Procedures

Exhibit 8:  GWU Non-Retaliation Policy

Exhibit 9:  GW School of Medicine and Health Sciences Regulations for MD Candidates

Exhibit 10:  GWU Guide to Student Rights and Responsibilities

Exhibit 11:  Email Communication by Dean to Trigger Professional Comportment
Review

Exhibit 12:  GWU Disruption of University Functions Policy

-65-

Exhibit 13:  Correspondence and E-Mail Communications re Professional Comportment

Subcommittee Review

Exhibit 14:  Twenty One (21) Questions Presented to Subcommittee on Professional

Comportment and Never Answered Against MD Candidate Regulations)

Exhibit 15: Letter from University Registrar re Transcript-Letter of No Transcript

Exhibit 16:  Letter from University Registrar re Transcript-Letter of Record Status)

Exhibit 17:  Affidavit of Mr. Jad Sarsour, Plaintiff's Emergency Counsel for MSEC)

Exhibit 18:  Mr. Syed H. Zaidi Affidavit, Plaintiff's Counsel for Subcommittee

Exhibit 19: Offer of Acceptance

## CERTIFICATE OF SERVICE

I hereby certify that one copy of the foregoing "Plaintiff's Leave to file Third

Amended Complaint" and the "Third Amended Complaint" has been sent by USPS, First

Class, to the following named counsel for Defendant, this 7th day of September, 2011:

Henry Morris, Jr., Esq.
ARENT FOX KINTNER PLOTKIN & KAHN, PLLC
1050 Connecticut Avenue, NW
Washington, D. C.  20036
E-Mail:  "moorish@arentfox.com"

**MOHAMMAD JAVAD HAJJAR-NEJAD**

By:  *Mohammad J. Hajjar Nejad*
Mohammad Javad Hajjar-Nejad
*Pro Se*
9920 Shelburne Terrace, Apt. 308
Gaithersburg, M.D.  20878

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON*
*UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK) **RECEIVED**

SEP - 7 2011

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

# EXHIBIT 1

(Right to Sue Notice)

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Mohammad J. Hajjar-Nejad<br>950 25th Street, N.W., Apt. 605n<br>Washington, DC 20037 | From: | Washington Field Office<br>131 M Street, N.E.<br>Suite 4NW02F<br>Washington, DC 20507 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No | EEOC Representative | Telephone No |
|---|---|---|
| 10C-2008-00023 | David Gonzalez,<br>State & Local Coordinator | (202) 419-0714 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different )

☒ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required ) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Mindy G. Weinstein*
_____
**Mindy E. Weinstein,**
**Acting Director**

September 29, 2010
_____
*(Date Mailed)*

Enclosures(s)

cc·

**GEORGE WASHINGTON SCHOOL OF MEDICINE**
**2300 Eye Street, N.W.**
**Washington, DC 20037**

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 2

(DC Commission on Human Rights Order Scheduling a Status Conference)

## DISTRICT OF COLUMBIA COMMISSION ON HUMAN RIGHTS

In the Matter of:                         :
                                          :
    Mohammed J. Hajjar-Nejad,          :
                                          :
        Complainant,              :
                                          :
           v.             :     Case No. 08-020-EI (DCS)
                                          :
  George Washington University,            :
                                          :
        Respondent.               :

## ORDER SCHEDULING STATUS CONFERENCE

On April 7, 2010, the Office of Human Rights for the District of Columbia made a finding of probable cause of discriminatory retaliation in the above-named matter and certified it to this Commission for a public hearing.  On August 20, 2010, counsel for the Complainant entered an appearance and requested resumption of the procedural schedule in this matter.  To this date, no further pleadings have been filed and no further action has been taken in this matter. In order to move this matter toward resolution,

**IT IS HEREBY ORDERED THAT:**

1)     The parties participate in a status conference via telephone on Thursday, June 16, 2011, at 11:00 am.

2)     Counsel for Complainant is requested to be responsible for initiating this telephonic status conference call to this judicial officer and Counsel for Respondent.

3)     In the event that a party cannot participate in this telephonic status conference call, the parties are directed to consult with one another to determine an alternative date and time, no later than June 24, 2011, during which they will both

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON*
*UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 3

(Plaintiff's -8- page *Reply Memorandum* to the Chief
Administrative Law Judge of the DC HRC)

## DISTRICT OF COLUMBIA COMMISSION ON HUMAN RIGHTS

IN THE MATTER OF:                          :

Mohammad J. Hajjar-Nejad,                  :

    Complainant,                           :

           v.                    :          Case No.: 08-020-EI (DCS)

George Washington University,              :

    Respondent.                            :

### REPLY MEMORANDUM

Comes forth, the Complainant/Plaintiff Mohammad J. Hajjar-Nejad, and states the following based on fact and meritorious grounds:

### I.     GENERAL STATEMENT

In this motion, Plaintiff aims to set the record straight as it pertains to him and make his position which has remained the same from the outset crystal clear.

### II.     INTRODUCTION

First Plaintiff responds directly to the Honorable Chief Judge Simmon's *Order Scheduling Status Conference* in the section entitled *Synopsis of Case Status*. Basically, the case is in federal court before a federal judge on three counts of discrimination, retaliation, and breach of contract. Second, Plaintiff spells out in chronological format the events as they have transpired since the DC OHR rendered its final decision in the section *Detailed Review of Case Status* and provides a brief non-inclusive rationale for filing and staying his case with our strong federal court system. Third, Plaintiff touches on the details surrounding the attainment of the Right to Sue Notice.

### III.    SYNOPSIS OF CASE STATUS

1. That this case presently resides in federal court, in the U.S. District Court for the District of Columbia, with **Civil Case No. 10-cv-626**.

2. The DC OHR rendered its initial decision on June 22, 2009 and its final opinion on January 12, 2010 after an almost two (2) year investigation. The investigation process has been completed and an opinion/determination generated.

3. Currently, the case has pleadings awaiting decision before the Honorable Judge Kollar-Kotelly.

4. A Right to Sue Notice was obtained from the EEOC, EEOC informed the DC OHR, and the case has been closed out thus extinguishing the EEO complaint process.

5. Mr. Michael Beasley filed a **Motion to Withdraw** from this case and is not the counsel of record before the DC OHR or federal court.  He is not my authorized representative and cannot make any decisions on my behalf.  However, out of courtesy he informed me that he had been in communication with the DC HRC and was informed of a Status Conference.  I never initiated or requested that any proceedings be scheduled by the DC HRC as my case has been in federal court all along.

6. Clearly, there is no case before the DC HRC for there to be scheduled a status conference. While I am thankful for the DC OHR's investigative efforts, this case now resides in federal court before a federal Judge outside of the jurisdiction of the DC HRC.

7. The DC HRC has taken no action whatsoever on this matter for almost two years.  It is questionable at best what the impetus is for trying to re-open a closed matter that was completed almost two years ago and who in this case would be trying to accomplish such a feat.

## IV.   DETAILED REVIEW OF CASE STATUS

1. On June 22, 2009 the DC Office of Human Rights ("OHR") issued a Letter of Determination (LOD) in this matter (Case No. 08-020-EI) for five (5) counts of probable cause retaliation.

2. On January 12, 2010 the DC OHR issued a final opinion which affirmed its "probable cause" finding as to plaintiff's claim of retaliation and affirmed its "no probable cause" findings regarding plaintiff's claims of disparate treatment and hostile education environment (*See Memorandum*, the Honorable Judge Blake, U.S. District Court for District of Maryland).

3. On April 9, 2010, Plaintiff, Mohammad J. Hajjar-Nejad filed a *pro se* complaint (Civil Action No. 10-cv-626) with the United States District Court for the District of Maryland (*See Memorandum*, the Honorable Judge Blake, U.S. District Court for District of Maryland).

4. Judge Blakes' Memorandum goes on to say that:

    a. "Plaintiff, who primarily focuses on Title VI and VII of the Civil Rights Act of 1964, or 42 U.S.C. §§2000d and 2000e, et seq. in support of his claims, states that he is a former medical student of the George Washington University ("GWU")."

    b. "Plaintiff provides thousands of pages of documents comprising his complaint and complaint exhibits regarding his academic background and credentials and the grievance and complaint process he followed within GWU, the Liaison Committee on Medical Education ("LCME"), the Medical Student Evaluation Committee ("MSEC"), U.S. Department of Education, and the District of Columbia Office of Human Rights ("DCOHR") to raise his claims of retaliation and discrimination."

5. On April 9, 2010 Plaintiff notified via e-mail the Director of the DC OHR and the Manager of the Mediation Unit that a Complaint had been filed with the U.S. District Court.

6. On April 22, 2010 the above-entitled action was transferred from the U.S. District Court of Maryland to the U.S. District Court for the District of Columbia and assigned to the Honorable Judge Kollar-Kotelly.

7. On September 29, 2010 the Plaintiff, received a **Notice of Right to Sue** from the U.S. Equal Employment Opportunity Commission (EEOC) based on Title VII of the Civil Rights Act of 1964. From the outset of filing a charge of discrimination I chose to cross file the case with the EEOC.

8. The Plaintiff reserves the right to keep his civil rights complaints before the U.S. District Court for the District of Columbia for the reasons stated forth in his *Memorandum in Support of Plaintiff's Notice of Right to Sue* before the U.S. District Court filed on November 9, 2010.

9. The civil rights complaints and the breach of contract in this case are inextricably intertwined (*See Memorandum*).

10. The Plaintiff sincerely and wholeheartedly attempted to gain a Notice of Right to Sue from the DC OHR initially upon filing, but for reasons stated in the *Memorandum*, and outlined below, such as the DC OHR failing to cross file the case, Plaintiff was unable to do so.

11 In addition to Title VII, Plaintiff respectfully suggests that he has jurisdiction also under §1981 and Title VI which he filed with the US Department of Education under to have his case heard in U.S. District Court.

12. On November 12, 2010, Mr. Michael W. Beasley, Esquire filed a Motion to Withdraw before the U.S. District Court for the District of Columbia.

13. Mr. Beasley's scope of representation was to provide legal services in federal court **only** and that was the basis of the agreement between Plaintiff and legal counsel.

14 It has been approximately two (2) years since the filing of the LOD by DCOHR and more than a year since the Plaintiff has filed his federal court case, therefore, it is unclear why

the DC HRC has chosen to schedule a status hearing regarding this matter now at this
time.

15. Plaintiff greatly appreciates the time, hard work and investigation of the DCOHR to
review his case for almost two years, however, the case is in federal court now before a
federal judge.

## V.    DETAILED CIRCUMSTANCES SURROUNDING ATTAINING THE NOTICE OF RIGHT TO SUE

1.  Initially, during the filing of the Charge of Discrimination on August 24, 2007 with the DC
Office of Human Rights (EEO), the DC Office of Human Rights (OHR) failed to cross file
the case with the EEOC as is required under the formal work sharing agreement and
memorandum of understanding. The Plaintiff clearly initialed next to the statement on
page 2 of the charge, emphasizing his position that "I want this charge filed with both the
EEOC and the State or local Agency…" (Page 2, left box at bottom above signature
line).

2.  Subsequently, after the filing of an Amendment to the initial Charge, filed on April 17,
2008, the DC OHR again failed to cross file the matter with the EEOC as is distinctly
reflected on the Charge Form.  First, on the charge form, page 1, the box at the top right
hand corner that conveys that the case was cross filed with the EEOC was not checked
in either of the Charge documents.  Second, at the end of the Charge, on the second
page, is where it should state briefly that the case has been cross-filed with the EEOC.
**However, it explicitly does not do so on either document**.

3.  In fact, the April 17, 2008 charge, second page, last paragraph reads, "Therefore, I
charge Respondent with an unlawful discriminatory act on the bases of my perceived
national origin… and religion… in violation of the DC Human Rights Act of 1977, as
amended [blank]…" and then states "I have not commenced any action, civil, criminal, or
administrative, based on the above allegations, other than the following: [blank]".  Upon

examining the original document it clearly and plainly shows that the following had been "whited-out" by the DC OHR.  For the first blank **it read** "…and in violation of Title VII of the Civil Rights Act of 1964, as amended." (Page 2, last paragraph).  For the second blank **it read** "CROSS-FILED WITH THE EEOC" (Page 2, last paragraph).  This document should be in the possession of the DC OHR, however, Plaintiff would gladly provide it to the Honorable Chief Judge based on his direction.

4. On neither the initial charge of August 24, 2007 or the amendment of April 17, 2008 was the case number cross filed with the EEOC to permit Plaintiff to attain a Right-to-Sue Letter.

5. The Plaintiff requested on numerous occasions from the DC OHR to cross file the case with the EEOC so that he may attain a Right to Sue Letter.  However, the DC OHR repeatedly denied him that right as evident by the records.

6. The Plaintiff requested countless times from the DC OHR Investigation Unit, Supervisory Staff and the head of the mediation unit Ms. Georgia Stewart to cross file the case with the EEOC.  However, they did not do so.

7. The Plaintiff, while the case was under investigation by the DC OHR  took the liberty of contacting the EEOC main office, and requested a notice of Right to Sue, however, because the DC OHR had failed to cross file, they were unable to provide a Right to Sue notice as they could not find the case number.

8. Finally, on September 29, 2010 I received the Notice that I had requested.

## VI.    STANDARD OF REVIEW

9. The DC OHR, or EEO[1], has a responsibility to cross file its cases with the EEOC under their work sharing agreement. "[U]nder a formal work-sharing agreement, filing a formal

---

[1] Equal Employment Office, which is local, has a duty to cross file its case load with the federal branch, or EEOC, under their work sharing agreement/requirement.

charge with the EEOC satisfies any requirement to file a formal charge with the District's

OHR, and vice –versa." *Cruz-Packer*, 539 F. Supp. 2d at 189.

## VII.    **CONCLUSION**

**Wherefore**, Plaintiff has attempted to fully explain the current status of his case to the DC

Human Rights Commission and the Honorable Chief Judge.

Respectfully submitted,

Mohammad Javad Hajjar-Nejad
9920 Shelburne Terrace, Apt. 308
Gaithersburg, M.D. 20878
Phone: (301) 869-3698
m.hajjar@ieee.net
Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing correspondence has been sent via electronic mail, this 14th day of June, 2011:

Since I was not directly sent your Scheduling Order, and there is no proceeding in this matter, I have only sent this document to you, the Chief Judge, to be fully informed of all of the facts.

David C. Simmons
Chief Administrative Law Judge
D.C. Commission on Human Rights

Respectfully submitted,

Mohammad Javad Hajjar-Nejad
Plaintiff

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 4

(Proposed Decision and Final Order of DC HRC)

**DISTRICT OF COLUMBIA COMMISSION ON HUMAN RIGHTS**

In the Matter of:                            :
                                             :
   Mohammed J. Hajjar-Nejad,              :
                                             :
      Complainant,                       :
                                             :
          v.                        :    Case No. 08-020-EI (DCS)
                                             :
   George Washington University,          :
                                             :
      Respondent.                        :

**PROPOSED DECISION AND FINAL ORDER**

On June 8, 2010, the Commission entered an Order, served upon all counsel of record, setting a telephonic status conference for June 16, 2011 at 11:00 a.m. As stated in that Order, Counsel for Complainant was tasked with the responsibility for coordinating this conference call and alerting the Commission if there were pre-existing scheduling conflicts that would prevent this conference call from occurring. On June 15, 2011, the Commission received, via e-mail, a Reply Memorandum ("Reply") directly from the Complainant, Mr. Mohammad J. Hajjar-Nejad. In this Reply, Mr. Hajjar-Nejad made the following representations:

- Mr. Hajjar-Nejad's controversy with the George Washington University is currently pending in the United States District Court for the District of Columbia, Civil Case No. 10-CV-626.

- Mr. Hajjar-Nejad obtained a "Notice of Right to Sue" issued by the Equal Employment Opportunity Commission ("EEOC").

- Attorney Michael Beasley, who had filed a Notice of Appearance on behalf of Mr. Hajjar-Nejad and filed a Request for Resumption of Procedural Schedule with the Commission, has filed a Motion to

Withdraw from the case pending in the District of Columbia federal court and is no longer Mr. Hajjar-Nejad's counsel in this controversy with George Washington University.

- Mr. Hajjar-Nejad "never initiated or requested any proceedings to be scheduled by the [Commission] as [his] case has been in federal court all along."

Based upon Mr. Hajjar-Nejad's Reply, the status conference scheduled for June 16, 2011 was cancelled, and this Proposed Order of Dismissal was drafted and forwarded to the Commission Hearing Tribunal for action pursuant to 4 DCMR § 426.1.

### Discussion

1.  Mr. Hajjar-Nejad's Reply clearly and unambiguously evidences his desire not to have this matter proceed before the Commission. See Reply at page 2, ¶ 5. Thus, his pleading is construed as a Motion to Withdraw his complaint pursuant to 4 DCMR § 416.1. *See also District of Columbia v. Beretta. U.S.A., Corp.*, 872 A.2d 633, 655 (D.C. 2005) (recognizing that "all pleadings shall be so construed as to do substantial justice").

2.  Pursuant to 4 DCMR § 416.1, Mr. Hajjar-Nejad's withdrawal request is timely, because no Final Decision and Order has been rendered by the Commission Hearing Tribunal. *Id.*

3.  Mr. Hajjar-Nejad's Reply states that he has received a "Notice of Right to Sue." See Reply at page 2, ¶ 4. However, he has not filed a copy of this Notice to the Commission.

4.  Section 416.3 of the D.C. Municipal Regulations states: "If the complainant has been concurrently filed with the Equal Employment Opportunity Commission ("EEOC"), and withdrawal is sought in order to proceed in civil court, the complainant shall furnish the Commission with a copy of the 'Notice of Right to Sue' issued by the EEOC."

2

5.      Section 416.4 states: "Upon receipt of the documentation required by this section for a request to withdraw a complaint, the Commission may dismiss the matter in accordance with § 426."

6.      Section 426.1 states: "The Hearing Tribunal may order the dismissal of any certified complaint at any time after receipt by the Commission, upon motion of a party [or] upon the recommendation of the hearing examiner . . . .  The order shall be considered a Final Decision and Order within the meaning of § 430, shall be preceded by a Proposed Decision and Order if the hearing of the complaint was delegated to one or more hearing examiners . . . and may be appealed in accordance with § 431."

Accordingly, the undersigned judicial officer gives notice to the parties of this proposed decision and final order.  Upon receipt by this Commission of the "Notice of Right to Sue" issued by the EEOC, a Final Order of Dismissal will be submitted to the Commission Hearing Tribunal for approval.

**ACCORDINGLY, IT IS HEREBY ORDERED** that Mr  Hajjar-Nejad shall file a copy of the "Notice of Right to Sue" issued by the EEOC within 15 days of receipt of this Proposed Decision and Order.

**SO ORDERED** this ____th day of June 2011.

David C. Simmons
Chief Administrative Law Judge
D.C. Commission on Human Rights

3

**SERVICE COPIES** sent via both first-class mail and electronic mail to:

Mohammad J. Hajjar-Nejad
9920 Shelburne Terrace, Apt. # 308
Gaithersburg, MD 20878
mjhajjar@verizon.net
Complainant

Michael W. Beasley, Esq.
200 Park Avenue, Suite 106
Falls Church, VA 22046
(703) 533-5875
mwbeasley@verizon.net
Counsel for Complainant (Former)

Henry Morris, Jr., Esq.
Arent Fox LLP
1050 Connecticut Avenue, NW
Washington, D.C. 20036
morris.henry@arentfox.com
Counsel for Respondent

4

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 5

(Notice of Final Decision and Order of DC HRC)

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## COMMISSION ON HUMAN RIGHTS



**COMMISSIONERS**
Anil Kakani, Chairperson
Nimesh M. Patel, Vice-Chairperson
Christopher Dyer, Secretary
Lamont Akins
Thomas Fulton
Nkechi Taifa
Michael E. Ward

**ADMINISTRATIVE LAW JUDGES**
David C. Simmons, Chief
Eli Bruch
Dianne S. Harris

June 24, 2011

To:  Mohammad J. Hajjar-Nejad, Complainant
    Michael W. Beasley, Esq., Counsel for Complainant (former)
    Henry Morris, Jr., Esq., Counsel for Respondent

From:  Anil Kakani, Chairperson, D.C. Commission on Human Rights

Subject: Notice of Final Decision and Order
    *Mohammad J. Hajjar-Nejad v. George Washington University,*
    Docket Number 08-020-EI (DCS)

  Attached is the Final Decision and Order entered in this matter. In accordance with 4 DCMR § 431, any party adversely affected by this Final Decision and Order may apply for reconsideration of this ruling <u>within fifteen (15) calendar days of its receipt</u>. A party applying for reconsideration shall submit his or her application to the Commission in the name of the Chairperson and provide service copies to the opposing party.

  Failure to apply for reconsideration shall <u>not</u> be deemed a failure to exhaust the administrative remedies under the Human Rights Act of 1977. Any party adversely affected by this determination may file a petition for review in the District of Columbia Court of Appeals in accordance with the rules and time frames established by that Court.

**DISTRICT OF COLUMBIA COMMISSION ON HUMAN RIGHTS**

In the Matter of:                                           :
                                                            :
    Mohammed J. Hajjar-Nejad,                           :
                                                            :
        Complainant,                             :
                                                            :
           v.                                  :      Case No. 08-020-EI (DCS)
                                                            :
    George Washington University,                       :
                                                            :
        Respondent.                              :

**DECISION AND FINAL ORDER**

On June 8, 2011, the D.C. Commission on Human Rights ("Commission") entered an

Order, served upon all counsel of record, setting a telephonic status conference for June 16, 2011

at 11:00 a.m.  As stated in that Order, Counsel for Complainant was tasked with the

responsibility for coordinating this conference call and alerting the Commission if there were

pre-existing scheduling conflicts that would prevent this conference call from occurring.  On

June 15, 2011, the Commission received, via e-mail, a Reply Memorandum ("Reply") directly

from the Complainant, Mr. Mohammad J. Hajjar-Nejad. ("Mr. Hajjar-Nejad").  In this Reply,

Mr. Hajjar-Nejad made the following representations:

- Mr. Hajjar-Nejad's controversy with the George Washington University is
  currently pending in the United States District Court for the District of
  Columbia, Civil Case No. 10-CV-626.

- Mr. Hajjar-Nejad obtained a "Notice of Right to Sue" issued by the Equal
  Employment Opportunity Commission (EEOC).

- Attorney Michael Beasley, who had filed a Notice of Appearance on
  behalf of Mr. Hajjar-Nejad and filed a Request for Resumption of

Procedural Schedule with the Commission, has filed a Motion to

Withdraw from the case pending in the United States District Court for the

District of Columbia and is no longer Mr. Hajjar-Nejad's counsel in this

controversy with George Washington University.

- Mr. Hajjar-Nejad "never initiated or requested any proceedings to be

scheduled by the [Commission] as [his] case has been in federal court all

along."

Based upon Mr. Hajjar-Nejad's Reply, the status conference scheduled for June 16, 2011

was cancelled.  On June 16, 2011, Chief Administrative Law Judge David Simmons served a

Proposed Decision and Final Order on the parties.  This Proposed Order stated that, upon the

filing of a copy of the "Notice of Right to Sue" with the Commission, a final order of dismissal

would be presented to the Commission's Hearing Tribunal for approval.  Upon review of the

record in this case, this Hearing Tribunal dismisses Mr. Hajjar-Nejad's complaint with prejudice,

for the reasons set forth below.

## Discussion

1.  Mr. Hajjar-Nejad's Reply clearly and unambiguously evidences his desire not to have

this matter proceed before the Commission. See Reply at page 2, ¶ 5.  Thus, his pleading

is construed as a Motion to Withdraw his complaint pursuant to 4 DCMR § 416.1. *See*

*also District of Columbia v. Beretta, U.S.A., Corp.,* 872 A.2d 633, 655 (D.C. 2005)

(recognizing that "all pleadings shall be so construed as to do substantial justice").

2.  Pursuant to 4 DCMR § 416.1, Mr. Hajjar-Nejad's withdrawal request is timely because a

Final Decision and Order has not been rendered by the Hearing Tribunal. *Id.*

3.  As Mr. Hajjar-Nejad's Reply states, he received a "Notice of Right to Sue."  See Reply
    at page 2, ¶ 4.

4.  Section 416.3 of the D.C. Municipal Regulations states: "If the complaint has been
    concurrently filed with the Equal Employment Opportunity Commission ("EEOC"), and
    withdrawal is sought in order to proceed in civil court, the complainant shall furnish the
    Commission with a copy of the 'Notice of Right to Sue' issued by the EEOC."

5.  Section 416.4 states: "Upon receipt of the documentation required by this section for a
    request to withdraw a complaint, the Commission may dismiss the matter in accordance
    with § 426."

6.  On June 20, 2011, Mr. Hajjar-Nejad filed a copy of the "Notice of Right to Sue" issued to
    him from the EEOC.

7.  Section 426.1 states, in part, "[t]he Hearing Tribunal may order the dismissal of any
    certified complaint at any time after receipt by the Commission, upon motion of a party
    [or] upon the recommendation of the hearing examiner. . . . The order shall be considered
    a Final Decision and Order within the meaning of § 430, shall be preceded by a Proposed
    Decision and Order if the hearing of the complaint was delegated to one or more hearing
    examiners . . . and may be appealed in accordance with § 431."

8.  The Proposed Decision and Final Order served by Chief Judge Simmons on June 16,
    2011 constituted a recommendation to this Tribunal that this matter be dismissed.

9.  Neither party has filed any objections to the recommendation that this matter be
    dismissed.

**ACCORDINGLY, IT IS HEREBY ORDERED** that this matter is **DISMISSED**

**WITH PREJUDICE.**


**SO ORDERED,** this 24<u>th</u> day of June 2011.



/s/ <u>Christopher Dyer</u>                                              /s/ <u>Nkechi Taifa</u>
    Commissioner                                                   Commissioner

/s/ <u>Michael E. Ward</u>
  Commissioner



**SERVICE COPIES** sent via both first-class mail and electronic mail to:

Mohammad J. Hajjar-Nejad
9920 Shelburne Terrace, Apt. # 308
Gaithersburg, MD 20878
mjhajjar@verizon.net
Complainant

Michael W. Beasley, Esq.
200 Park Avenue, Suite 106
Falls Church, VA 22046
(703) 533-5875
mwbeasley@verizon.net
Counsel for Complainant (Former)

Henry Morris, Jr., Esq.
Arent Fox LLP
1050 Connecticut Avenue, NW
Washington, D.C. 20036
morris.henry@arentfox.com
Counsel for Respondent

4

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 6

(Dean Schroth's email to give Plaintiff a Conditional or Failing Grade in the Surgery Clerkship against MD Candidate Regulations)

From:      W Scott Schroth
To:        Lee, Juliet
Date:      Fri, Sep 22, 2006 7:44 AM
Subject:   Re: Medical Student

hi juliet,

this is 100% consistent with the information that we received from his first rotation, the medicine clerkship, who also gave him a low pass (and lots of feedback that he resists). i have met with mr repeatedly. he lacks insight into his deficiencies i'm afraid. i would urge you and the residents to strongly consider whether his performance is indeed 'passing' or not. technically, a low pass is still a pass, and he will move on through the curriculum. if you really think that he has serious clinical performance deficiencies, a below passing grade (eg. conditional or fail) will bring this to a clear 'head' and allow us to work with him on remediation efforts. he is very bright, and very 'book' smart, but he has trouble functioning in the clinical environment, difficulty working as part of a team, and lacks insight into these problems. I see that he is scheduled to meet with me again next week. probably about this issue i suspect

scott

W. Scott Schroth, MD, MPH
Senior Associate Dean for Academic Affairs
Associate Professor, Dept of Medicine

>>> Juliet Lee 9/21/2006 2:13 PM >>>
Dear Scott

I have to let you know about one of the students in the new curriculum, MJ. He has really struggled throughout his six weeks and my major concern is that he lacks insight into his own deficiencies and has progressed minimally throughout the rotation in his clinical judgement and understanding. I have been following his progress over the last several weeks with the residents and they are at their wit's end with him. They really feel that he may have some kind of personality disorder or something that is preventing him from developing into a functioning physician. They give him almost daily feedback about his performance and the Chief resident has been giving him weekly formal feedback. Despite all their efforts, he has not made any strides.

I recognized this fairly early on in the rotation and brought him into my office about 2 weeks into the rotation. You know that I am straight forward and I basically told him that he was lagging far behind the expectations for a third year. I gave him specific examples of situations where I thought he was behind, i.e. proper documentation and note writing in the chart. I also gave him examples that the residents let me know about. Over the last few weeks, the minimal improvement has been in saying the right things to satisfy the residents, but no true understanding about a patient's clinical situation or the important issues that direct patient care.

I observed him in his SP exercise. On the surface, it appears that he is asking the right questions and knows what he is talking about, but then he starts going off on wild tangents that have no relevance to the patient's complaints. Some of the things he says are just plain wrong. This happens on almost a daily basis on ward rounds.

He also has been noted to wander off from the rotation for a few hours at a time, saying he has medical appointments to one person and then giving another story to another member of the team. As far as I now, he was only excused by me for one medical appointment. He also mentioned that he had to go do some lab work. If he has some work that he is performing for his project and using surgery clerkship time to do it, I am not going to tolerate it. He also told the residents that he has a medical condition which



— Exhibit 1, p 95

95

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON*
*UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 7

(GWU School of Medicine and Health Sciences Student
Mistreatment Policy and Procedures)

**The School of Medicine and Health Sciences**

About The School
Admissions
Academic Programs
Departments
Faculty
Current Students
Prospective Students
Visiting Students
Alumni & Friends
Contact Us
Website Map
SMHS Home
GWUMC
GWU

# *Regulations*

## GWU School of Medicine and Health Sciences Student Mistreatment Policy and Procedures

***Please note:*** The Mistreatment Officer is Dr. Jeffrey Akman.

### Policy's Principles

The George Washington University School of Medicine and Health Sciences (the "School") is committed to maintaining a positive environment for study and training, in which individuals are judged solely on relevant factors such as ability and performance, and can pursue their educational and professional activities in an atmosphere that is humane, respectful and safe. The School's mission statement provides that the Medical School "will achieve our mission through our commitment to the following principles: altruism, collaboration, compassion, innovation, integrity, respect and service excellence". Medical student mistreatment is destructive of these fundamental principles and will not be tolerated in the Medical School community.

### Policy's Objectives

This policy and related procedures are intended to inform members of the Medical School community what constitutes medical student mistreatment and what members can do should they encounter or observe it. In addition, the policy and related procedures are intended to: (i) prohibit medical student mistreatment by any employee of the University, Hospital or Medical Faculty Associates ("MFA") including faculty members (pre-clinical and clinical), clerkship directors, attending physicians, fellows, residents, nurses and other staff, and classmates in the Medical School community; (ii) encourage identification of medical student mistreatment before it becomes severe or pervasive; (iii) identify accessible persons to whom medical student mistreatment may be reported; (iv) require persons (whether faculty, staff or student) in supervisory or evaluative roles to report medical student mistreatment complaints to appropriate officials; (v) prohibit retaliation against persons who bring medical student mistreatment complaints; (vi) assure confidentiality to the full extent consistent with the need to resolve the matter appropriately, (vii) assure that allegations will be promptly, thoroughly, and impartially addressed; and (viii) provide for appropriate corrective action.

The ultimate goal is to prevent medical student mistreatment through education and the continuing development of a sense of community. But if medical student mistreatment occurs, the School will respond firmly and fairly. As befits an academic community, the School's approach is to consider problems within an informal framework when appropriate, but to make formal procedures available for use when necessary.

### What constitutes medical student mistreatment

The School has defined mistreatment as behavior that shows disrespect for medical students and unreasonably interferes with their respective learning process. Such behavior may be verbal (swearing, humiliation), emotional (neglect, a hostile environment), and physical (threats, physical harm). When assessing behavior that might represent mistreatment, students are expected to consider the conditions, circumstances, and environment surrounding such

E18

behavior. Medical student training is a rigorous process where the welfare of the patient is the primary focus that, in turn, may appropriately impact behavior in the training setting.

**Examples of mistreatment include but are not limited to:**

- harmful, injurious, or offensive conduct
- verbal attacks
- insults or unjustifiably harsh language in speaking to or about a person
- public belittling or humiliation
- physical attacks (e.g., hitting, slapping or kicking a person)
- requiring performance of personal services (e.g., shopping, baby sitting)
- intentional neglect or lack of communication (e.g., neglect, in a rotation, of students with interests in a different field of medicine)
- disregard for student safety
- denigrating comments about a student's field of choice
- assigning tasks for punishment rather than for objective evaluation of performance (inappropriate scutwork)
- exclusion of a student from any usual and reasonable expected educational opportunity for any reason other than as a reasonable response to that student's performance or merit
- other behaviors which are contrary to the spirit of learning and/or violate the trust between the teacher and learner.

Violation of this policy may lead to disciplinary action, up to and including expulsion or termination.

It is expected that when there is a need to weigh the right of an individual's freedom of expression against another's rights, the balance will be struck after a careful review of all relevant information and will be consistent with the School's commitment to free inquiry and free expression.

Other mistreatment behaviors such as sexual harassment, discrimination based on race, religion, ethnicity, sex, age, disability, and sexual orientation will ordinarily not be covered under this policy and instead will be covered by already existing GW University policies and procedures. However, the VPHA has the authority to determine (on a case by case basis) whether or not an alleged form of mistreatment would be more appropriately covered under this policy. When a medical student is alleged to have engaged in medical student mistreatment, the Assistant Dean for Curricular and Student Affairs will determine whether such cases shall be handled under this policy or the medical school policy on professional comportment.

## Prevention; dissemination of information

The School is committed to preventing and remedying mistreatment of medical students. To that end, this policy and related procedures will be disseminated among the School's community. In addition, the School will periodically sponsor programs to inform medical students, residents, fellows, faculty, administrators, nursing and other staff about medical student mistreatment and its resulting problems; advise members of the School community of their rights and responsibilities under this policy and related procedures; and train personnel in the administration of the policy and procedures.

<top>

**Methods of communicating to specific groups include but are not limited to the following:**

**To medical students**

- inclusion of a section on medical student mistreatment in the Regulations for M.D. Candidates,
- inclusion as an agenda topic for MSI, MSII, and MSIII orientation,

**E19**

- inclusion of a reference to the topic in the guidelines/description of each pre-clinical course and clinical rotation,
- education of the medical student body through class meetings with student members of the medical student mistreatment committee.

## To faculty, residents, fellows

- Annual transmittal, by the Dean, of a copy of the policy and procedures to department chairs, course directors, clerkship and program directors on site and at affiliated institutions, with instructions to distribute and explain the policy and procedures to faculty participating in the teaching and training of medical students,
- inclusion as an agenda topic for chief resident/resident/ fellow orientations.

## To nurses and other clinical staff

- Annual transmittal, by the Dean, of a copy of the policy and procedures to nurse executives on site and at affiliated institutions with instructions to distribute and explain the policy and procedures to all staff involved in the training of or otherwise interacting with medical students.

## Consensual relationships

Relationships that are welcomed by both parties do not entail mistreatment, and are beyond the scope of this policy. Whether a relationship is in fact welcomed will be gauged according to the circumstances; special risks are involved when one party --- whether a faculty member, staff member or student -- is in a position to evaluate or exercise authority over the other. Members of the School community are cautioned that consensual relationships can in some circumstances entail abuse of authority, conflict of interest, or other adverse consequences that may be addressed in accordance with pertinent University policy and practice.

## What to do

Three procedural avenues of redress are available to medical students who believe that mistreatment has occurred -- consultation, informal resolution, and formal complaint. Often, concerns can be resolved through consultation or informally resolved. If the matter is not satisfactorily resolved through the consultation or informal resolution procedure, then the person who made the allegation of mistreatment (whether a medical student or otherwise) or the person against whom the allegation was made may initiate a formal complaint

<top>

## Consultation

A medical student who believes she/he has been mistreated may discuss the matter with the person who has engaged in the behavior or with his/her department chair, the clerkship director, the residency director, the Assistant Dean for Curricular and Student Affairs, the relevant staff supervisor, or the Grievance Officer assigned to cases of medical student mistreatment who shall be consulted when appropriate by any of the foregoing persons. The Grievance Officer will provide a copy of the medical student mistreatment policy and procedures, respond to questions about them, assist in developing strategies to deal with the matter and work in accordance with the procedure set forth in Appendix A.

## Informal resolution procedure

An informal resolution procedure, which is initiated in the same manner as a consultation, entails an investigation by the Grievance Officer of the charges in accordance with Appendix B.

E20

**Formal complaint procedure**

The formal complaint procedure is available when the informal resolution procedure fails to resolve satisfactorily the allegation of mistreatment. The person who made the allegation of mistreatment (the "Complainant"), the person against whom the allegation was made (the "Respondent") or a responsible School official may initiate a formal complaint.

A formal complaint is initiated by submitting to the Grievance Officer a signed, written request to proceed with a formal complaint. The request is due within 15 business days after the person receives from the responsible School official a statement of the disposition of the informal resolution procedure. The Grievance Officer will inform the requesting party of the process that will be followed and provide a copy of the applicable procedure.

<top>

**Outcomes**

If the informal resolution procedure or formal complaint procedure results in a determination that mistreatment occurred, the findings and recommendations shall be referred to the appropriate University, Hospital or MFA official for imposition of corrective action, including sanctions that the official is authorized to impose. A range of relevant considerations may be taken into account in determining the extent of sanctions, such as the severity of the offense, the effect of the offense on the victim and on the University community, and the offender's record of service and past offenses. Sanctions may include, but are not limited to, oral or written warning, termination of privileges to train/interact with/evaluate medical students, probation, suspension, expulsion, or termination of employment; provided that a respondent may not be dismissed except in accordance with the procedural safeguards for faculty, residents, staff, and students set forth in the relevant documents. The appropriate University, Hospital or MFA official may impose interim corrective action at any time, if doing so reasonably appears required to protect a medical student.

**Redress of disciplinary action**

Nothing in this policy or these procedures shall be deemed to revoke any right that any member of the University community may have to seek redress of a disciplinary action, such as a faculty member's right to maintain a grievance under the Faculty Code.

**Confidentiality**

The Grievance Officer and other investigators and decision-makers will strive to maintain confidentiality to the full extent appropriate, consistent with the need to resolve the matter effectively and fairly. The parties, persons interviewed in the investigation, persons notified of the investigation, and persons involved in the proceedings will be advised of the need for discretion and confidentiality. Inappropriate breaches of confidentiality may result in disciplinary action.

**Retaliation**

Retaliation against a person who reports, complains of, or provides information in a mistreatment investigation or proceeding is prohibited. Alleged retaliation will be subject to investigation and may result in disciplinary action up to and including termination or expulsion.

**False claims**

A person who knowingly makes false allegations of mistreatment, or who knowingly provides false information in a mistreatment investigation or proceeding, will be subject to disciplinary action (and, in the case of students, consistent with the Honor Code).

E21

Time limits

The School aims to administer this policy and these procedures in an equitable and timely manner. Persons making allegations of mistreatment are encouraged to come forward without undue delay.

**Interpretation of policy**

The Office of the Vice President and General Counsel is available to provide advice on questions regarding interpretation of this policy and these procedures.

<top>

---

**Appendix A: Consultation Procedure**

1. The consultation consists of one or more meetings between the Grievance Officer or his or her designee ("the Officer") and the person who requests the consultation.
2. The Officer will provide a copy of the medical student mistreatment policy and procedures to the person requesting consultation and respond to questions about them. The Officer may discuss the situation with the person, assist in developing strategies to deal with the matter, determine (and notify such person) that no further action is necessary, or initiate the informal resolution procedure under Appendix B.
3. The Officer will prepare a record of the consultation, which will be maintained only in his or her office. Such record (i) will be maintained by the Officer for a ten year period (and thereafter may be discarded), and (ii) will not be made a part of an individual's personnel, departmental or other employment related records. If the person accused of mistreatment is identified by name or can be identified by the nature of the incident then that person alleged of mistreatment will be notified (by the Officer) of the allegation and the complainant's name(s) will also be disclosed. Such individual shall have an opportunity to review the record of the allegation, and submit a written response which will be maintained by the Officer. The record will be treated confidentially to the full extent possible consistent with fairness and the University's need to take preventive and corrective action.
4. When the Officer has reason to believe that criminal conduct may have occurred or that action is necessary to protect the health or safety of any individual, the University, Hospital, or MFA may take appropriate actions consistent with its policies to refer the matter to appropriate authorities. Under these circumstances, it may not be possible to maintain complete confidentiality with regard to the matter.

<top>

**Appendix B: Informal Resolution Procedure**

1. A person who requests consultation (the "Person") may pursue an informal resolution.
2. The Officer will ask the Person to provide a factual account of the alleged mistreatment and to sign a statement to such effect. The Officer may assist the Person in preparing a signed statement.
3. The Officer will inform the person accused of mistreatment ("the Respondent") of the allegation in sufficient detail to enable the Respondent to make an informed response.
4. The Officer will (i) investigate the alleged mistreatment as promptly as circumstances permit, (ii) afford the Respondent a reasonable opportunity to respond to the allegation, (iii) advise the parties and persons interviewed or notified about the alleged mistreatment of the need for discretion and confidentiality.

E22

5. Upon initiating an investigation, the Officer may inform University, Hospital or MFA officials who would be charged with recommending corrective and disciplinary action ("Responsible Officials") of the fact that an informal resolution procedure is under way.

6. Upon concluding the investigation, the Officer will report his or her findings on the matter to the Responsible Official, and may include a recommendation as to what action, if any, should be taken. Corrective or disciplinary action shall be imposed by the Responsible Official, in his or her discretion, consistent with his or her authority.

7. If the Officer is unable to resolve the matter informally, the Responsible Official shall determine, based on the report obtained from the Officer, whether or not to impose corrective or disciplinary action. Any corrective or disciplinary action imposed by the Responsible Official shall be in his or her discretion, consistent with his or her authority.

8. A Responsible Official will notify the parties of the disposition of the informal resolution procedure to the extent consistent with University policies, appropriate considerations of privacy and confidentiality, fairness, and applicable law.

9. If dissatisfied with the disposition of the informal resolution procedure, the Person who alleged the mistreatment, the Respondent, or a Responsible Official may initiate the formal complaint procedure.

top

### Appendix C: Formal Complaint Procedure -- Special Panels

### A. Initiation of special panel procedure

1. The party requesting to proceed with a formal complaint must file a written request to such effect with the Officer. The request must be filed within 15 business days after receipt of information from a Responsible Official of the disposition of the informal resolution procedure (See Appendix B). The written request for a formal hearing (the "Complaint") must state why the disposition of the matter should be modified or overturned, and may include a statement of the relief requested.

2. The Officer will send a copy of the Complaint to the responding party and the Vice President for Health Affairs (or designee).

3. An aim of the special panel process is to complete, if feasible, the formal complaint procedure within 45 business days of the Officer's receipt of the formal complaint request.

### B. Establishment of special panels

1. A Complaint filed under Appendix C will be heard by a five-member panel selected by lot by the Vice President for Health Affairs, as described in Section C below. Panelists will be selected from a pool of 15, six of whom are faculty members appointed by the Vice President for Health Affairs, six of whom are students appointed by the Assistant Dean for Student Affairs and three of whom are staff members appointed by the Associate Vice President for Human Resources.

2. Each appointee to the pool ordinarily will serve a two-year term. The appointing official should stagger the appointments so that, if feasible, the terms of not more than five of his or her appointees expire in any year.

3. An appointee to the pool may be removed and replaced at any time, at the discretion of the appointing official. The appointing official should promptly fill vacancies in the pool according to the procedure in Section B.1 above.

### C. Selection of panel

1. Within five business days of receiving the Complaint, pursuant to Section A.2, above, the Vice President for Health Affairs (or designee) will select by lot the five-member panel from the pool. Two of the panel members will be drawn from the same status group as the Respondent,

two panel members will be drawn from the same status group as the Complainant and one panel member will be drawn from among the pool members in the remaining status group. No member of a faculty member's department may serve on the special panel. Within the five-day period, the Vice President for Health Affairs (or designee) will notify the Officer of the names of the special panel members.

2. The Officer will notify the parties of the panelist names  Within three business days of receipt of the notice, either party may submit to the Vice President for Health Affairs a written objection to designation of any panel member. The objection must clearly state the reasons for the objection. The Vice President for Health Affairs may, at his or her discretion, replace a challenged panelist with another member of the pool from the same status group.

3. A designated panelist who at any time has or may reasonably be perceived as having a conflict of interest or is otherwise unable to serve on a special panel shall recuse him or herself, and notify the Vice President for Health Affairs of the recusal. For sound reasons, which shall be disclosed to the parties and panel members, the Vice President for Health Affairs in his or her discretion, may replace a panel member. The successor panel member shall be selected by lot by the Vice President for Health Affairs from among pool members of the replaced panel member's status group.

<top>

## D. Scheduling the hearing

1. Within five business days after their appointment, special panel members will select a chairperson. The special panel will set a hearing date and time. The hearing will be held within a reasonable time, normally within 20 business days after the special panel is appointed. Panel members may not communicate with either party outside the presence of the other party.

2. The special panel chairperson will notify the parties of the hearing date, time, and location at least seven business days before the hearing. Within two business days after receiving notice of the hearing, a party with a scheduling conflict may submit to the chairperson a request for postponement. The chairperson, after consulting the special panel members, has discretion to reschedule the hearing. All parties will be notified as soon as feasible if the hearing is rescheduled.

3  If a party does not appear for the hearing within 30 minutes after the scheduled time, the special panel will decide whether to reschedule the hearing or proceed.

## E. Conduct of hearing

1. The special panel chairperson will preside at the hearing and decide procedural issues. Only persons participating in the proceeding may be present during the hearing except as otherwise provided in these procedures. The hearing will be conducted in the following sequence·

   **(a)** Preliminary matters. The chairperson will introduce the parties, their counsel or advisors, and the special panel members; review the order of proceedings; explain procedures that govern use of the tape recorder; and present a brief summary of the Complaint.
   **(b)** Opening statements. The party who requested the hearing may make an opening statement. The responding party may then make an opening statement. Each opening statement shall not exceed 15 minutes.
   **(c)** Presentation of Complaint. The party who requested the hearing may present to the panel testimony, witnesses, documents or other evidence. Following the testimony of the party who requested the hearing, and of each witness, the responding party may ask questions.
   **(d)** Response to Complaint. The party who responded to the Complaint may present testimony, witnesses, documents or evidence to the panel. Following the testimony of the responding party, and of each

**E24**

witness, the party who requested the hearing may ask questions.
**(e)** Closing statements. The party who requested the hearing may make a closing statement. The responding party may then make a closing statement. Each closing statement shall not exceed 15 minutes.

2. Special panel members may ask questions of parties or witnesses at any time during the hearing.
3. The hearing will not be conducted according to strict rules of evidence. However, the special panel chairperson may limit or exclude irrelevant or repetitive testimony, and may otherwise rule on what evidence may be offered.
4. When the hearing cannot be completed in one session, the special panel chairperson may continue the hearing to a later date and time.
5. The hearing will be recorded on audiocassette. Either party may obtain a copy of the recording at reasonable cost, on written request.

<top>

## F. Witnesses

1. Each party (and the panel) may ask witnesses to testify at the hearing, but no person may be compelled to testify. However, each party shall have a right to know prior to the hearing the contents of and the names of the authors of any written statements that may be introduced against him or her, and to rebut unfavorable inferences that might be drawn from such statements.
2. At least three business days before the hearing, each party must provide the chairperson and the other party a list of witnesses he or she intends to present at the hearing.
3. The special panel may request that additional witnesses appear. The Officer will, if feasible, arrange for the appearance of these witnesses.
4. Each party is responsible for notifying its witnesses of the hearing date, time, and location. A hearing will not necessarily be postponed because a witness fails to appear.
5. All witnesses will be excluded from the hearing before and after their testimony. A witness may be recalled at the discretion of the special panel chairperson.
6. A University, Hospital or MFA employee must obtain permission from his or her supervisor to be absent from work to appear at a hearing. Employees will be paid while appearing at a hearing during working hours, but not for other time spent on the Complaint during or outside working hours.
7. A student must obtain permission from his or her professor to be absent from class to appear at a hearing.
8. Supervisors and professors should be aware of the importance of hearings and not unreasonably withhold permission to appear at a hearing. If an employee or student needs assistance in obtaining permission to appear at a hearing, he or she should contact the Officer.

## G. Advisors

1. Each party may be accompanied by not more than two advisors, who may be University, Hospital or MFA employees or other persons the party selects.
2. Except as contemplated by Section 3 below, no advisor may speak on behalf of the party, make an opening or closing statement, present testimony or examine witnesses. The advisor's role is limited to assisting the party to prepare for the hearing and providing the party private advice during the hearing.
3. Notwithstanding the preceding paragraph, in the event that a faculty member shall be involved in a hearing and such person has active representation, the other party involved in the hearing will also be allowed active representation. In that event each party shall be permitted to select an advisor, who throughout the proceeding may (but shall not be required to) speak on behalf of the party, make opening and closing statements, and examine witnesses.
4. A Complainant or Respondent who plans to be accompanied by an

## E 25

attorney or other advisor at the hearing must notify the chairperson and the other party at least five business days before the hearing.

5. The special panel may request or the University may provide an advisor to be present at any hearing to advise the special panel.
6. The University may have an observer present at any hearing

<top>

## H. Decision after hearing

1. After the hearing, the special panel will meet in closed session to review the hearing and make a decision on the Complaint, consistent with the substantial weight of the evidence. The decision must be approved by a majority of the special panel members.
2. The special panel report of its decision must be in writing and set forth findings of fact, conclusions, and, where appropriate, recommendations for corrective or disciplinary action.
3. The special panel will submit the report of its decision to the Vice President for Health Affairs within ten business days after the hearing ends.
4. If the special panel concludes that medical student mistreatment occurred, the Vice President for Health Affairs will forward a copy of the special panel report to an official responsible for implementing corrective or disciplinary action. After reviewing the special panel report, a Responsible Official will decide whether to impose corrective or disciplinary action, consistent with that official's authority. A Responsible Official will notify the parties of the disposition, to the extent consistent with University policies, appropriate considerations of privacy and confidentiality, and applicable law. A Responsible Official may, in his or her discretion, send a copy of the special panel report to the parties (at their home addresses of record, by courier, overnight mail or certified mail, return receipt requested). The report sent to the parties may omit portions, to maintain consistency with University policies regarding confidentiality.

## I. Review of special panel decision

1. A party dissatisfied with a special panel decision may submit a request for review to the Vice President for Health Affairs, who will transmit the request to the senior official responsible for oversight of the status groups to which the parties belong.
2. The request for review must be in writing and set forth reasons why the special panel decision should be modified or overturned. The review must be based on the hearing record and may not present new evidence or testimony.
3. The request for review must be submitted within 15 business days of the party's receipt of the special panel decision. If the request is not received by then, the special panel decision will be the final University decision on the Complaint.
4. The senior official(s) will strive to issue a final decision on the review within 20 business days following submission of the request for review. The decision of the senior official(s) shall be the final decision on the Complaint within the University.
5. When the special panel decision is final, or when the final decision on a review is issued, the VPHA will provide a copy of it to the Responsible Official for implementing corrective or disciplinary action. Any corrective or disciplinary action taken by the Responsible Official shall be within discretion, and consistent with the authority of the Responsible Official. A range of relevant considerations should be taken into account in determining the extent of sanctions, such as the severity of the offense, the effect of the offense on the victim and on the University community, the consequences of the sanction to the Respondent, and the offender's record of service and past offenses. Respondent will be promptly notified of the outcome.
6. A Responsible Official may, in his or her discretion, send a copy of the final decision to the parties (at their home addresses of record, by

# E26

courier, overnight mail or certified mail, return receipt requested). The copy sent to the parties may omit portions, to maintain consistency with University policies regarding confidentiality

top
*Approved by the Medical Center Faculty Senate*
*February 6, 2002*

The George Washington University is an Equal Opportunity/Affirmative Action Employer
Disabled individuals who need special information should call the Office of Disability Support Services. (202) 994-8250 (TTD/voice)

©2003 - 2007 The George Washington School of Medicine and Health Sciences
Last updated. March 10, 2004

E27

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 8

(GWU Non-Retaliation Policy)



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

> **Responsible University Official:**
> Assistant Vice President for
> University Compliance and Privacy
> **Responsible Office:** Compliance and
> Privacy Office
> **Origination Date:** Not Available

# NON-RETALIATION POLICY

## Policy Statement

Retaliation against members of the University community who make good faith reports regarding potential University-related violations of laws, regulations or University policies is prohibited, and violators may be subject to disciplinary action.

## Reason for Policy/Purpose

To comply with applicable federal and local laws prohibiting retaliation, and to promote the fair treatment of members of the University community who make good faith reports of potential University-related violations of laws, regulations or University policies.

## Who Needs to Know This Policy

Faculty, staff and students

## Table of Contents       Page #

Policy Statement ...................................................................................1
Reason for Policy/Purpose ..........................................................1
Who Needs to Know This Policy.......................................................1
Table of Contents ............................................................................1
Policy/Procedures ...........................................................................2
Website Address ..............................................................................2
Contacts.............................................................................................2
Definitions.........................................................................................3
Related Information ........................................................................3
Who Approved This Policy ...........................................................3
History/Revision Dates ...................................................................3



- Exhibit 3, pgs. 28-33  -

NON-RETALIATION POLICY

## Policy/Procedures

The University is committed to conducting its affairs honestly, ethically and in compliance with applicable laws and regulations.  Members of the University community are encouraged to report good faith concerns about University-related violations of laws, regulations or University policies. Attempts to resolve any such concerns should normally be made by contacting the appropriate supervisor or other contact person within the individual's unit.  If the member is, for any reason, uncomfortable with doing so, reports may be made directly to the University officials responsible for the subject area in question, to the Compliance and Privacy Office, or confidentially through the University's toll free, 24 hour *Regulatory Compliance Help and Referral Line* at 1-888-508-5275.  Reports may also be made to relevant external entities or governmental agencies responsible for the enforcement of laws containing non-retaliation provisions.

Retaliation against a member of the University community for making a good faith report of potential University-related legal or policy violations is prohibited and will not be tolerated.  The University will review complaints of retaliation and any attempted or actual retaliatory action covered under this Policy may subject the violator to disciplinary action.

Reports that are knowingly false, made with malicious intent, or with reckless disregard for or willful ignorance of facts that would disprove the allegation made are not good faith reports, are prohibited by this Policy, and may subject the violator to disciplinary action.

Members of the University community who believe that they have been retaliated against in violation of this Policy may submit a written or oral complaint to the Compliance and Privacy Office, who may refer the complaint to the appropriate University office(s) for review and disposition.  Interim actions may be taken by the University prior to final disposition.

## Website Addresses for This Policy

GW University Policies

## Contacts

| Subject | Contact | Telephone | Email Address |
|---------|---------|-----------|---------------|
| Retaliation | Compliance and Privacy Office | (202) 994-3386 | comply@gwu.edu |
| | *Regulatory Compliance Help & Referral Line* | 1-888-508-5275 | |

2

**E29**

NON-RETALIATION POLICY

## Definitions

| | |
|---|---|
| **Good Faith Report** | A report made with the honest and reasonable belief that a University-related violation of law or policy or other instance of non-compliance or related misconduct may have occurred. |
| **Retaliation** | Materially adverse action against the individual because of the individual's good faith report. |

## Related Information

University materials that address retaliation include, but are not limited to:
*University Compliance and Privacy Office*
*Regulatory Compliance Help and Referral Line*
The George Washington University Statement of Ethical Principles
GW University Policies

## Who Approved This Policy

Dennis H. Blumer, Vice President and General Counsel
Louis H. Katz, Executive Vice President and Treasurer

## History/Revision Dates

| | |
|---|---|
| **Origination Date:** | Not Available |
| **Last Amended Date:** | August 18, 2006 |
| **Next Review Date:** | September 1, 2007 |

3

**E 30**

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 9

(GW School of Medicine and Health Sciences Regulations for MD Candidates)

THE GEORGE
WASHINGTON
UNIVERSITY
MEDICAL CENTER
WASHINGTON DC

**SMHS**

The School of Medicine and Health Sciences

SEARCH

About The School
Admissions
Academic Programs
Departments
Faculty
Current Students
Prospective Students
Visiting Students
Alumni & Friends
Contact Us
Website Map
SMHS Home
GWUMC
GWU

# *Regulations*

## The GW School of Medicine and Health Sciences Regulations for MD Candidates
### Preamble

Students enrolled in the MD program are required to conform to, and are entitled to the benefits of, the *Guide to Student Rights and Responsibilities* (hereinafter "the Guide"), as well as other rules, regulations, and policies with University-wide applicability. However, because of the unique curriculum and degree requirements of the School of Medicine and Health Sciences, the University Board of Trustees has established the following Regulations for MD Candidates (hereinafter "Regulations"). Certain procedures in these Regulations are designed to supplement policies established by the Guide. For instance, the process set forth in Section 7 of Article B of these Regulations is designed to provide protection against improper academic evaluation as guaranteed by Article II, Section B of the Guide (Protection Against Improper Academic Evaluation). Other procedures in these Regulations are meant to replace procedures set forth in the Guide in most instances. For example, all cases involving alleged misconduct by MD candidates will be processed under these Regulations, unless the School of Medicine and Health Sciences dean or his/her designee (hereinafter "dean") decides in a particular case to have the case processed under the Guide's Code of Student Conduct. In the case of any inconsistency or ambiguity between these Regulations and University-wide rules, regulations, and policies, including the Guide, these Regulations shall govern.

[Go to top]

### A.   General

1.   The minimum requirement for the MD degree will be the completion of all courses designated by the School's Faculty Senate to be required, and a passing grade in all courses taken, whether required or not, other than electives in the first and second years. (Minimum requirements for MD candidates in the Doctor of Medicine Special Programs are different, and such students are referred to Article I of these Regulations for a statement regarding modified minimum requirements)

2.   Using the guidelines below, the Education Council will periodically determine and report to the School's Faculty Senate on the appropriate number of credits for all courses.

First- and Second-Year Courses:
a.   One credit hour for each hour of lecture time per week per semester, adjusted as appropriate.

b.   One credit hour for each two or three hours of laboratory and/or small group teaching time per week per semester, adjusted if appropriate.

Third- and Fourth-Year Courses:

c.   Five credit hours for each four-week experience; three credit hours for each two-week experience.

[Go to top]

### B.   Evaluation of Academic Performance

1.   The faculty is responsible for evaluation of the performance of students in a

E 101

Exhibit 3, RGS 101-119

134

meaningful, useful, and timely manner. The authority for assignment of grades rests with academic departments or with faculty of interdisciplinary courses. Exceptions are the notations of Incomplete and Withdrawal (see below), which require the concurrence of the dean.

2.   Departments are responsible for the assignment of grades on a basis that is rational, just, and unbiased.

3.   The grading system for all non-required electives will be:

Pass (P)                    Fail (F)

For all required courses in the first and second years, the grading system will be:

Honors (H)              In Progress (IPG)
Pass (P)                  Incomplete (I)
Conditional (CN)        Withdrawal (W)
Fail (F)                   Exempt (EX)

For all courses in the third and fourth years, the grading system will be:

Honors (H)              In Progress (IPG)
High Pass (HP)          Incomplete (I)
Pass (P)                  Withdrawal (W)
Conditional (CN)        Exempt (EX)
Fail (F)

4.   The following definitions apply:

Honors (H) -- Those students whose performance in a subject is determined by the responsible department to be of superior quality may    be assigned the grade of Honors (H).

Pass (P) -- All students, with the exception of those defined above, whose performance in a subject meets the requirements established by the responsible department shall be assigned a grade of Pass (P).

Conditional (CN) -- Those students who do not meet the minimum requirements established by the responsible department, but who could reasonably be expected to do so through a limited program of remedial work, may be assigned the grade of Conditional (CN).

Fail (F) -- Those students whose performance in a subject clearly falls so far below departmental passing standards that limited remedial work would be inadequate to correct the deficiencies shall be given a grade of Fail (F).

In Progress (IPG) -- The notation of IP will be assigned to students in courses that require more than one semester for completion. A grade will be assigned upon completion of the entire course in a subsequent semester.

Incomplete (I) -- The notation of I will be assigned by the faculty member or department when a student fails to complete all the required work in a course. Assignment of an Incomplete requires the concurrence of the dean on a case-by-case basis. A student in the first or second year may not proceed in the work of the following year until a grade of I has been converted; a student in the third or fourth year must remove a grade of I prior to graduation. If not converted to a Pass, a grade of I will be changed automatically to a grade of F after one year.

Withdrawal (W) -- The notation of W will be assigned only when a student is unable to continue the course for reasons acceptable to the dean  Such reasons may not include poor scholarship.

**E 102**                                            i 34

Exempt (EX) -- The notation of EX will be assigned when a student proves competent in a subject and is excused by the responsible department; or when a student is given credit for passing an equivalent course in another institution acceptable to the department and the dean.

[Go to top]

5.    All departments should submit F and CN grades to the Office of the Dean as soon as possible after the student has completed a course or clerkship.

A definition of work required to convert an F or CN shall be developed by the department, reviewed by the Committee on Medical Student Evaluation (otherwise known as the Medical Student Evaluation Committee, or MSEC), and approved by the dean  Any F or CN grades must be converted at a minimum to a Pass grade. A grade of F requires that the student repeat the course or complete an equivalent remedial experience. A grade of CN may be converted by a program of more limited work, as developed by the responsible department and approved by the MSEC.

No student may proceed from the first to the second year or from the second to the third year of the MD program without having first upgraded all grades of F and CN. Students with failing or conditional performances in third-year clerkships may remedy those deficiencies during the fourth year with the approval of the dean. Conditional or failing grades in fourth-year courses shall be remedied in the fourth year prior to receiving the MD degree.

Performances upgraded from the conditional to the passing level will be graded as CN/P. A student may elect to repeat the course, provided it is being offered, rather than undertake a limited remedial program to convert a Conditional grade. In that case, the initial grade remains CN and the repeated course is listed and graded separately.

Failure to convert a CN within the period as proscribed by the dean shall result in automatic conversion of a CN to CN/F

6.    The dean will inform the MSEC of the names of all students receiving grades F or CN and submit their records to the Committee for evaluation and recommendations.

7.    Any student who considers a grade or evaluation to be unjust or inaccurate may, within 14 calendar days of receiving the grade, appeal in writing to the signer of the evaluation with a copy to the dean. The student is deemed to have received the grade three days after mailing of the official grade form  If the issue is not resolved to the student's satisfaction within 14 calendar days of receipt of the appeal, the student may appeal it in writing to the Chair of the responsible department, setting forth the reasons for reconsidering the grade or evaluation. The student shall send a copy of this written statement to the dean.

The Chair shall conduct a review, consulting as appropriate with other faculty, staff, and the student, and convey a determination to the student in writing, with a copy to the dean. If the issue is not resolved to the student's satisfaction within 14 days of receipt of the appeal to the Chair, and s/he wishes to appeal it further, s/he shall do so in writing to the dean. In considering the student's appeal, the dean is limited to determining whether or not the evaluational or grading procedures used were essentially the same as those used of other students in that course; and, *independent of that conclusion,* whether or not there is sufficient evidence of unjust or erroneous evaluation. In carrying out this task, the dean may, at his/her sole discretion, seek advice from an ad hoc committee formed to review the complaint. There should be both student and faculty representation on such a committee, but no member may be from the department in question.

Should the dean find that the grade or evaluation is unjust or inaccurate, s/he will, in consultation with the Chair of the department, determine an appropriate reevaluation procedure and/or grade for the student. The decision of the dean is final.

136

Failure of the student to comply with these procedures, including the stated time limits, indicates acceptance of the grade.

[Go to top]

### C.  Academic Dismissal

1.  A student is at risk for academic dismissal under the following circumstances:

   a.  The student receives grades of CN and/or F in two or more required courses in the first semester of Year I;

   b.  The student receives grades of F in 2 or more required courses (or senior electives) of greater than three credits in any academic year;

   c.  The student receives grades of CN and/or F in three or more required courses (or senior electives) in any academic year;

   d.  The student receives a grade of F in one or more required courses (or senior electives) totaling 12 or more credit hours in any academic year; or totaling 20 or more credit hours in the MD program;

   e.  The student receives grades of CN and/or F in required courses (or senior electives) totaling 20 credit hours or more of work in any academic year; or totaling more than 30 credit hours in the MD program;

   f.  The student receives a grade of CN or F in a required course or senior elective, when that student has previously been at risk for academic dismissal; or

   g.  The student receives a Fail grade on the USMLE Step I exam on three attempts;

   h.  The student fails to meet any special requirement(s) previously specified for that student by the dean as a condition for continuation in the MD program.

2.  All conditional (CN) and failing grades (F) in required courses and senior electives contribute to risk for academic dismissal, including those that have been upgraded. A CN downgraded to CN/F shall count as an F in determining whether a student is at risk for academic failure. A failure in a course that was taken to remedy a grade of F in a required course will count as an additional F.

3.  A student at risk for academic dismissal will receive notification from the dean that s/he is at risk. Notification will be made upon report of the grade that puts the student at risk for academic dismissal.

4.  The MSEC, in an advisory capacity to the dean, shall conduct a review of the student's academic record and any written statement the student may wish to submit to the dean in a timely fashion. The review shall include an opportunity for the Committee to meet with the student; since the meeting is not adversarial, neither the University nor the student shall have legal representation present. Thereafter, the MSEC will meet in executive session and develop a recommendation to the dean. The written recommendation will be submitted to the dean, along with the written documentation reviewed by the MSEC.

5.  The dean will decide on a student's dismissal from, or continuation in, the MD program. The dean, at his/her sole discretion, may meet with the student prior to making a determination. The decision of the dean shall be in writing and will include the reasons for the decision.

E104

6.   The dean is not bound by the MSEC recommendation. In the case of a student who is allowed to continue in the MD program, the dean may modify the academic program and/or impose special conditions that may be continuing in nature. The decision of the dean is final.

[Go to top]

## D.  Irregular Progress

1.   Repetition of a Year

Upon advice of the MSEC, the dean may require that a student in academic difficulty repeat a year, or s/he may permit a student at risk for dismissal to repeat a year. Requiring repetition of a year would be an option if there was a pattern of academic problems that would be difficult or impossible to remedy before the beginning of the next academic year. Permitting repetition of a year would be an option if the student was subject to dismissal on academic grounds but showed promise of mastering academic material on an additional attempt and of proceeding without further major difficulty toward becoming a competent physician. A student eligible for promotion may be allowed to repeat a year at his/her own request.

2.   Leave of Absence

Leave of absence, including the conditions and timing of the return, may be granted at the discretion of the dean.

3.   Withdrawal from the MD Program

In the event that a student who withdraws from the MD program subsequently changes his/her mind and wishes to re-enter the program, s/he must reapply through the admissions process, as would any other applicant for medical school.

[Go to top]

## E.  Evaluation of Professional Comportment

Occasionally, a student's behavior, or pattern of behavior, may raise concerns as to the student's suitability to continue in the study of medicine. The process described below is intended to deal with behavior that may be unacceptable to the School of Medicine and Health Sciences or raise questions about the student's fitness for the practice of medicine.

1.   When a problem with professional comportment (other than academic dishonesty) regarding a student is perceived, the observer will communicate this concern to the dean. If the communication is verbal, it must be confirmed immediately by a signed written statement or else it will not be pursued further.

2.   Upon receiving such a communication, the dean will create a confidential file in which all documents pertaining to the matter will be placed. The contents of the file will be preserved for a period of time not less than five years from the date of separation or graduation from the School of Medicine and Health Sciences. Access to this file will be restricted to the student under consideration; the dean and his/her staff; the MSEC; the Subcommittee on Professional Comportment of the MSEC, if one is constituted; and attorneys for the University and student.

3.   The dean will notify the student in writing that s/he has received a communication from someone who perceives that the student has a problem with professional comportment. The notice will include a copy of these Regulations.

4.   The dean will meet informally with the student as soon as possible. At that meeting, or as soon thereafter as possible, the dean may do one or more of the following:

a.   Advise the student.

**E105**

b.   Recommend that the student seek professional assistance, at the student's expense.

c.   Develop additional information through contacts with the student, his/her peers, faculty, professional consultants, and/or any other source deemed to have relevant information. With the student's concurrence, s/he may be referred for a medical, psychiatric, and/or psychological evaluation. The cost of such an evaluation will be paid by the University, and the student will be asked to authorize the professional consultant to make a written report to the dean for inclusion in the student's confidential file. This authorization of the release of information regarding a psychiatric or psychological evaluation shall be made only after the student has had a chance to review the written report.

d.   Refer the case to a Subcommittee on Professional Comportment.

e.   Suspend the student pending investigation and recommendation of the Subcommittee on Professional Comportment and/or the MSEC.

5.   The involvement of, and actions taken by, the dean may be continuing in nature.

[Go to top]

*Paragraphs 6 through 19 apply if the student is referred to a Subcommittee on Professional Comportment.*

6.   A Subcommittee on Professional Comportment and its Chair will be named by the Chair of the MSEC. The Subcommittee will consist of two students from the third and/or fourth year of the MD Program and two faculty, at least one of whom shall be a member of the MSEC.

7.   The dean will notify the student in writing of the composition of the Subcommittee  The student will be allowed ten calendar days from the mailing of this notice to object to any person's appointment to the Subcommittee. Such objection must be sent to the dean in writing. The dean will, at his/her sole discretion, determine whether an objection warrants the appointment of one or more different persons to the Subcommittee, who shall be selected as set forth in paragraph 6.

8   The Subcommittee will investigate the allegation. The Subcommittee will review the student's confidential file and interview him or her. The Subcommittee also may gather and review other material and interview any other person who the Subcommittee, at its sole discretion, has reason to believe may have relevant information to contribute. The Subcommittee, when it deems appropriate, may ask the dean to refer the student for a medical, psychiatric, or psychological evaluation so that the Subcommittee may consider information such an evaluation would reveal

9   If the Subcommittee requests such an evaluation, the dean will make such a referral. No student may be compelled to be evaluated; the cost will be borne by the University, and the student will be asked to authorize the professional consultant to make a written report to be included in the student's confidential file. This authorization of the release of information derived from the evaluation shall be made only after the student has had a chance to review the written report.

10.   The student under review and/or the student's attorney or advisor may attend the information-gathering sessions. These sessions are not in the nature of an adversarial proceeding; the student and/or his or her attorney or advisor may submit questions to be answered by persons interviewed by the Subcommittee, but the procedure regarding their questioning is left to the sole discretion of the Subcommittee. The student may speak on his/her behalf and may submit other material. The legal rules of evidence, including, but not limited to, those rules regarding relevancy and hearsay, are not applicable. The student may suggest that the Subcommittee interview such persons, but the decision to interview such persons is left to the sole discretion of the Subcommittee. The student and the student's attorney or advisor cannot be present when the Subcommittee meets in executive

**E 106**

11.   Meetings of the Subcommittee are confidential. Minutes of the Subcommittee will be placed in the student's confidential file upon the completion of the Subcommittee's review

12.   The Chair and all members shall be required to be present for all meetings of the Subcommittee.

13.   The Subcommittee will make its final recommendation(s) to the dean. Such recommendation(s) will be in writing and shall include findings of fact and the reasons for the recommendation(s). The recommendation(s) could include, but is (are) not limited to, one or more of the following:

    a.   Advising the student.
    b.   Recommending that the student seek professional assistance, at the student's expense.
    c.   Recommending conditions with which the student must comply in order to continue in the MD program.
    d.   Recommending temporary suspension from the MD program.
    e.   Recommending dismissal from the MD program.

The Subcommittee shall make an additional recommendation regarding whether or not the confidential file will be made a part of the student's permanent academic file.

[Go to top]

14.   If the Subcommittee recommends suspension or dismissal from the MD program, or any modifications of the academic program, the matter will be referred to the MSEC. The MSEC will review the confidential file and the report of the Subcommittee. The Chair of the Subcommittee will present the Subcommittee report to the MSEC and will respond to inquiries from the MSEC members  The student and/or his or her attorney or advisor may be present during the presentation of the Subcommittee Chair and may submit a written statement to the MSEC. The student and/or his or her attorney or advisor will not be able to question the Subcommittee Chair or the MSEC members, or present additional witnesses, and cannot be present when the MSEC meets in executive session. The student may be interviewed by the MSEC if the student attends the meeting; however, this meeting shall not be a *de novo* hearing of the matter. The MSEC will either remand the matter back to the Subcommittee if additional information is required, or it shall submit its written recommendations, along with those of the Subcommittee, to the dean.

15.   The dean will review the student's confidential file, the report of the Subcommittee, and the report of the MSEC, if one has been produced. The dean, at his/her sole discretion, may meet with the student prior to making his/her determination.

16   The dean will take whatever action s/he deems appropriate, including dismissal of the student from the MD program. The dean will inform the student in writing of his/her decision.

17   The student shall have 15 calendar days in which to appeal the decision of the dean. Such appeal shall be in writing sent to the vice president for academic affairs The scope of this appeal is for the vice president for academic affairs or his/her designee to determine whether the procedures set forth in these Regulations have been complied with. Failure to appeal the decision shall be deemed a waiver of any and all rights to challenge the dean's decision and shall be deemed an acceptance of the same.

18.   The vice president for academic affairs or his/her designee will make his/her decision on the written record of the proceedings. His/her decision shall be final.

19.   At any time during the process, if the student in question is accompanied by an attorney, the University will have its attorney present. The student, therefore, is required to inform the Office of the Dean two days in advance of the hearing is

E107

counsel is to be present

[Go to top]

## F.   The Honor Code

### 1.   Purpose

The objective of the Honor Code is to foster a sense of trust, responsibility, and professionalism among students and between students and faculty. Its fundamental goals are to promote ethical behavior, to ensure the integrity of the academic enterprise, and to develop in students a sense of responsibility to maintain the honor of the medical profession. This code of behavior is designed to assist in the personal and intellectual development of the medical student on the journey to becoming a physician and member of the medical community. All members of the medical community must be accountable to themselves and others.

### 2   Student Responsibilities

a.   Students will not:

(1)   Give or receive aid during an examination
(2)   Give or receive unpermitted aid in assignments.
(3)   Plagiarize any source in the preparation of academic papers or clinical presentations.
(4)   Falsify any clinical report or experimental results.
(5)   Infringe upon the rights of any other students to fair and equal access to educational materials.
(6)   Violate any other commonly understood principles of academic honesty.

b.   No code can explicitly enumerate all conceivable instances of prohibited conduct. In situations where the boundaries of proper conduct are unclear, the student has the responsibility to seek clarification from the appropriate Honor Code Council member(s), faculty member(s), or dean(s).

c   Each student has the responsibility to participate in the enforcement of this Code. Failure to take appropriate action is in itself a violation of the Code.

d.   The student must agree to participate in the enforcement of this Honor Code, and prior to matriculation, must sign a statement agreeing to uphold its principles while enrolled at the George Washington University School of Medicine and Health Sciences.

### 3.   Faculty Responsibilities

Each faculty member has the responsibility to participate in the enforcement, promotion, and clarification of the Honor Code. The faculty plays an integral role in the maintenance of the Honor Code. To this end, faculty will endeavor to:

a.   Define the types of aid or collaboration permissible in course work.
b.   Avoid procedures or ambiguities that may create undue temptation to violate the Honor Code.
c.   Reinforce the tenets of the Honor Code.

### 4.   The Honor Code Council

The Honor Code Council (hereinafter the "Council") shall consist of six faculty members and twelve students. Each year's class shall be represented by three students. These students shall be nominated by the Medical Center Student Council in consultation with the Council and approved by the dean. The faculty shall be selected by the Chair of the Educational Evaluation Committee and approved by the dean. The Chair of the Council, who shall be a member of the faculty, shall be appointed by the dean. To ensure continuity, faculty and Chair terms of appointment will be three years and staggered, with the possibility of two contiguous terms of

**E108**

appointment. Students will be encouraged to renominate their representative members.

Members of the Council shall serve as reference persons for students and faculty. Furthermore, the Council as a whole shall be charged with the continued monitoring of the Honor Code system. It shall review all cases of alleged Honor Code violations that have been submitted to a Subcommittee on Professional Comportment in order to educate the academic community following the resolution of each case. It shall meet periodically during the academic year and report its findings to the MSEC, including suggested amendments to the Honor Code. Members of the Council shall serve on a Subcommittee on Professional Comportment convened as an Honor Code Committee either to review an alleged violation of the Honor Code or to recommend sanctions in established cases of Honor Code violation.

[Go to top]

**G.   Academic Dishonesty and Violations of the Honor Code**

1.   When a student, member of the faculty, or Medical Center staff member observes something that appears to be a violation of the Honor Code, that person shall do one or more of the following:

a.   confront the individual(s) to receive an explanation and to gain satisfaction that there was no intention of breaching the Code. It is hoped that most events will be dealt with in this manner. If satisfaction is not gained the witness will take further action. (See b and c below);

b.   consult with a member of the Council regarding the witnesses' observation in order to determine whether a written report should be made; and/or

c.   submit a signed written report of the alleged infraction to the dean.

2.   When the dean receives such a report, s/he will create a confidential file in which all documents pertaining to the matter will be placed. The contents of the file will be preserved for a period of time not less than five years from the date of separation or graduation from the school of Medicine and Health Sciences. Access to this file will be restricted to the student under consideration; the dean and his/her staff; the MSEC; the Council; the Subcommittee on Professional Comportment, if one is constituted; and attorneys for the University and student.

3.   The dean will notify the student in writing that s/he has received a written report alleging a violation of the Honor Code. The notice will include a copy of the report and these Regulations for MD Candidates.

4.   The dean will meet with the student as soon as possible. At that meeting, or as soon thereafter as possible, the dean may do one or more of the following:

a.   If the witness filing the report, the student concerned, and the dean agree on the accuracy of the charges, the fact of this agreement shall be noted in writing by all three parties, and the case will be referred to a Subcommittee on Professional Comportment sitting as an Honor Code Sanctions Committee. The recommended sanctions will then be referred to the MSEC for its consideration and action and for modification of the student's academic program if necessary (see Section 11 of this Article G);

b.   If upon reviewing the charge and any supporting evidence, the dean believes that there is insufficient evidence of academic dishonesty to warrant further review, s/he may dismiss the charge without further investigation or review;

c.   If the student denies the accuracy of the charge and the charge is not withdrawn or dismissed, the case will be referred for review by a

**E109**

Subcommittee on Professional Comportment sitting as an Honor Code Hearing Committee.

*Paragraphs 5 through 15 apply if the student is referred to a Subcommittee on Professional Comportment. Paragraph 12 does not apply if the Professional Comportment Subcommittee is sitting as an Honor Code Sanctions Committee*

5.    The Subcommittee on Professional Comportment and its Chair will be named by the dean in consultation with the Chair of the Honor Code Council. The Subcommittee will consist of at least two student members of the Honor Code Council and at least two faculty members of the Honor Code Council.

6.    The dean will notify the student in writing of the composition of the Subcommittee. The student will be allowed five calendar days from the mailing of this notice to object to any person's appointment to the Subcommittee. Such objection must be sent to the dean in writing. The dean will, at his/her sole discretion, determine whether an objection warrants the appointment of one or more different persons to the Subcommittee, who shall be selected as set forth in paragraph 5.

7.    The Subcommittee will investigate the alleged Honor Code violation. The Subcommittee will review the student's confidential file and provide the student with the opportunity to be interviewed. The Subcommittee also may gather and review other material and interview any other person who the Subcommittee, in its sole discretion, believes may have relevant information to contribute.

8.    The student under review and/or the student's attorney or advisor may attend the information-gathering sessions. These sessions are not in the nature of an adversarial proceeding; the student and/or his or her attorney or advisor may submit questions to be answered by persons interviewed by the Subcommittee, but the procedure regarding questioning is left to the sole discretion of the Subcommittee. The student may speak on his/her behalf and may submit other materials. The legal rules of evidence, including, but not limited to, those rules regarding relevancy and hearsay, are not applicable. The student may suggest that the Subcommittee interview additional persons, but the decision to interview such persons is left to the sole discretion of the Subcommittee. The student and the student's attorney or advisor cannot be present when the Subcommittee meets in executive session

[Go to top]

9.    Meetings of the Subcommittee are confidential. Minutes of the Subcommittee will be placed in the student's confidential file upon the completion of the Subcommittee's review.

10.    The Chair and all members shall be required to be present for all meetings of the Subcommittee.

11.    The Subcommittee will make its final recommendation(s) to the dean. Such recommendation(s) will be in writing and shall include findings of fact and the reasons for the recommendation(s). The recommendation(s) could include, but are not limited to, one or more of the following:

   a.    Advising the student.

   b.    Recommending that the student seek professional assistance, at the student's expense.

   c.    Recommending conditions with which the student must comply in order to continue in the MD program.

   d.    Recommending that the work product be discarded, which might result in an Incomplete, with the requirement that the student satisfactorily complete compensatory work, or be re-evaluated on relevant material.

**E1 10**

e.   Recommending that a grade of F be awarded, with the remedy for the F being the repetition of the entire course (i.e., not the summer remedial) with a notation of "Failed the course for academic dishonesty [or violation of the Honor Code]" appearing on the transcript, and with the notation to be expunged at the option of the MSEC at a later date or upon graduation.

f.   Recommending that a grade of F be awarded, with the remedy for the F being the repetition of the entire course (i.e., not the summer remedial) with a notation of "Failed the course for academic dishonesty [or violation of the Honor Code]" placed permanently on the transcript.

g.   Recommending temporary suspension from the MD program, with the notation of "Suspended for academic dishonesty [or violation of the Honor Code]" placed permanently on the transcript.

h.   Recommending permanent dismissal from the MD program, with the notation of "Dismissed for academic dishonesty [or violation of the Honor Code]" placed permanently on the transcript.

The Subcommittee shall make an additional recommendation regarding whether or not the confidential file will be made a part of the student's permanent academic record.

12.   Should the Subcommittee on Professional Comportment decide that no infraction of the Honor Code has occurred, there will be no further review.

13.   If the Subcommittee recommends suspension or dismissal from the MD program, or any modifications of the academic program, the matter will be referred to the MSEC. The MSEC will review the confidential file and the report of the Subcommittee. The Chair of the Subcommittee will present the Subcommittee report to the MSEC and will respond to inquiries from the MSEC members. The student and/or his or her attorney or advisor may be present during the presentation of the Subcommittee Chair and may submit a written statement to the MSEC. The student and/or his or her attorney or advisor will not be able to question the Subcommittee Chair or the MSEC members, or present additional witnesses, and cannot be present when the MSEC meets in executive session. The student may be interviewed by the MSEC if the student attends the meeting; however, this meeting shall not be a *de novo* hearing of the matter. The MSEC will either remand the matter back to the Subcommittee if additional information is required, or it shall submit its written recommendations, along with those of the Subcommittee, to the dean.

[Go to top]

14.   The dean will review the student's confidential file, the report of the Subcommittee, and the report of the MSEC, if any. The dean at his/her sole discretion, may meet with the student prior to making his/her determination.

15.   Should the dean concur with the Subcommittee on Professional Comportment's conclusion that a violation of the Honor Code has occurred, one or more sanctions must be invoked by the dean. This may range from discarding the work product to dismissal of the student from the MD program, with an appropriate notation placed on the transcript.

16.   The dean will take whatever action s/he deems appropriate, including dismissal of the student from the MD program. The dean will inform the student in writing of his/her decision.

17.   The student shall have 15 calendar days in which to appeal the decision of the dean. Such appeal shall be sent in writing to the vice president for academic affairs. The scope of this appeal is for the vice president for academic affairs or his/her designee to determine whether the procedures set forth in these Regulations have been followed. Failure to appeal the decision shall be deemed a waiver of any and all rights to challenge the dean's decision and shall be deemed an acceptance of the

**E111**

18.   The vice president for academic affairs or his/her designee will make his/her decision on the written record of the proceedings. His/her decision will be final.

19.   At any time during the process, if the student in question is to be accompanied by an attorney, the University will have its attorney present. The student, therefore, is required to inform the Office of the Dean two days in advance of the hearing if counsel is to be present.

20.   Should the review procedures not be completed before the date on which grades are submitted by the Department, the notation Incomplete will be recorded for the student in that course until the charges have been fully adjudicated.

21.   If the student voluntarily withdraws from the institution prior to completion of the review process, the following notation will be placed on his or her transcript:

> "Withdrew following accusation of academic dishonesty [or Honor Code violation] and prior to complete review and determination."

[Go to top]

### H. Policy on Promotions and Graduation -- Academic Requirements

1. In general, promotion from one year to the next for regular MD candidates -- and recommendation to the School's Faculty Senate for award of the MD degree -- will be automatic upon completion of academic requirements. As indicated in Section 1 of Article A of these Regulations, the minimum requirement for the MD degree will be the completion of all courses designated by the School's Faculty Senate to be required, and a passing grade in all courses taken, whether required or not, other than electives in the first and second years. When evaluation of professional comportment and/or academic dishonesty is pending or completed under procedures described in Articles E and G of these Regulations, promotion and graduation may be postponed, denied, or subject to additional requirements set for individual students by the dean. Additional requirements may be set for all students by the faculty and/or dean.

2. Specific Requirements

a. Year I to Year II: Successful completion of all required work of the first year, with performance at least at the passing level. The student may not begin the work of second year until all deficiencies of the first year have been satisfactorily remedied.

b. Year II to Year III: Successful completion of all required work of the second year, with performance at least at the passing level; and successful completion of the requirements set by the School's Faculty Senate as a prerequisite to entering the third year. At present these include receipt in the Office of the Dean of a passing score on Step I of the United States Medical Licensing Examination (USMLE) and certification of computer literacy by the Department of Computer Medicine. Additional requirements may be established and implemented by the MSEC and the School's Faculty Senate action alone. The student may not proceed with the work of third year until all deficiencies in work of the second year have been satisfactorily remedied.

c. Year III to Year IV: Successful completion of all required clerkships of the third year with performance at least at the passing level. A student may be permitted to matriculate in the fourth year despite unremedied deficiencies in the third year performance; however, those deficiencies must be remedied prior to graduation during time that would otherwise be available to the student as elective time or vacation.

d. Beginning with the class of 2003, all students are required to report a passing grade on the USMLE Step II prior to graduation.

3. Eligibility for Graduation

# E1 12

a. Students will be recommended to the School's Faculty Senate to be awarded the MD degree upon completion of the minimum academic requirements described in Section 1 of Article A of these Regulations and fulfillment of any additional conditions relating to professional comportment and/or academic dishonesty imposed by the dean pursuant to Articles E and G of these Regulations.

b. A candidate is required to be present at the commencement ceremony unless a written request for graduation in absentia is approved by the dean.

4. USMLE Policy

As of 1994, the United States Medical Licensing Examination (USMLE), comprising three "step" examinations, has become the sole examination pathway to licensure for physicians. The National Board of Medical Examiners (NBME) Part Examinations and the Federation Licensing Examinations (FLEX) have been phased out. This major change in medical licensure procedures, plus the recognition that the majority of medical schools required passing the USMLE Step I exam as a separate requirement for promotion to clinical clerkships or for graduation, has led to a reconsideration of the role of the USMLE at The George Washington University School of Medicine and Health Sciences. Passing the USMLE Step I exam is essential to obtaining a license to practice medicine in the US; and, while our graduates may not choose to practice, we believe passing these exams should ultimately be among criteria for graduation.

As of 1998, USMLE exams are to be administered by computer, and are scheduled directly by students on a first-come, first-served basis. In the following policy, the dates will be strictly enforced. It is the student's responsibility to establish and complete the exam prior to the dates noted. Excuses based on inability to schedule the exam will not be accepted.

USMLE Step I

All students are required to take USMLE Step I by June 30 of Year II. All students will be allowed to begin the Year III program, but a Pass grade is required as a prerequisite to being allowed to continue beyond the first clerkship of Year III. (Students who receive a CN and/or F grades in one or more required courses of three or more credits in Year II may petition the Dean to extend the deadline to September 30 of that year.)
Students who receive a Fail grade on Step I (in the exam[s] taken prior to June 30 of Year II) are to complete the first clerkship of Year III (in July and August) and then have the following two options:

Option A: To take a leave of absence from school for the month of September and retake the exam by September 30. The student will resume Year III in October and while awaiting the score to be recorded. It this is the student's second attempt at Step I and s/he does not achieve a Pass grade, then the student is placed on leave of absence until recording a passing score. A passing score must be recorded by June 30th the following year.

Option B: To take a leave of absence from school until a passing grade is recorded. The score must be recorded by June 30th the following year.

Students who fail Step I three times or who do not meet these testing deadlines are at risk for academic dismissal. Section C of the Regulations for MD Candidates will apply in this situation.

USMLE Step II

Students matriculating in the fall 1999 semester and thereafter are required to record a passing grade on Step II prior to graduation. Students are encouraged to submit applications for USMLE Step II by July 1 of the year prior to graduation. Students are encouraged to submit applications for USMLE Step II by July 1 of the year prior to graduation and to schedule the exam no later than December 31 of their fourth year (The exam is not offered during the first two weeks of January.) This scheduling will allow adequate time for processing of the application and for results to be reported well in advance of graduation. In the event of a failing grade, it will allow time to repeat the exam. Students who fail Step II three times will be at risk for academic

dismissal; Section C of the Regulations for M.D. Candidates will apply in these situations. No student will be allowed to receive the Doctor of Medicine degree without a passing grade of Step II. If a student chooses to take Step II after January 1 of the fourth year and fails the exam, NBME restrictions on processing time, rescheduling of the exam, and reporting of scores will not allow sufficient time to permit the student to graduate on time. It is unlikely that a student with a delayed graduation will be allowed to start the scheduled residency.

## I. Doctor of Medicine Special Policy

Within the School of Medicine and Health Sciences, a division exists to accommodate certain MD candidates in special situations. These include students who are not carrying a full academic load, but who are repeating courses during the academic year. Also included are students in a decelerated program that allows them to complete the work of the first two semesters across the span of two academic years. Other special programs may be developed for inclusion in this division. The Regulations for MD Candidates apply to all students in the Doctor of Medicine Special Programs, with the following exception for students in the decelerated program.

For all required courses of the first two years in the decelerated program -- normally taken during the first two semesters of the regular four-year program -- students are required to achieve better than a minimally passing performance as evidence of the likelihood of success when later carrying a full academic load. To be allowed to continue from one semester to the next, the student must achieve a grade in each course of three or more credit hours that is passing by departmental standards and that, in addition, is not more than one standard deviation below the mean for the whole class (being all those students in both the regular and decelerated program taking that course). Any student who fails to meet this standard may be dismissed summarily by action of the dean without review by the MSEC.

Upon successful completion of the entire (traditional) first-year curriculum, students will be transferred into the regular MD program and will be graded as all other medical students. At that point, the exception regarding dismissal without review by the MSEC no longer applies.

*Adopted September 1, 1982, by the Medical Center Faculty Senate*

*As amended by the Medical Center Faculty Senate November 3, 1982; May 6, 1992; June 16, 1995;*
*by the Faculty Senate Executive Committee June 17, 1997; October 21, 1997; June 30,*
*1998.*
*by the Faculty Senate February 3, 1999; November 16, 1999; September 6, 2002; February 7, 2007.*

The George Washington University is an Equal Opportunity/Affirmative Action Employer
Disabled individuals who need special information should call the Office of Disability Support Services  (202) 994-8250 (TTD/voice)

©2003 - 2007 The George Washington School of Medicine and Health Sciences
Last updated: February 16, 2007

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 10

(GWU Guide to Student Rights and Responsibilities)

# THE GEORGE WASHINGTON UNIVERSITY

## WASHINGTON DC

# GUIDE TO STUDENT RIGHTS AND RESPONSIBILITIES
## 2006-2007

| | |
|---|---|
| Statement of Student Rights and Responsibilities | 1 |
| University Policy on Equal Opportunity | 4 |
| Policy on Sexual Harassment | 4 |
| Student Grievance Procedures | 5 |
| Code of Student Conduct | 6 |
| Additional Conduct Regulations | 13 |
| Code of Academic Integrity | 15 |
| Privacy of Student Records | 19 |
| University Policies Available On-Line | 20 |
| A Final Word about Security | 20 |

*Distributed by The George Washington University Dean of Students Office*

## Statement of Student Rights
## and Responsibilities

## Preamble

Academic institutions exist for the transmission of knowledge, the pursuit of truth, the development of students, and the general well-being of society. Free inquiry and free expression are indispensable to the attainment of these goals. As members of the academic community, students should be encouraged to develop the capacity for critical judgment and to engage in a sustained and independent search for truth.

Freedom to teach and freedom to learn are inseparable facets of academic freedom. The freedom to learn depends upon appropriate opportunities and conditions in the classroom, on campus, and in the larger community. Students should exercise their freedom with responsibility.

The responsibility to secure and to respect general conditions conducive to the freedom to learn is shared by all members of the academic community. The University has a duty to develop policies and procedures that provide and safeguard this freedom.

The George Washington University believes that the procedures, rights, and safeguards outlined below are indispensable to achieving the goals desired -- freedom to teach, to learn, and to search for truth.

## I. Basic Assumptions

### A. Freedom of Expression

Student organizations and individual students shall be free to examine and to discuss all questions of interest to them and to express opinions publicly and privately. They shall be free to support causes by orderly means that do not disrupt the regular and essential operation of the institution. At the same time, it shall be made clear to the academic and the larger community that in their public expressions or demonstrations the students or student organizations speak only for themselves.

The students have the rights and responsibilities of a free academic community. They shall respect not only their fellow students' rights but also the rights of other members of the academic community to free expression of views based on their own pursuit of the truth and their right to function as citizens independent of the University.

### B. Freedom from Discrimination

The University will not permit discrimination on grounds of sex, race, color, religion, national origin, disability, sexual orientation or identity, or any other illegal basis in any University-recognized area of student life. Additionally, all areas of student life are subject to the provisions of the District of Columbia Human Rights Law. However, those campus organizations that are essentially and avowedly social fraternal groups may limit membership on the basis of sex; those campus organizations that are essentially and avowedly sectarian may limit membership on the basis of religion.

### C. Student Rights in the Governing of the University

The University is a community of scholars engaged in the search for knowledge. Students, faculty, and administrators participate in this search. In light of this, the student body shall have clearly defined means, including membership on appropriate committees and administrative bodies, to participate in the formulation and application of the institutional policy affecting student affairs. The concern of students, however, legitimately extends beyond what has normally been considered student affairs. Their interest in academic

policies, for example, is a development to be encouraged bearing in mind the teaching -- learning context of the University community.

### D. Professional Rights of the Faculty

In order to safeguard the professional rights of the faculty, no provision for the rights of students can be considered valid if it suspends professional rights or in any measure invades them.

## II. Students in the Classroom

The professor in the classroom and in conference should encourage free discussion, inquiry, and expression. Student performance should be evaluated solely on an academic basis, not on opinions or conduct in matters unrelated to academic standards.

### A. Protection of Freedom of Expression

Students should be free to take reasoned exception to the data or views offered in any course of study and to reserve judgment about matters of opinion, but they are responsible for learning the content of any course of study for which they are enrolled.

### B. Protection Against Improper Academic Evaluation

Students should have protection through orderly procedures against prejudiced or capricious academic evaluation. At the same time, they are responsible for maintaining standards of academic performance established for each course in which they are enrolled. Except in instances that involve a student grievance based on allegation of illegal discrimination for which other remedy is provided under "Student Grievance Procedures," a student who alleges an instance of arbitrary or capricious academic evaluation shall be heard and the allegation reviewed through faculty peer review procedures established by the dean and faculty of the school in which the contested academic evaluation took place. Should the peer review processes find in favor of and uphold the complaint of the student, yet the faculty member were to persist in refusing to alter the academic evaluation at issue, the Dean's Council and the dean shall afford the student an appropriate remedy after consultation with the peer review body.

### C. Protection Against Disclosure

Information about student views, beliefs, and political associations, which professors acquire in the course of their work as instructors, advisers, and counselors, should be considered confidential. Protection against disclosure is a serious professional obligation. Judgments of ability and character may be provided under appropriate circumstances, normally with the knowledge or consent of the student.

## III. Student Participation in Academic Policy-Making

In light of the basic assumption of student involvement in academic affairs, each department or academic unit administering a degree program should encourage formation of an organization of its majors to reflect student views on matters of academic policy, and each department or other academic unit administering a degree program shall establish an advisory council representing faculty, students, and others as deemed advisable so as to provide a meaningful exchange of views on departmental policies among the parties so represented, provided, however, that the application to specific individuals of department policies on salary, promotions, and tenure is a matter of faculty responsibility.

In addition, clearly defined means for student participation in academic policy-making at the college or school level of the respective schools and college, where college- or school-wide advisory councils have not been established in accordance with the provisions above, shall be developed by faculty-student committees

## IV. The Student as a Campus Citizen

### A. Student Government
The University recognizes the right of the students to form and democratically elect their governing bodies as a means to participate in discussion of issues and problems facing the academic community The governing bodies shall function as representatives of the student to the administration and faculty of the University, as well as to the entire community

The electorate of a University-wide student government shall consist of the entire student body. Any elected members of a governing body representing less than the entire student body shall be elected in such manner as to create or preserve essential representational equality

### B. Student Organizations
#### 1. Freedom of Student Association
The students of The George Washington University are free to organize and join organizations to promote their common and lawful interests, subject to University regulations. All members of a student organization must be currently registered students of the University The fact of affiliation with any extramural association or national organization or political party, so long as it is an openly declared affiliation, should not of itself bar a student organization from registration or recognition. However, action may be taken to insure that the University does not, through the activities of campus student organizations, stand in violation of laws that place limits on campus political activities. The administration and faculty shall not discriminate against a student because of membership in any student organization meeting the conditions of this section

#### 2. Registration, Recognition, and Disclosures
All student organizations shall be registered and recognized in accordance with the University regulations. Registration or recognition may be withheld or withdrawn from organizations that violate University regulations. Registration and recognition procedures shall require identification of responsible officers  On a case by case basis, upon request of the Student Activities Center, organizations may be asked to provide a list of all members of their group

Once recognition of a student group or like organization has been withdrawn, no actions may be taken at or within the University in the name of that group or organization  Students who do so may be subject to disciplinary action

#### 3. Use of Campus Facilities
Meeting rooms and other campus facilities and funding should be made available, on an equitable basis, only to all registered student organizations, as far as the primary use of these facilities and funding for other University purposes permits and in keeping with the best interests of the University

Under the Bylaws of the University, only designated officers of the University may sign contracts binding on the University  Students may not sign contracts or agreements in the name of the University or a student organization or otherwise commit University or organization funds. Students who do so shall be held personally and financially liable for all costs and commitments made  Students should refer to the Student Organization Manual or Student Activities Center website for information on contracting procedures

### C. Student-Sponsored Forums
Students shall have the right to assemble, to select speakers, and to discuss issues of their choice, provided that the assembly is lawful in nature, does not interfere with the processes of the University, and does not infringe upon the rights of others; the University reserves

the right to prohibit assemblies having in its judgment the clear likelihood of failing to meet one or more of these conditions Students shall be allowed to invite and hear any person of their own choosing, subject to the conditions listed here. Those routine procedures required by the University before a guest speaker is invited to appear on campus shall be designed only to ensure that there is orderly scheduling of facilities and adequate preparation for the event and that the occasion is conducted in a manner appropriate to an academic community  The control of campus facilities shall not be used as a device to restrict a guest speaker's expression solely on the basis of disapproval or apprehension of his ideas or motives However, it shall be made clear to the academic and larger community by sponsoring organizations that sponsorship of guest speakers does not necessarily imply University approval or endorsement of views expressed.

Students must recognize their responsibility to uphold the right of free speech and to permit invited speakers to appear and speak without inappropriate interruption or demonstration. The members of the University community are urged to hear all sides of controversial issues represented

### D. Pamphlets, Petitions, and Demonstrations
The George Washington University is committed to the protection of free speech, the freedom of assembly, and the safeguarding of the right of lawful protest on campus  Therefore, student organizations and individual students shall have the right to distribute pamphlets, collect names for petitions. and conduct orderly demonstrations provided these actions are not disruptive of normal University functions and do not encompass the physical takeover or occupation of buildings, offices, classrooms. hallways, or other parts of buildings without authorization of the University, whether or not University functions are performed in them at that time

While all students have the right to dissent and to protest, the limitation exists that these rights shall not be exercised in such a manner as to infringe on the rights of other students, or of faculty members, to conduct class, hold their own meetings or hear another speaker, or in such a manner as to be disruptive of normal University functions  No one group or organization holds a monopoly on dissent or on freedom to hear all sides  Further, the fact that students may pursue their interests through speech and assembly on campus does not abrogate their accountability as citizens to the laws of the larger society, and the University is entitled to reflect these constraints in its own regulations

### E. Student Publications and Media
The student press and media shall be free of censorship and advance approval of copy, while being governed by the canons of responsible journalism.

Editors and managers of student publications or broadcast stations shall be free from arbitrary suspension and removal because of student, faculty, administrative, or public disapproval of editorial policy or content  Only for proper and stated causes shall editors and managers be subject to removal and then by orderly and prescribed procedures. Such removal shall be deemed a form of disciplinary action and therefore subject to prescribed due process in disciplinary cases. The agency responsible for the appointment of editors and managers shall be the agency responsible for their removal.

Even though certain publications may be financially dependent on the University, in the delegation of editorial responsibility to students, the University shall provide sufficient editorial freedom and financial autonomy for the student publications to maintain their integrity of purpose as vehicles for free inquiry and free expression in an academic community

All student publications that are published and financed by the University shall explicitly state on the editorial page that the opinions expressed are those of the publication and are not necessarily those of the University or the student body

Any committees for the supervision of such publications or media shall have student members.

## V. Regulations Concerning Student Life on Campus

### A. The Enactment of Regulations
University-wide regulations intended to formalize general standards of student conduct may be recommended to the Board of Trustees by appropriate committees composed entirely of students or jointly of students, faculty, and administrative representatives. University-wide regulations do not contemplate specialized regulations or rules governing academic, business, administrative, or contractual matters, nor rules or regulations published by administrators, students, or faculty for the control of facilities or programs, such as those not normally submitted to the Board of Trustees for approval. Generally understood standards of conduct, such as respect for the persons or property of others, continue to apply and may form the basis of disciplinary action though nowhere specified in particular detail

It is the intent of this section to bring students into active participation in the formulation of University-wide regulations not excepted above, and to encourage the inclusion of students as active participants in the formulation of those regulations excepted above to the extent that such involvement can be accomplished reasonably and practicably

### B. Standards of Fairness and Student Rights in Disciplinary Cases
The George Washington University respects and is determined to protect the individual dignity, integrity, and reputations of its students. At the same time it requires that students comply with those conventions and regulations of University life that are necessary to maintain order, to protect individuals and property, and to fulfill its purposes and responsibilities as a University. To this end, the University realizes that the prevailing rule in matters of student discipline must continue to be that of common sense, and an excessive legalism can only disserve the University and its community of students, faculty, and staff. The model for disciplinary procedures that the University adopts is that of the administrative process, not that of the criminal or civil courts

Certain procedural rights shall be guaranteed to a student in any University disciplinary proceeding in which he or she stands to bear significant injury, such as expulsion, suspension, permanent reprimand, or other stigmatizing action. A student subject to such disciplinary action is in danger of injury to his or her reputation, opportunity to learn, and earning power. He or she therefore should enjoy full protection of his or her rights:

1. The right to notice of charges whenever formal action upon such charges is initiated, such notice to be given within a reasonably prompt period and with sufficient particularity as to the facts that the student may reasonably investigate the charge and prepare his or her defense, with reasonable and appropriate recesses and continuances being provided to all parties.

2. The right to confront and cross-examine any witnesses appearing against him or her, to produce witnesses on his or her own behalf, to present evidence, to know prior to the hearing the contents of and the names of the authors of any written statements that may be introduced against him or her, and to rebut unfavorable inferences that might be drawn from such statements. The right not to be compelled to be a witness against himself or herself or to have his or her silence taken as an indication of guilt.

3. The right to a decision based upon evidence of a kind upon which responsible persons are accustomed to rely in serious affairs. However, rules of evidence in courts of law shall not, as such, be applied. The reliance upon evidence shall be determined by fundamental principles of fair play.

4. The right not to be sanctioned unless the decision maker is persuaded by a preponderance of the evidence that the student is guilty

5. The right to be accompanied in all proceedings by an adviser (student, faculty, or other) of his or her own choosing and at his or her own expense.

6. The right to have the option of a public hearing in the discretion of the presiding officer, upon the student respondent's request

7. The right to appeal decisions to a higher authority or hearing body within the administrative processes provided.

8. The right to have his or her case processed without prejudicial delay
Hearings shall be tape recorded or transcribed.

Following an alleged act of student misconduct, and until final disposition of the charges, the status of a student shall not be altered or his or her right to be present on campus and to attend classes suspended, except for reasons relating to his or her physical or emotional safety and well-being or for reasons relating to the safety and well-being of other students, faculty, or University property, or for reasons relating to the protection of the normal functions of the University

Changes in the status of a student that are not disciplinary in character intended neither as punishment nor as censure, but required by administrative, academic, or security interests of the University and its community are not governed by these disciplinary procedures.

The University disciplinary hearing system should not become excessively legalistic or adversarial. The hearing bodies may find it necessary frequently and firmly to remind parties, counsel, or advisers that the proceedings are not criminal or civil trials, that criminal or civil standards of due process and rules of evidence are not controlling, and that the hearing bodies shall enjoy considerable discretion to interpret, vary, and waive procedural requirements to the end that a just and fair decision may be obtained

## VI. Students as Off-Campus Citizens

In their off-campus lives, in matters not related to University functions, students shall not be considered under the control of the University, nor shall the University or its student governments be held responsible for the off-campus activities or personal conduct of its individual students

### A. Off-Campus Political Activities of Students
No disciplinary action shall be taken by the University against a student for engaging in such off-campus activities as political campaigning, picketing, or participating in public demonstrations, subject to the provisions of paragraph B

### B. Other Off-Campus Activities of Students
Students who violate a local ordinance or any law risk the legal penalties prescribed by civil authorities. An educational institution need not concern itself with every violation. Nevertheless, the University may take disciplinary action against those students whose

— Exhibit A, Sect 6, p 3   —

behavior off University premises indicates that they pose a serious and substantial danger to self or others

## C.  Student Records

Policies concerning the retention, release, and confidentiality of student records shall be recommended by the registrar, the schools, departments, and other record-keeping agencies, with appropriate student representation in the formulating of these policies, and shall be published upon adoption by the Board of Trustees

## VII.  Amendment, Interim and Emergency Powers, and Implementation

### A.  Amendment, Interim and Emergency Powers

In conformity with the University Charter, the By-Laws of the Board of Trustees, this statement may be amended by the Board of Trustees, the faculty retains interim power to discipline students prior to action of the Board of Trustees under regulations adopted by the Board of Trustees

Nothing in this statement can infringe or intends to infringe upon the authority of the Trustees to amend the statement. Further, this statement shall not prevent the Administration of the University from taking such action as it deems necessary to the functioning or welfare of the University in any matter prior to action of the Board of Trustees.

### B.  Implementation

After adoption by the Board of Trustees, the provisions of this statement shall be put into effect in a manner that provides for both speedy implementation and orderly transition. Adopted by the Executive Committee of the Board of Trustees, August 7, 1970

## University Policy on Equal Opportunity

The George Washington University does not unlawfully discriminate against any person on the basis of race, color, religion, sex, national origin, age, disability, veteran status, or sexual orientation. This policy covers all programs, services, policies, and procedures of the University, including admission to education programs and employment. The University is subject to the District of Columbia Human Rights Act

Inquiries concerning the application of this policy and federal laws and regulations concerning discrimination in education or employment programs and activities may be addressed to Susan B Kaplan, Senior Counsel, The George Washington University, Washington, DC 20052, (202) 994-4433, to the Assistant Secretary for Civil Rights of the U.S. Department of Education, or to the Director of the U.S. Equal Employment Opportunity Commission Washington Field Office

To request disability accommodations, students should contact the Office of Disability Support Services, (202) 994-8250 (TDD/voice), and employees should contact the Office of Equal Employment Opportunity, (202) 994-9656 (voice) or (202) 994-9650 (TDD)

*May, 1991*

## Policy on Sexual Harassment

The George Washington University is committed to maintaining a positive climate for study and work, in which individuals are judged solely on relevant factors, such as ability and performance, and can pursue their activities in an atmosphere that is free from coercion and intimidation. Sexual harassment is inimical to such an atmosphere and will not be tolerated

The University's Sexual Harassment Policy and Procedures is located at http://www.gwu.edu/~vpsc/harass.html and at http://my.gwu.edu/files/policies/SexualHarassmentFINAL.pdf

The University has adopted the following definition of sexual harassment, substantially derived from Equal Employment Opportunity Commission and Department of Education statements:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when

- (1) submission to such conduct is explicitly or implicitly made a term or condition of academic participation or activity, educational advancement, or employment,

- (2) submission to or rejection of such conduct by an individual is used as the basis for employment or academic decisions that affect the individual,

- (3) such conduct has the purpose or effect of unreasonably interfering with an individual's academic or work performance or limiting participation in University programs, or

- (4) the intent or effect of such conduct is to create an intimidating, hostile, or offensive academic or work environment

This policy acknowledges that conduct that has the effect of sexual harassment may occur without regard to the gender of either party

Nothing in this policy limits academic freedom, guaranteed by the Faculty Code, which is a pre-eminent value of the University. This policy shall not be interpreted to abridge academic freedom. Accordingly, in an academic setting expression that is reasonably designed or reasonably intended to contribute to academic inquiry, education or debate on issues of public concern shall not be construed as sexual harassment

A person who commits sexual harassment in violation of this policy will be subject to disciplinary action, up to and including expulsion or termination

If you believe you are being or have been sexually harassed, if someone has accused you of sexual harassment or inappropriate behavior of a sexual nature, or if you receive a report of sexual harassment, please contact the Sexual Harassment Response Coordinator, located in the Office of the Vice President and General Counsel, as soon as possible. Staff in this office will respond to questions, address your concerns, and, if warranted, coordinate an investigation.

Other resources are also available—Ms Annie Wooldridge, Assistant Vice President for Faculty Recruitment and Personnel Relations, is available to faculty to discuss complaints of sexual harassment. Ms

Linda Donnels, Associate Vice President and Dean of Students, or her designee, is available to students to discuss complaints of sexual harassment. Ms. Cynthia Richardson-Crooks, Director of the Office of Equal Employment Opportunity, and her staff, will discuss complaints with administrative staff and employees

## Student Grievance Procedures

### I. General

These grievance procedures are promulgated to provide a channel for resolution of the grievances of students who feel they have been discriminated against on the basis of sex, race, color, religion, age, national origin, disability or sexual orientation in any of the policies, procedures, programs, or activities of or by any individual employed by or acting in an official capacity for The George Washington University.

The procedures are intended to encourage resolution of the student's grievance informally and at the earliest possible stage. At the same time, where such resolution is not possible, these procedures provide for a more formal review of the situation by individuals not party to the case, and a final decision based upon that review by the appropriate dean or vice president. In providing these procedures, it is the intention of the University to carry them out in an equitable and timely manner. However, in extenuating circumstances, it may not be possible to adhere to established time frames, and extension of time shall not be construed as failure to follow established procedures. It shall be a violation within the meaning of these regulations to discriminate against any student because he or she has opposed any discriminatory practice proscribed by these procedures, or because he or she has filed a grievance, testified, assisted, or participated in any manner in the procedures provided for herein

#### A. Eligibility

Any full-time or part-time student who believes that he or she has been discriminated against on any of the bases cited above may initiate these procedures. Employees, both full-time and part-time, who are also students may use these procedures for matters relating to their student status only. (For grievance procedures to resolve charges of discrimination in employment, employees should consult the Faculty Code and Ordinances, or the Employee Handbook, as appropriate.) These grievance procedures are not available to applicants to any of the University's academic units, including applicants who are or have been registered students in another of the University's academic units

#### B. Coverage

A student may charge discrimination on the basis of sex, race, color religion, age, national origin, disability, or sexual orientation in the policies, procedures, programs, or activities of or by any individual employed by and acting in an official capacity for The George Washington University. However, in accordance with the statement on academic freedom as outlined in the Faculty Code and Ordinances, course content or emphasis and/or textbooks and other assigned materials are specifically exempt from coverage

Individuals and/or registered student organizations who feel they have been discriminated against by chartered student organizations as they act to carry out responsibilities specifically delegated to them by the Board of Trustees or the President may charge the organization under these procedures. Individuals who feel they have been discriminated against by having been denied the rights and privileges of membership or participation in registered student organizations may also charge the registered student organization under these

procedures. University policy permits campus organizations that are social fraternal groups to limit membership on the basis of sex and sectarian groups to limit membership on the basis of religion

A faculty member or administrator having administrative responsibility relating to the group being charged shall be appointed by the Senior Associate Dean of Students or designee, to carry out the function assigned to the department chair outlined in II.C Grievance Review Committees for student organizational matters shall consist of two faculty members, one administrator, and two students

### II. Grievance Procedures

**A.** Students who believe they have been injured in some fashion by discrimination must first seek to clarify or resolve the question through direct contact with the individuals whose action gave rise to the matter

**B.** If the student is unable to clarify or resolve the matter, the student must confer with and submit a signed written statement of the charge to the Senior Associate Dean of Students or designee. The written statement must include the following: the name of the faculty member, administrator, or student organization whose action gave rise to the matter, the type of discrimination alleged, a statement of the injury alleged and the resolution sought, and a summary, to include time, place, and results, of the discussion that took place as required in II.A above

**C.** The Senior Associate Dean of Students or designee shall refer the charge to the appropriate academic or administrative department chair. The department chair shall seek to mediate the charge and thereby effect an informal resolution of the matter; failing informal resolution, after consultation with both parties, the department chair shall make a decision concerning the charge that shall be conveyed in writing to both parties by registered or certified mail and to the Senior Associate Dean of Students or designee. This mediation phase of the procedures should be completed within 15 class days

If the individual whose action gave rise to the matter is an academic department chair, dean, or administrator, or a faculty member reporting directly to a dean or vice president, the Senior Associate Dean of Students or designee shall refer the matter directly to a dean or vice president, or if the academic or administrative department chair wishes to disqualify himself or herself because of prior knowledge of the matter, the Senior Associate Dean of Students or designee shall refer the matter directly to the appropriate dean or vice president, who shall designate another academic department chair, dean, administrator, or faculty member under his or her supervision to perform the function required by this subsection. The person selected by the dean or vice president must be at least equal in position and rank to the person against whom the grievance has been filed

If, because of prior knowledge of the matter, the dean or vice president wishes to disqualify himself or herself from performing any of the functions outlined in these grievance procedures, the matter will be referred to the President who shall designate another dean or vice president to perform one or more of the functions outlined in these procedures

**D.** Either party to the case may request a review of the decision rendered under Subsection C, by writing the Senior Associate Dean of Students or designee within five class days of receipt of the department chair's decision

E. The Senior Associate Dean of Students or designee shall send a copy of the request for review to the appropriate dean or vice president, and shall, within ten class days, appoint a Grievance Review Committee, which shall advise the dean or vice president

1. The Grievance Review Committee for academic matters will consist of two faculty members and two students.

2. The Grievance Review Committee for administrative matters will consist of one faculty member, one administrator, and one student.

3. Committee members will be selected from among a panel of ten faculty members selected by the Faculty Senate, ten students selected by The George Washington University Student Association, and five administrators selected by the Associate Vice President for Human Resources  At least five students named to the panel shall be enrolled in programs at the graduate level  Appointments to the panel shall be made for one year from July 1 to June 30  Appointments are renewable  The Senior Associate Dean of Students or designee will select the committee members for each review and will appoint one of the members to serve as chair  In the event panel members are not available to serve, the Senior Associate Dean of Students or designee shall have the authority to appoint committee members from the appropriate constituency from outside the panels to hear a particular grievance  Upon the request of the chair, the Senior Associate Dean of Students or designee shall serve as advisor to the Review Committee

4. Within thirty class days of appointment, the Grievance Review Committee shall hear the grievance together with such witnesses as it deems germane to the grievance or as may be called by either party. Each party shall be entitled to question all witnesses appearing at the hearing and to present written statements or other evidence  Either party may be accompanied at the hearing by one person whom he or she has selected

The proceedings shall in all respects be under the control of the chair and shall not be subject to formal rules of evidence or procedure. At the discretion of the Committee, the proceedings may be closed or may be open to members of the University community  The proceedings shall be recorded and the recording preserved for three years along with any written statements of evidence presented  A copy of the recording will be made available to the grievant upon request  Costs incurred in producing the copy shall be the responsibility of the grievant.

The Grievance Review Committee shall convey its advice on the solution of the grievance to the appropriate dean or vice president and to the Senior Associate Dean of Students or designee within five class days of the conclusion of the hearing  The Senior Associate Dean of Students or designee shall distribute copies of the Committee's findings to both parties

5. The dean or vice president shall make a decision within five class days after receiving the advice of the Grievance Review Committee. The decision of the dean or vice president shall be in writing and shall be conveyed to both parties by registered or certified mail, the decision made by the dean or vice president shall be final  However, to the extent that the decision involves the changing of an academic evaluation, the decision cannot be implemented without the consent of the cognizant faculty member(s) unless approved by the Dean's Council

F. The Faculty Senate, the Joint Committee of Faculty and Students, and the Student Senate shall be consulted before any revisions are made to these procedures

*February, 1988*

## Code of Student Conduct

### Authority for Student Discipline

1. Ultimate authority for student discipline is vested in the Board of Trustees by the University Charter.  Disciplinary authority may be delegated to University administrators, faculty members, student committees, and organizations, as set forth in the "Code of Student Conduct" ("Code"), or in other appropriate policies, rules, or regulations adopted by the Board  Students are asked to assume positions of responsibility in the University judicial system so that they may contribute their skills and insights to the resolution of disciplinary cases

### Rationale

2. The primary purpose for the maintenance of discipline in the University setting is to protect the campus community and to establish clear standards for civil interaction among community members  The University's goal, through maintenance of standards set forth in the "Code", is to help students experience democratic citizenship, and its attendant obligations and responsibilities.

The purpose of a disciplinary proceeding is to establish the factual record of an alleged violation of the "Code"  The procedures outlined do not attempt to recreate or approximate a court of law  Procedures shall reflect standards of fundamental fairness; however, minor deviation from procedural guidelines for hearings suggested in this "Code" shall not invalidate a decision or proceeding resulting from a conference or hearing unless significant prejudice to the accused or the University may result, as judged by the Senior Associate Dean of Students or designee

### Definitions

3. When used in this "Code",
   a. **"Distribution"** means any form of sale, exchange, or transfer

   b. **"Group"** means a number of persons who are associated with each other, but who have not complied with University requirements for registration as a student organization

   c. **"Institution"** and "University" mean The George Washington University and all of its undergraduate, graduate, and professional schools, divisions, and programs

   d. **"Organization"** means any number of persons who have complied with University requirements for registration with the Student Activities Center as a student organization

   e. **"Student"** means any currently enrolled person, full-time or part-time, or on continuous enrollment, pursuing undergraduate, graduate, or professional studies, whether or not in pursuit of a degree or of any form of certificate of completion.

   f. **"University premises"** means buildings or grounds owned or leased by the University, including but not limited to buildings or grounds in which students reside and University food service facilities are located, Marvin Center facilities; Columbia Plaza; and facilities operated in the name of any officially registered student organization  This definition is not limited to buildings or grounds owned or leased by the University at the Foggy Bottom Campus

g. "**University-sponsored activities**" means events and activities initiated by a student, student organization, or University department, faculty member, or employee that

(1)  Are expressly authorized, aided, conducted or supervised by the University, or

(2)  Are funded in whole or in part by the University, or

(3)  Are initiated by an officially registered student organization and conducted or promoted in the name of that student organization and/or the University, or

(4)  Take place on University premises

## Interpretation of Regulations

4.  The purpose of publishing disciplinary regulations is to inform students of prohibited behavior. This "Code" is not written with the specificity of a criminal statute, and any similarity to the language of any criminal statute does not mean that such language or statute or case(s) applies to the University's judicial system or is relevant to the interpretation or application of the "Code".

## Inherent Authority

5.  The University reserves the right to take necessary and appropriate action to protect the safety and well-being of the campus community. Such action may include taking disciplinary action against those students whose behavior off University premises constitutes a violation of this "Code".

6.  Students may be accountable both to civil authorities and to the University for acts that constitute violations of law and of this "Code". Disciplinary action at the University will not be subject to challenge on the grounds that criminal charges involving the same incident have been dismissed or reduced or that no criminal charges have been brought.

## Interim Suspension

7.  The Dean of Students or a designee, following consultation with the Executive Vice President for Academic Affairs and the General Counsel or their designees, may evict a student from University housing or suspend a student from the University for an interim period not to exceed 21 days, pending disciplinary proceedings or medical evaluation. The interim eviction/suspension shall become immediately effective without prior notice whenever there is evidence that the continued presence of the student on the campus poses a substantial and immediate threat to himself or herself or to others or to the stability and continuance of normal University functions. Interim suspension shall be considered an excused absence.

8.  A student suspended or evicted on an interim basis will be granted a disciplinary hearing or conference as soon as is practical.

## Standards of Classroom Behavior

9.  The primary responsibility for managing the classroom environment rests with the faculty. Students who engage in any prohibited or unlawful acts that result in disruption of a class may be directed by the instructor to leave the class for the remainder of the class period. Longer suspensions from a class or dismissal on disciplinary grounds must be preceded by a disciplinary conference or hearing, as set forth in Articles 25 and 26 of this "Code", or in accordance with Articles 7 and 8 above.

The term "prohibited acts" includes behavior prohibited by the instructor (including but not limited to smoking in the classroom, persistently speaking without being recognized or called on, refusing to be seated, disrupting the class by leaving and entering the room without authorization). It must be emphasized that this provision is not designed to be used as a means to punish classroom dissent. The expression of disagreement with the instructor or classmates is not in itself disruptive behavior.

## Office of Student Judicial Services

10.  The Office of Student Judicial Services within the Dean of Students Office directs the efforts of students and staff members in matters involving student discipline. The responsibilities of the Office include

a   Determining the disciplinary charges to be filed according to this "Code";

b   Interviewing, advising, and assisting parties involved in disciplinary proceedings and arranging for a balanced presentation before the various judicial boards on a timely basis;

c   Training and advising the campus judiciary,

d   Maintaining all student non-academic disciplinary records;

e   Developing procedures for conflict resolution;

f   Conducting disciplinary conferences,

g   Collecting and disseminating research and analysis concerning student conduct,

h   Resolving cases of student misconduct, including the imposition of sanctions lesser than suspension or expulsion

## Prohibited Conduct

11.  **Violence of any kind will not be tolerated on or off University premises or at University-sponsored activities.** Any student, group, or organization found to have committed misconduct is subject to disciplinary action and to the sanctions outlined in this "Code". Attempts to commit any of these acts of misconduct are included in the scope of these definitions. The following are examples of misconduct subject to disciplinary action (subject to the provisions of Article 5)

a   Sexual Assault - Inflicting any sexual invasion (including but not limited to sexual intercourse) upon any person without that person's consent. "Consent" requires actual words or conduct indicating a freely-given agreement to have sexual intercourse, or to participate in sexual activities. The University community should be aware that, depending on the particular circumstances, previous sexual relationships, or current relationship between the persons involved, or silence or lack of protest do not necessarily constitute consent. Further, the degree of impairment of a person's ability to give or withhold consent (including but not limited to incapacity or helplessness caused by alcohol or other drugs) may be introduced as pertinent information at any University disciplinary hearing.

b   Physical Abuse - Committing physical abuse and/or battery of any person

c   Assault - Placing a person in fear of imminent physical danger or injury through the use of verbal or physical threats

d   Sexual Harassment - Committing sexual harassment against another person. "Sexual harassment" means sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when

   (1)   Submission to such conduct is made explicitly or implicitly a term or condition of academic performance, advancement or employment, or

   (2)   Submission to or rejection of such conduct by a person is used as a basis for a decision relating to the academic performance, advancement or employment of the person, or

   (3)   A person knows or should have known that such conduct is unwelcome and that the conduct has the purpose or effect of

      (a)   Substantially interfering with a person's academic or work performance, or
      (b)   Limiting participation in University programs or University-sponsored activities; or
      (c)   Creating an intimidating, hostile, or offensive academic, work, social or living environment

e   Drug / Alcohol Violation - Possession or use of alcohol by persons under 21, intoxication on University premises possession of illegal drugs or controlled substances; possession of paraphernalia containing drug residue, manufacture or distribution of illegal drugs or controlled substances

f   Weapon Violation - Use, possession, or storage of any firearms, ammunition, knives or other weapons, or objects that could be construed as weapons. Items that pose a potential hazard to the safety or health of others are also prohibited

g   False Alarm/Report – Knowingly or negligently causing or attempting to cause a fire in a University building; initiating or causing to be initiated any false alarm/report, warning, or threat of fire, explosion, or other emergency

h   Interfering With University Events - Interfering with any normal University or University-sponsored events, including but not limited to studying, teaching, research, and University administration, fire, police or emergency services

i   Sanction Violation - Violating the terms of any disciplinary sanction imposed in accordance with this "Code"

j   Dishonesty - Non-academic dishonesty including but not limited to,

   (1)   Furnishing false information to the University or University personnel, including the University Police

   (2)   Furnishing false information at University disciplinary proceedings

   (3)   Forgery, unauthorized alteration or unauthorized use of any University documents, records, or identification cards, including computer records, misuse of computer facilities and electronic mailing systems. Academic dishonesty violations will be handled according to the Code of Academic Integrity

k   Misuse of Fire Safety Equipment - Misuse or damage to fire safety equipment, such as fire extinguishers or exit signs

l   Theft - Theft of property or of services or knowing possession of stolen property

m   Destruction of Property - Destroying or damaging University property, such as library holdings, or the property of others

n   Non-compliance - Failure to comply with reasonable directions of University officials, including University Police officers and representatives of the Office of Student Judicial Services acting in performance of their duties. Directives to cooperate in the administration of this "Code" including those to appear and give testimony at a University disciplinary proceeding as well as directives to produce identification are included in the scope of this provision.

o   Regulation Violation - Any violation of other published University regulations including but not limited to The Alcoholic Beverage Consumption and Distribution Policy, regulations governing student organizations, the CLLC Residential Community Conduct Guidelines and Administrative Policies (whether the student lives in residence or not) and other lease agreements with the University, the Code of Computer Usage, and the Gelman Library Rules and Regulations.

p   Fireworks Violation - Use or possession of fireworks

q   Violation of Law - Violation of federal and/or local law, including, but not limited to, possession of any falsified identification, manufacture, sale or distribution of local, state or federal identification

r   Unauthorized Use of the University's Name - Any unauthorized commercial use of the University's name, logo, or other representation.

s   Disorderly Conduct - Acting in a manner to annoy, disturb, interfere with, obstruct, or be offensive to others, shouting or making excessive noise either inside or outside a building to the annoyance or disturbance of others, verbally abusing University officials acting in performance of their duties, or acting in a lewd or indecent manner

t   Hazing - Any act of hazing. Hazing is defined as any action taken or situation created, intentionally, with or without consent, whether on or off campus, to produce mental or physical discomfort, embarrassment, harassment or ridicule. Such activities and situations include but are not limited to paddling in any form, creation of excessive fatigue, physical and psychological shocks; quests, treasure hunts, scavenger hunts, road trips, or any other such activities carried on outside the confines of the house or organization; wearing, publicly, apparel that is conspicuous and not normally in good taste; engaging in public stunts and buffoonery, morally degrading or humiliating games

and activities, and any other activities which are not consistent with the academic mission of the University Groups will be held responsible for the actions of their members including pledges, associates, and any other pre-initiates

Persons will be charged, in addition to the group itself, under this, as well as any other applicable violations. See Articles 28 and 29 for further information on this prohibition

u   Discrimination - Committing any of the above acts because of a person's race, color, religion, sex, national origin, age, disability, veteran status, or sexual orientation

## Sanctions

Articles 12 and 13 represent an attempt to give needed assistance to those who are assessing sanctions  The guidance is directed toward imposing more severe disciplinary sanctions in serious cases. However, the language concerning "mitigating factors" is broad enough to give considerable discretion to do justice, depending upon the facts in each case. The burden of establishing mitigating factors prior to imposition of sanctions is on the student accused

**12.** This "Code" seeks to preserve flexibility in the imposition of sanctions so that each student or group offender is afforded the greatest possibility for appropriate and just treatment

Significant mitigating or aggravating factors shall be considered, which may include the current demeanor and the presence or lack of a disciplinary or criminal record of the offender, as well as the nature of the offense and the extent of any damage, injury or harm resulting from it

a   Censure - An official written reprimand for violation of specified regulations, including a warning that continuation or repetition of prohibited conduct will be cause for additional disciplinary action

b   Disciplinary Probation - Exclusion from participation in privileged or extracurricular institutional activities for a specified period of time, including athletic and any other team activity or sport  Additional restrictions or conditions may also be imposed  Violations of the terms of disciplinary probation, or any other violation of this "Code" during the period of probation, will normally result in suspension or expulsion from the University.

c   Restitution - Repayment to the University or to an affected party for damages, loss, or injury resulting from a violation of this "Code"

d   Suspension - Exclusion from classes and other privileges or activities, including access to University premises or University-sponsored activities off campus, as set forth in the notice of suspension, for a specified period of time  Any student who is suspended shall not be entitled to any tuition or fee refund and is barred from University premises

e   Expulsion - Termination of student status and exclusion from University privileges and activities, including access to University premises or University-sponsored activities off campus, in perpetuity  Any student who is expelled shall not be entitled to any tuition or fee refund and is barred from University premises

f   Eviction from Residence - Termination of residence contract and exclusion from visiting within certain or all residence facilities as set forth. Any student who is evicted shall not be entitled to a refund of room fees  Evicted students may not reside in other University-owned/controlled housing unless a waiver is granted by the Office of Student Judicial Services

g   Other sanctions - Other sanctions may be imposed instead of or in addition to those specified above  For example, students may be subject to restrictions upon or denials of University parking privileges for violations involving the use or registration of motor vehicles on campus  Service projects may also be assigned  Students may be directed to have "no contact" with other students and/or may be forbidden to access specified areas of campus ("persona non grata")

13.   The following are recommended **minimum** sanctions

a   Sexual Assault  One year suspension and eviction from the residence halls or University-owned housing.

b   Physical Abuse  One semester suspension and eviction from the residence halls and University-owned housing.

c   Assault.  Disciplinary probation

d   Sexual Harassment  Disciplinary probation

e   Drug Violation

(1)  Possession and/or use
1st offense  $50 fine, required participation in a drug abuse education program and eviction from residence halls;

2nd offense  $100 fine and required evaluation by a certified service at the student's expense,

3rd offense.  Conference with the Dean of Students or a designee to determine the viability of the student's remaining at the University

(2)  Manufacture, distribution, possession with intent to distribute drugs  One year suspension

(3)  Violation of the Alcohol Policy
1st offense  $50 fine and required participation in an alcohol education program,

2nd offense  $100 fine and required assessment by a certified service at the student's expense,

3rd offense. Conference with the Dean of Students or a designee to determine the viability of the student's remaining at the University

f   Possession or Storage of a Weapon or Object That Could Be Construed as a Weapon
Disciplinary probation and eviction from the residence halls and University-owned housing

(1) Use of weapons, ammunition or objects that could be construed as weapons  One semester suspension.

(2) Use of firearms  One year suspension

g   False Alarm/Report.  $300 resetting fee  Suspension from the University and/or eviction from the residence halls and University-owned housing

h   Interfering with University Events  Censure

i   Sanction Violation  Disciplinary probation

j   Dishonesty  Disciplinary probation.

k   Misuse of Fire/Safety Equipment  Restitution

l   Theft  Restitution

m   Destruction of Property: Restitution for the cost of replacement or repairs; loss of privileges in libraries or computer or other laboratories

n   Non-compliance  Disciplinary probation

o   Regulation Violations  Disciplinary probation, eviction from residence halls and University-owned housing; denial of computer privileges/access, loss of library privileges  In egregious cases, such as tampering with University computer records, the student may be suspended for no less than one semester

p   Fireworks Violation  Eviction from residence and University-owned housing, restitution for the cost of repairs

q   Violation of Law  Disciplinary probation for acts including but not limited to possession of any falsified means of identification, one semester suspension or, in egregious cases, expulsion for acts including, but not limited to, manufacture, sale, or distribution of local, state or federal means of identification

r   Unauthorized Use of the University's Name  Disciplinary probation

s   Disorderly Conduct  Disciplinary probation and/or eviction from residence halls and University-owned housing

t   Hazing  For groups, loss of University registration and all attendant privileges, for individuals, disciplinary probation or any other sanction applicable for additional charges

u   Discrimination  Will not have a separate, minimum sanction since it only will be charged in conjunction with charges or other prohibited conduct as an aggravating circumstance to be considered in imposing sanctions for another violation

**14.**  Repeated or aggravated violations of any part of this "Code" may also result in expulsion or suspension or any other sanction that may be appropriate

**15.**  Attempts to commit acts prohibited by this "Code" or encouraging others to commit acts prohibited by this "Code" shall be punished to the same extent as completed violations

**16.**  Students subject to eviction from University housing or suspension or expulsion from the University will be entitled to a Judicial Board hearing. Students subject to any other sanction will be entitled to an informal disciplinary conference  (See Sections 25 and 26.)

### Case Referrals

**17.**  Any person may refer students or student groups or organizations suspected of violating any part of this "Code" to the Office of Student Judicial Services and the University Police Department.  Any person who witnesses a violation in progress should report it immediately to the University Police Department

**18.**  The Senior Associate Dean of Students or a designee will review the reported allegation to determine whether a sanction of suspension, eviction from housing, or expulsion is warranted  From that determination, a Judicial Board hearing or disciplinary conference will be scheduled based on the terms in Articles 25 and 26  Any student, however, may elect to have a disciplinary conference  If a student entitled to a judicial board hearing elects a disciplinary conference, the full range of sanctions may be imposed, including, eviction, suspension, and expulsion

**19.**  The Senior Associate Dean of Students or a designee may defer disciplinary proceedings (Judicial Board hearing or disciplinary conference) for alleged violations of this "Code" for a period not to exceed one semester  Pending charges may be withdrawn thereafter, depending on the conduct of the accused student, or be added to any subsequent charges within the period of deferment.

### Judicial Boards

**20.**  Judicial Bodies.

a   The University Hearing Board hears cases to be resolved in accordance with this "Code"  The Board is composed of five full-time students to be selected from the pool  The pool shall consist of at least 10 full-time students selected according to Article 22 of this "Code"  If the alleged misconduct may result in suspension or expulsion from the University, whenever possible, a faculty member or administrator will be included, however, the absence of a faculty member or administrator will not prevent the University Hearing Board from hearing a case  Quorum will consist of at least three students

b   The Student Parking Violations Board considers appeals of offenses for which a ticket was issued by the Parking Services, as well as other parking matters referred by the Office of Parking Services  It may both impose and reduce prescribed fines or suspensions of parking privileges  The Board is composed of three full-time students  Board decisions are subject to administrative review at the discretion of the Senior Associate Dean of Students or designee, but are otherwise considered final and conclusive  Requests for appeal of parking tickets must be submitted in writing to the Office of Parking Services within thirty business days from the date the ticket was issued  Failure to appeal within this allotted time will render the original decision final and conclusive

c   Ad hoc Boards may be appointed by the Senior Associate Dean of Students or designee if after reasonable effort a board is not able to be constituted, is unable to obtain a quorum, or is otherwise unable to hear a case  Ad hoc Boards may be composed of administrators, faculty members, students, or any combination thereof

Reasonable efforts should be made to arrange for student membership on any ad hoc Board

d    The Committee on the Judicial System, appointed by the President for a term of two years, will be composed of the following members: two faculty members to be nominated by the Faculty Senate, two administrators to be nominated by the Dean of Students; and two full-time undergraduate students and one graduate student to be nominated by the President of the Student Association   Quorum will consist of three members with each constituency - administrators, faculty and students - represented    The chair should be a member of the Faculty Senate   In addition to reviewing appeals, other tasks or assignments may be referred to the Committee at the discretion of the Dean of Students.   The Committee on the Judicial System's decisions on appeals are final and conclusive

**21.**  With the exception of the Student Parking Violations Board, the finding of fact as determined by each Judicial Board will be forwarded to the Senior Associate Dean of Students or a designee for determination and imposition of sanction, if applicable.  In case of suspension or expulsion, the Dean of Students or a designee, in concurrence with the Executive Vice President for Academic Affairs or a designee, will impose sanctions

### Selection and Removal of Judicial Board Members

**22.**  Student members of each Judicial Board and the presiding officer are selected in accordance with procedures developed by the Senior Associate Dean of Students or a designee  Student members of each Judicial Board are appointed by the Dean of Students or a designee to serve for a term of one year   Faculty and administrative members of each Judicial Board are nominated by the Faculty Senate and the Dean of Students, respectively, and are appointed by the President for terms established by the Faculty Senate

**23.**  Members of any judicial pool who are charged with any violation of this "Code" or with a criminal offense will be suspended from their judicial positions by the Senior Associate Dean of Students or a designee during the pendency of the charges against them   Members found guilty of any such violation or criminal offense will be disqualified from any further participation in the University judicial system   Additional grounds and procedures for removal may be established by the Senior Associate Dean of Students or designee.

**24.**  Students, faculty and staff appointed as members of any Judicial Board must adhere to absolute confidentiality relative to the matters and names of all persons who participate in the judicial process   Any student who violates this provision will be charged and, if found in violation, will be sanctioned

### Procedural Guidelines - Disciplinary Conferences

**25.**  When deemed appropriate by violation, when requested by students in place of a Judicial Board hearing, or when used to adjudicate minor violations of residence hall regulations, the following procedural guidelines for a disciplinary conference will be used

A disciplinary conference will normally consist of an informal, non-adversarial meeting between the accused student and a University administrator or an experienced member of the University Hearing Board as designated by the Senior Associate Dean of Students, designee, or the Office of Student Judicial Services.  Respondents may request the Office of Student Judicial Services to call appropriate and relevant witnesses on their behalf   Accused students who fail to appear after written notice will be deemed not to have

contested the allegations against them; however, a student may elect not to speak on his or her own behalf.

The following procedural guidelines are applicable to respondents in disciplinary conferences

a    Written notice of the specific charges and date of the scheduled conference at least three days prior to the conference.

b    Reasonable access to the case file at least three days prior to and during the conference   A case file is part of the student's education record under the Family Educational Rights and Privacy Act of 1974   The personal notes of University staff members are not included in the case file   The case file will be retained in the Office of Student Judicial Services

c    The opportunity to respond to the evidence and to call appropriate and relevant student witnesses   It is expected that all witnesses will provide information that is true and correct.  Any student who knowingly provides false information during a disciplinary conference will be charged under Article 11, section j of this "Code".

d    The right to an advisor in accordance with the guidelines in Article 27

e    If a student entitled to a Judicial Board hearing elects a disciplinary conference, the full range of sanctions may be imposed, including eviction, suspension, and expulsion

f    Notarized affidavits may be accepted or other accommodations made at the discretion of the presiding officer in lieu of live testimony if a witness is out of state or otherwise determined to be unavailable.

### Procedural Guidelines - Disciplinary Hearings

**26.**  The following procedural guidelines shall be applicable in all disciplinary hearings

a    Students accused of violations will be given written notice of the hearing date and the specific charges against them within a reasonable amount of time and be given reasonable access to the case file, which will be retained in the Office of Student Judicial Services

b    The Office of Student Judicial Services will take steps to compel the attendance of student witnesses whose testimony may help the University Hearing Board establish the factual record   Failure to appear when called will result in charges under this "Code" but will not invalidate the proceedings  Character witnesses will not be heard   It is expected that all witnesses will provide information that is true and correct   Any student who knowingly provides false information during a disciplinary hearing will be charged under Article 11, section j of this "Code"

c    Accused students who fail to appear after written notice will be deemed not to have contested the allegations against them, however, a student may elect not to speak on his or her own behalf   In such cases, the University Hearing Board's decision will be based solely on witness testimony and other information presented during the proceeding

d    Hearings will be closed to the public

e  The presiding officer will exercise control over the proceedings to maintain proper decorum, to avoid needless consumption of time and to achieve an orderly completion of the hearing  Anyone disrupting the hearing may be removed or excluded from the hearing by the presiding officer, the Senior Associate Dean of Students, or designee. Such disruption is a violation of this "Code", and a person may be charged following his or her disruption and removal

f  Hearings will be tape recorded or transcribed  The method used is at the discretion of the Senior Associate Dean of Students or designee

g  Any party may challenge a Board member on the grounds of personal bias  The decision to disqualify a Board member will be made by the Senior Associate Dean of Students or designee  This decision is final.

h  Witnesses will be truthful in giving testimony before the Board  Furnishing false information in such a context is a violation of this "Code" and appropriate sanctions will be applied

i  Only the immediate parties (and the respondent's advisor if applicable) to the alleged violation may be present throughout the hearing  All parties will be excluded during Board deliberations

j  The Board will question all parties in an effort to establish the factual record.  On disputed points, a preponderance of the evidence available, fairly considered, will decide the facts.  A "preponderance of the evidence" means that it is "more likely than not" that a fact is true or an event occurred

k  Formal rules of evidence will not be applicable in disciplinary proceedings described in this "Code"  Confidentiality will be observed

l  All parties may question witnesses who testify for any of the parties at the hearing

m  Prior to the hearing, the Senior Associate Dean of Students or designee may appoint a special presiding officer in complex cases.

n  Reports of the Board shall include a finding of fact and a determination of whether or not the respondent is in violation of the alleged misconduct.  If the Board determines the respondent to be in violation, the report will also include a recommendation of sanction.  The Board may consider mitigating or aggravating circumstances when making a sanction recommendation  The report will be forwarded to the Senior Associate Dean of Students or designee for review  If in the judgment of the Senior Associate Dean of Students or designee the sanction recommended by the Board is significantly at variance with sanctions imposed in closely similar cases, the Senior Associate Dean of Students or designee may then revise the sanction

o  In cases of suspension or expulsion, the Dean of Students or a designee, in concurrence with the Executive Vice President for Academic Affairs or a designee, will impose sanctions.  The past disciplinary record of the accused student and applicable mitigating and aggravating

circumstances will be taken into account in determining the sanction(s).

p  The accused student will receive, in writing within a reasonable amount of time, the decision of the Board and the sanction(s) determined

q  Accused students have the right to an advisor in accordance with the guidelines in Article 27.

r  Notarized affidavits may be accepted or other accommodations made at the discretion of the presiding officer in lieu of live testimony if a witness is out of state or otherwise determined to be unavailable

### Representatives and Advisors

27.  Representation is not permitted in University disciplinary hearings or conferences  Accused students may be accompanied by an advisor or friendly observer  The role of advisors shall be limited to consultation with respondents, advisors may not address the Board or question hearing participants.  Violations of this limitation will result in the advisors being ejected from the hearing at the discretion of the presiding officer  The advisor may be, but may not act as, legal counsel.  Accused students must notify the Office of Student Judicial Services if they will have legal counsel at the hearing or conference at least three business days prior to the hearing or conference

### Student Groups and Organizations

28.  Student groups and organizations may be charged with violations of the 'Code"

29.  A student group or organization may be held collectively responsible and its officers may be held individually responsible when violations of the 'Code" by those associated with the group or organization have occurred

A position of leadership in a student group, organization, or athletic team entails responsibility.  Student officers cannot permit, condone, or acquiesce in any violation of this "Code" by the group or organization

This section of the "Code" is also designed to hold a group, including athletic teams, student organizations, and their officers, accountable for any act of hazing  For example, requiring, expecting, or encouraging members to consume any drugs, including alcohol, as a condition or prelude to membership or further participation in the organization would constitute a violation of Article 11, sections a, b, e, h, and t  This is because such an activity may be physically abusive, constitutes an interference with normal University activities and violates drug or alcohol regulations  The express or implied "consent" of the victim or participant is not a defense  Participants in these activities will be charged, the University community is considered to be the victim

30.  The officers or leaders or any identifiable spokesperson for a student group or organization may be directed by the Senior Associate Dean of Students or a designee to take appropriate action designed to prevent or end violations of this "Code" by the group or organization.  Failure to make reasonable efforts to comply with the Senior Associate Dean of Students or designee's directive shall be considered a violation of this "Code" by the officers, leaders, or spokesperson for the group or organization and by the group or organization itself

31. Sanctions for group or organization misconduct may include revocation or denial of registration, as well as other appropriate sanctions

**Appeals**

32. Appeals must be based on new information that is relevant to the case, that was not previously presented at the hearing or conference, and that significantly alters the finding of fact.

33. Appeals must be submitted in writing to the Office of Student Judicial Services within five business days from the date of the written sanction notice  These appeals will be reviewed by the Senior Associate Dean of Students or designee to determine their viability based on new information significantly altering the finding of fact  Only when deemed viable will the appeal be forwarded to the Committee on the Judicial System for its review.  Failure to appeal within the allotted time will render the original decision final and conclusive  Decisions to grant or deny the appeal will be based on information supplied in the written appeal and, when necessary, on the record of the original proceedings. Findings and sanctions arising from new hearings or conferences ordered by the Committee on the Judicial System are final and conclusive.

34. The Committee on the Judicial System may

    a   Affirm the finding of the original board or conference,

    b   Remand the case to the original board or conference officer for a new hearing;

    c   Request that a new board or conference officer hear the case

35. The imposition of sanctions will be deferred during the pendency of appellate proceedings unless, in the judgment of the Dean of Students or a designee, the continued presence of the student on campus poses a substantial threat to others, to himself or herself, or to the stability and continuance of normal University functions

**Transcript Notations**

36. An encumbrance may be placed on a student's University records by the Senior Associate Dean of Students or a designee while disciplinary proceedings are pending or sanctions are incomplete

37. Notation of disciplinary action will be made on the transcript whenever a student is expelled or suspended.  Students may petition for removal of the notation of suspension when the suspension period has expired or after three years, whichever comes first. Such petitions may be granted at the discretion of the Senior Associate Dean of Students or a designee  Factors to be considered in reviewing petitions for notation removal include the current demeanor of the student, the student's conduct subsequent to the violation, and the nature of the violation, including the damage, injury, or harm.

**Disciplinary Files and Records**

38. Case referrals may result in the development of a disciplinary file in the name of the student, the file shall be voided if the charge is not substantiated.  Voided files will be so marked, shall not be kept with active disciplinary records, and shall not leave any student with a disciplinary record.

39. The files of students found in violation of any prohibited conduct will be retained as a disciplinary record until their graduation  This provision shall not, however, prohibit any program,

department, college or school of the University from retaining records of violations and reporting violations as required by their professional standards, the University may retain, for appropriate administrative purposes, records of all proceedings regarding violations of the "Code of Student Conduct".  Disciplinary records may be reported to third parties in accordance with University regulations and law

40. Disciplinary records may be removed from the student disciplinary files of the Office of the Dean of Students by the Senior Associate Dean of Students or designee, upon written request of the student, no sooner than one year after the finding of fact for the case  In deciding whether to grant the request, the Senior Associate Dean of Students or designee will consider such factors as the current demeanor of the student, the student's conduct subsequent to the violation, and the nature of the violation, including the severity of any other student's damage, injury or harm

41. Students assigned to complete any sanction as a result of violating any section of this "Code" will have their records encumbered by the Office of Student Judicial Services  The encumbrance will be removed upon completion of all sanctions required by the University

**Conflicts**

42. In event of conflict between the terms of this "Code of Student Conduct" and any other provision of the Guide to Student Rights and Responsibilities, the terms of this "Code" shall govern

*Approved – October, 1996*

## Additional Conduct Regulations

In addition to the Statement of Student Rights and Responsibilities and the "Code of Student Conduct", the following are the principal regulations governing student conduct. They are quoted from official University documents (cited in parenthesis following the title), which are available in the Dean of Students Office.

**A. Violations of Law, Including Laws Proscribing Certain Drugs**
   (Board of Trustees Resolution – October 19, 1968)
The University cannot condone violations of law, including violation of those laws that proscribe possession, use, sale, or distribution of certain drugs. Members of the academic community should know that administrative action, which may include dismissal from the residence halls, revocation of other privileges, or suspension or dismissal  from the University, may be taken in order to protect the interests of the University and the rights of others

**B. Possession of Firearms**
   (Facilities Use Policy)
It is prohibited to possess firearms, explosives, or other weapons on the premises of the University without the explicit authorization of the University, whether or not a federal or state license to possess the same has been issued to the possessor

**C. Unauthorized Entry/Tresspass**
   (Facilities Use Policy)
It is prohibited to enter, without express or implied permission, onto the premises or into a facility or office, to refuse to vacate any University facility, to refuse to cease any unauthorized

activity; to refuse to produce identification after being requested to do so by an Administrative Officer of the University, or by the University Police Department, or to remain without authorization in any facility after closing hours

### D. Misuse of University Identification

(Regulations Governing Student Identification Cards)
1. The student identification card (with picture) is not transferable. The owner of the card will be called upon to account for any fraudulent use of his or her identification card and will be subject to discipline by the University authorities if he or she has aided such fraudulent use. The card will be forfeited if the student to whom it was issued allows any other person to use the identification card.

2. At the end of each semester, or upon the owner's withdrawal from the University, all rights and privileges related to the identification card automatically cease, and in the event of withdrawal, the identification card must be surrendered to the office of the dean of the school in which the student is enrolled or to the office of the Dean of Students.

3. Identification cards must be presented upon request of any University official or agent in the normal conduct of University business or service.

### E. Animals in University Buildings

(Facilities Use Policy)
No animals (including, but not limited to, dogs, cats, or birds) are allowed in any University building, with the exception of service animals (i.e., guide dogs)

### F. Demonstration

(Board of Trustees Resolution – October 19, 1968)
In the event a demonstration at this University exceeds the bounds of free assembly and lawful advocacy, and demonstrators are engaging in unlawful acts that cause or imminently threaten injury to persons or property, or that obstruct or interfere with normal and necessary University activities, the Board of Trustees affirms the authority of the President, or other University officials designated to act in his absence, to take such reasonable steps, if possible after consultation with the Chairman of the Executive Committee of the Faculty Senate and the President of the Student Body, as are required to restore and preserve order; including, if deemed necessary and appropriate, suspension of students or faculty engaging in such acts, and use of such law enforcement personnel as are needed to effect the removal, arrest, and prosecution of law violators. Any such suspension shall be reviewed by an appropriate tribunal as soon after order is restored as is practicably possible

### G. Disruption of University Functions

(Board of Trustees Resolution -- January 16, 1969)
Any member of the University (including as members of the University all persons having a formal connection with the University) who

1. Engages in conduct that unreasonably obstructs teaching, research, and learning, or

2. Unreasonably obstructs free access to members of the University or to University buildings, or

3. Disobeys general regulations of the University, or

4. Damages University property or injures members or guests of the University may be punished for conduct by dismissal from

the University, or by some lesser disciplinary action, through procedures established within the University for the government of its members

### H. Political Activities

(Resolution approved by the President -- October 1970)
1. Neither the name nor seal of the University or any of its schools or institutions should be used on letters or other written material intended for political purposes, or activities

2. No University office and no faculty or staff member's office should be used as a return mailing address for the solicitation of funds for political purposes, or the solicitation of endorsement of candidates for public office, or support for proposed legislation.

3. In political correspondence, the University title of a faculty or staff member should be used only for identification and only when accompanied by a statement that the individual is speaking for himself and not as a representative of the University.

4. Whenever University duplicating machines, computers, or other equipment or supplies are used for political or other non-University purposes, their use must be fully compensated from private funds.

5. No office employee nor other employees of the University should be asked to perform tasks in any way related to political activities while on regular duty.

6. In no case should any action be taken that might implicate the University in any political activities

7. In furtherance of the philosophy expressed in this resolution, the University has granted permission for recognized student organizations to use assigned University facilities for political activities in support of candidates for public office when such activities are directed within and for the University community

### I. Right to Change Rules

(University Bulletin)
The University and its various academic units reserve the right to modify or change requirements, rules and fees. Such regulations shall go into force whenever the proper authorities may determine

### J. Right to Dismiss Students

(University Bulletin)
The right is reserved by the University to dismiss or exclude any student from the University, or from any class or classes, whenever, in the interest of the student or the University, the University Administration deems it advisable

It should be further noted that 1) students living in University residence halls are responsible for the Residential Community Conduct Guidelines and Administrative Policies that are attached to and a part of their leases, and 2) officers and members of student organizations are responsible for the Regulations Governing Student Organizations that are received upon registration of their organization at the Student Activities Center.

### Non-Punitive Administrative Actions

In the course of University administration, faculty and administrators may take actions that have some coloring of punitive action but that, in fact, are not taken with intent to punish the student. Actions of this kind are necessary to the reasonable operation of the University, but

care must be exercised that they do not become devices for avoiding the safeguards established to avoid unfair, arbitrary, or capricious invasions of student rights. An example is the refusal to re-enroll a student with unpaid indebtedness to the University. Another example would be the refusal to re-enroll a student with incapacitating psychological disturbances. Another example would be the requirement that a student pay for damage to University property caused by his or her negligence. These examples are illustrative, not a comprehensive description of these inherent administrative powers. These actions are not governed by the disciplinary procedures of the Statement of Student Rights and Responsibilities or by the "Code of Student Conduct".

## Code of Academic Integrity

### Preamble
We, the Students, Faculty, Librarians and Administration of The George Washington University, believing academic honesty to be central to the mission of the University, commit ourselves to its high standards and to the promotion of academic integrity. Commitment to academic honesty upholds the mutual respect and moral integrity that our community values and nurtures. To this end, we have established The George Washington University Code of Academic Integrity.

### Article I: The Authority of the Code of Academic Integrity

#### Section 1: Jurisdiction of the Code of Academic Integrity
The Code of Academic Integrity shall have jurisdiction over the following schools within the University:

1) the Columbian College of Arts and Sciences,
2) the Elliott School of International Affairs,
3) the Graduate School of Education and Human Development,
4) the College of Professional Studies,
5) the School of Business,
6) the School of Engineering and Applied Science,
7) the School of Public Health and Health Services,
8) all programs in the School of Medicine and Health Sciences, except the Doctor of Medicine program

#### Section 2: Repeal of Prior University Policies on Academic Dishonesty
Academic dishonesty policies of The George Washington University applicable to the aforementioned schools previous to the time of the passage of this Code of Academic Integrity are hereby repealed and are for all intents and purposes null and void. The George Washington University Law School maintains its own code of academic integrity and is excluded from this Code.

#### Section 3: Interpretation
Conflicts or questions about the Code of Academic Integrity (including its interaction with other policies of the University) should be forwarded to the Office of the Executive Vice President for Academic Affairs. The Executive Vice President for Academic Affairs or a designee shall be the final interpreter of the Code of Academic Integrity.

### Article II: Basic Considerations

#### Section 1: Definition of Academic Dishonesty
(a) Academic dishonesty is defined as cheating of any kind, including misrepresenting one's own work, taking credit for the work of others without crediting them and without appropriate authorization, and the fabrication of information.

(b) Common examples of academically dishonest behavior include, but are not limited to, the following:

1) *Cheating* - intentionally using or attempting to use unauthorized materials, information, or study aids in any academic exercise; copying from another student's examination, submitting work for an in-class examination that has been prepared in advance; representing material prepared by another as one's own work; submitting the same work in more than one course without prior permission of both instructors; violating rules governing administration of examinations; violating any rules relating to academic conduct of a course or program

2) *Fabrication* - intentional and unauthorized falsification or invention of any data, information, or citation in an academic exercise.

3) *Plagiarism* - intentionally representing the words, ideas, or sequence of ideas of another as one's own in any academic exercise; failure to attribute any of the following: quotations, paraphrases, or borrowed information.

4) *Falsification and forgery of University academic documents* - knowingly making a false statement, concealing material information, or forging a University official's signature on any University academic document or record. Such academic documents or records may include transcripts, add-drop forms, requests for advanced standing, requests to register for graduate-level courses, etc. (Falsification or forgery of non-academic University documents, such as financial aid forms, shall be considered a violation of the non-academic student disciplinary code.)

5) *Facilitating academic dishonesty* - intentionally or knowingly helping or attempting to help another to commit an act of academic dishonesty

#### Section 2: Reportage
(a) It is the moral responsibility but not the sanctioned obligation (unless otherwise provided herein) of each member of the George Washington University community to respond to suspected acts of academic dishonesty by:

1) consulting the individual(s) thought to be involved and encouraging them to report it themselves, and/or
2) reporting it to the instructor involved, and/or
3) reporting it to the Academic Integrity Council

(b) Reporting oneself after committing academic dishonesty is strongly encouraged and may be considered in determining sanctions.

#### Section 3: Assignments and Examinations
(a) Instructors are solely responsible for establishing academic assignments and methods of examination.

(b) Instructors are encouraged to provide to students clear explanations of their expectations regarding the completion of assignments and examinations, including permissible collaboration

(c) Instructors are encouraged to choose assignments and methods of examination believed to promote academic honesty. Examples of these include careful proctoring of examinations and the constant creation of fresh exams. Collaborative projects and unproctored examinations do not violate the promotion of academic integrity. When assigning collaborative projects or using unproctored examinations, the instructor should explicitly state the expectations of performance for all participants.

(d) Instructors are encouraged to provide opportunities for students to affirm their commitment to academic integrity in various settings including examinations and other assignments. The following statement may be used for this purpose. "I, (student's name), affirm that I have completed this assignment/examination in accordance with the Code of Academic Integrity."

## Article III:  The Academic Integrity Council

### Section 1:  Mission of the Academic Integrity Council
(a)  The Academic Integrity Council will be responsible for promoting academic integrity and for administering all procedures in this Code.

(b)  Administrative and logistical support for the Academic Integrity Council shall be provided by the Office of the Associate Vice President for Academic Planning and Special Projects. The office shall be the repository for records pertaining to the Code of Academic Integrity and Academic Integrity Council.

### Section 2:  Composition of the Academic Integrity Council and the Hearing Panels
(a)  The Academic Integrity Council shall have members from each of the participating schools. There will be six students and four faculty members from the Columbian School of Arts and Sciences. There will be four students and two faculty members from each of the following schools: the Elliott School of International Affairs, the Graduate School of Education and Human Development, the College of Professional Studies, the School of Business, the School of Engineering and Applied Science, the School of Public Health and Health Services, and the programs of the School of Medicine and Health Sciences (except the Doctor of Medicine program). The terms of all members shall be one academic year. Members may reapply for additional terms. The process for identifying and selecting candidates to serve on the Academic Integrity Council shall be determined by the Implementation Team, as described in Article V, Section 2.

(b)  At the beginning of each academic year, five presiding officers will be elected by the full membership of the Council, from among the student members, at a meeting convened by the Associate Vice President for Academic Planning and Special Projects or a designee. Insofar as possible, these Officers shall rotate responsibility for presiding over cases. The presiding officer will have no vote in the deliberations on establishing guilt or recommending a sanction at the hearing.

(c)  Hearing Panels selected from members of the Academic Integrity Council shall adjudicate all cases arising under this Code. The Associate Vice President for Academic Planning and Special Projects or a designee will select and convene hearing panels as needed. A Hearing Panel shall be comprised of a presiding officer, two student members and two faculty members. Two of the members shall be from the home school of the respondent(s). One of the members shall be from the home school of the course. Should Academic Integrity Council members from the home schools of the respondent and course be unavailable to adjudicate a case, the Associate Vice President for Academic Planning and Special Projects or a designee may appoint other Academic Integrity Council members as substitutes.

(d)  Cases arising in the summer may be adjudicated in the summer, providing that members of the Academic Integrity Council are available. Otherwise they will be adjudicated during the following academic year.

(e)  All members of the Academic Integrity Council shall participate in training organized by the Associate Vice President for Academic Planning and Special Projects or a designee.

### Section 3:  Selection and Removal of Academic Integrity Council Members
(a)  During each spring semester, a Selection Committee will handle the nomination, application and selection processes of the Academic Integrity Council members who will serve in the next academic year. This committee shall be convened by the Associate Vice President for Academic Planning and Special Projects or a designee, and will be comprised of the following members.

   1)   the Faculty Co-Chair of the Joint Committee of Faculty and Students;

   2)   the Student Co-Chair of the Joint Committee of Faculty and Students;

   3)   the Chair of the Faculty Senate Committee on Educational Policy;

   4)   the Chair of the Student Association Senate Academic Affairs Committee;

   5)   the Chair of the Faculty Senate Executive Committee or a designee;

   6)   the President of the Student Association or a designee

(b)  The following criteria shall be used in the selection of the student members:

   1)   must be students registered for at least three credit hours in a degree-granting program of the School which they are representing;

   2)   must have made satisfactory academic progress and be in good academic standing;

   3)   may not have any disciplinary record or probation of any sort;

   4)   may not hold any position, either elected or appointed, in the Student Association

(c)  The following criteria shall be used in the selection of the Faculty members

   1)   must be full-time faculty members in the School that they are representing;

   2)   may not be elected members of the Faculty Senate

(d)  Members of the Academic Integrity Council who are charged with any violation of this Code or the "Code of Student Conduct" shall be suspended from participation during the pendency of the charges against them. Members found guilty of any violation of this Code or the "Code of Student Conduct" shall be disqualified from any further participation in the Academic Integrity Council. Faculty members involved in a pending case shall not participate on a Hearing Panel during the pendency of the charge

(e)  The Academic Integrity Council, by a two-thirds vote of the membership, may remove a member for non-participation. Each Academic Integrity Council shall, at the beginning of its term, define an expectation of participation for its members

(f)  Vacancies, as they occur, shall be filled by the Selection Committee

### Section 4: Case Procedures

(a)  Charges involving violations of the Code of Academic Integrity may be initiated by either faculty, students, librarians or administrators Any charges should be made as expeditiously as is reasonably possible (normally within twelve working days except in the summer or during academic breaks and holidays) from the discovery of the infraction  Charges may be initiated as follows

1)  A student may initiate a charge of academic dishonesty against another student, by referring the case to the faculty member involved and/or to the Academic Integrity Council If the case is brought directly to the Academic Integrity Council, for action by a Hearing Panel, then the Associate Vice President for Academic Planning and Special Projects or a designee shall promptly notify the instructor of the involved course

2)  When a faculty member initiates a charge or is made aware of a violation which the faculty member determines to be substantive, the faculty member shall contact the Academic Integrity Office in order to discover whether the student has ever been found guilty of a charge of academic dishonesty

   i)   In first offense cases, the instructor shall either act directly, in consultation with the Department Chair, or refer the case to the Academic Integrity Council for action by a Hearing Panel  An instructor who acts directly must present the student with specific charges and a proposed sanction  Sanctions will be determined in accordance with Article III, Section 5 and Article II, Section 2 of this Code

   ii)  If the faculty member acts directly then the accused student shall have the right to appeal directly to the Academic Integrity Council, for action by a Hearing Panel, should he or she disagree with the validity of the charge or the appropriateness of the sanction

   iii) Second offenses shall go directly to the Academic Integrity Council, for action by a Hearing Panel
   iv)  If a faculty member is made aware of a violation which the faculty member determines not to be substantive, the faculty member shall notify the complaining student promptly

3)  All charges initiated by members of the administration or librarians shall go directly to the Academic Integrity Council, for action by a Hearing Panel

(b)  All actions, on any level, shall be recorded with the Office of the Associate Vice President for Academic Planning and Special Projects This includes cases handled directly by instructors.

(c)  Deliberation of the hearing shall occur in two stages  the establishment of guilt and the recommendation of sanction. To find a respondent guilty, three-quarters of the voting panel members must agree. If the panel finds a respondent guilty, they shall also make a recommendation of sanction. A sanction other than expulsion can be recommended by three-quarters of the voting panel members. A sanction of expulsion can only be recommended by a unanimous vote of the voting panel members.

(d)  Reports of the Hearing Panel shall include a finding of fact and a determination of the guilt or innocence of the respondent  If the respondent is found guilty, then the report will also include a recommendation of sanction  Sanctions will be determined in accordance with Article III, Section 5 and Article II, Section 2 of this Code  This report shall be forwarded to the Executive Vice President for Academic Affairs, who will review the report of the Hearing Panel. If in the judgment of the Executive Vice President for Academic Affairs the sanction recommended by the Panel is significantly at variance with sanctions imposed in closely similar cases, the Executive Vice President for Academic Affairs may revise the sanction before notifying the respondent of the Hearing Panel's decision of guilt or innocence and the decision as to sanction  The complainant, appropriate Department Chair and Dean shall receive a copy of the Hearing Panel's report and the Executive Vice President's decision as to sanction

(e)  These proceedings should be concluded as expeditiously as possible  The Hearing Panels should strive to have proceedings concluded within seven weeks of the report of the violation However, failure to do so shall not constitute improper procedure under the Code

### Section 5: Sanctions

(a)  The recommended minimum sanction in first offense cases shall be failure of the assignment in question  The recommended minimum sanction in repeat violation cases shall be failure of the course  For more serious offenses sanction may be suspension from the University for a specified, minimum time or expulsion from the University.  Other sanctions may be appropriate for particular cases

(b)  Sanctions of suspension or expulsion, as a result of academic dishonesty, may only be determined by a Hearing Panel

(c)  Attempts to commit acts prohibited by this Code may be punished to the same extent as completed violations

(d)  Respondents found in violation of this Code may also be removed from certain University programs, in accordance with the regulations and bylaws of that program

(e)  All sanctions except failure of the assignment in question shall be marked on the respondent's permanent record (i.e., transcript) with the phrase "Academic Dishonesty"  In the case of failure of the course, the notation shall remain on the transcript of the respondent for a minimum of two years  In the case of suspension or expulsion, the notation shall remain on the transcript of the respondent for a minimum of three years  After the minimum time has elapsed, the respondent may petition to the Executive Vice President for Academic Affairs for the removal of the sanction notation from the transcript  This provision shall not, however, prohibit any program, department, college or school of the University from retaining records of violations and reporting violations as required by their professional standards, the University may retain, for appropriate administrative purposes, records of all proceedings regarding violations of the Code of Academic Integrity.

### Section 6: Hearing Panel Procedural Guidelines

(a)  All attendant procedures and records of the Academic Integrity Council and its Hearing Panels, from the initial charge to the final resolution, shall be strictly confidential

(b)  Respondents and complainants shall be given notice of the hearing date and the specific charges against them at least five calendar days in advance and shall be accorded reasonable access to

the case file, which will be retained in the Academic Integrity Office. The instructor of the involved course, appropriate academic Dean, Department Chair and the Dean of Students shall also receive notification of the pending charges within five calendar days of the hearing.

(c) The presiding officer may request the attendance of witnesses upon motion of any panel member, or of either party. Only witnesses who can provide direct knowledge about the given case shall be called. Requests must be approved by the Associate Vice President for Academic Planning and Special Projects or a designee, and shall be personally delivered or sent by certified mail, return receipt requested. University students and employees are expected to comply with such requests. Complainants and respondents shall be accorded an opportunity to question those witnesses who testify for either party at the hearing. Failure of witnesses to appear will not invalidate the proceedings.

(d) Hearings will occur in the absence of respondents who fail to appear after proper notice. In this instance, complainants will still be required to present a case.

(e) Hearings will be closed to the public, without exception. Prospective witnesses, other than the complainant and respondent, shall be excluded from the hearing during the testimony of other witnesses. All parties and witnesses shall be excluded from Panel deliberations. Both the complainant and the respondent may be accompanied by an advisor. The role of these advisors shall be limited to consultation. Under no circumstances are advisors permitted to address the Panel or question witnesses. At the discretion of the presiding officer, violations of this limitation will result in the advisor being ejected from the hearing. The University retains the right to have legal counsel present at any hearing.

(f) Hearings shall be conducted in accordance with the investigatory model of administrative hearings, in which the Hearing Panel assumes responsibility for the questioning of witnesses and the eliciting of relevant evidence. The purpose of the hearing is to establish the facts. The burden of proof shall be upon the complainant, who must establish the guilt of the respondent by a preponderance of the evidence. "Preponderance of the evidence" is that evidence, which when fairly considered, produces the stronger impression, has the greater weight, and is more convincing as to its truth when weighed against the evidence offered in opposition.

(g) Formal rules of evidence shall not be applicable in proceedings conducted pursuant to this Code. The presiding officer shall have the discretion to admit all matters into evidence that reasonable persons would accept as having probative value. Panel members may take into consideration matters that would be within the general experience of University students and faculty members.

(h) The presiding officer shall exercise control over the proceedings to achieve orderly and timely completion of the hearing. Any person, including the complainant and respondent, who disrupts a hearing may be excluded by the presiding officer. The presiding officer shall direct the hearing through the following statements from both the complainant and respondent, questioning and cross-examination of witnesses by both the complainant and respondent, the questioning of the complainant, respondent and any witnesses by panel members, and concluding statements by the complainant and respondent.

(i) Hearings shall be tape-recorded. These tapes will be retained for a period of three years.

(j) Any party may challenge a panel member on the grounds of personal bias. In such cases, panel members may be disqualified from the hearing by the Associate Vice President for Academic Planning

and Special Projects or a designee, or upon majority vote of the remaining members of the Panel, conducted by secret ballot.

(k) Witnesses shall be asked to affirm that their testimony is truthful. False testimony will be subject to charges of intentionally providing false information to the University, pursuant to Part 11(f) of the "Code of Student Conduct."

(l) Affidavits shall only be admitted into evidence if signed by the affiant and witnessed by the Associate Vice President for Academic Planning and Special Projects or a designee. An affiant who is unable to appear may submit an affidavit which has been witnessed by a notary.

### Section 7: Appeals

Appeals of the decision of the Hearing Panel or of the sanction imposed by the Executive Vice President for Academic Affairs shall only be based on new evidence or evidence of bias. After a decision has been confirmed by the Executive Vice President for Academic Affairs, either party may file, within three working days, an intention to appeal with the Academic Integrity Office. A petition of appeal must be filed within five working days of the declaration of intention. Appeals will be reviewed by the President of the University or a designee. The President or a designee will then make a decision on the appeal, based on the petition and the reports of the Hearing Panel and the Executive Vice President for Academic Affairs.

## Article IV:   Amendments to the Code of Academic Integrity

### Section 1: Amendments

(a)   Amendments to the Code of Academic Integrity shall be referred to or initiated by either the Faculty Senate or the Student Association. In order for an amendment to pass, both must approve the measure with a simple majority vote.

(b)   Amendments will then be forwarded to the President of the University for confirmation and submission to the Board of Trustees with the President's recommendation for action.

### Section 2: Reports and Reviews

(a)   The Office of the Associate Vice President for Academic Planning and Special Projects shall make an annual report to the Academic Affairs Committee of the Board of Trustees, Joint Committee of Faculty and Students, the Faculty Senate Educational Policy Committee, the Student Association Senate Academic Affairs Committee, and the Council of Deans on the work of the Academic Integrity Council.

(b)   The Academic Integrity Council may, from time to time, make reports and recommendations to the Faculty Senate, the Student Association Senate or the Joint Committee of Faculty and Students about the state of the Code of Academic Integrity.

(c)   The Office of the Associate Vice President for Academic Planning and Special Projects shall coordinate with the Joint Committee of Faculty and Students to conduct a review of the Code of Academic Integrity after its first year of operation, and then at least once every five years after that.

## Article V: Implementation

### Section 1: Mission of the Implementation Team

(a) The mission of the Implementation Team will be to plan for effective implementation of the Honor Code and to ensure that appropriate, adequate, and timely preparation is completed prior to the date of implementation.

(b) The types of preparation essential to effective implementation include, but are not limited to the following

1) publication and distribution of the Code itself;

2) preparation of documents that relate the Code to practical student and faculty experience and that provide both groups with strategies for avoiding academic dishonesty;

3) inclusion of the Honor Code in the recruitment of prospective students and faculty;

4) planning for student, faculty, and graduate teaching assistant orientation, guidance and training;

5) working out practical details of implementation not explicitly covered in the Code, such as the organization of the Honor Council, the process for identifying candidates for the Honor Council, and the development of an application for Honor Council members;

6) prepare a fuller listing of potential sanctions and guidelines about the offenses for which they might be appropriate;

7) planning ways to maintain a high level of visibility for the Code;

8) developing ways to educate faculty and students about the importance of academic integrity and its impact on the University

**Section 2: Composition of the Implementation Team**
(a) The Implementation Team will be convened by the Associate Vice President for Academic Affairs, upon adoption of the Honor Code

(b) The Implementation Team will be comprised of the following members

1) the Faculty Co-Chair of the Joint Committee of Faculty and Students;

2) the Student Co-Chair of the Joint Committee of Faculty and Students;

3) the Chair of the Faculty Senate Committee on Educational Policy;

4) the Chair of the Student Association Senate Academic Affairs Committee;

5) the Chair of the Faculty Senate Executive Committee or a designate;

6) the President of the Student Association or a designate;

7) the University's General Counsel or a designate;

8) the Dean of the Columbian School of Arts and Sciences or a designate;

9) the Dean of the Elliott School of International Affairs or a designate;

10) the Dean of the Graduate School of Education and Human Development or a designate;

11) the Dean of the School of Business or a designate;

12) the Dean of the School of Engineering and Applied Science or a designate;

13) the Associate Dean of the Health Sciences Program in the School of Medicine and Health Sciences or a designate;

14) the Dean of Students or a designate;

15) any other members of the University the Associate Vice President for Academic Affairs or a designate may deem necessary

*Approved by the Board of Trustees— May 12, 1995*

## Privacy of Student Records

The following statement of policy and procedures has been adopted in compliance with the provisions of the Family Educational Rights and Privacy Act (FERPA) of 1974, as amended.

Students of record in attendance at the University will receive notice of their rights under FERPA by publication in the University Bulletin. Student rights under FERPA are also published in the Office of the Registrar web site at http://www.gwu.edu/~regweb/web-content/policies.html, which is reviewed annually and updated as necessary

### I. Right to Inspect and Review Student Education Records

Any student, once enrolled at The George Washington University as a student of record, shall have the right to inspect and review the student's Education Records, as defined in FERPA, within 45 days of the day the University receives a request for access  Students should submit to the University Registrar, dean, head of the academic department, or other appropriate official, written requests that identify the record(s) they wish to inspect  The University official will make arrangements for access and notify the student of the time and place where the records may be inspected.  If the records are not maintained by the University official to whom the request was submitted, that official shall advise the student of the correct official to whom the request should be addressed

FERPA also excludes certain records from inspection and these records will not be made available  The following records are specifically excluded from inspection

1 Financial records of parents

2 Confidential letters and statement of recommendation entered in the education record after January 1, 1975, to which the student has waived right of access

3 Personal notes of institutional, supervisory and educational personnel

4 Campus law enforcement records, except reports of investigations and incidents that have been forwarded for action or information to other University officials

5 Employee files, if the student is employed by the University

6 Medical, psychological-counseling and psychiatric records, or case notes maintained by appropriate professional personnel.

(Such records may however, be reviewed personally with an appropriate professional of the student's choice.)

7   Admissions record on file in other component units (of the University) in which the student has not yet been enrolled

## II.  Right to Request Amendment of Records

Any student shall have the right to request the amendment of the student's education records that are believed to be inaccurate or misleading   They should.

1   Write the University official responsible for the record.
2   Clearly identify the part of the record they want to be changed, and
3   Specify why it is inaccurate or misleading

If the University decides not to amend the record as requested by the student, the University will notify the student of the decision and advise the student of his or her right to a hearing regarding the request for amendment   Additional information regarding the hearing procedures will be provided to the student when notified of the right to a hearing

## III.  Right to Consent to Disclosure of Personally Identifiable Information from Student Records

Any student has the right to consent to disclosures of personally identifiable information contained in the student's education records, except to the extent that FERPA authorizes disclosure without consent

One exception which permits disclosure without consent is disclosure to school officials with legitimate educational interests   A school official is a person employed by the University in an administrative, supervisory, academic, research or support staff position (including law enforcement unit personnel and health staff), a person or company with whom the University has contracted (such as an attorney, auditor or collection agent); a person serving on the Board of Trustees; or a student serving on an official committee, such as a disciplinary or grievance committee or assisting another school official in performing his or her tasks   A school official has a legitimate educational interest if the official needs to review an education record in order to fulfill his or her professional responsibility

Upon request, the University discloses education records without consent to officials of another school in which a student seeks or intends to enroll

The University may release the following directory information upon request   name, local address (including email), telephone numbers, likeness used in University publications, photographs, name and address of emergency contact, dates of attendance, school or division of enrollment, enrollment status, field of study, credit hours earned, degrees earned, honors received, participation in University recognized organizations and activities (including intercollegiate athletics) and height, weight and age of members of athletic teams.

Any student who does not wish directory information released must file written notice to this effect in the Office of the Registrar.

Absent a court order to the contrary, the University is required to make a reasonable effort to notify the student in the event of a subpoena of his or her educational record or a judicial order requiring the release of such data.

## IV.  Right to File a Complaint

Each student has the right to file a complaint with the Department of Education concerning alleged failure by the University to comply with the requirements of FERPA.  Complaints should be filed in writing to the following address·

Family Policy & Compliance Office
United States Department of Education
400 Maryland Avenue, SW
Washington, D C  20202-0498

## University Policies Available On-Line

Please visit the following websites for additional information·

Collection of University Policies On Line
**http://www.policy.gwu.edu**

The Office of the Vice President and General Counsel
**http://www.gwu.edu/~vpgc/**

The University Police Department
**http://gwired.gwu.edu/upd**

The GWired Network
**http://gwired.gwu.edu**

## A Final Word About Security

The University is located in one of the safest areas of the city, but no campus is free of crime, whether it is urban, suburban, or rural.  All members of the University community should therefore take reasonable precautions to protect themselves and their property

The University Police Department provides 24-hour police service to the campus community and they enforce federal and local statutes as well as GW regulations

Community members, students, faculty, staff, and guests are encouraged to report all criminal and public safety related incidents to the University Police Department in a timely manner   This can be accomplished by calling 994-6110 for non-emergencies or 994-6111 in an emergency   The University Police Department publishes a brochure titled "Pride in Protection and Service" and sends a notice of availability of the brochure to all registered students and all employees on an annual basis   There are also other brochures available at UPD that provide security and safety related information to increase your awareness

**Summary of Programs and Services offered by UPD**

- Emergency Phones located in various areas throughout the campus
- Escort vans and shuttle buses are available to provide safe escorts for students from 7 p m. to 6 a m   Students may be escorted to and from campus within the three-block boundaries of the escort service   For an escort or more information call 994-RIDE

- Crime prevention programs are available to groups upon request. Topics range from general crime prevention practices to sexual assault prevention.
- Community Service Aides are on duty in several buildings on campus to monitor access and provide additional "eyes and ears" for the University Police Department.
- Sexual Assault Crisis Consultation Team: members are trained and prepared to assist the survivor of sexual assault or rape 24 hours a day
- Self-Defense classes are available to students and employees Call 994-6994 for dates and times

GW is committed to assisting all members of the GW community in providing for their own safety and security. Information regarding campus security and personal safety including topics such as, crime prevention, university police law enforcement authority, crime reporting policies, crime statistics for the most recent three year period, and disciplinary procedures is available by accessing our web site at http://gwired.gwu.edu/upd or from the UPD at 2033 G Street, NW, Woodhull House, Washington, DC, 10052 (202) 994-6948.

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 11

(Email Communication by Dean to Trigger Professional Comportment Review)

| | |
|---|---|
| **From:** | W. Scott Schroth |
| **To:** | Lee, Juliet |
| **Date:** | 10/18/2006 10:21:30 AM |
| **Subject:** | Re: Fwd: MJ |

ok, juliet, thanks. this is very concerning. so i assume this means he will receive at least a conditional (if not a fail) grade for the surgery clerkship? if so, i need to know ASAP because it will mean that we must pull him out of the honors curriculum (!) and integrate him back into the standard curriculum. will reza's evaluation be submitted as part of his formal surgery evaluation? i think it should be, and it may trigger a professional comportment committee review. i will go over it with the other deans.

scott

W. Scott Schroth, MD, MPH
Senior Associate Dean for Academic Affairs
Associate Professor, Dept. of Medicine


>>> Juliet Lee 10/18/2006 9:40 AM >>>
Hi Scott
Here is the write up from the Chief Resident on the Surgery service for MJ Hajjar-Nejad.
As we discussed before, he had much difficulty on the surgical rotation on a number of issues. I think the residents and attendings tried very hard to work with him. I also confronted him early on about his shortcomings. I am also quite troubled by the professionalism and integrity issues as outlined in the attachment as well as verbal communications I reeived from the residents. I know Reza Askari very well as do you; he is a residents and physician of high integrity who gave him the benefit of the doubt. I also witnessed Reza giving him essentially daily feedback.



— Exhibit 1, p 97

**E38**

97

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 12

(GWU Disruption of University Functions Policy)



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

| |
|---|
| **Responsible University Official**: Chief, University Police **Responsible Office**: Board of Trustees **Origination Date**: January 16, 1969 |

# DISRUPTION OF UNIVERSITY FUNCTIONS

## Policy Statement

No member of the University shall: a) Engage in conduct that obstructs teaching, research or learning; or b) engage in conduct that obstructs free access to members of the University or to University buildings; or c) disobey general regulations of the University; or d) damage University property or injure members or guests of the University.

## Reason for Policy/Purpose

The purpose of this policy is to promote an environment conducive to education and research activities.

## Who Needs to Know This Policy

Faculty, Staff and Students

## Table of Contents                                           Page #

Policy Statement ...................................................................................1
Reason for Policy/Purpose.......................................................................1
Who Needs To Know This Policy .............................................................1
Table of Contents........ ......................... ..........................................1
Policy /Procedures ...................................................................................2
Website Address .......................................................................................2
Definitions.................................................................................................2
Related Information ..................................................................................2
Who Approved This Policy ......................................................................2
History/Revision Dates ............................................................................3



~ Exhibit 3, pgs 37-36 ~

DISRUPTION OF UNIVERSITY FUNCTIONS

## Policy/Procedures

Examples of disruptive conduct include, but are not limited to: Engaging in riots or demonstrations that exceed the bounds of free assembly or lawful advocacy; engaging in conduct that causes or threatens injury to persons or property; acting without authority to prevent another's access to University buildings, facilities or events; interfering with or obstructing fire, police or emergency officials acting in performance of their duties; destroying or damaging University property or the property of others; or causing false fire alarms, or making false reports of emergencies or dangerous conditions.

**Violations**
Members of the University may be disciplined for conduct in violation of this policy by dismissal from the University, or by some lesser disciplinary action through procedures established within the University for the governance of its members. Violators may also face criminal prosecution.

## Website Addresses for This Policy

GW University Policies

## Definitions

| | |
|---|---|
| **Member of the University** | A person, group or organization, including visitors, having a  connection with the University, whether the connection is formal or informal, recognized or unrecognized. |
| **University Police Officials** | UPD employees have the authority to enforce this policy. |

## Related Information

Guide to Student Rights and Responsibilities, Code of Student Conduct
Residential Community Conduct Guidelines and Administrative Policies
Employee Handbook
Faculty Code
Board of Trustees Resolution, January 16, 1969

## Who Approved This Policy

Board of Trustees Resolution, January 16, 1969
Dennis H. Blumer, Vice President and General Counsel

2

DISRUPTION OF UNIVERSITY FUNCTIONS

## History/Revision Dates

**Origination Date:**    January 16, 1969

**Last Amended Date:**    April 10, 2006

**Next Review Date:**    April 1, 2007

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON*
*UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 13

(Correspondence and E-Mail Communications re
Professional Comportment Subcommittee Review)



WASHINGTON
UNIVERSITY
MEDICAL CENTER
WASHINGTON DC

OFFICE OF THE DEAN

SCHOOL OF MEDICINE AND HEALTH SCIENCES

TO:  Members of the Professional Comportment Subcommittee
    Bud Wiederman, M.D. Chairman
    Carolyn Rabinowitz, M.D.
    Michael Fishman MSIV
    Rachel Cohn MSIV

FROM:  Rhonda M. Goldberg
    Associate Dean for Student Affairs

DATE:  April 17, 2007

RE:  Review of Mohammad Javad Hajjar-Nejad

    Thank you for agreeing to serve on the Professional Comportment Subcommittee
reviewing Mr Hajjar-Nejad.  The Subcommittee will be meeting on Wednesday, April 25, 2007
in 713 Conference Room for approximately two hours.

Enclosed please find the following documents.

1)  Regulations for M D Candidates (please refer Section E)

2)  Letter from Dean. Schroth to Mr. Hajjar-Nejad informing him of the formation of the Professional
    Comportment Subcommittee

3)  Email correspondence between Dean Goldberg and Mr Hajjar-Najjar regarding the Professional
    Comportment Subcommittee meeting

4)  Application information on Mr. Hajjar-Nejad

5)  Letter from Dean Schroth to Mr. Hajjar-Nejad summarizing meeting of October 23, 2006

6)  First and second year grades

7)  POM evaluation from Years 1 and 2

8)  Third year clerkship evaluations from Medicine, OBGYN, Primary Care. Surgery and Psychiatry

9)  Notes and emails regarding Mr. Hajjar-Nejad during third year rotations

10) Letter and documents sent by Mr. Hajjar-Nejad to President Trachtenberg

I have invited Mr. Hajjar-Nejad to the meeting and have also asked Deans Schroth and Haywood
to be available if you choose to interview them. as well as several clerkship evaluators.

Please feel free to contact me should you have any questions.



- Exhibit 1, pgs 75-94  -

2300 EYE STREET, NW · ROSS HALL 713 WEST · WASHINGTON, DC 20037
202-994-2987 · FAX 202-994-0926

75

| | |
|---|---|
| **From:** | Rhonda Goldberg |
| **To:** | Mohammad Javad Hajjar-Nejad |
| **Date:** | 2/20/2007 4:51 PM |
| **Subject:** | Professional Comportment Subcommittee |

Hi MJ

As you know from Dr. Schroth's letter to you dated December 27, 2006, a Professional Comportment Subcommittee is being formed to review reports about you of unprofessional behavior. I will be facilitating that process. I understand that you were provided the Regulations for M.D. Candidates within which are the Professional Comportment regulations. As you can see, the Subcommittee must consist of two students, from either the third or fourth years, and two faculty members, at least one of whom shall be a member of the MSEC. I am to notify you about the composition of the Subcommittee and you are allowed ten days to object to any person's appointment to the Subcommittee.

The Subcommittee I am proposing is

Dr. Bud Wiederman
Associate Professor and Vice Chair for Education
Dept of Pediatrics

Dr. Tim Crimmins
Faculty Member
Division of General Internal Medicine

Michael Fishman MSIV

Anisha Dua MSIV

Please respond to me in writing (email or paper) by March 2, 2007

Once a Subcommittee membership is approved, I will set up a meeting.

Please feel free to let me know if you have any questions.

Dean Goldberg

76

From:        Mohammad Javad Hajjar-Nejad <mj5@gwu edu>
To:          Rhonda Goldberg <msdrmg@gwumc edu>
Date:        3/2/2007 9:06 PM
Subject:     Response (possibly spam: 10 8668)

Dear Dean Goldberg,

Per your request to call you immediately on Thursday conveyed to the student coordinator Ms Bradford at Children's National Medical center during student day, I am responding because you have told me to do so. You informed me that I have ten days time to respond, and set my deadline as Monday  Therefore, today March 2nd I am responding to you via email and if you request I can provide a signed copy at your office

The Dean's office, with the formation of three committees of three professors and/or deans accepted my application to the Honor's program after review  I was given the results by Dean Schroth. My application was based on two respects: research and three fields of interest  The Dean's office approved my proposal in order for me to participate in this program and complete out this plan

Furthermore, university regulations provide that for any remediation approval by the MSEC is first required. Dean Scott stepped me down from the Honor's program before going through a committee process to verify and investigate the comments of the evaluations  I obeyed with the Office of the Dean and stepped down out of respect for this organization. However, I should have been given due process and taken through the correct procedures. Now that the Dean's office has not done this what is the exact reason for formation of such a subcommittee  The reason is vague. Dean Scott told me during our meeting with Dean Schroth that if I would not step down he would form a committee. Now is after the matter has taken place

Furthermore, Dr. Lee provided in an email to Dean Schroth that I will be able to pass the surgery clerkship given that I have good book knowledge even with the current evaluations and higher score requirements for Honor's students

Also, Dean Schroth provided me with a letter spelling out the program that he has made for me for the third and fourth year of medical school. This was a meeting that you were not present for, but I am sure you have a copy of the letter  He informed me that he is the Dean and this is the program that I must follow. I followed his order  Now that I have stepped down from Honors, what is this committee supposed to do?  I don't understand

I would very much appreciate that you inform the other leadership of the Dean's office. If you would like me to do so, please let me know and I will proceed to do so  As I said I have responded objectively and in writing rather than over the phone so as to have no hearsay or ambiguity. I would appreciate it if you respond to me before Shelf exam time nears.

Sincerely,


MJ Hajjar-Nejad, MSIII
GWUSOM

77

From:       Rhonda Goldberg
To:         Mohammad Javad Hajjar-Nejad
Date:       3/8/2007 5:45 PM
Subject:    Re: Response (possibly spam: 10.8668)

MJ,

My email to you on February 20, 2007 was to request that you confirm that you have no objections to any of the proposed Subcommittee members. Since you did not object in your email, I will assume that all are approved and therefore I will set up a meeting to review your situation.
Please understand that the purpose of the meeting is to discuss your behavior reported in your clinical evaluations from the medicine, surgery and obgyn clerkships. I am not clear about your reference to the Honors curriculum or the MSEC in your email. You will, of course, have an opportunity to talk with the Subcommittee and share your views.

I will contact you as soon as a meeting time and date have been set

Please feel free to let me know if you have any questions

Dean Goldberg

>>> Mohammad Javad Hajjar-Nejad <mj5@gwu.edu> 3/2/2007 8 59 PM >>>
Dear Dean Goldberg,

Per your request to call you immediately on Thursday conveyed to the student coordinator Ms. Bradford at Children's National Medical center during student day, I am responding because you have told me to do so. You informed me that I have ten days time to respond, and set my deadline as Monday. Therefore, today March 2nd I am responding to you via email and if you request I can provide a signed copy at your office

The Dean's office, with the formation of three committees of three professors and/or deans accepted my application to the Honor's program after review. I was given the results by Dean Schroth. My application was based on two respects: research and three fields of interest. The Dean's office approved my proposal in order for me to participate in this program and complete out this plan.

Furthermore, university regulations provide that for any remediation approval by the MSEC is first required. Dean Scott stepped me down from the Honor's program before going through a committee process to verify and investigate the comments of the evaluations. I obeyed with the Office of the Dean and stepped down out of respect for this organization. However, I should have been given due process and taken through the correct procedures. Now that the Dean's office has not done this what is the exact reason for formation of such a subcommittee. The reason is vague. Dean Scott told me during our meeting with Dean Schroth that if I would not step down he would form a committee. Now is after the matter has taken place.

Furthermore, Dr. Lee provided in an email to Dean Schroth that I will be able to pass the surgery clerkship given that I have good book knowledge even with the current evaluations and higher score requirements for Honor's students.

Also, Dean Schroth provided me with a letter spelling out the program that he has made for me for the third and fourth year of medical school. This was a meeting that you were not present for, but I am sure you have a copy of the letter. He informed me that he is the Dean and this is the program that I must follow. I followed his order. Now that I have stepped down from Honors, what is this committee supposed to do? I don't understand

I would very much appreciate that you inform the other leadership of the Dean's office. If you would like me to do so, please let me know and I will proceed to do so. As I said I have responded objectively and in writing rather than over the phone so as to have no hearsay or ambiguity. I would appreciate it if you respond to me before Shelf exam time nears.

Sincerely,


MJ Hajjar-Nejad, MSIII
GWUSOM

78

| From: | Rhonda Goldberg |
| To: | Mohammad Javad Hajjar-Nejad |
| Date: | 3/20/2007 5:51 PM |
| Subject: | Professional Comportment Subcommittee |

Hi MJ

Unfortunately Dr. Timothy Crimmins is leaving GW and will not be able to serve on the Professional Comportment Subcommittee. I would like to replace him with Dr. Carolyn Rabinowitz    Please let me know if you have any objections to Dr  Rabioowitz, and if so, please state your reasons.
As you know, you have 10 days to reply but certainly a more prompt reply would be appreciated

Dean Goldberg

79

**From:** Rhonda Goldberg
**To:** Mohammad Javad Hajjar-Nejad
**Date:** 3/22/2007 12:36 PM
**Subject:** Professional Comportment Subcommittee

MJ

Please also approve Rachel Cohn MSIV for the Subcommittee in the event that Anisha Dua will not be able to serve on the Subcommittee.

Thank you

Dean Goldberg

80

From:          Mohammad Javad Hajjar-Nejad <mj5@gwu edu>
To:            <msdrrng@gwumc edu>
Date:          3/30/2007 12:49 AM
Subject:       Response

Dear Dean Goldberg,

As your order to respond within the ten day timeframe I am doing so.

With your permission, I would like to itemize for you the March 2, 2007 letter to your office regarding this matter

1) That according to university regulations approval by the MSEC is required for any remediation

2) The Dean's office removed me from the Honor's program without the formation of a committee

3) I respected the decision of the Office of the Dean which ordered me to step down

Therefore, a committee was not formed at that time which was necessary per University policy   Please refer to the March 2nd letter for the details

Sincerely,


MJ Hajjar-Nejad, MSIII
GWUSOM

81

From:        Rhonda Goldberg
To:          Mohammad Javad Hajjar-Nejad
Date:        4/17/2007 3:44 PM
Subject:     Professional Comportment Subcommittee

MJ,

I have scheduled the Professional Comportment Subcommittee meeting to review your case.  Please meet the Subcommittee at 5:15 pm on Wednesday April 25, 2007 in 713 conference room.

I would be happy to meet with you prior to that meeting to review the process and any questions you may have   Please call Natalie at 994-3176 to schedule a time

Take care,
Dean Goldberg

82

From:          Mohammad Javad Hajjar-Nejad <mj5@gwu edu>
To:            <msdrmg@gwumc edu>
Date:          4/18/2007 6:40 PM
Subject:       Response to Dean's office email on April 17, 2007

Dear Dean Goldberg,


I am writing this letter in response to your email on April 17, 2007 and stating the following based on meritorious grounds and in line with the laws and regulations of The George Washington University

1. That on February 20, 2007 you emailed about a Professional Comportment Subcommittee. (Exhibit 1)

2. That on March 2, 2007 I responded to your email stating that there is no base for the formation of any committee for the reasons stated in my response email. (Exhibit 2)

3. That you responded on March 8, 2007 stating that I did not object and that you would proceed with a committee  However, attention to my March 2nd letter clearly conveys that I objected wholeheartedly Interesting enough you cite that you don't understand my points in regards to the MSEC and the Honor's curriculum (i e., alternative curriculum).  There was a complete disregard for the valid and just points that were raised.  You said that a meeting regarding this subject would be arranged and I would be contacted, but no email was sent. (Exhibit 3)

4. That on March 20 and March 22, 2007 you wrote two emails and did not at all refer to the subject raised by me and according to which University policies my objections were correct or not. (Exhibit 4 and 5, respectively)

5. That on March 30, 2007 I provided three points that elucidated the subject for you.  However, you did not respond until seventeen (17) days later  In your response, you did not respond to the original and main point

6. That on April 17, 2007 you emailed me without attention to my three points raised and no denial of my argument  This means that you agreed to what I said  Furthermore, in accord with what I have learned from you ten (10) days is the allotted time for a response per University procedure  Your response was after the ten day period

7. The policy and rules of our University are a right to its students.  In effect, this is our constitution that we respect  The right that our constitution at GW has given me I have not been allowed to use.  The Dean's offices' unilateral decision making without following University procedures is unjust.



Sincerely,


MJ Hajjar-Nejad, MSIII
GWUSOM

83

**From:**      Rhonda Goldberg
**To:**        Mohammad Javad Hajjar-Nejad
**Date:**      4/19/2007 3:20 PM
**Subject:**   Re: Response to Dean's office email on April 17, 2007

MJ,

   The procedures for the Subcommittee on Professional Comportment are set forth in the 2006-2007 School of Medicine and Health Sciences Bulletin. I would specifically call your attention to Section E of the Regulations for M D. Candidates which sets forth the procedures that must be followed. (this document is also on the www.gwumc.edu website). As is stated in Section E(10), you and or an attorney or advisor may attend the information gathering sessions of the Subcommittee and may speak on your own behalf and present material for the Subcommittee to consider. I would suggest that you direct any issues that you have directly to the Subcommittee. As you have been previously notified, the Subcommittee meeting will take place on Wednesday, April 25, 2007 at 5:15 p m  in 713 Ross Hall.

Dean Goldberg

>>> Mohammad Javad Hajjar-Nejad <mj5@gwu edu> 4/18/2007 6:40 PM >>>
Dear Dean Goldberg,

I am writing this letter in response to your email on April 17, 2007 and stating the following based on meritorious grounds and in line with the laws and regulations of The George Washington University

1. That on February 20, 2007 you emailed about a Professional Comportment Subcommittee. (Exhibit 1)

2  That on March 2, 2007 I responded to your email stating that there is no base for the formation of any committee for the reasons stated in my response email  (Exhibit 2)

3  That you responded on March 8, 2007 stating that I did not object and that you would proceed with a committee However, attention to my March 2nd letter clearly conveys that I objected wholeheartedly  Interesting enough you cite that you don't understand my points in regards to the MSEC and the Honor's curriculum (i.e , alternative curriculum). There was a complete disregard for the valid and just points that were raised  You said that a meeting regarding this subject would be arranged and I would be contacted, but no email was sent. (Exhibit 3)

4  That on March 20 and March 22, 2007 you wrote two emails and did not at all refer to the subject raised by me and according to which University policies my objections were correct or not.  (Exhibit 4 and 5, respectively)

5. That on March 30, 2007 I provided three points that elucidated the subject for you. However, you did not respond until seventeen (17) days later.  In your response, you did not respond to the original and main point.

6. That on April 17, 2007 you emailed me without attention to my three points raised and no denial of my argument  This means that you agreed to what I said  Furthermore, in accord with what I have learned from you ten (10) days is the allotted time for a response per University procedure. Your response was after the ten day period

7  The policy and rules of our University are a right to its students.  In effect, this is our constitution that we respect. The right that our constitution at GW has given me I have not been allowed to use. The Dean's offices' unilateral decision making without following University procedures is unjust.

Sincerely,

MJ Hajjar-Nejad, MSIII
GWUSOM

84

| | |
|---|---|
| **From:** | Rhonda Goldberg |
| **To:** | Mohammad Javad Hajjar-Nejad |
| **Date:** | 4/23/2007 4:47 PM |
| **Subject:** | Professional Comportment Subcommittee |

MJ,

As you know, the Professional Comportment Subcommittee is meeting at 5:15 on Wednesday, April 25, 2007 in 713 Ross Hall conference room.
As I mentioned in my previous email, I would be happy to meet with you prior to that meeting to discuss the process and answer any questions.
I have distributed materials to the Subcommittee for their review, a copy of which you can pick up from Natalie in the Dean's office.  In addition, please notify me by 2:00 p.m on Tuesday, April 24, 2007 if you plan to bring an attorney/advisor to the proceedings   If you would like to submit any material for the Subcommittee to review in addition to the material in the packet mentioned above, please either email it to me by tomorrow evening and I will make copies for them, or bring 5 copies with you to the meeting

Feel free to let me know if you have any questions

Dean Goldberg



From:       Mohammad Javad Hajjar-Nejad <mj5@gwu edu>
To:         Rhonda Goldberg <msdrmg@gwumc edu>
Date:       4/24/2007 1:01 PM
Subject:    Response

Dear Dean Goldberg,

I would appreciate your consideration to my points below  However, there is much to be said and this is in no way all inclusive and does not signify any agreement to anything.

It is a very short notice to tell me today that I can come and get my file one day before Wednesday  This could have been done much further in advance

Also, the notice for this hearing was very late in coming again giving me short notice to bring my attorney I am and have been working very hard to speak with my attorney who is out of town so that he or someone from his law firm would appear  In fact, given the very late notice I have spent most of my time on coordinating my attorney to be present

My family works with two law firms, Ferguson, Schetelich & Ballew, P A  and the Law Offices of Michael Beasley  We are working on finding a partner that practices in D C   Additionally, no discovery has been provided one day before Wednesday.

This is not fair at all

Sincerely,


M.J. Hajjar-Nejad



----- Original Message -----
From: Rhonda Goldberg <msdrmg@gwumc edu>
Date: Monday, April 23, 2007 4:47 pm
Subject: Professional Comportment Subcommittee
To: Mohammad Javad Hajjar-Nejad <mj5@gwu edu>


> MJ,
>
> As you know, the Professional Comportment Subcommittee is meeting at
> 5:15 on Wednesday, April 25, 2007 in 713 Ross Hall conference room
> As I mentioned in my previous email, I would be happy to meet with
> you prior to that meeting to discuss the process and answer any questions.
> I have distributed materials to the Subcommittee for their review, a
> copy of which you can pick up from Natalie in the Dean's office. In
> addition, please notify me by 2:00 p.m. on Tuesday, April 24, 2007 if
> you plan to bring an attorney/advisor to the proceedings. If you
> would like to submit any material for the Subcommittee to review in
> addition to the material in the packet mentioned above, please either
> email it to me by tomorrow evening and I will make copies for them, or
> bring 5 copies with you to the meeting
>
> Feel free to let me know if you have any questions
>

86

> Dean Goldberg

**From:**      Rhonda Goldberg
**To:**        Mohammad Javad Hajjar-Nejad
**Date:**      4/25/2007 11:35 AM
**Subject:**   professional comportment subcommittee

MJ

Please call me as soon as possible

202-994-3176

Dean Goldberg



| From: | Rhonda Goldberg |
|-------|-----------------|
| To: | Mohammad Javad Hajjar-Nejad |
| Date: | 4/25/2007 12:50 PM |
| Subject: | Professional Comportment Subcommittee Meeting |

MJ,

You have not responded to my e-mail of yesterday during which I advised you to let me know by 9:00 a.m. this morning as to whether you wanted an extension of the Subcommittee on Professional Comportment hearing which I offered to you. This morning, we have left multiple voice mails and an e-mail for you asking that you contact me this morning, but you have not contacted me regarding the extension. In light of this, I am attempting to re-schedule the hearing until Wednesday, May 2, 2007 at 5:00 p.m. in Ross Hall 713. I will let you know as soon as possible if that date is confirmed. Please be advised that no further postponements of the hearing will be granted. Once again, I will need to know if you are planning to bring an attorney/advisor. The packet of information distributed to Subcommittee members is available for you to pick up in my office.

Please let me know if you have any questions.

Dean Goldberg

89

From:         Mohammad Javad Hajjar-Nejad <mj5@gwu edu>
To:           <msdrmg@gwumc.edu>
Date:         4/25/2007 3:55 PM
Subject:      Response

Dear Dean Goldberg,

I was preparing for the hearing today.  I recently checked that your office had called and canceled the hearing for today.  I informed my attorney that your office had canceled and has re-scheduled to next week May 2, 2007 at 5:00 P M  at the same location   I will inform him to contact you as soon as possible to forward his request to you and receive the file you recommended yesterday

Sincerely,


M J. Hajjar-Nejad, MSIII
GWUSOM

90

**From:** Rhonda Goldberg
**To:** Mohammad Javad Hajjar-Nejad
**Date:** 4/25/2007 4:38 PM
**Subject:** Re: Response

MJ,

The hearing was postponed at your request of yesterday  Since you did not respond to repeated calls and e-mails today, it was unclear whether you planned to appear this evening and we did not want the Subcommittee members to appear if you were not going to go forward.  That having been said, we are attempting to re-schedule for either next Wednesday or Thursday depending upon the availability of the Subcommittee members and I will let you know once it has been confirmed.

Dean Goldberg


>>> Mohammad Javad Hajjar-Nejad <mj5@gwu.edu> 4/25/2007 3.55 PM >>>
Dear Dean Goldberg,

I was preparing for the hearing today.  I recently checked that your office had called and canceled the hearing for today  I informed my attorney that your office had canceled and has re-scheduled to next week May 2, 2007 at 5:00 P.M. at the same location  I will inform him to contact you as soon as possible to forward his request to you and receive the file you recommended yesterday.

Sincerely,


M.J. Hajjar-Nejad, MSIII
GWUSOM

91

From:       Rhonda Goldberg
To:         Mohammad Javad Hajjar-Nejad
Date:       4/26/2007 7:22 PM
Subject:    Professional Comportment Subcommittee

MJ,

The Professional Comportment Subcommittee meeting has been rescheduled for Thursday, May 3, 2007 at 5:00 p.m. in the 713 Conference Room of Ross Hall.  Please let me know not later than Monday at noon whether or not you will be bringing an attorney/advisor.

Dean Goldberg

92

From:           Mohammad Javad Hajjar-Nejad <mj5@gwu edu>
To:             <msdrmg@gwumc.edu>
Date:           4/27/2007 5:28 PM
Subject:        Rule to Follow for Composition of the Subcommittee 6-19, and in advance Sections 1-
5 (possibly spam: 5 9793)

Dear Dean Goldberg,


Please allow me to summarize my concern (s) and request in line with MD Candidate Regulations and
University policy.

A.)                This email is in no way all inclusive and does not signify any agreement to anything
This only deals with the committee selection and my other motions will be provided on hearing day   The
point of the email below is that the entire issue of discussion was about whether to form a committee or
not. It had nothing to do with selection of its members   This is because I had already stepped down from
the Honor's program       You bypassed that discussion by not responding and by selecting committee
members while the point of a committee was not addressed yet. You did this without first addressing the
factual reasons that would necessitate starting such a process.

B.)                Starting the selection of committee members without given full discourse and
consideration of Sections 1-5 of Article E is plain and simple wrong.  In fact due process was not given
and sections of 1-5 of Article E as spelled out in the Motion abrogated.

1                In my last email on April 18, 2007 I explained that since the start of our dialogue
together you never responded to my original objection.  The objection was that a committee was not
formed at the time I was stepped down from the Honor's program.

2.                You, as a Dean, did not respond to my objection.  I was not told directly that I am not
right and that a committee was being formed for the same reasons as before and that the members of this
committee are as follows

3.                As a result, the original reason for the need to form a committee was not addressed
You rather repeatedly denied me a response and unilaterally proceeded to form and confirm your own
committee members without my input as the record of emails very clearly like daylight shows

4.                If you now wish to form a committee for those same reasons I am guaranteed certain
specific rights from our regulations and university policy.

5.                Additionally, there was never one all inclusive email that put forth the exact factual
reason for formation of a committee and the exact members for that committee for those particular
reasons. There is a lack of a final list of committee members to allow me the right to decide who would be
on such a committee.  This is both haphazard and one-sided, being demonstrable of a complete lack of
respect for the MD Candidate Regulations.  This method of conduct is not straightforward and raises
significant concern.

6.                This is unilateral and haphazard delineating a lack of compliance with the regulations
as set forth.  A number of these points are illustrated below, and are to be provided in a motion requesting
dismissal during the hearing, however I am providing them to you now so that you will have time to correct
the errors and so that you will have been notified well in advance of next week:

a                Section 6 of Article E states that the subcommittee and its chair are to be named by
the Chair of the MSEC.  First, I have not been informed who the chair of the MSEC is.  In your February
20, 2007 email you directly state that you have chosen the subcommittee members.  There was no
response to my March 2, 2007 email questioning the point for the formation of a committee and with a
very direct objection  Your March 8, 2007 response says that you assume all are approved, referring to

93

the members you selected, and that you confirmed without my input. Also, as a side point you state in March 8, 2007 that you will contact me as soon as a meeting time and date have been set. You did not do as you said you would.

b.                    Further, in line with Section 6 of Article E, I have to be notified who of the two faculty members is a member of the MSEC during selection of members  As a Dean you have not notified me so and as a result of this denied my right to know per this article and Section 7 of Article E in approving members of a committee by me.

c                     Moreover, without my confirmation and approval on March 20, 2007 you changed one of the faculty members again in violation of Sections 6 and 7 of Article E

d                     As a continuation of show of neglect for the Regulations you hold students accountable to but you yourself don't follow you changed one of the two (2) students  and have not informed me up until today who of the three (3) students you have emailed me is on the committee that you selected and confirmed all by yourself

7                     I have been denied my right to participate in the selection of a committee for the above stated reasons, in accord with Section 7 of Article E and one that I believe would have an intimate understanding of the idiosyncrasies of the matter due to certain specific circumstances of this case

8                     Also, additional errors in procedure were committed that are present in the Motion that Requests Secondary Dismissal based on errors in procedure.

9                     According to the regulations that allow me a right to participate in this process I have selected the following committee members. Please know that I respect each professor and student that you have suggested, but the guidelines allow me the right to have a say in this matter

10.                   Faculty Member No. 1  Dr. Matthew Mintz, Associate Professor of Medicine

11                    Faculty Member No. 2  Dr  Kurt Johnson, Professor of Anatomy and Cell Biology

12                    Student No. 1.  Asad Chaudhry MSIV

13.                   Student No. 2  Omer Awan MSIII

14.                   These are my selections in accordance with the regulations

Sincerely,

M.J. Hajjar-Nejad, MSIII
GWUSOM

94

***MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON
UNIVERSITY,*** CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S
THIRD AMENDED COMPLAINT**

# EXHIBIT 14

(Twenty One (21) Questions Presented to Subcommittee on
Professional Comportment and Never Answered Against
MD Candidate Regulations)

From Mohammad Javad Hajjar-Nejad <mj5@gwu.edu>

Sent Friday, May 4, 2007 4:30 pm

To msdrmg@gwumc.edu

Subject Questions Presented to and for the Committee

Dear Dean Goldberg,

Here are my questions that the committee stated I have until 5 P.M. today to submit.  I would appreciate you forwarding them to the committee.

(1) If the Dean's office has as its primary response that all concern (s) risen by me will be addressed by the sub-committee, then why does the sub-committee close the door on the matter of grades/evaluations by stating that they will be not be considered but rather the focus will only be on the behavior issues?  Why did the dean's office not respond to my objections and designate the responsibility to the committee which clearly explained that this is not its role?

(2) What is the reason for the above way of proceeding if the behavior issues were drawn from the evaluations, which in turn determine the grades?

(3) During his statement to the committee, Dean Schroths'statement that I had not informed the Office of the Dean about not taking the Surgery Shelf exam does not match with the email from his secretary Ms. Johnson stating that I had spoken to her about this already.  Is there a communication barrier in the Office of the Dean regarding such matters, and if so, what are its implications?

(4) Also, in his timeline Dean Schroth states that this matter started in April of 2006, however, given that the third year clerkships do not start until July, does this timeline provide for an accurate reflection of the facts of this case?

(5) In line with the above question, why did the Dean's office include new documents in the file that were not given to me in advance?

(6) In regards to the above question why was there a letter provided of our October 23, 2006 meeting that was never given to me?  The Dean's office has always communicated with me by email, so why is there not any email record of such a letter?  Also, along with that, why does the letter not accurately reflect the contents of our meeting together as spelled out in my brief to the case?

(7) Will the committee being willing to satisfy the necessary proper investigation of this matter by speaking with my other clinical supervisors (Departments other than medicine and surgery) about my interactions with them and residents during their respective rotations?

(8) Pertaining to the question above, will the committee in order to fully satisfy a proper investigation of this matter explore from the departments in the hospital (other than medicine and surgery) if they give consideration of student behavior in evaluations?

(9) If Dr. Lee thought it was necessary to give me any instructions on performance, why did she not inform me in writing before she submitted her letter to the Deans at the very end of the clerkship?

(10) In line with the question above, was it not late that Dr. Lee has waited until the end of the clerkship to address the matter officially and in writing?

(11) If Dr. Askari thought that it was necessary to give me any instructions on performance, why did he not inform me in writing during the clerkship before submitting his letter to the Dean's office at the end of the clerkship?


— Exhibit 1, pgs 98-102 —

98

(12) In line with the question above, why did Dr. Askari not provide me with official mid-rotation feedback on the Department's official forms?

(13) During questioning of Dr. Lee she admitted that the information that she had conveyed to the office of the Dean in her writing was not first hand information, rather it was secondhand information. Why did she write it as a first hand observation while at the hearing she described that many of her points raised were from other residents?

(14) In line with the question above, what is the consequence both on the student and with regard to the MD candidate regulations given her method of proceeding based on second-hand information?

(15) Dr. Gaskins, the Obstetrics and Gynecology resident, was not my teaching resident (TR) at the start of the evaluation? All of my other colleagues on the rotation were evaluated by Dr. Lenaburg given our interactions with her in teaching sessions. Why did a different TR that had not worked with me directly but for one (1) day evaluate me?

(16) In line with the question above, Dr. Palmer writes that I found the "easy way out of doing work." Given that I was only doing inpatient as part of the Honor's curriculum, why did Dr. Palmer, an outpatient attending comment on my work ethic?

(17) Further, with the above stated question in mind, why were there no comments by Dr. Palmer on my academic performance and understanding which was what our interactions were primarily based on?

(18) In my medicine evaluations, it cites a problem with timing and being on rounds on time. How does this compare when looked at in light of Dr. Jablonover's statement (s) that there was only one known incident of being late according to his knowledge? Does his statement not contradict the generalization (s) made by the Medicine evaluation?

(19) Additionally, how does the interpretation of the medicine and surgery evaluations change based on the good faith reports made by me after a request by the Dean's office for me to put in writing such information? Does the issue of temporal causality factor into this framework given that my report (s) was filed on September 22, 2006, both before the Medicine and Surgery evaluations.

(20) In line with the question above, and generally speaking, is there a disservice done to the facts of this matter when it is examined in bits and pieces rather than connecting the thread of evidence and seeing what transpired in its entirety?

(21) Why were the evaluations that are intertwined with reports on behavior not processed according to the MD candidate regulations with the necessary reviews and committees formed at the correct time in this matter ten (10) months ago?


Sincerely submitted,


MJ Hajjar-Nejad, MSIII

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON*
*UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)


**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**


# EXHIBIT 15

(Letter from University Registrar re Transcript-Letter of No
Transcript)



THE GEORGE
WASHINGTON
UNIVERSITY

OFFICE OF THE REGISTRAR

# LETTER OF NO TRANSCRIPT

April 7, 2008

RE:    Mohammad Javad Hajjar-Nejad

To Whom It May Concern:

The Office of the Registrar is unable to produce a transcript for the above mentioned individual because this student has a hold on their record and it is the policy of the university not to issue transcripts for students who have specific types of holds.

The hold was placed by the Dean of the School of Medicine and Health Sciences and reads "Dismissed per SMHS".

The George Washington University is accredited by its regional accrediting agency, the Middle States Association of Colleges and Schools.

This is an official document of the George Washington University and serves as a valid verification of student information. If you have any additional questions concerning this matter, please call (202) 994- 4900.

Sincerely,

Elizabeth A. Amundson
University Registrar

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 16

(Letter from University Registrar re Transcript-Letter of Record Status)



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

OFFICE OF THE REGISTRAR

# LETTER OF RECORD STATUS

April 14, 2008

Re:   Mohammad Javad Hajjar-Nejad

To Whom It May Concern:

This is to certify that the academic hold (SMHS Dean's Office) preventing the above student from obtaining his transcript was erroneously placed. The hold was intended to prevent future registration, but unwittingly additionally prevented transcript production. The hold was removed on April 8, 2008. The student remains dismissed from The George Washington University for reasons of Professional Comportment effective July 26, 2007.

The George Washington University is accredited by its regional accrediting agency, the Middle States Association of Colleges and Schools.

This is an official document of the George Washington University and serves as a valid verification of student information. If you have any additional questions concerning this matter, please call (202) 994- 4900.

Sincerely,

Elizabeth A. Amundson
University Registrar

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON
UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 17

(Affidavit of Mr. Jad Sarsour, Plaintiff's Emergency Counsel
for MSEC)

# GILL & GALLINGER LLP

### LOS ANGELES | WASHINGTON | ST. LOUIS

1750 Tysons Boulevard, Suite 100
McLean, VA 22102
P: (703) 992-6849
F: (703) 940-7077

November 8, 2007

Mr. Gustavo F. Velasquez
Director

Office of Human Rights
Government of the District of Columbia
One Judiciary Square
441 4th Street NW
Suite 570N
Washington, DC 20001

Re:          Docket No. 08-020-EI

Subject:     *Mohammad Javad Hajjar-Nejad vs. The George Washington University*
             *School of Medicine and Health Sciences*

Dear Mr. Velasquez,

I was present on June 18, 2007 during the MSEC hearing against Mr. Hajjar-Nejad as

emergency counsel.

I witnessed firsthand that he was discriminated against.  I have presented the facts clearly

and concisely below in my affidavit that is signed, sworn and notarized.

Very Truly Yours,

Jad N. Sarsour, Esq.
Gill & Gallinger, LLP
jsarsour@gillgallinger.com

1

# GILL & GALLINGER LLP

LOS ANGELES | WASHINGTON | ST. LOUIS

1750 Tysons Boulevard, Suite 100
McLean, VA 22102
P: (703) 992-6849
F: (703) 940-7077

## AFFIDAVIT FOR DISCRIMINATION

I, Jad N. Sarsour, witness **UNDER OATH SWEAR** that I am an attorney and **TESTIFY THAT:**

1. I fully affirm the accuracy of the facts contained within the Medical Student Evaluation Committee (MSEC) transcript hearing (See Exhibit 2, Transcript, End, pgs. 1-21). It was transcribed by Mr. Hajjar-Nejad after being denied permission to tape record the June 18, 2007 hearing. I was present during the hearing as emergency counsel.

2. The hearing was one-sided and proper defense and freedom to speak freely was not permitted.  Mr. Hajjar-Nejad was not permitted to speak freely, was told to be quiet when trying to defend himself, and was not allowed to ask any questions.  During the end, he was able to speak to the MSEC after being forced to remain silent most of the session.  In fact, prior to the hearings start, the Dean, Ms. Rhonda Goldberg, told him to remain silent and to only respond to questions.  Even while speaking, he was told to stop speaking by Dr. Michael Golder.  Upon examining the regulations, it was apparent that this is not the appropriate procedure. Also, he was denied the right to bring any witnesses forward.

3. Mr. Hajjar-Nejad asked that the committee review and respond to the 21 questions he presented to the lower Subcommittee on Professional Comportment of the MSEC who

2

# GILL & GALLINGER LLP

LOS ANGELES | WASHINGTON | ST. LOUIS

1750 Tysons Boulevard, Suite 100
McLean, VA 22102
P: (703) 992-6849
F: (703) 940-7077

met on May 3, 2007 (See Exhibit 1, pgs. 98-102).  He explained that the Dean removed

him unjustly from the Honors Academic Program based on false evaluations.  He was

told by the Chairman of the Subcommittee that his questions were concerned with

process and thereby all ignored.  This is in violation of the regulations that provide for

questioning and cross-examination (See Exhibit 1, pgs. 130-134).

4. He explained clearly to the members of the MSEC and Chairman of the Subcommittee

   that the restrictions against him were not uniform.  In fact, upon examining the record,

   they are absolutely discriminatory.  In effect the administration of the dean's office

   changed the school's regulations specifically for Mr. Hajjar-Nejad by changing grading

   policies (See Exhibit 3, pgs. 101-114).

5. Mr. Hajjar-Nejad put in plain words that he had communicated with the Deans that he

   was removed from the Honors Academic Program without the formation of a committee

   review process which was necessary because he was admitted into the program based on

   a committee review and the regulations necessitated such a process (See Exhibit 1, pgs.

   75-94).  He conveyed that the Deans, precisely Drs. Scott Schroth and Jim Scott, told him

   to leave the Honors program and stop doing all research on heart disease (See Exhibit 3,

   pgs. 1-18).

6. Mr. Hajjar-Nejad stated that the Dean told him on October 23, 2006 that he did not want

   him to follow a direct path into surgery as a profession.  Additionally, he informed the

3

# GILL & GALLINGER LLP

LOS ANGELES | WASHINGTON | ST. LOUIS

1750 Tysons Boulevard, Suite 100
McLean, VA 22102
P: (703) 992-6849
F: (703) 940-7077

MSEC members that the dean stated his comments on research made the dean angry (See Exhibit 2, Transcript, End, pgs. 1-21).

7. Furthermore, Mr. Hajjar-Nejad elucidated that the dean and his administration were actively discriminating against him during the subcommittee hearing by selectively choosing documents to place on the record for review by the subcommittee.

8. Mr. Hajjar-Nejad enlightened the MSEC that the Dean was pre-informing and biasing clerkship directors against him so that he would receive capricious and damaging academic evaluations. Along with this, he clearly conveyed that he had appealed his grades in medicine and surgery according to the regulations and had not received a response (See Exhibit 2, pgs. 126-127).

9. Mr. Hajjar-Nejad informed the MSEC that the Dean, Dr. Scott Schroth had emailed the Director of the Medicine clerkship, Dr. Robert Jablonover, informing him that he had leveled criticisms at the Director and the Department of Medicine (See Exhibit 2, p.15). This violated the confidentiality clause of the university non-retaliation policy and resulted in retaliation against Mr. Hajjar-Nejad.

10. Additionally, Mr. Hajjar-Nejad stated to the MSEC that Dean Scott Schroth had told the Director of Surgery to give him a conditional or failing grade (See Exhibit 1, p.95) after the Director had explained that he would pass the clerkship (See Exhibit, p. 96). This is a distinct act of discrimination against Mr. Hajjar-Nejad.

4

# GILL & GALLINGER LLP

## LOS ANGELES | WASHINGTON | ST. LOUIS

1750 Tysons Boulevard, Suite 100
McLean, VA 22102
P: (703) 992-6849
F:  (703) 940-7077

11. Importantly, the matter of timing was brought before the MSEC (See Exhibit 1, pgs. 55-
56).  Additionally, upon examination of the record, it showed that the Dean had broken
rules that she had set.  For instance, an apparent ten day filing period for responses was
not honored by the Dean (See Exhibit 1, p.83)

12. On June 24, 2007, I delivered by certified mail a letter to the Dean stating that it was
inappropriate that the dean did not provide Mr. Hajjar-Nejad the subcommittee
recommendations until after midnight of the day of the MSEC hearing.[1]  This was
damaging to him despite the fact that the hearing appeared to me to be fixed by the Dean
in advance.  The Chairman of the MSEC, Dr. Jeffrey Akman, was an employee of the
dean, including the members of the MSEC.

13. The MSEC failed to provide a written opinion or recommendations based on the hearing,
evidence or facts of the case conveyed by Mr. Hajjar-Nejad.  Mr. Hajjar-Nejad's
questions in the MSEC written statement for the MSEC were ignored as were his twenty
one questions for the subcommittee (See Exhibit 2, p.13).  It is unfathomable how a
private institution such as G.W. easily violates the rights of its students by not following
its own regulations or federal civil laws that protect civil rights.

14. The MSEC without any basis decided to dismiss Mr. Hajjar-Nejad from medical school.
Upon review of a memo from the Chairman, the MSEC by way of a motions and secret

---

[1] Letter from Jad N. Sarsour to the George Washington University School of Medicine and
Health Sciences, Office of the Dean, June 24, 2007

# GILL & GALLINGER LLP

LOS ANGELES | WASHINGTON | ST. LOUIS

1750 Tysons Boulevard, Suite 100
McLean, VA 22102
P: (703) 992-6849
F:  (703) 940-7077

voting reached a decision (See Exhibit 1, pgs. 143-144).  No opinion of the faculty or

members of the MSEC was provided.

*Wherefore*, in light of the facts above, I solemnly swear under the penalties of perjury

and my personal knowledge that the contents of this affidavit are true.   Accordingly that Mr.

Hajjar-Nejad has been discriminated against on the bases of his national origin, religion and

retaliated against in violation of the D.C. Human Rights Act of 1977, as amended.


Jad N. Sarsour, Esq.

Signed and Sworn _____ 20 _____ November, 2007


SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE:

5/10/2010

6

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 18

(Mr. Syed H. Zaidi Affidavit, Plaintiff's Counsel for Subcommittee)



# SYED H. ZAIDI

Attorney at Law

37-52, 72nd St, first Floor
Jackson Heights, NY 11372

TEL:  (718) 779-8900
FAX:  (718) 533-0007

December 10, 2007

Mr. Gustavo F. Velasquez, Director
Office of Human Rights

Re:          Docket No. 08-020-EI

Subject:     *Mohammad Javad Hajjar-Nejad vs. The George Washington University
             School of Medicine and Health Sciences*

Dear Mr. Velasquez,

I was emergency counsel to Mr. Mohammad Javad Hajjar-Nejad on May 3, 2007

for the Subcommittee on Professional Comportment of the Medical Student Evaluation

Committee (MSEC).

I have personal knowledge of the facts of this case and that a determination for

discrimination based on the D.C. Human Rights Act of 1977 is warranted.

Sincerely,

Syed H. Zaidi
Attorney at Law

1

## AFFIDAVIT OF DISCRIMINATION

I, Syed H. Zaidi, witness under oath hereby swear that I am an attorney and I testify to the following facts and my attestation is based on my knowledge obtained from the documents and information provided to me by Mr. Hajjar-Nejad before and after the hearing on May 3, 2007, which was conducted by the Subcommittee on Professional Comportment of the Medical Student Evaluation Committee (MSEC).

My affirmation is divided into three parts:

1.  Breaches in regulation of the university and school of medicine in forming a subcommittee

2.  Errors in procedure and violation of civil rights during the subcommittee hearing, and

3.  Further violations of internal university and federal regulations within the subcommittee recommendations.

### I.  Process up to Subcommittee:

i.  As I was present with Mr. Hajjar-Nejad at the hearing, I observed that Mr. Hajjar-Nejad was fully cooperative, directly responded to questioning by members of the subcommittee and maintained a professional demeanor throughout.

ii.  Mr. Hajjar-Nejad advised me that he was informed by Dean Scott Schroth On December 27, 2006, that a Subcommittee on Professional Comportment of the

2

MSEC would be formed against him (Exhibit 3, p. 16).  The purpose of the investigation was to evaluate unprofessional behavior, according to the Dean. On this same day, the same Dean, wrote that in order to complete his third year of medical school a two month repetition of the surgery clerkship was necessary (Exhibit 3, p. 17).

iii.  After a two-month gap, on February 20, 2007, Mr. Hajjar-Nejad was informed by another Dean, that the Subcommittee was going to take place.  This was during the same week of his psychiatry exam, and he felt that the threats of committee formation, precisely coinciding with exam times, was to destroy Mr. Hajjar-Nejad's academics and to be part of an overall larger attempt to harass.(Exhibit 2, p. 5).

iv.  Mr. Hajjar-Nejad communicated his objections to the Dean to the formation of a sub-committee on March 2, 2007, clearly stating that there was no reason to form it, because the dean had already reviewed the matter and made a decision.

First, he objected because the Dean had already decided to remove him from the Honors program and to stop his research on October 23, 2006. Mr. Hajjar-Nejad informed him that L.C.M.E guidelines state students should have the opportunity to perform research (Section B, IS-14 L.C.M.E. Standards for Accreditation of Medical Education Programs). Initially he requested that the Dean allow him to continue his research work.  It was denied by the Dean.

3

Second, Mr. Hajjar-Nejad at that time requested that the decision of his removal from the Honor's Program should be through a committee process but was denied.

It could be easily inferred that Mr. Hajjar-Nejad's request was based on **two principles**:

**First**, that <u>he was admitted into honors program through a nine person committee</u> and <u>the removal should also be through a committee process</u>, and

**Second**, that the regulations require the dean <u>form a committee prior to removing him from his academic program</u> and <u>not to form committee just to confirm his decision</u> which he made ultra vires.

Therefore, taking the regulations into consideration, the dean violated his rights by not forming a committee at the time it was necessary in line with the regulations.  By moving to further punish Mr. Hajjar-Nejad by reopening a closed matter with new late false allegations demonstrates a distinct, biased and prejudiced act of the administration of the Dean's office.

v.    In violation of the regulations, the Dean made appointments of the members of the subcommittee rather than the Chairman of the MSEC (Exhibit 1, p. 76).  It is apparent from the documents that the dean's hands were involved in the entire process from rendering of evaluations, to forming subcommittees and determining punishments and restrictions.

4

v i.    The Dean's involvement is evident from the record.  On October 18, 2006, about a month after the surgery rotation ended and five days before Mr. Hajjar-Nejad's removal from the honors academic program, the Director of the Surgery rotation emailed a written report by Dr. Reza Askari (General Surgery resident) to the Dean (Exhibit 1, p. 97, paragraph 2).  Next, on October 18, 2006, Dean Schroth replies stating that Mohammad will not pass the surgery clerkship, he will be removed from Honors (before even forming the subcommittee or getting its recommendations for removal) and that the resident report should be used to "trigger" a subcommittee on professional comportment (Exhibit 1, p. 97, paragraph 1).  Dean Schroth had already told Dr. Lee on September 22, 2006 not to pass him.  Clearly from all this it is evident that the Dean was retaliating against Mr. Hajjar-Nejad after his good faith report submitted on September 22, 2006 (See Exhibit 3, pgs. 1-15).

vii.    Obviously, his removal from the honors academic program was not based on academic reasons.  Also at that time the Dean made no mention of any professional concerns.  According to the medical school's regulations (herein after referred to as "Regulations") the dean is obliged to inform the student of any professional concerns in writing.  No such action was taken until December 27, 2007, well after Mr. Hajjar-Nejad's removal from the Honors Academic Program and almost three (3) months after the surgery rotation had ended.  This demonstrates mishandling by the office of the dean.  The Dean, against the school's own regulations, dictated what grades Mr. Hajjar-Nejad was to receive, biased his evaluations and used information against him which was not true.

5

viii.    <u>Lack of openness and disclosure</u> is evident from many aspects.  One, when the Dean informed Mr. Hajjar-Nejad on December 27, 2006 about his professional concerns, he never told Mr. Hajjar-Nejad beforehand what would be the subject of the meeting.  Rather, he told him that he wished to discuss his spring semester schedule (Exhibit 4, Section 4a).

ix.    The period between December 27, 2006 (letter) and April 17, 2007 (e-mail) that specifically gives a time for the hearing was a four-month hi-a-tus.  Prima-facie, the motive of the dean to proceed after such a gap of four months lacks bona fides. It may be assumed that the motive could have stemmed from the tragedy at Virginia Tech that happened on April 16, 2007.  It appears that the deans were justifying their actions to retaliate against Mr. Hajjar-Nejad after his September 22, 2006 good faith report and Brief submitted to President Trachtenberg that highlighted student mistreatment, poor medical education and deficiencies in patient care that the administration was responsible for. Or, preemptively acting to punish and investigate Mr. Hajjar-Nejad to make an example of him rather than addressing the above issues he had raised with the Dean's office for the betterment of patients and training of physicians based on the Senior Associate Dean's request.  Dean Scott Schroth had told him to write such a report.  Rather than dealing with such deficiency and tragedy through a university town hall meeting to address student concerns the Dean decided to use this report as an opportune time for his office to punish a student that had provided recommendations for fixing internal university problems that dealt with health care for the District of Columbia area and training of physicians.

6

x.   On April 18, 2007 Mr. Hajjar-Nejad through email informed the Dean that the ten-day rule for filing of responses set by the Dean was not followed (Exhibit 1, pgs. 76, 83).  In fact, the dean himself broke it.  The reason for this is provided above in section (ix).  It is fair to ask the Dean what was the reason for the gap after filing no response at all from March 8, 2007 until April 17, 2007.  The dean suddenly decided that the administration would take advantage of a tragedy. There was no material reason based on fact to form a subcommittee.  Therefore, the dean found the tragedy to be a precipitating factor to restart a discriminatory case against Mr. Hajjar-Nejad.

xi.   On April 27, 2007 Mr. Hajjar-Nejad re-emailed the dean his position that the administration had not followed the medical school's process (Exhibit 1, p.93). He was denied the right to participate in the selection and confirmation of the members as provided for within the regulations.  He was never provided with any specific formal charges against him or factual reasons for forming a subcommittee against him as required by the university guide to student rights and responsibilities (Exhibit 4, Section 6).   Further demonstrating perpetual neglect, Mr. Hajjar-Nejad's objections, although very clearly stated in his emails to the Dean, were ignored numerous times.  No response or reason for such a proceeding was ever provided.

## II.  The Subcommittee Hearing:

xii.   The Subcommittee hearing commenced at 5:00 P.M. on May 3, 2007.  I was present as Mr. Hajjar-Nejad's emergency counsel.  The Subcommittee Chairman

7

was Dr. Bud Wiedermann.   The second faculty member was Dr. Carolyn Rabinowitz.  The student members were Michael Fishman and Rachel Cohn.

xiii.     Dr. Wiedermann stated that the purpose of the subcommittee was to investigate Mr. Hajjar-Nejad's veracity. This was the first time the dean had used this point as the reason of the subcommittee.  Throughout the record there is a constant shift of allegations by the administration.  Initially, Mr. Hajjar-Nejad was accused of having academic problems in order to remove him from Honors (Exhibit 1, p. 127).  Next, after accomplishing this, the Dean shifted to problems with behavior (Exhibit 3, p.16). Therefore, the dean and his administration continued to shift the allegations to conceal the main objective.

xiv.     Dr. Wiedermann further stated that Mr. Hajjar-Nejad's evaluations and grades would not be considered.  This was prejudicial because it connoted a deliberate attempt to do away with all the successes and achievements of Mr. Hajjar-Nejad in order to focus only on what the dean and his administration thought necessary for the sole purpose of punishing Mr. Hajjar-Nejad.

xv.     Mr. Hajjar-Nejad had appealed his medicine and surgery grades because he believed that they were of capricious and inaccurate nature due to the interference in the evaluation process by the Dean (See See Exhibit 2, p. 15; Exhibit 1, pgs. 95-96).   However, the Departments of Medicine and Surgery did not respond to his appeals.   Therefore, his grades for those two remain incomplete. Rather than addressing concerns the subcommittee was focused on meeting the discriminatory and biased objectives of the Dean.

8

xvi.     In addition, Mr. Hajjar-Nejad requested to tape record the session.   And this request was also denied against his right to do so.   As a result, he transcribed the hearing from his memory and generated an accurate transcript of that day based on my review.

xvii.    I requested from the Chairman that the specific charges that are being brought against Mr. Hajjar-Nejad be clearly conveyed at the start before proceeding with questioning.   However, no specific formal charges were given and the Chairman proceeded forward.

xviii.   Mr. Hajjar-Nejad's freedom of speech protected by the First Amendment, his right to Equal Protection specified by the Fourteenth Amendment and his rights for Due Process were violated.   The subcommittee in working for the administration of the dean did not have authority to restrict Mr. Hajjar-Nejad from exercising his rights to free speech.   Yet, they did this exactly by not allowing either me or Mr. Hajjar –Nejad to speak freely, not allowing him or myself to question members of the subcommittee or cross examine witnesses brought against him by the dean to examine their veracity.

xix.     His right to defend himself and present his side of the story was completely taken away by the Dean or the Sub-committee appointed by him.   Also, Mr Hajjar-Nejad was not given the chance to bring forward his own witnesses to testify. This internal proceeding conducted by the dean or the Sub-committee was not just or fair by any means.

xx.     The Subcommittee Chairman allotted Mr. Hajjar-Nejad less than 22 hours, until 5:00 P.M. next day, to submit questions for the subcommittee and for the witnesses.  Mr. Hajjar-Nejad with my assistance submitted twenty-one questions to the subcommittee but not a single one of them was answered.  Each and every question was ignored, solidifying the one-sided nature of the proceedings. All of the subcommittee members were of particular ethnicity, either employees or students of G.W. I did not find any of them fair, unbiased or impartial. The recommendations cite that the Chairman had specified the questions of Mr. Hajjar-Nejad "clarify his actions," but I, as a witness at the hearing and having first hand knowledge of the proceeding I can state with surety that the facts were otherwise. (Exhibit 1, p. 133).  Furthermore, the school's regulations state that the student may ask questions without any caveats or restrictions, not  as the Chairman is stating. It is clear that the Chairman and the members were not investigating but in contrast they were aiding in implementing the dean's decision to dismiss Mr. Hajjar-Nejad from medical school as it was conveyed by the Dean on October 23, 2006 after Mohammad Javad requested a committee review before removal from the Honors Program.  Further, they were lending support to the decisions already made by the dean in removing Mr. Hajjar-Nejad from honors, stopping his research and harassing him on three specific occasions during exam weeks.

xxi.    Given that I was not permitted to speak either, I was unable to raise important points in questioning.  Mainly, that Mr. Hajjar-Nejad had pointed out to me that, according to the L.C.M.E Standards for Accreditation of Medical Education

10

Program, the governing board that oversees the medical school cannot have members with a pecuniary interest in the medical school or its related enterprises.  I was informed that the Dean of the G.W. Medical School is a member of the Board of Trustees of the Medical Faculty Associates (M.F.A) outpatient facility and a member of the faculty senate.  Thus, this organizational arrangement provides for a relevant conflict of interest in this case.

xxii.    The University has failed to abide by federal and local regulations pertaining to civil rights and human rights.  The medical school administration has not abided by the rules and regulations that it has set within the Regulations for M.D. Candidates.  The University did not follow the Guide to Student Rights and Responsibilities.  Moreover, certain of the medical school's regulations hindered and violated Mr. Hajjar-Nejad's rights under the first and fourteenth amendments. Hence, the regulations are not constitutional.

xxiii.    The testimonies provided against Mr. Hajjar-Nejad during the subcommittee hearing were lacking the test of veracity, contained contradictory statements, facts twisted, and were not based on direct observations (rather based on secondhand information and hearsay).  The witnesses lacked accountability for what they had written against Mr. Hajjar-Nejad.  He was not allowed to cross-examine the witnesses.  I was not permitted by the Chairman to ask a single question to check the statements.  Specifically, Dean Schroth accused Mr. Hajjar-Nejad of not being forthright with him about not taking his surgery shelf exam.  Although he knew that for the honors program, students have the right to

11

take their exams on a flexible schedule, rather than the fixed schedule for the traditional program.   But he was asked this question to put him in spot. As counsel, I attempted to put a question to Dean Schroth based on Exhibit 3 page 57 paragraph/e-mail 3 that showed Dean Schroth's secretary was informed of Mr. Hajjar-Nejad's plans for taking the exam later.  But the Chairman blocked my question during the hearing.  It was re-asked in the 21 questions presented to him and for the subcommittee but not responded to again (Exhibit 1, pgs. 98-102).

xxiv.    **Section on Witnesses:**

   **A. Dr. Schroth, Associate Dean:**

   a.  Dean Schroth is the Director of the Honors Academic Program.

   b.  Dean Schroth provided a timeline with documents.

   c.  During the interview, he admitted that he has recommended one (1) professional comportment hearing in his ten years as Dean at G.W. Further, he informed Mr. Hajjar-Nejad that his good faith report was the only one of its like he had received in his ten years as Dean. *This confers the fact that Mohammad was retaliated against only because of his good faith report.*

   d.  Within his timeline, a contradiction with regards to stopping Mohammad's research exists.  Namely in a personal memo (Exhibit 1, pgs. 48-49) he writes that he ordered that research be stopped, in direct violation of the non-retaliation policy. This goes against a letter never received by Mohammad until receiving the hearing file from the Dean.  In that letter, Dean Schroth writes that stopping research was only on an advisory basis and not forced.  *On October 23, 2006, he was ordered to stop his research on heart disease. The letter is an invalid attempt to correct incorrect actions on this day.*

   e.  In Mohammad's acceptance e-mail from Dean Schroth (Exhibit 5, p. 9B) for the Honors Academic Program, the Dean writes that Mohammad was *"selected"* based on his *"independent, self-directed, and flexible personality[y]."*  After the good faith report there is a

12

distinct change by Dean Schroth in his representation of Mohammad from positive to severely negative, reflected in his email to the Clerkship Director of Medicine. *The dean actively discriminated against him by biasing other instructors against him.*

f.  Dr. Jablonover changes his views of Mr. Hajjar-Nejad after the intervention of Dean Schroth. He changes his views on him from *"very conscientious to defensive," "enthusiastic to resistant," and "disciplined to "closed to constructive feedback."* (Exhibit 2, pgs. 15-17). The dean's intervening caused Mr. Hajjar-Nejad to be retaliated against by the Department of Medicine because he told them that Mohammad had criticized the entire Department, including the Director. This was against the confidentiality policy of the university and a presentation of facts in different manner by the Dean Scott Schroth (Exhibit 2, p.7). *The dean's interference resulted in retaliation and capricious and inaccurate evaluation by the Department of Medicine.*

## B. Dr. Jablonover, Clerkship Director of Medicine

a.  The influence on Dr. Jablonover by Dean Schroth is shown by the record. The motivation behind Dean Schroth's actions is also clear. *Chiefly, he was retaliating against Mohammad for his good faith report by biasing Dr. Jablonover against him.*

b.  The Medicine evaluation cites that Mohammad had difficulty generating a differential diagnosis on patients. *This was not correct as proven by the record.*

c.  The Director on August 23, 2006, informed Dean Schroth that Mohammad made an excellent presentation on a patient with abdominal pain and was able to provide *"an appropriate differential diagnosis" (Exhibit 2, pgs. 16-17). Thus, Dr. Jablonover's statement contradicts the medicine evaluation.*

## C. Dr. Gaskins, Obstetrics and Gynecology resident; {(Dr. Palmer)-not a witness, Outpatient Clinic Attending Holy Cross Hospital (HCH)}

a.  Mohammad and I were not allowed to speak and defend.

b.  Mohammad was evaluated by a different resident than the rest of his classmates.

13

c. Dr. Gaskins, who evaluated him, did not work with him on a clinical basis.  Mr. Hajjar-Nejad had <u>only one brief interaction</u> with her on the last day of the rotation.

d. During questioning by the Chairman, she failed to remember if she was the teaching resident during the entire period or if she made the schedule for students.

e. She was not accountable for her accusations and demonstrated lack of responsibility.

f. Dr. Palmer was an outpatient clinic attending that evaluated him on a clinical basis, however, no clinical interactions existed between the two.  *In so doing, the clinic attending made a statement against the facts and damaging by saying that Mohammad finds "the easy way out of doing work."*

g. Mohammad was an Honors student and he explained to me that Honors students do no clinical work for the first six months of the third year.

## D. Dr. Lee, Clerkship Director of Surgery

a. Mohammad and I addressed in his questions for the subcommittee that Dr. Lee did not inform him of any clinical problems during the surgery rotation (Exhibit 1, p.98, questions 9 and 10).

b. Mohammad informed me that the L.C.M.E. requires that if there are any issues with performance students should be evaluated early enough to correct themselves (Section C, ED-31 L.C.M.E. Standards for Accreditation of Medical Education Programs).

c. Dr. Lee did not do so.  No real problem existed.

d. Dr. Lee stated in her responses that her written reports against Mohammad were based on second-hand reports from residents that she failed to identify.  *Dr. Lee at no point during the rotation attempted to clarify these reports she claimed to have received that she based her judgment on.*

e. Dr. Lee's statements about Mohammad's physical examination skills contradicted her residents' evaluation.  She stated that his skills were not at the level they should be, while he rated them as appropriate for

14

a third year medical student.  Also, during questioning she admitted that she never saw Mohammad examine a floor patient (on the ward), despite her claims about his physical exam skills.  *Hence, she made her claims based on somebody's suggestions and on hearsay, not on direct observation.*

 f. Mohammad provided me with a report of his end of third year exam report that evaluates physical skill (Exhibit 1, p. 65).  He passed above the class average.

## E.  Dr. Askari, General Surgery Chief Resident

 a. Dr. Askari was the Chief Resident of General Surgery on Mohammad's team one of general surgery.

 b. Dr. Askari's responses to questioning by the subcommittee did not follow along with his written statements.

 c. He stated that the information he had reported was conveyed by other residents to him that were not identified.

 d. His reports were not based on direct observation.

 e. Mohammad reported Dr. Askari's wrongdoings as a resident (Exhibit 4, Section 5), that show lack of adherence to L.C.M.E resident teaching guidelines (Section C, ED-24 L.C.M.E. Standards for Accreditation of Medical Education Programs).

xxv. It is very obvious from the above tat the Dean's office interfered in the grading and evaluation process of Mr. Hajjar-Nejad in order to retaliate against him for his good faith report.  On August 25, 2006 the Dean, Dr. Scott Schroth, emailed the Director of Medicine telling him that Mr. Hajjar-Nejad had leveled criticisms at the level of the Director and Department of Medicine against the university's non-retaliation and confidentiality policies. Dean Schroth biased Dr. Jablonover's view of Mr. Hajjar-Nejad from seeing him as a "very conscientious, enthusiastic, and disciplined student" with valid concerns of "experiences not conducive to

15

learning" to describing him as someone "defensive," "resistant," and "closed to constructive" criticism (Exhibit 2, page 7).

xxvi.    According to the evidence cited above it  could be inferred that the Dean interfered in the grade of Mr. Hajjar-Nejad in the Surgery rotation. The Dean told the Director of the Surgery Clerkship not to give him a passing grade, but a conditional or failing grade to remove him from the Honors Academic Program (Exhibit 2, p.19).  This email very clearly shows that the dean was discriminating against Mr. Hajjar-Nejad.

xxvii.    During interview of witnesses brought by the Dean, it became clear that there was a general lack of accountability to what the witnesses had provided in the form of written statements, there were contradictions when the testimonies were compared to other relevant documents or other testimony, and statements were made that were secondhand and based on hearsay.

###    III.  Subcommittee Recommendations:

xxviii.    On June 18, 2007 the Subcommittee recommendations were sent to Mr. Hajjar-Nejad at 12:03 A.M. The dean did not send them within an appropriate time so that we could review the recommendations and for Mr. Hajjar-Nejad to arrange for my presence at the hearing.  The Subcommittee concluded that it found no proof or evidence of any untruthfulness by Mr Hajjar-Nejad.  The original purpose of the investigation as stated by the Chairman on May 3, 2007 was to investigate veracity.  As a result, this matter should have been dropped by the

16

Dean. However, the dean and his administration discriminated against Mr. Hajjar-Nejad by requiring him to repeat any courses he received a low pass in (Exhibit 3, pgs. 95-100).  While Mohammad informed me that the current university policy was that a low pass and a pass are the same and appear as pass on the final transcript.   Hence, he was being held to a different standard than his other classmates.  Also, the Dean informed him via telephone that this meant he must repeat the medicine, surgery and obstetrics and gynecology rotations (Exhibit 2, End, pgs. 1-21, hearing transcript). However, Mr. Hajjar-Nejad received a high pass in the obstetrics and gynecology rotation (Exhibit 1, p.135).  Further, the dean was carrying out his objective of hindering Mr. Hajjar-Nejad's ability to succeed and get a residency position in surgery through the NRMP (National Resident Matching Program) by forcing him to take a leave of absence.  The dean stated such on October 23, 2006 to Mr. Hajjar-Nejad if he were not to comply with the dean's order to step down from the Honors Program.  The dean's administration, included in the recommendations, that Mr. Hajjar-Nejad take a leave of absence and that the baseless information created by the Dean's administration would be placed on his permanent academic file.  This clearly shows the dean's hand within the generating and writing of these restrictions by the Subcommittee Chairman.

xxix.   On July 26, 2007 Mr. Hajjar-Nejad was dismissed from the medical school by the Dean, Dr. Jim Scott (Exhibit 1, p. 136).  The dean did not follow the regulations that require him to allow Mr. Hajjar-Nejad to stay enrolled in his

17

course of study until a final decision is made (Exhibit 4, Section 6).  The final decision was to be made by the Vice President for Academic Affairs (VPAA).

xxx.    The Medical Student Evaluation Committee (MSEC) did not act according to the medical school regulations.  They are permitted to either remand the matter back to the Subcommittee or provide for a written recommendation.  They took neither of these actions.  Instead, the MSEC Chairman Dr. Jeffrey Akman writes to the Dean Jim Scott that through motions and secret ballot voting the MSEC decided to dismiss Mr. Hajjar-Nejad from medical school (Exhibit 1, pgs. 143-144).  This decision removes Mr. Hajjar-Nejad's civil liberties to pursue a medical education in the United States free from fear of discrimination against his religion or national origin.

xxxi.    On August 7, 2007 Mr. Hajjar-Nejad appealed to the Vice President for Academic Affairs based on numerous regulation violations by the Dean and his administration (Exhibit 1, pgs. 33-46). I submitted a cover letter to the Vice President for Academic Affairs for the appeal.  Mr. Hajjar-Nejad hand delivered it, along with the five exhibits, to Ms. Miki Kaplan.

xxxii.    On September 13, 2007 the designee of the Vice President for Academic Affairs, Ms. Carol Sigelman, informed me that she concurred with the Dean of the School of Medicine.

I affirm that the contents of this affidavit are true and based on my personal knowledge, the documents reviewed by me and the information provided by Mr. Hajjar-Nejad,.  I

18

believe that Mr. Hajjar-Nejad has been discriminated against on the bases of either of his national origin, religion or ethnicity and was retaliated against in violation of the D.C. Human Rights Act of 1977, as amended.

_____
Syed H. Zaidi
Attorney at Law

Signed and Sworn ___10th Day of December, ~~November~~, 2007

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE:

_____
Notary Public

MADHUREEMA GUPTA
Notary Public, State of New York
No. 02GU6118709
Qualified in Queens County
Commission Expires Oct. 12, 20XX

19

*MOHAMMAD JAVAD HAJJAR-NEJAD v THE GEORGE WASHINGTON UNIVERSITY,* CIVIL ACTION NO. 1:10-cv-0626 (CKK)

**PLAINTIFF'S**
**THIRD AMENDED COMPLAINT**

# EXHIBIT 19

(Offer of Acceptance)

Case 1:10-cv-00626 CKK Document 18-2 Filed 08/20/10 Page 1 of 9



THE GEORGE
WASHINGTON
UNIVERSITY
MEDICAL CENTER
WASHINGTON DC

OFFICE OF ADMISSIONS
SCHOOL OF MEDICINE AND HEALTH SCIENCES

Date: **November 5, 2003**

### OFFER OF ACCEPTANCE

Upon recommendation by the Committee on Admissions, with approval of the School of Medicine and Health Sciences of The George Washington University, **Mohammad Ja Hajjar-nejad (AAMC: 11569366)** is hereby offered admission to the Doctor of Medicine degree program for the academic year beginning on August 18, 2004. This offer is subject to conditions set forth below and execution of the Certification by Applicant.

### CONDITIONS FOR ADMISSION

1  As a condition of admission, you must complete your application file by ensuring that all materials required for consideration of your application, even if not listed on application materials, are provided to the SMHS. This includes all coursework with grades not on the AMCAS application, complete official transcripts for each college and graduate school attended, and complete official transcripts for each course (elective or required) taken prior to the commencement of your Doctor of Medicine degree program. All transcripts must be submitted directly to SMHS by the registrars of each college and graduate school attended and must demonstrate, in the determination of the Committee on Admissions, satisfactory completion of all courses. The SMHS Office of Admissions reserves the right to rescind your conditional acceptance in the event that it determines that your performance in required or elective coursework is substantially lower than that reflected at the time you applied for admission. All required transcripts are due no later than July 15, 2004 or your place in the SMHS Doctor of Medicine degree program will be forfeited.

2  As a condition of admission, if you are registered in college, university, or professional school, successful completion of the academic year or special session is required. The GWUMC Office of Admissions reserves the right to rescind acceptance in the event that it determines that your performance in required or elective coursework is substantially lower than that reflected at the time you applied for admission

3  As a condition of admission, you must demonstrate financial ability pay tuition and related expenses throughout matriculation in the SMHS Doctor of Medicine degree program. SMHS reserves the right to defer your entry into the Doctor of Medicine degree program until it receives financial information sufficient to demonstrate such ability

4.  As a condition of admission, you must complete the following requirements:

### CERTIFICATION BY APPPLICANT

- I hereby accept the conditional offer of acceptance by The George Washington University School of Medicine and Health Sciences for admission in the Doctor of Medicine degree program for the academic year beginning with mandatory orientation on August 18, 2004

- I will arrange my program of studies to complete satisfactorily the conditions for admission as set forth above

- I understand that, prior to the commencement of my first year in the Doctor of Medicine degree program, I must have completed a minimum of eight (8) semester hours (including two (2) semester hours of lab work) in each of the following: biology or zoology, general (inorganic) chemistry, organic chemistry, and physics. In addition, I understand that a minimum of six (6) semester hours of English must be completed

- I understand that the SMHS has an Honor Code, which I agree to sign at orientation. As a medical student, I agree to abide by this Code.

- I understand that I will be subject to the Regulations for M D Candidates that are set forth in the SMHS Bulletin As a medical student, I agree to become familiar with the Bulletin and the Regulations and to abide by them

- I understand and agree that I have an ongoing obligation to report to SMHS Office of Admissions any charges or convictions of a legal violation (other than a minor traffic violation) between the time of my application for the Doctor of Medicine degree program and my matriculation in the program. I further understand and agree that, during this time period, I also have an ongoing obligation to report to the Office of Admissions any disciplinary actions (including, but not limited to, probation, suspension and/or dismissal) taken against me by any educational institutional that I have attended. I agree to abide by these reporting obligations

- I understand that in order to reserve my place in the Doctor of Medicine degree program, I must pay a $100 deposit I understand that this deposit is due between May 1 and May 15, 2004 and will not be refunded after May 15, 2004

- I understand that there will be a **$2,900** tuition prepayment required on or before June 15, 2004 I also understand that this prepayment will be refunded if I withdraw my acceptance prior to July 1, 2004 I also understand that this prepayment will not be refunded if I withdraw my acceptance after July 1, 2004.

- I understand that I must provide proof of health insurance at orientation and that I must maintain health insurance during my matriculation at SMHS

- I understand that the submission of false or misleading information or material omission in connection with the application process shall be grounds for withdrawing my conditional offer of acceptance to SMHS I further understand and agree that if any such submissions or omissions are discovered after matriculation in the Doctor of Medicine degree program or award of a degree, SMHS has the right, in its sole discretion, to dismiss me from SMHS and/or revoke my degree.

- I agree to comply with all Conditions of Acceptance set forth above and represent that I understand and will comply with the statements in the foregoing Certification of Acceptance

*M.J. Hajjar-Nejad*        *November 7, 2003*
Signature                        Date

**This Offer of Acceptance is valid only if signed and returned by November 26, 2003. Please sign and return the original of this signed Offer of Acceptance and retain a copy for your records.**

**This Offer of Acceptance is null and void if the recipient was a matriculated student in a Doctor of Medicine degree program (at an American or Canadian medical school) on the date of this Offer.**

2300 I Street, NW · Ross Hall, Room 716 · Washington, DC 20037 · 202-994-3506 · Fax 202-994-1753 · EMAIL medadmit@gwu.edu