# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MOHAMMAD JAVAD HAJJAR-NEJAD,

     Plaintiff,

     v.

GEORGE WASHINGTON UNIVERSITY,

     Defendant.

Civil Action No. 10-626 (CKK)

## MEMORANDUM OPINION
(March 31, 2014)

Plaintiff Mohammad Javad Hajjar-Nejad brings this action *pro se* against the George Washington University, principally challenging his dismissal as a medical student from GW's School of Medicine and Health Sciences in July 2007. Presently before the Court is Defendant's [154] Motion for Summary Judgment.[1] Upon consideration of the pleadings[2], the relevant legal authorities, and the record as a whole, the Court GRANTS Defendant's [154] Motion for

---

[1] In Plaintiff's [168] Opposition to Defendant's Motion for Summary Judgment, Plaintiff appears to be seeking not only a denial of Defendant's motion, but also an entry of judgment in his favor, as he "moves this Honorable Court, under Federal Rule of Civil Procedure 56 and the Local Rules of this Court, to enter a judgment in Plaintiff's favor in the above-captioned action." To the extent Plaintiff is implicitly asserting a cross-motion for summary judgment in his opposition, this motion is DENIED for the reasons discussed, *infra*, granting summary judgment in Defendant's favor.

[2] Third Amended Complaint, ECF No. [44] ("TAC"); Def.'s Mot. for Summ. J., ECF No. [154] ("Def.'s MSJ"); Def.'s Mem. in Supp. of its Summ. J. Mot., ECF No. [154-1] ("Def.'s Mem."); Def.'s Stmt. of Material Facts, ECF No. [154-3] ("Def.'s Facts"); Pl.'s Opp'n to Def.'s Mot. for Summ. J, ECF No. [168] ("Pl.'s Opp'n"); Pl.'s Responsive Stmt. of Facts, ECF No. [168-3] ("Pl.'s Facts"); Def.'s Opp'n to Pl.'s Mot. for Summ. J., ECF No. [186] ("Def.'s Opp'n"); Def.'s Consolidated Reply to Pl.'s Opp'n to Def.'s Summ. J. Mot. and Opp'n to Pl.'s Summ. J. Mot., ECF No. [187] ("Def.'s Reply"); Notice of Suppl. Auth. in Supp. of Def.'s Mem. in Supp. of its Summ. J. Mot., ECF No. [193] ("Def.'s Suppl."); Pl.'s Resp. to Def.'s Notice of Suppl. Auth., ECF No. [194] ("Pl.'s Resp. to Def.'s Suppl.").

Summary Judgment. Accordingly, this action is DISMISSED WITH PREJUDICE in its entirety.

## I. BACKGROUND

### A. Factual Background

Defendant the George Washington University ("GW" or "Defendant") is a private, not-for-profit, university located in Washington, D.C. Def.'s Ex. 1 (Goldberg Decl.) ¶ 3. It offers an M.D. degree through its School of Medicine and Health Sciences ("Medical School"). *Id.* ¶ 4. Plaintiff Mohammed Javad Hajjar-Nejad ("Hajjar-Nejad" or "Plaintiff") was an M.D student in Defendant's Medical School from August 18, 2004 until July 26, 2007. Pl.'s Facts ¶ 5. On November 7, 2003, Plaintiff signed an Offer of Acceptance form provided by Defendant confirming his decision to attend GW's Medical School. Def.'s Ex. 3 (Hajjar-Nejad Dep. Exhibits), Ex. 36 (Offer of Acceptance). Plaintiff's Third Amended Complaint presents his race as "Arabic or Middle Eastern," his religion as "Muslim," and his national origin as "Iranian" (the nationality of his parents). TAC ¶ 7.

The standard curriculum for M.D. students at GW's Medical School spans four years, with the first two years focused on classroom instruction in the basic sciences and the final two focused on clinical clerkships and electives. Def.'s Ex. 4 (Schroth Decl.) ¶¶ 3-5. When Plaintiff was an M.D. student, GW also ran an alternative curriculum for third-year students – referred to as the "third year honors curriculum." *Id.* ¶ 6. This Honors curriculum varied from the standard curriculum in the distribution of time spent in the inpatient and outpatient clinical settings. *Id.* ¶ 7. Honors curriculum students also had to perform a special project, which could include such things as basic science research, clinical research, community service, medical humanities research, health policy research, and international health research. *Id.* ¶¶ 8-9. During the 2006-

2007 academic year, W. Scott Schroth, M.D., M.P.H., Senior Associate Dean for Academic Affairs, ("Dean Schroth") ran the Honors curriculum. *Id.* ¶ 1, 13. Plaintiff applied to the Honors curriculum for his third year, and on April 22, 2006, Dean Schroth notified Plaintiff that he had been selected for the program after a review of applications by a committee of nine faculty members. Pl.'s Ex. 12 (Honors Curriculum Acceptance E-mail). Plaintiff's special project as part of the Honors curriculum involved research into cardiovascular disease. Pl.'s Ex. 8 (Plaintiff's MSEC Statement) at 147-52.

Plaintiff's first rotation, or "clerkship," in the Honors curriculum was internal medicine, which was headed by Dr. Robert Jablonover and ran from July 7, 2006 to August 11, 2006. Def.'s Ex. 3, Ex. 14 (Subcommittee Minutes of May 30, 2007) at 1. On July 25, 2006, during this clerkship, Plaintiff sent an e-mail to Dr. Jablonover, reporting an alleged "recent difficulty" Plaintiff was experiencing with a resident who supervised his work. Def.'s Ex. 3, Ex. 4 (July 25, 2006 E-mail) at 1. Plaintiff complained the "tone, manner, and actions" of this resident were "very unprofessional and coercive." *Id.* at 1. Plaintiff also detailed several disagreements with this resident, whom he felt was interfering with his education. *Id.* at 1-2 ("[A] learning environment should be positive and conducive to student learning. This resident has become an obstacle to this."). Dr. Jablonover replied to Plaintiff's e-mail the same day stating "thank you for your message and for bringing this to my attention. It would be difficult for me to meet today at 1:30; would 4:30 be okay today?" Def.'s Ex. 3, Ex. 8 (Jablonover-Schroth E-mail Exchange) at 2. Based on e-mails in the record, Dr. Jablonover apparently met with Plaintiff regarding his concerns with this resident and e-mailed other doctors asking them to "meet with [this resident] to anonymously discuss [Plaintiff's concerns] . . . and to help provide her with some feedback and guidance re: her interactions with students and her role as a teacher." *Id.*

On August 23, 2006, Dr. Jablonover sent an e-mail to Dean Schroth which set out the details of Plaintiff's evaluation for the internal medicine clerkship. *Id.* at 1-2. This e-mail states that Plaintiff's "overall performance grade was 2 (low pass)" and identifies the following issues with Plaintiff's performance: "[d]id not always seem to complete reading assignments; average knowledge base; sometimes focuses on basic sciences without necessarily applying the information clinically to the patient"; "[s]ometimes had difficulty generating differential diagnosis; did not always focus on/prioritize clinical duties"; "[s]ometimes not prepared with his patients' information; now [sic] always present on rounds (intermittent); did not seem to appreciate opportunities inherent in hands-on learning; resistant to feedback sometimes; sometimes defensive when given constructive feedback"; "[s]ometimes seemed uncomfortable talking with patients, which sometimes made therapeutic relationships difficult; sometimes gowned and gloved when not appropriate clinically." *Id.* This evaluation did also note positive aspects of Plaintiff's performance in the rotation, with Dr. Jablonover stating "he did present in student conference with me an excellent resident-level Powerpoint presentation." Dr. Jablonover also specifies in this e-mail that he met with Plaintiff about his grade and "explained to [Plaintiff] that [he] was presenting information given to [him] second-hand [by other doctors supervising Plaintiff] and that there are always two or more sides or perspectives to an issue." *Id.* In response, Dr. Jablonover notes that during this discussion "he seemed to counter each point and was defensive throughout." Dr. Jablonover concluded his e-mail to Dean Schroth by noting, "I don't think the problem is one of academics but more one of attitude. I'm concerned that [Plaintiff], while being very motivated, is often seems [sic] quite resistant and closed to constructive feedback. I encouraged him to be more open to suggestions given to him by others who are farther along in their training and to discuss with them in a constructive manner any

disagreements that might arise." *Id.* Dr. Jablonover also noted that Plaintiff would likely be interested in challenging his grade. *Id.* Dean Schroth replied to this e-mail stating that he was scheduled to meet with Plaintiff that Friday. *Id.* at 1. He also provided background on the process for student complaints regarding grading. *Id.* Neither party cites evidence in the record of any e-mail communication between Dean Schroth and Dr. Jablonover regarding Plaintiff that occurred prior to this exchange.

On August 25, 2006, Dean Schroth sent an e-mail to Dr. Jablonover and another physician, Dr. Samantha McIntosh, summarizing his August 25, 2006 meeting with Plaintiff:

> [H]ad a very interesting discussion with [Plaintiff] today. [A]lthough I think his agenda all along related to his concerns about his evaluation, he spent the first 10 minutes explaining how he wanted to work with me on the medical center strategic plan to improve teaching at the medical school. [H]e has some good points and I appreciate his interest in quality improvement.

> [H]owever, all of this obviously came out of his experience in medicine. I'll reflect back to you what he was concerned about. [F]irst, he sees his weak evaluation as a 'grudge' by the department because he did not get along with the resident and leveled criticisms at the department and the clerkship director. [H]e felt like rounds were too long, not focused much on education per se (more on just getting clinical tasks done) and had little bedside teaching. [H]e was concerned that he was rarely observed taking a history or physical exam (he's probably right on this one, to which [I] agreed). [H]e denied being difficult at times, ascribing this to one misunderstanding with his resident who paged him to come perform a rectal exam and then was not there when he showed up. [H]e went off to do something else and then got 'yelled' at for not being there. [H]e implied that he'd had little feedback about his performance during the 6 weeks. [H]e was fairly dismissive of his meetings with [R]obert, implying that you were contradictory in your advice and poorly informed about his fund of knowledge and work habits.

> [I] think I can see how he got himself into this situation. [H]e is very rigid, and his interaction style, although polite on the surface, is not collaborative but rather confrontational and critical. [I] reflected this back to him in those exact terms because he was making me feel defensive and uncomfortable, but [I]'m not sure he's hearing me either.

> [I]n the end, [I]'m not sure we got very far. [H]e will challenge his evaluation and follow our regs. [I] told him that if he didn't like your decisions he could go to [W]asserman, and then to the [D]ean's office if he wants. [I]t will be

interesting to see how he does on other rotations. [I] told him point blank that [I] thought he needed to be more introspective about his interpersonal style and think about how he interacts with others.

Def.'s Ex. 3, Ex. 12 (Written Statement to MSEC), Ex. 2.

Plaintiff next proceeded to his surgery clerkship, which ran from August 14, 2006 to September 22, 2006. Def.'s Ex. 3, Ex. 24 (Askari Surgery Evaluation). Dr. Juliet Lee was the clerkship director for the surgery clerkship and Dr. Reza Askari was a senior resident in this rotation. Def.'s Ex. 6 (Askari Decl.) ¶ 4; Def.'s Ex. 7 (Lee Decl.) ¶ 1. On September 21, 2006, Dr. Lee sent an e-mail to Dean Schroth expressing concerns regarding Plaintiff's performance in the surgery clerkship. This e-mail reads:

> I have to let you know about one of the students in the new curriculum, [Plaintiff]. He has really struggled throughout the six weeks and my major concern is that he lacks insight into his own deficiencies and has progressed minimally throughout the rotation in his clinical judgment and understanding. I have been following his progress over the last several weeks with the residents and they are at their wit's end with him. [REDACTED] They give him almost daily feedback about his performance and the Chief resident has been giving him weekly formal feedback. Despite all efforts, he has not made any strides. . . .
>
> He also has been noted to wander off from the rotation for a few hours at a time, saying he has medical appointments to one person and then giving another story to another member of the team. As far as I know, he was only excused by me for one medical appointment. He also mentioned that he had to go do some lab work. If he has some work that he is performing for his project and using surgery clerkship time to do it, I am not going to tolerate it. He also told the residents that he has a medical condition which requires him to eat frequently. While this is OK to get something to eat, it shouldn't take three hours. . . .
>
> In terms of his book knowledge, he is doing fine. But none of this information has been translated to patient care or clinical medicine. I am seriously concerned about him and his ability to function. From the residents['] standpoint, they would not want [Plaintiff] taking care of them. My understanding from them and the attendings is that he will likely get a low pass for his clinical rotation in Surgery. With the changes in the grade points for the new curriculum students, he would be at a -4 for his total points. Failing the clerkship is -7 points. While I think he might pass overall based on exams, I think his clinical skills are far behind what we expect of third years.

Def.'s Ex. 3, Ex. 19 (Lee-Schroth E-mail Exchange).  Dean Schroth replied to Dr. Lee's e-mail with the following:

> [T]his is 100% consistent with the information that we received from his first rotation, the medicine clerkship, who also gave him a low pass (and lots of feedback that he resists).  [I] have met with [Plaintiff] repeatedly.  [H]e lacks insight into his deficiencies I'm afraid.  [I] would urge you and the residents to strongly consider whether his performance is indeed 'passing' or not.  [T]echnically, a low pass is still a pass, and he will move on through the curriculum.  [I]f you really think that he has serious clinical performance deficiencies, a below passing grade (eg. [sic] conditional or fair) will bring this to a clear 'head' and allow us to work with him on remediation efforts.  [H]e is very bright and very 'book' smart, but he has trouble functioning in the clinical environment, difficulty working as part of a team, and lacks insight into these problems.  [I] see that he is scheduled to meet with me again next week.  [P]robably about this issue [I] suspect.

*Id.*  There is no evidence in the record of any e-mail communication between Dean Schroth and Dr. Lee regarding Plaintiff that occurred prior to this exchange.  In addition, Dean Schroth states that he did not intend his e-mail as a directive to give Plaintiff a below passing grade, Def.'s Ex. 4 ¶ 17, and Dr. Lee states that she did not perceive it as such, Def.'s Ex. 7 ¶ 5.

Plaintiff also received a negative evaluation for the surgery clerkship from Chief Resident Reza Askari.  In this evaluation, Askari states "[t]here were several instances in which there appeared to be inconsistencies in the information [Plaintiff] provided to the members of the team.  He often told members of the team varying stories as to his whereabouts and the need to be elsewhere." Def.'s Ex. 3, Ex. 24 at 3.  Dr. Askari noted that these "several instances of untruthfulness, raise[] doubts as to adherence to ethical principles" and "[Plaintiff's] lack of ethical integrity toward the members of the team and his colleagues makes his overall performance unacceptable."  *Id.* at 4, 6. Askari did note that Plaintiff was "educationally motivated, did ask for repeated feedback and wanted to improve, however while he made a small

amount of progress, the lack of adherence to ethical principles hurt his overall performance." *Id.*
at 5.

Plaintiff alleges that at one point during his surgery clerkship, he asked Dr. Askari to eat
breakfast with him. Def.'s Ex. 2 at 272:4-19. According to Plaintiff, Dr. Askari replied "I don't
eat with your kind." *Id.* Defendant disputes that this statement was ever made. Def.'s Facts ¶
37. Plaintiff concedes that both he and Dr. Askari are of Iranian descent. Pl.'s Facts ¶ 33. He
alleges that Dr. Askari is a member of the Baha'i faith, and argues that this statement shows Dr.
Askari's discriminatory purpose in negatively evaluating Plaintiff. Def.'s Ex. 2 at 272:15-19.
However, there is no evidence in the record that Askari is a member of the Baha'i faith, and in
his deposition, Plaintiff recognized that his belief that Askari is Baha'i is speculation. *Id.* at
263:22-264:9.

Dean Schroth met with Plaintiff on September 25, 2006, as he said he planned to in his e-
mail to Dr. Lee. Def.'s Ex. 4 ¶ 18. Prior to this meeting, on September 22, 2006, Plaintiff
submitted to Dean Schroth a document entitled "Motion for Injunctive Relief of Incorrect/Wrong
Evaluation and for Development of an Active Task Force Committee." Def.'s Ex. 2 at 85:17-
86:18; Def.'s Ex. 3, Ex. 5 (Plaintiff's Motion) at 1. This fifteen page document is styled as a
legal brief, and includes a case caption which states "MJ HAJJAR-NEJAD, MSIII, Complainant,
Vs. Department of Medicine, Respondent." Def.'s Ex. 3, Ex. 5 at 1. In its introduction, the
document "requests the overturning of the evaluation by the Department of Medicine and, more
importantly and essentially, for the creation of an active task force committee composed of
students, administrators, deans, and hospital officials for the coordination and implementation of
our goals and objectives as spelled out so explicitly in the University strategic plan." *Id.* In this

document, Plaintiff appears to take issue with the setup of the clinical curriculum as well as his grade in the internal medicine clerkship. *Id.* at 14-15.

According to Dean Schroth's private memo regarding the September 25, 2006 meeting, he discussed Plaintiff's appeal of his medicine grade as well as the concerns raised by Dr. Lee regarding Plaintiff's surgery clerkship. Def.'s Ex. 4, Ex. A (Schroth Memo of Sept. 25, 2006 Meeting) at 1. In this memo, Dean Schroth states:

> [Plaintiff] continues to be defensive and shows no insight into the fact that he is having these problems. [H]e blames everything on residents who don't teach well, are 'unethical' and uninterested in patient care or student learning. I told him point blank that he needs to stop doing his research on the side, and focus on what is causing these problems in his performance. [I] plan to remove him from the honors curriculum and [I] told him this. [I] will gather some more information about his performance from the medicine and surgery teams. [H]e is staring [sic] OB at [Holy Cross Hospital] today.

*Id.* Plaintiff disputes that Dean Schroth told him to discontinue his research at the September 25, 2006 meeting. Pl.'s Facts ¶ 50.

Plaintiff next proceeded to his obstetrics and gynecology clerkship, which ran from September 25, 2006 to October 20, 2006. Def.'s Ex. 3, Ex. 27 (Gaskins Evaluation) at 1. Plaintiff also received negative evaluations in this rotation. Dr. Sherita Gaskins, a clinician in the obstetrics and gynecology clerkship, raised concerns regarding Plaintiff's conduct during the clerkship. *Id.* "[P]laintiff consistently left morning sign outs before they were over. His fellow students complained that he refused to assist them in the morning rounds (which is a requirement for all students)." *Id.* at 3. As one of several examples of her concerns regarding Plaintiff's truthfulness, she stated that "[Plaintiff] misrepresented Dr. Mufarrij, the site director, by telling me that he had Dr. Mufarrij's permission to take the afternoons off to study during the last week of the rotation. When Dr. Mufarrij and I compared notes, he informed me that this was not the

case. [Plaintiff] had not spoken to him about taking time off." *Id.* at 2. Dr. Gaskins concluded her evaluation by stating:

> [Plaintiff] is undoubtedly a very intelligent, ambitious student, but we as a group had very serious concerns regarding his very unprofessional behavior. He openly lied to us on more than one occasion and he refused to pull his weight with regard to patient care. Integrity is one of the cornerstones of our profession and the strong lack of it demonstrated at this early stage of [Plaintiff's] career is very disturbing.

*Id.* at 5. Obstetrics and gynecology attending physician Dr. Joel Palmer also gave Plaintiff a negative evaluation, stating that he "appears to find the easy way out of doing work" and "has on several occasions left before the recommended time for students to be here in the hospital." Def.'s Ex. 3, Ex. 28 (Palmer Evaluation) at 2. Dr. Palmer stated that Plaintiff "[n]eeds to be informed that there is a requirement for physicians or physicians in training to be truthful and cooperative with the other physicians he works with." *Id.* at 4.

Subsequently on October 18, 2006, Dr. Lee e-mailed Dean Schroth a letter prepared by Dr. Askari discussing concerns with Plaintiff's "professionalism and integrity." Pl.'s Ex. 22 (Plaintiff's Appeal to Vice President for Academic Affairs) at 97. In her e-mail, Dr. Lee stated, "[a]s we discussed before, [Plaintiff] had much difficulty on the surgical rotation on a number of issues. I think the residents and attendings tried very hard to work with him." *Id.* The letter from Dr. Askari states that Plaintiff "lacked the ability to synthesize . . . information into useful assessments and clinical plans." Def.'s Ex. 6, Ex. B (Askari Memorandum) at 1. "With relation to his behavior towards other members of the team, there were problems as well. I had several complaints by the other student of the team as to the unfair distribution of cases, which eventually led me to assign the daily cases myself and no longer left it up to the students to pick." *Id.* Dr. Askari closed his letter with the following:

However, my biggest problem with [Plaintiff] relates to his adherence to honesty and ethical principles. As the rotation continued it started to become apparent that [Plaintiff] was often telling different members of the team, including myself and our attending staff different stories as to his whereabouts during parts of the day (examples of his need for a dental appointment for which he never went to, or the need to get a loan to pay for his dental visit). . . .

It appears that while on the surface [Plaintiff] was motivated, on repeated attempts he failed to show improvement in his clinical assessments and most importantly he lacked honesty and integrity and failed to show adherence to basic ethical principles. I am thereby unable to pass him for his surgical clinical rotation.

*Id.* at 1-2. Dean Schroth responded to Dr. Lee's e-mail containing Dr. Askari's letter by stating "this is very concerning. [S]o I assume this means he will receive at least a conditional (if not a fail) grade for the surgery clerkship? [I]f so, [I] need to know ASAP because it will mean that we must pull him out of the honors curriculum (!) and integrate him back into the standard curriculum." Pl.'s Ex. 22 at 97. With regard to Dr. Askari's e-mail, Dean Schroth asked "will reza's evaluation be submitted as part of his formal surgery evaluation? [I] think it should be, and it may trigger a professional comportment committee review. [I] will go over it with the other deans." *Id.*

Later that same day, October 18, 2006, Dean Schroth e-mailed Plaintiff requesting that the two meet. Def.'s Ex. 3, Ex. 29 (Schroth October 18, 2006 E-mail). This e-mail read:

[W]e need to talk this week. I am waiting on the final word from surgery, but it looks like you will not pass the surgery clerkship. [T]his means that we will have to mainstream you back into the regular curriculum. [W]e have a few options which we can discuss. [T]he immediate question is to decide what you will do next week: stay for another month of OB, or move to another clerkship (primary care and psychiatry both have room to accommodate you). [P]lease call the office. I have time to meet on Friday both in the morning or the afternoon. I know you are at HC now, so we can also do this by phone.

*Id.* Plaintiff failed to respond, despite apparently being in the building where Dean Schroth's office is located on October 20, 2006. Def.'s Ex. 4, Ex. B (Gebara Memorandum) at 3. On

October 20, 2006, Dean Schroth sent Plaintiff another e-mail, with the subject line of "hello?",

again requesting that the two speak:

> [Plaintiff], you need to call me. [Y]ou will not be starting pediatrics on Monday.
> [Y]ou need to transition to the regular curriculum and pediatrics does not have
> room for you for two months. [Y]ou can start on psychiatry or primary care, but
> we need to talk about this right away. [H]arolyn [Johnson, an administrative
> assistant in the Dean's office] has been trying to reach you all afternoon at home,
> cell phone, and at HC hospital. [W]e've paged you and called all the units at HC.
> I sent you a message two days ago, but you have not responded.
>
> CALL ME on my cell phone: …. I'll have it on the rest of the day and most of
> the time over the weekend.

Def.'s Ex. 3, Ex. 30 (Schroth October 20, 2006 E-mail). Plaintiff did not respond to this e-mail.

Instead, on October 23, 2006, according to Defendant, Plaintiff reported for his pediatrics

rotation. Def.'s Ex. 4 ¶¶ 23. Upon learning from the coordinator of this rotation that Plaintiff

had done so, Dean Schroth had him sent to GW. *Id.* ¶ 24. Plaintiff states that he contacted Dean

Schroth to set up an appointment on the morning of October 23, 2006. Pl.'s Facts ¶ 59.

However, there is other evidence in the record that Plaintiff admitted receiving Dean Schroth's e-

mails and failed to respond to them. Def.'s Ex. 3, Ex. 14 at 2-3.

In any case, Plaintiff met with Dean Schroth on October 23, 2006. Def.'s Ex. 4 ¶ 25.

Also present for parts of this meeting were Dr. Jim Scott, Dean of the Medical School ("Dean

Scott"), Dr. Yolanda Haygood, Associate Dean for Student and Curricular Affairs, and Plaintiff's

parents. *Id.* During these discussions, Plaintiff was told that he would be receiving a below

passing grade in the surgery clerkship, that he was being returned to the standard curriculum, and

that he needed to focus on improving his clinical performance instead of doing research. *Id.* ¶

26. Plaintiff asserts that at this meeting Dean Schroth also threatened that Plaintiff would be

forced to take a leave of absence. Pl.'s Facts ¶ 67. Plaintiff also alleges that Dean Scott

promised that the Medical School would take no further action against Plaintiff after removing

him from the Honors curriculum. *Id.* At the same time, Plaintiff also contends that Dean Scott told Plaintiff that he would not allow Plaintiff to go into surgery as a profession and would place false performance appraisals on Plaintiff's permanent file and transcript, so as to prohibit his transfer to any other medical school or graduate program. *Id.* The Court notes that in a document prepared by Leigh Anne Gebara, Executive Assistant to the Dean, memorializing the portion of the October 23, 2006 discussions that she attended, none of these allegations are supported.[3] Def.'s Ex. 4, Ex. B. Further, in a letter Dean Schroth states that he sent to Plaintiff summarizing the October 23, 2006 discussion and the preceding events, there is no mention of a request that Plaintiff take a leave of absence, Dean Scott's alleged vow not to pursue further action against Plaintiff, or Dean Scott's alleged threats to keep Plaintiff from becoming a

---

[3] At most, this transcript reveals that Plaintiff believed Dean Scott wanted him to take a leave of absence:

[Dean Scott]: He can start back today in primary care or psychiatry.

[Plaintiff]: I spoke with pediatrics. They said there is room.

[Dean Schroth]: There is room if you were in the honors curriculum. You can't remediate surgery during honors curriculum.

[Plaintiff's Mother]: How can make decide [sic] in 6 weeks?

[Dean Schroth]: We discussed this today with Dean Haywood . . .

[Plaintiff]: You want me to take a leave of absence.

[Dean Schroth]: Now [Plaintiff] . . .

[Plaintiff]: You said that I had psychiatry, primary care or a leave of absence. You threatened me with a leave of absence.

[Dean Scott]: Let me set one thing straight, as of today [Plaintiff] is not in the honors curriculum.

*Id.* at 3.

surgeon and bar his transfer. *Id.*, Ex. C (Schroth Letter Summarizing October 23, 2006 Meeting).

Ultimately, Plaintiff received the below passing grade of "conditional" in his surgery rotation based on the fact that he failed the clerkship's clinical portion. Def.'s Ex. 3, Ex. 20 (Plaintiff's Surgery Evaluation).

On December 27, 2006, Dean Schroth sent Plaintiff a letter informing him of plans to "form a Professional Comportment Subcommittee of the Medical School Evaluation Committee (MSEC) to investigate the numerous instances of unprofessional behavior reported in your clinical evaluations from the medicine, surgery, and obstetrics and gynecology clerkships completed earlier this semester." *Id.*, Ex. D (Schroth letter of December 27, 2006). This letter also provided Plaintiff with a copy of the Regulations for M.D. Candidates ("Regulations") which governed the Professional Comportment review process. These Regulations set out procedures for evaluation of a student's professional comportment, stating "[o]ccasionally, a student's behavior, or pattern of behavior, may raise concerns as to the student's suitability to continue in the study of medicine. The process described below is intended to deal with behavior that may be unacceptable to the School of Medicine and Health Sciences or raise questions about the student's fitness for the practice of medicine." Def.'s Ex. 3, Ex. 16 (SMSHS Bulletin) at 32.

On February 20, 2007, Associate Dean Rhonda Goldberg sent Plaintiff an e-mail stating that she would be "facilitating [the] process" of forming the Professional Comportment Subcommittee. Def.'s Ex. 12 (Third Amended Complaint Exhibit) at 76.[4] She further stated "I am to notify you about the composition of the Subcommittee and you are allowed ten days to

---

[4] For this Exhibit, the Court refers to the page numbers listed at the bottom of the page rather than the absolute number of pages from the beginning of the document.

object to any person's appointment to the Subcommittee." *Id.* Dean Goldberg then stated "[t]he Subcommittee I am proposing is" and listed four names. *Id.* Plaintiff responded to this e-mail on March 2, 2007. *Id.* at 77. In this e-mail, Plaintiff did not object to any specific member named in Dean Goldberg's e-mail, but rather objected to the process by which he was removed from the Honors curriculum and the fact of the Subcommittee's formation. *Id.* Dean Goldberg responded to this e-mail on March 8, 2007 stating:

> My e-mail to you on February 20, 2007 was to request that you confirm that you have no objections to any of the proposed Subcommittee members. Since you did not object in your email, I will assume that all are approved and therefore I will set up a meeting to review your situation.
>
> Please understand that the purpose of the meeting is to discuss your behavior reported in your clinical evaluations from the medicine, surgery and obgyn clerkships. I am not clear about your reference to the Honors curriculum or the MSEC in your email. You will, of course, have an opportunity to talk with the Subcommittee and share your views.

*Id.* at 78. On March 20 and 22, 2007, Dean Goldberg sent Plaintiff two additional e-mails advising him of two changes to the membership of the Subcommittee. *Id.* at 79, 80. She again requested that he e-mail her if he objected to either of these individuals. *Id.* Plaintiff replied on March 30, 2007 again objecting to the process by which he was removed from the Honors curriculum as well as the fact of the Subcommittee's formation. *Id.* at 81. However, he did not specifically object to either individual mentioned by Dean Goldberg. On April 27, 2007, Plaintiff sent Dean Goldberg an e-mail raising various procedural objections in the formation of the Subcommittee and naming four alternative individuals Plaintiff proposed for the Subcommittee. *Id.* at 93-94. These objections to the individuals on the Subcommittee were untimely under the Regulations.

In addition, on April 21, 2007, Plaintiff submitted to GW Dean of Students Linda Donnels a document entitled "Brief of Case Findings." Def.'s Ex. 3, Ex. 6 (Brief of Case

Findings). This document sets out, in outline form, various procedural errors that Plaintiff contends were committed in his dismissal from the Honors curriculum and in the initiation of the Professional Comportment Subcommittee. *Id.*

On May 3, 2007, the Professional Comportment Subcommittee, consisting of two Medical School faculty members and two Medical School students, met to consider the issues raised with respect to Plaintiff's professional comportment. Def.'s Ex. 3, Ex. 13 (Minutes of Professional Comportment Subcommittee May 3, 2007 Meeting). Plaintiff was present and accompanied by counsel. *Id.* According to minutes of the May 3, 2007 meeting, the Chair of the Subcommittee, Dr. Bernard Weidermann "explained that [the] meeting pertained to issues of comportment and was not a forum to address disagreements with grades per se." *Id.* The Subcommittee then interviewed several individuals, including Plaintiff. *Id.* At this meeting, Plaintiff presented documents to the Subcommittee, which the Subcommittee "agreed to review." The Subcommittee also agreed to "consider any questions [Plaintiff] may wish to submit . . . ." *Id.* On May 4, 2007, Plaintiff e-mailed Dean Goldberg twenty-one proposed questions for the Subcommittee to consider in investigating his professional comportment. Def.'s Ex. 12 at 98-99.

On May 30, 2007, the Professional Comportment Subcommittee met again. Def.'s Ex. 3, Ex. 14 (Minutes of Professional Comportment Subcommittee May 30, 2007 Meeting). According to minutes of this meeting, the members discussed the twenty-one questions proposed by Plaintiff and "agreed that all were focused on various procedural questions related to the comportment review process, rather than questions that would add further insight into the events in question." *Id.* at 1. By way of example, the Subcommittee noted the following questions proposed by Plaintiff: "If Dr. Lee thought it was necessary to give me any instructions on performance, why did she not inform me in writing before she submitted her letter to the Deans

at the very end of the clerkship?" *Id.*  The Subcommittee then discussed "the key elements of concern for professional comportment." *Id.*  First, reviewing the evidence regarding Plaintiff's internal medicine clerkship, the Subcommittee found that although the concerns with Plaintiff's performance did "not directly speak to comportment issues . . . [they] could reflect an interpersonal skills problem that also manifested itself in comportment concerns." *Id.*  Second, Plaintiff's surgery rotation was "a source of significant problematic reports" regarding Plaintiff's professional comportment. *Id.* at 1-2.  The Subcommittee also found "significant concerns about [Plaintiff's] comportment on the next clerkship in obstetrics and gynecology . . . ." *Id.* at 2.  The Committee also was concerned by Plaintiff's failure to respond to Dean Schroth's request for a meeting in October 2006:

> During questioning in the Subcommittee meeting on May 3, [Plaintiff] admitted that he had received Dean Schroth's messages, but preferred to study for his obstetrics exam scheduled for October 20 rather than focus on the message. However, [Plaintiff] could not offer a credible answer as to why he did not contact Dean Schroth after the exam was completed, well before starting the pediatrics rotation.  Rather than answer direct questions to explain his thought process over these days, he kept returning to the fact that he needed to complete his exam.  This type of response to direct questioning astonished some Subcommittee members and seemed to support the idea that [Plaintiff] was either directly manipulative or simply unable to process information and respond in a direct fashion, perhaps due to some basic deficit in interpersonal skills.

*Id.* at 2-3.  The Subcommittee found that, taken as a whole, "the documents and discussions point to some central themes extending over these clerkships." *Id.* at 3.  First, "[t]here were numerous instances of misunderstandings regarding [Plaintiff's] absence from clinical duties, all associated with his working on research projects, studying for exams, or attending to personal issues.  To this end, he at least worked to manipulate the system to his advantage." *Id.*  Second, "he appears to have difficulty functioning as a team member with a purpose other than making the best possible grade, and this harms his relations with team members." *Id.*  Third, "rather than seeking

to improve his performance by examining his own behavior, he instead seems inclined to externalize this information to blame others, rather than himself, for all issues. He focuses on grading system process rather than on working to understand how he can improve." *Id.* Finally, the Subcommittee found that Plaintiff's "behavior during the comportment review process itself seems to confirm the concerns of his clerkships. Most concerning was his reaction to direct pleas from Dean Schroth in late October to meet with him and develop a new plan for third year. . . ." *Id.* Furthermore, "[t]hroughout numerous emails to plan the comportment hearing, he continued to avoid answering direct questions about the composition and scheduling of the comportment hearing, choosing instead to argue about process. This mode of response was vividly apparent during his attendance at the May 3 meeting as well as his list of follow-up questions which did not address the specific issue of clarifying his actions as requested." *Id.* Based on these findings, the Subcommittee issued the following conclusion and recommendations:

> The Subcommittee members have serious concerns regarding [Plaintiff's] comportment and his ability to function as a physician. We are concerned that he may do well in classroom, standardized tests, and one-on-one interactions, but he appears to need work in synthesizing information into valid differential diagnoses and treatment plans, and he has displayed serious difficulties in working as a team member focused on patient care rather than on individual performance. We believe he should expend a great deal of effort in trying to understand his own interpersonal interaction modes and how that relates to becoming an effective physician. We therefore recommend the following:
>
> 1. He must repeat any clerkship for which he receives a grade of low pass or below.
>
> 2. Even if he receives passing grades subsequently, the Subcommittee Chair must review his clerkship evaluations when he has completed all clerkships to look for comportment-related issues, and if less than satisfactory will refer to the Medical Student Evaluation Committee for investigation.
>
> 3. Following successful completion of all his third-year clerkships, he must complete an acting internship in internal medicine at George Washington

University hospital, as soon as possible in his fourth year. This rotation was recommended because of the likelihood that he will have reliable supervision and observation in a complex medical setting.

4. The Subcommittee minutes shall become part of his permanent record.

5. He is encouraged to spend time reflecting on his evaluations and difficulties in these rotations and consider a leave of absence to attend to these details optimally. He may wish to seek further resources and assistance through the dean's office to help him improve in these areas.

*Id.* at 3-4. Pursuant to the Regulations, the Subcommittee referred Plaintiff's professional comportment review to the Medical Student Evaluation Committee (MSEC), consisting of faculty members and medical school students. *See* Def.'s Ex. 3, Ex. 16 at 33. The MSEC met to consider Plaintiff's case on June 18, 2007. Def.'s Ex. 3, Ex. 33 (Letter from Akman to Scott). Plaintiff was present and accompanied by counsel. *Id.* Based on a letter summarizing this meeting, Bernard Weidermann, the Chair of the Subcommittee, presented the Subcommittee's findings and recommendations and answered questions from the MSEC members. *Id.* Plaintiff answered questions from the MSEC, and was provided the opportunity to make an oral statement to the MSEC and to submit a written statement after the meeting. *Id.*

Next, according to the summary of its proceedings, the MSEC met in executive session on July 9, 2007 to consider Plaintiff's written statement and to conclude its deliberations on the matter. *Id.* As summarized in the MSEC Chair's letter to Dean Scott:

A motion was made and seconded to accept the Professional Comportment Subcommittee's report and recommendations. Serious concerns were raised about [Plaintiff's] professionalism, honesty and integrity, his interpersonal relationships and his capacity to work with others. Of particular concern, were the following: [Plaintiff's] inability to accept responsibility for his own actions; refusal to accept instructions or constructive feedback from residents, faculty and deans; inability to work and communicate effectively with peers and residents; inadequate understanding of the commitment to and responsibility for patient care; lack of insight into personal weaknesses and areas for improvement; and, inappropriate understanding of the role of a medical student in the medical education hierarchy. In addition, the Committee noted that these concerns were

not the result of an isolated incident, but appeared to be a pattern in most interactions with [Plaintiff]. The motion to accept the Subcommittee's report failed to pass by a vote of zero (0) in favor of the motion, ten (10) against, with zero (0) abstentions. The Chair did not vote.

A motion for dismissal from the MD Program was made and seconded. There was further discussion regarding the issues above as they related to [Plaintiff's] suitability to practice medicine. In a secret ballot vote, the motion passed by a vote of nine (9) in favor of the motion, zero (0) against the motion, with one (1) abstention. The Chair did not vote.

*Id.* at 2. The MSEC's recommendation of dismissal was forwarded to Dean Scott, pursuant to

the Regulations. *Id.* at 2; Def.'s Ex. 3, Ex. 16 at 34. Dean Scott met with Plaintiff on July 17,

2007. Def.'s Ex. 3, Ex. 34 (Letter from Scott to Plaintiff). On July 26, 2007, Dean Scott sent

Plaintiff a letter stating the following:

As you know, the School of Medicine and Health Sciences has initiated a professional comportment proceeding regarding your conduct.

Under the Regulations for M.D. candidates, my job is to decide whether to dismiss you from the M.D. Program or allow you to remain. In making that decision, I have carefully considered our July 17, 2007 discussion, the Professional Comportment Subcommittee's findings and recommendations, the Medical Student Evaluation Committee's report, and all other materials contained in your confidential file, which includes everything submitted to the MSEC.

The MSEC has recommended that the School of Medicine and Health Sciences dismiss you due to your unprofessional comportment. I concur with the MSEC's recommendation. Accordingly, I have decided to dismiss you from the M.D. Program effective immediately.

The Regulations for M.D. Candidates permit you to appeal my decision, within 15 calendar days, to the Vice President for Academic Affairs. Please consult the Regulations for information regarding the basis and procedure for an appeal.

*Id.* Based on this letter, Plaintiff was dismissed from the Medical School on July 26, 2007.

Plaintiff appealed his dismissal to Donald Lehman, Ph.D., GW's Executive Vice President of

Academic Affairs on August 7, 2007. Def.'s Ex. 13 (Sigelman Decl.), Ex. A (Plaintiff's Appeal

of Dismissal). Lehman delegated the matter, for a decision, to Carol Sigelman, Associate Vice

President for Graduate Studies and Academic Affairs. *Id.*, Ex. B (Letter from Lehman to Sigelman). Under the Regulations, "[t]he scope of this appeal is for the vice president for academic affairs or his/her designee to determine whether the procedures set forth in these Regulations have been followed." Def.'s Ex. 3, Ex. 16 at 34. On September 13, 2007, Sigelman sent Plaintiff a letter stating:

> I have thoroughly reviewed the entire written record of the proceedings, including the student's confidential file and submissions to the Subcommittee on Professional Comportment and the Medical School Evaluation Committee (MSEC), as well as the submissions made by [Plaintiff's counsel] Mr. Zaidi to Dr. Lehman on [Plaintiff's] behalf. I focused my review on Section E of the Regulations, Evaluation of Professional Comportment, because the matter at hand concerns dismissal from the program as a result of comportment issues. Based on the written record of the proceedings, I have reached the conclusion that the procedures set forth in the regulations for MD Candidates have been followed. Therefore, I sustain the decision of the Dean of the School of Medicine and Health Sciences in the case of [Plaintiff].

Def.'s Ex. 3, Ex. 35 (Sigelman Letter to Plaintiff).

Plaintiff claims that on August 9, 2007, during a meeting with Stephen Trachtenberg, the former President of GW, Trachtenberg told Plaintiff that, in light of his dismissal, he should "return back to Iran to complete medical studies" as another medical student had done. Pl.'s Facts ¶ 124. In his deposition, President Trachtenberg did not specifically recall making this remark. *See* Pl.'s Ex. 36 (Trachtenberg Dep.) at 46:2-13 ("[W]e are really here deep into the muddy of speculation."). In addition, Plaintiff provides no additional evidence, beyond conclusory allegation, that this remark was ever made.

On September 20, 2007, Dean Goldberg sent a letter to Anthony Galarza, Associate Registrar of GW requesting that Plaintiff's "transcript be updated to reflect the change in status" "Dismissed for Reasons of Professional Comportment on July 26, 2007." Def.'s Ex. 15 (Fillian Dep.), Ex 1. According to Defendant, in response to this letter, Assistant Registrar Larry Fillian

erroneously placed an academic hold on Plaintiff's account, which kept Plaintiff from obtaining a copy of his transcript. Def.'s Ex. 15 at 10:18-11:15; Def.'s Ex. 16 (Fillian Decl.) ¶ 1. Fillian stated that he placed the hold as a precaution to prevent Plaintiff, as a dismissed student, from registering, and did not know it would prevent Plaintiff from obtaining a copy of his transcript. Def.'s Ex. 15 at 15:3-19. On April 7, 2008, after requesting his transcript, GW's Registrar issued a letter stating:

> The Office of the Registrar is unable to produce a transcript for the above mentioned individual because this student has a hold on their record and it is the policy of the university not to issue transcripts for students who have specific types of holds.
>
> The hold was placed by the Dean of the School of Medicine and Health Sciences and reads "Dismissed per SMHS".

Pl.'s Ex. 41 (April 7, 2008 Letter from Registrar to Plaintiff). After Plaintiff complained of the hold, GW's Registrar removed the hold, Fillian apologized to Plaintiff, and GW sent Plaintiff letter "certify[ing] that the academic hold (SMHS Dean's Office) preventing the above student from obtaining his transcript was erroneously placed." Def.'s Ex. 15 at 11:1-15; *id.*, Ex. 3 (April 14, 2008 Letter from Registrar to Plaintiff). The letter further states, "[t]he hold was intended to prevent future registration, but unwittingly additionally prevented transcript production." *Id.*, Ex. 3.

On November 19, 2007, GW notified the National Board of Medical Examiners ("NBME") that it had dismissed Plaintiff. Def.'s Ex. 8 (Harolyn Johnson Decl.), Ex. A (E-mail from Harolyn Johnson to NBME). The NBME co-sponsors the United States Medical Licensing Examination ("USMLE"). *Id.* ¶ 4. According to Defendant, a student dismissed from medical school is ineligible to take the exam, even if he is contesting the dismissal. *Id.* ¶ 6. The NBME routinely asks GW to verify student enrollment before students sit for the exam. *Id.* ¶ 7.

Defendant states that in keeping with this normal practice, it notified the NBME of Plaintiff's dismissal. *Id.* ¶¶ 8-9.

Subsequent to his dismissal, Plaintiff filed a complaint with the District of Columbia Office of Human Rights ("DCOHR") alleging that (1) Defendant engaged in disparate treatment on the basis of Plaintiff's religion and perceived national origin in taking several of the actions leading up to and concluding in Plaintiff's dismissal from the Medical School, (2) Defendant subjected him to a hostile work environment, and (3) Defendant retaliated against Plaintiff for his written submissions on July 25, 2006, September 22, 2006, and April 21, 2007. Pl.'s Ex. 20 (Plaintiff's DCOHR Complaint). On June 22, 2009, the DCOHR issued a cause determination finding no probable cause to believe Plaintiff's claims of disparate treatment and hostile work environment. Pl.'s Ex. 21 (DCOHR Opinion) at 86-87. However, the DCOHR did find probable cause to believe that Defendant retaliated against Plaintiff for his written complaints. *Id.* at 86. These determinations were affirmed on January 12, 2010. Pl.'s Ex. 66 (DCOHR Opinion Denying Cross-Motions for Reconsideration). However, on June 15, 2011, Plaintiff sought to voluntarily withdraw his administrative complaint from further consideration. *Hajjar-Nejad v. George Washington Univ.*, 873 F.Supp.2d 1, 13 (D.D.C. 2012). The Commission, honoring what it saw as Plaintiff's clear and unambiguous desire, granted the request and dismissed the administrative proceedings with prejudice on June 24, 2011. *Id.*

**B. Procedural Background**

This case has a long and winding procedural history, which the Court sets out here in summary form. Plaintiff originally filed suit *pro se* in the United States District Court for the District of Maryland on April 9, 2010. *See* Compl., ECF No. [1-4]. By any reasonable measure, Plaintiff's original Complaint was sprawling; it spanned 121 color-coded pages, included 193 paragraphs (several with discrete sub-parts), and was accompanied by thousands of pages of

exhibits. Although far from clear, Plaintiff appeared to allege that he was unfairly and unlawfully dismissed from GW based on his race, religion, and perceived national origin in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq.* (the "DCHRA"); and his constitutional rights to free speech, the free exercise of religion, and equal protection under the law.

On April 19, 2010, the action was transferred to this Court, *see* Mem. (Apr. 19, 2010), ECF No. [1-10], whereupon Plaintiff secured legal counsel and, with GW's consent, filed an Amended Complaint (the "First Amended Complaint"), *see* Am. Compl., ECF No. [13]. The First Amended Complaint – itself no model of clarity – included three counts. In Count I, Plaintiff appeared to claim that GW discriminated against him on the basis of his race, religion, and national origin in violation of Title VII; Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); and the DCHRA. *See id.* ¶¶ 72-75. In Count II, Plaintiff appeared to claim that GW retaliated against him for engaging in protected activity in violation of Title VII; Section 1981; and the DCHRA. *See id.* ¶¶ 77-79. In Count III, Plaintiff alleged that GW breached the terms of the Offer of Acceptance by dismissing him from the Medical School. *See id.* ¶¶ 81-83.

On July 26, 2010, GW filed its first Motion to Dismiss, targeted at Plaintiff's First Amended Complaint. *See* Def.'s Mot. to Dismiss First Am. Compl., ECF No. [14]. On August 20, 2010, Plaintiff, then acting through counsel, responded by filing a partial opposition and voluntarily dismissing Counts I and II of the First Amended Complaint without prejudice. *See* Pl.'s Partial Opp'n to Def.'s Mot. to Dismiss First Am. Compl. and Voluntary Dismissal of All

Pending Civil Rights Claims, ECF No. [17].  Concurrently, Plaintiff moved this Court for leave to file a Second Amended Complaint omitting his "civil rights claims" but retaining his claim for breach of contract, *see* Pl.'s Mot. for Leave to File Second Am. Compl., ECF No. [18], which the Court granted, *see* Order (Aug. 24, 2010), ECF No. [19].

On August 24, 2010, Plaintiff filed his Second Amended Complaint. *See* Second Am. Compl., ECF No. [20]. Despite the sweep of its allegations, Plaintiff's Second Amended Complaint asserted a single cause of action sounding in breach of contract.  *See id.* ¶¶ 58-60. Specifically, Plaintiff's Second Amended Complaint contended that the Offer of Acceptance constitutes a binding contractual agreement and that GW breached the agreement by dismissing him from the Medical School.  *See id.*

On September 17, 2010, GW filed its second Motion to Dismiss, which Plaintiff, through his chosen legal counsel, opposed.  *See* Def.'s Mem. of P. & A. in Supp. of its Mot. to Dismiss Pl.'s Second Am. Compl., ECF No. [21-1]; Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss Second Am. Compl., ECF No. [22].  After this motion was fully briefed, however, Plaintiff filed his second Motion to Amend, seeking to add claims arising under Title VI, Title VII and Section 1981. *See* Pl.'s Mem. in Supp. of Pl.'s Mot. to Reinsert Civil Rights Compls., ECF No. [24]. Even though Plaintiff was represented by counsel at the time, he filed his second Motion to Amend *pro se*. This prompted his legal counsel to file a Motion to Withdraw.  *See* Mot. for Leave to Withdraw as Pl.'s Counsel of Record, ECF No. [25]. Therein, Plaintiff's counsel represented that "[s]everal disagreements ha[d] arisen" between him and Plaintiff "with respect to the management of this case," *id.* at 1, and claimed that Plaintiff filed his Motion to Amend with the Clerk of the Court without his prior review or approval, *id.* at 2.

On August 15, 2011, this Court issued a detailed Memorandum Opinion and Order resolving GW's second Motion to Dismiss, Plaintiff's second Motion to Amend, and Plaintiff's counsel's Motion to Withdraw. *See Hajjar-Nejad v. George Wash. Univ.*, 802 F. Supp. 2d 166 (D.D.C. 2011). Beginning with GW's Motion to Dismiss, the Court first noted that Plaintiff, through his chosen counsel, had voluntarily narrowed the scope of his Second Amended Complaint to assert a single claim sounding in breach of contract – specifically, his claim that the written Offer of Acceptance constituted a binding agreement between him and GW and that GW breached the terms of that agreement by dismissing him from the Medical School and refusing to provide him with the contemplated educational services. However, outside of this Offer of Acceptance, "Hajjar-Nejad's Second Amended Complaint fail[ed] to provide adequate notice of his breach of contract claim to the extent he intend[ed] to base it on an unidentified universe of 'regulations,' 'policies,' 'rules,' 'procedures,' and 'directives.'" *Id.* at 175. Moreover, the Court underscored that "Hajjar-Nejad's claim for breach of contract, as it is framed in the Second Amended Complaint, is based on one, and only one, alleged breach – namely, that GW allegedly 'rescinded the contract to provide educational services to [Plaintiff] through its precipitous and unlawful dismissal of [him].' " *Id.* at 177 (quoting Second Am. Compl. ¶ 59). Indeed, in his opposition to GW's second Motion to Dismiss, Plaintiff "confirm[ed] this and expressly disclaim[ed] that he [was] alleging that anything outside of the ultimate contract termination constituted separate actionable breaches." *Id.* at 175 (quotation marks and citation omitted).

Nonetheless, the Court could not conclude that Plaintiff had "completely failed to state a claim for breach of contract." *Id.* Plaintiff had incorporated the Offer of Acceptance into the Second Amended Complaint, specifically alleged that it constituted a mutually binding agreement supported by consideration on both sides, maintained that GW breached the Offer of

Acceptance by dismissing Plaintiff from the Medical School, and averred that he had suffered damages as a result of the alleged breach. Noting that GW had "never argue[d] that the Offer of Acceptance does not – as a matter of law – impose any obligations on GW that would preclude it from dismissing Hajjar-Nejad [from the Medical School] under the facts alleged," the Court concluded that "Hajjar-Nejad ha[d] stated sufficient facts to provide GW with 'fair notice' of a claim that GW breached the Offer of Acceptance by dismissing Hajjar-Nejad from the Medical School in July 2007." *Id*. at 176-77. Only that narrow claim survived GW's second Motion to Dismiss.

After resolving GW's second Motion to Dismiss, the Court turned to Plaintiff's second Motion to Amend, through which he sought to reintroduce claims arising under Title VI, Title VII, and Section 1981. Briefly stated, the Court found that Plaintiff's second Motion to Amend, which he had filed *pro se* despite being represented by counsel, was procedurally defective because he had failed to comply with the meet-and-confer requirements imposed by Local Civil Rule 7(m) and had further failed to provide a proposed amended pleading as required by Local Civil Rules 7(i) and 15.1. *See id.* at 178-79. For these reasons, the Court denied Plaintiff's second Motion to Amend, advising Plaintiff that, "[t]o the extent [he] intend[ed] to move this Court for leave to amend his complaint, he must include with his motion to amend a proposed pleading identifying each [and] every claim he intends to pursue in this action and a short and plain statement of the factual basis for those claims." *Id.* at 179.

Finally, in its August 15, 2011 Memorandum Opinion and Order, the Court granted Plaintiff's counsel's Motion to Withdraw, which Plaintiff had not opposed. *See id.* at 179-80. Although Plaintiff was subsequently afforded an opportunity to secure alternate legal counsel, he has elected to proceed in this action *pro se*.

Subsequently, on September 7, 2011, Plaintiff filed his Third Motion to Amend. *See* Pl.'s Mot. for Leave to File Third Am. Compl., ECF No. [33]. In this motion, Plaintiff sought to assert additional claims for breach of contract and for violations of Title VI, Title VII, Section 1981, the DCHRA, and his constitutional rights under the First and Fourteenth Amendments.

In a Memorandum Opinion and Order issued January 4, 2012, the Court granted in part and denied in part Plaintiff's Third Motion to Amend. *See Hajjar-Nejad v. George Washington Univ.*, 873 F.Supp.2d 1 (D.D.C. 2012). Specifically, for reasons stated in the opinion, the Court denied Plaintiff leave to amend his complaint to add (a) breach of contract claims beyond his claim that GW breached the Offer of Acceptance by dismissing him from the Medical School in July 2007, (b) claims that GW discriminated and retaliated against him in violation of the DCHRA, (c) claims of discrimination and retaliation arising under Title VII, (d) constitutional claims arising under the First and Fourteenth Amendment; and (e) claims of discrimination and retaliation arising under Title VI based on acts pre-dating April 9, 2007. *Id.* at 17. However, the Court granted Plaintiff leave to amend his complaint insofar as he sought to add claims identified in his proposed Third Amended Complaint that alleged (a) discrimination or retaliation under Title VI based on acts occurring on or after April 9, 2007; and (b) claims of discrimination or retaliation under Section 1981 based on acts occurring on or after April 9, 2006. *Id.* In order to avoid disputes as to which portions of the proposed Third Amended Complaint filed by Plaintiff were rendered viable by this opinion, the Court directed the Clerk of the Court to file a redacted version of the Third Amended Complaint attached to the Court's opinion. *Id.* at 16-17. *See generally* TAC. The Court further stated that the Third Amended Complaint would be viable only insofar as it was compatible with the terms of the Court's orders in this case. *Hajjar-Nejad*, 873 F.Supp.2d at 17.

The parties then proceeded to discovery, supervised by Magistrate Judge John M. Facciola. *See Hajjar-Nejad v. George Washington Univ.*, No. 10-cv-626, 2013 WL 2635190 (D.D.C. June 12, 2013); *Hajjar-Nejad v. George Washington Univ.*, No. 10-cv-626, 2013 WL 178729 (D.D.C. Jan. 16, 2013); *Hajjar-Nejad v. George Washington Univ.*, No. 10-cv-626, 2012 WL 1655724 (D.D.C. May 9, 2012).

On March 29, 2013, Defendant filed its [154] Motion for Summary Judgment, seeking dismissal of this case in its entirety and an entry of judgment in Defendant's favor. Plaintiff subsequently filed a [158] Response to Defendant's Memorandum in Support of its Summary Judgment Motion. This response consisted of 283 pages of briefing, and was accompanied by a 171 page Statement of Facts as well as 3,126 pages of exhibits. By Minute Order issued May 2, 2013, this Court struck Plaintiff's response and all the attached exhibits for failing to comply with the instructions set forth in the Court's [146] Scheduling and Procedures Order. Specifically, Plaintiff had failed to file a statement of material facts responding to the specific facts set out by Defendant and stating whether each fact was admitted or denied. *See* Minute Order (May 2, 2013). In addition, the Court noted that "Plaintiff's statement of facts is egregiously lengthy and is abounding with facts that are not relevant to Plaintiff's claims and certainly not 'material.' To proceed on these pleadings would be a severe waste of the time and resources of both the Court and the parties." *Id.* The Court ordered Plaintiff to file a renewed response to Defendant's motion, correcting the identified deficiencies. Further, the Court ordered that Plaintiff's renewed opposition not exceed fifty pages and that his revised statement of facts not exceed seventy-five pages.

After the Court denied Plaintiff's request for reconsideration of this Order, Plaintiff filed his [168] Opposition to Defendant's Motion for Summary Judgment. In accordance with the

Court's orders, Plaintiff limited his Opposition to fifty pages and his revised responsive statement of facts to seventy-five pages. Plaintiff also attached to his opposition brief seventy-four very lengthy exhibits, consisting of approximately 1,600 pages. However, in addition to these submissions, Plaintiff accompanied his opposition with filings entitled "Appendices A-I," which consist of fifty-two pages of supplementary briefing on discrete topics addressed in Plaintiff's responsive statement of facts and opposition brief. Recognizing "Plaintiff's filing of these 'Appendices' [as] a transparent attempt to subvert the briefing page limits previously ordered by the Court, the Court declin[ed] to consider them" and ordered the Clerk of the Court to strike these materials from the record. *See* Minute Order (June 12, 2013).

Defendant subsequently filed its [187] Reply. Accordingly, Defendant's Motion for Summary Judgment is now ripe for review. In an exercise of its discretion, the Court finds that holding oral argument on the motion would not assist the Court in rendering its decision. *See* LCvR 7(f).

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence – in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. FED. R. CIV. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in his favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

## III. DISCUSSION

Based on the Court's prior orders in this case, Plaintiff now alleges three claims. First, Plaintiff alleges that GW committed a breach of contract by terminating his enrollment at the university. Second, Plaintiff alleges that various actions by Defendant were discriminatory in violation of Title VI and Section 1981. Finally, Plaintiff alleges that various actions by Defendant were retaliatory in violation of Title VI and Section 1981. The Court addresses each of these claims below.

### 1. Breach of Contract

Plaintiff alleges breach of contract by GW in terminating his enrollment. The Court has addressed this claim at length in its prior orders and opinions in this case, holding that Plaintiff's claims of breach of contract are limited to GW's termination of his enrollment. *See Hajjar-Nejad*, 802 F.Supp.2d at 175 ("Hajjar-Nejad's claim for breach of contract, as it is framed in the Second Amended Complaint, is based on one, and only one, alleged breach – namely, that GW allegedly 'rescinded the contract to provide educational services to [Hajjar–Nejad] through its precipitous and unlawful dismissal of [him].' ") (quoting Second Am. Compl. ¶ 59). Although Plaintiff premises his discrimination and retaliation claims on other alleged incidents of mistreatment by GW, his breach of contract claim does *not* address these events. Furthermore, to the extent Plaintiff is seeking to hold GW to a written contract, his claims are limited to the Offer of Acceptance, which Plaintiff signed in order to confirm his decision to attend the School of Medicine and Health Sciences.

A breach of contract claim requires: "'(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; (4) damages caused by the breach.'" *Mesumbe v. Howard Univ.*, 706 F.Supp.2d 86, 94 (D.D.C. 2010) (quoting *Tsintolas*

*Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). "The determination whether an enforceable contract exists, when based on the contract documents, is a question of law." *Kramer Assocs. v. Ikam, Ltd.*, 888 A.2d 247, 251 (D.C. 2005) (quoting *Rosenthal v. National Produce Co.*, 573 A.2d 365, 369 n. 9 (D.C. 1990)). Under District of Columbia law, "[t]he party asserting the existence of an enforceable contract . . . bears the burden of proving that the parties entered into an enforceable contract." *Ponder v. Chase Home Fin., LLC*, 666 F.Supp.2d 45, 48 (D.D.C. 2009). "A contract is valid only where there is 'both (1) agreement as to all material terms and (2) intention of the parties to be bound.'" *Mosby-Nickens v. Howard Univ.*, 864 F.Supp.2d 93 (D.D.C. 2012) (quoting *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995)).

Reviewing the Offer of Acceptance, the Court does not find that it creates a binding contract limiting Defendant's ability to dismiss Plaintiff for post-matriculation action. The Offer of Acceptance is a one page document that was provided to Plaintiff upon his admission to GW's Medical School. Def.'s Ex. 3, Ex. 36. The Offer of Acceptance does not describe the circumstances under which Plaintiff could be dismissed from the Medical School or the scope of Defendant's discretion in determining when dismissal would be appropriate. Nor, for that matter, does it purport to describe whether Plaintiff had any continuing right to attend the medical school. To be sure, the Offer of Acceptance requires the *student* to agree to "be subject to the Regulations for MD Candidates that are set forth in the SMHS Bulletin," and to "become familiar with the Bulletin and Regulations and to abide by them." *Id.* However, no bilateral obligation is imposed upon Defendant. Indeed, there is *no* obligation imposed on Defendant by this agreement other than to admit Plaintiff if he meets all of his responsibilities. The Offer of Acceptance does not speak to post-matriculation action, such as termination for professional

comportment reasons.  Accordingly, Defendant has breached no obligation or duty imposed on it by the contract.

However, this is not the end of Plaintiff's breach of contract claim.  *See Manago v. District of Columbia*, 934 A.2d 925, 927 (D.C. 2007) ("[W]e recognize the general rule 'that the relationship between a university and its students is contractual in nature . . . .'") (quoting *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977); *Kraft v. William Alanson White Psychiatric Found.*, 498 A.2d 1145, 1148 (D.C. 1985) ("The relationship between an educational institution and its students is contractual in nature.").  However, to the extent Plaintiff is premising his breach of contract claim not on any written contract, but rather on the generalized relationship between a student and a university, his claim also fails.  "Under D.C. law, all contracts contain an implied covenant of good faith and fair dealing."  *Bain v. Howard Univ.*, No. 11-1639, 2013 WL 5423101, *4 (D.D.C. Sept. 30, 2013) (citing *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000)).  Yet in the academic context, this inquiry is carefully circumscribed.

"[D]ecisions involving academic dismissal merit summary judgment . . . 'unless the plaintiff can provide some evidence from which a fact finder could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance.'"  *Paulin v. George Washington Univ. School of Medicine & Health Sciences*, 878 F.Supp.2d 241, 247 (D.D.C. 2012) (quoting *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1109 (D.C. 1999)).  "When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment.  Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."  *Regents of the Univ. of Michigan v. Ewing*, 474 U.S.

214, 225 (1985).  *See also Bd. of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 96 n. 6 (1978)

(Powell, J., concurring) ("University faculties must have the widest range of discretion in making

judgment as to the academic performance of students and their entitlement to promotion or

graduation.").  "This 'judicial reluctance to intervene' is based upon 'sound considerations of

public policy.'"  *Alden*, 734 A.2d 1103, 1109 (D.C. 1999) (quoting *Olsson v. Bd. of Higher Ed.*,

49 N.Y.2d 408, 413 (1980)).

> When a school issues a diploma to one of its students, it certifies to society that the student is well-versed in all of the knowledge and skills required by his or her chosen profession.  *See id*. Thus, to ensure society's confidence in the qualifications of individuals who have graduated from a particular educational institution, "it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis."  *Id.* In addition, to involve the courts in assessing the propriety of a particular grade would encourage endless litigation by unsuccessful students and "undermine the credibility of the academic determinations by educational institutions." *Susan M. v. New York Law Sch.*, 76 N.Y.2d 241 (1990). This rule of judicial nonintervention is "particularly appropriate in the health care field" where the students who receive degrees will provide care to the public, *Burke v. Emory Univ.,* 177 Ga.App. 30 (1985); *see also Bilut*, *supra*, 206 Ill.Dec. 531, 645 N.E.2d at 542, and because "'courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine.'" *Jansen v. Emory Univ.*, 440 F.Supp. 1060, 1063 (N.D. Ga. 1977) (quoting *Connelly v. Univ. of Vt. and State Agric. College*, 244 F.Supp. 156, 160–61 (D. Vt. 1965)).

*Id.* at 1109-10.  Plaintiff argues deference is inappropriate here, as GW dismissed him for

reasons related to professional comportment, rather than *purely* academic concerns.  Yet other

courts have concluded that, *particularly for medical students*, professional comportment issues

fall under the umbrella of deference to academic decisions.  *See e.g.*, *Halpern v. Wake Forest*

*Univ. Health Sciences*, 669 F.3d 454, 463 (4th Cir. 2012) ("Adopting an appropriately deferential

view, we find that professionalism was an essential requirement of the Medical School's

program and that, without an accommodation, [plaintiff] could not satisfy this requirement.");

*Shin v. Univ. of Md. Med. Sys. Corp*, 369 Fed. App'x. 472, 482 (4th Cir. 2010) ("we defer to the

views of Appellees on the standards for professional and academic achievement."); *Wheeler v. Miller*, 168 F.3d 241, 250 (5th Cir. 1999) ("the university promotion and review board 'was uniquely positioned to observe [the student's] judgment, self-discipline, and ability to handle stress, and was thus especially well situated to make the necessarily subjective judgment of [his] prospects for success in the medical profession.'") (quoting *Ewing*, 474 U.S. at 228 n. 14). *See also Kraft*, 498 A.2d at 1148-49 ("Whether [a student's] clinical supervisors were accurate in their evaluations of his clinical work is not a question for the court. An academic judgment of school officials that a student does not have the necessary clinical ability to perform adequately and was making insufficient progress toward that goal is a determination calling for judicial deference.").

Here, as discussed, GW states that it dismissed Plaintiff because it concluded that he was unsuited, due to his poor professional comportment, to practice medicine. Def.'s MSJ at 1. After first referring the issue to a Professional Comportment Subcommittee, GW's Medical Student Evaluation Committee convened on two separate occasions to assess Plaintiff's professional comportment. At the MSEC meetings, Plaintiff was present with counsel, was permitted to make an oral statement to the Committee and was also provided the opportunity to submit a written statement. At its July 9, 2007 executive session meeting, the MSEC approved a motion for Plaintiff's dismissal from the M.D. Program. The Committee provided the following reasoning for this decision:

> Serious concerns were raised about [Plaintiff's] professionalism, honesty and integrity, his interpersonal relationships and his capacity to work with others. Of particular concern, were the following: [Plaintiff's] inability to accept responsibility for his own actions, refusal to accept instructions or constructive feedback from residents, faculty and deans; inability to work and communicate effectively with peers and residents; inadequate understanding of the commitment to and responsibility for patient care; lack of insight into personal weaknesses and areas for improvement; and inappropriate understanding of the role of a medical

> student in the medical education hierarchy. In addition, the Committee noted that these concerns were not the result of an isolated incident, but appeared to be a pattern in most interactions with [Plaintiff].

Def.'s Ex 3, Ex 33 at 2. Based on this recommendation, the Dean of the Medical School dismissed Plaintiff. Upon appeal, the office of the Vice President for Academic Affairs found no material procedural irregularities in this dismissal. In response, Plaintiff alleges that his dismissal was "motivated by bad faith or ill will unrelated to academic performance." Pl.'s Opp'n at 42. He contends that these alleged professionalism issues prompting his dismissal were a "veneer." *Id.* at 29.

Assessing the body of evidence before the MSEC when it recommended dismissing Plaintiff and before the Dean when he dismissed Plaintiff, the Court cannot conclude that this decision was lacking in rational bases. The Subcommittee which investigated the issue of Plaintiff's professional comportment for the MSEC had before it evidence that suggested that these issues were a problem for Plaintiff. Although Plaintiff disputes the accuracy of much of this evidence, the Court does not find that the members of the MSEC had any reason to believe that this information was inaccurate. Furthermore, the Committee provided a written explanation justifying its recommendation that Plaintiff be dismissed from the Medical School. Although Plaintiff objects to the MSEC recommending a more severe sanction than the Subcommittee, based on the evidence before the MSEC, and in light of the deference appropriate in reviewing dismissal decisions by medical schools, the Court cannot conclude that either the Committee's recommendation that Plaintiff be dismissed, or the Dean's ultimate decision to dismiss Plaintiff based on this recommendation were arbitrary and capricious.

As an additional argument that his dismissal was motivated by bad faith and ill will, Plaintiff points to a bevy of alleged procedural irregularities in the dismissal process. Pl.'s

Opp'n at 40-49. Clearly, "a school's failure to comply with published policies can be evidence of arbitrariness." *Bain*, 2013 WL 5423101, at *4. However, reviewing the evidence concerning the dismissal process and the applicable procedures here, the Court concludes that either there were no procedural irregularities here, or there were not the sort of procedural irregularities that would indicate an arbitrary decision. The Court addresses each of Plaintiff's procedural objections to the dismissal process below.

Plaintiff first raises a series of objections to the procedure for initiating the Subcommittee review. First, he contends that Dean Schroth never informed Plaintiff prior to December 27, 2006 of his plans to initiate a subcommittee investigation regarding professionalism concerns. Pl.'s Facts ¶ 87. Yet the Regulations do not require that the Dean meet with the student *prior* to initiating a Subcommittee Investigation. Rather, the Dean may initiate the review "at that meeting [with the student]."[5] Def.'s Ex. 3, Ex. 16 at 32. Plaintiff next argues that Dean Schroth failed to conduct additional fact-finding before launching a Subcommittee. Pl.'s Facts ¶ 89. However, such additional fact-finding is not required by the Regulations, which state only that the dean "may" "[d]evelop additional information through contacts with the student . . . ." Def.'s Ex. 3, Ex. 16 at 32. In lieu of additional fact-finding, the dean is permitted to "[r]efer the case to a Subcommittee on Professional Comportment", as occurred here. *Id.*

Next, Plaintiff contends that the initiation of the Subcommittee was inappropriate because it was premised on Dr. Askari's unsigned statement raising concerns regarding Plaintiff's professional comportment. Pl.'s Facts ¶ 89. The Regulations state that "[w]hen a problem with

---

[5] Plaintiff does not appear to argue that *no* meeting occurred on December 27, 2006. *See* Pl.'s Facts ¶ 89 ("[A] comportment committee was not triggered until December 27, 2006. . . . Dr. Schroth never truly informed Plaintiff regarding the substance of the meeting on that day."). Rather, he seems to contend that he should have been told of the initiation of the subcommittee review *prior* to this meeting. The regulations do not appear to require such notice.

professional comportment (other than academic dishonesty) regarding a student is perceived, the observer will communicate this concern to the dean. If the communication is verbal, it must be confirmed immediately by a signed written statement or else it will not be pursued further." Def.'s Ex. 3, Ex. 16 at 32. However, the Court notes that the Askari statement raising concerns regarding Plaintiff's professional comportment does appear to be signed, although it is unclear by whom. Def.'s Ex. 6, Ex. B. Furthermore, the Regulations only appear to require "a signed written statement" "[i]f the communication is verbal." Def.'s Ex. 3, Ex. 16 at 32. The Regulations do not speak to the situation where the original communication is *not* verbal. In engaging in this reading, the Court notes that some deference to the Medical School in interpreting its own regulations is appropriate. *See Pride v. Howard Univ.*, 384 A.2d 31, 35 (D.C. 1978) ("Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is. The readings of the market place are not invariably apt in this non-commercial context.") (quoting *Greene v. Howard Univ.*, 412 F.2d 1128, 1135 (D.C. Cir. 1969)). To the extent Defendant reads its regulations to not require a signed written statement in all instances, the Court cannot say that such a reading is unreasonable.

Finally, Plaintiff points to the delay between his removal from the Honors curriculum in October 2006 and the initiation of the Subcommittee review by Dean Schroth in December 2006. Pl.'s Facts ¶ 89. Plaintiff argues this delay somehow shows that the Dean was not motivated by actual concerns regarding professional comportment in initiating the Subcommittee review process. However, the Court notes that there is no set timeframe in the Regulations by which the

Dean must inform the student of the report.[6]  Furthermore, the Court notes that Dean Schroth's letter premises the initiation of the Subcommittee review process in part on Plaintiff's evaluations in the obstetrics and gynecology rotation, which were not received until late November 2006.  Def.'s Ex. 4, Ex. D.  Therefore, the Court does not find evidence suggesting an arbitrary motive in the mere fact of delay in the Dean's processing of the complaint.  Accordingly, the Court finds no procedural irregularities in the initiation of the subcommittee.

In addition, Plaintiff argues that the decision to terminate him was arbitrary because the subcommittee may have been selected by Rhonda Goldberg, Associate Dean for Student Affairs, rather than the Chair of the MSEC.  Pl.'s Facts ¶ 88.  The Regulations state that after the dean refers a case to a Subcommittee on Professional Conduct, "[a] Subcommittee on Professional Comportment and its chair will be named by the chair of the MSEC.  The Subcommittee will consist of two students from the third and/or fourth year of the M.D. Program and two faculty, at least one of whom shall be a member of the MSEC."  Def.'s Ex. 3, Ex. 16 at 32.  Here, Plaintiff points to an e-mail from Dean Goldberg in which she advises Plaintiff that she will be "facilitating [the Professional Comportment Subcommittee] process" and states "[t]he Subcommittee *I* am proposing is . . . ."   Def.'s Ex. 12 at 76 (emphasis added).  Plaintiff argues, based on this e-mail, that an improper party chose the membership of the Subcommittee.  In response, Defendant points to deposition testimony from Dr. Jeffrey Akman, Chair of MSEC in which he states that "I give the assistant or associate dean the authority to identify potential members, based on the regulations. . . . I approve them, and then specifically then [sic] request the student to review the members, the proposed members, of the subcommittee."  Def.'s Ex. 11

---

[6] The Regulations do state that "[t]he dean will meet informally with the student as soon as possible" but this appears to be after "[t]he dean . . . notif[ies] the student in writing that s/he has received a communication from someone who perceives that the student has a problem with professional comportment."  Def.'s Ex. 3, Ex. 16 at 32.

(Akman Dep.) at 39:1-7. Defendant also points to an April 25, 2007 e-mail between Goldberg and Akman in which Akman states "[a]s we discussed, as the MSEC Chair I am approving the composition" of the Subcommittee. Def.'s Ex. 1, Ex. B (E-mail from Akman to Goldberg). Therefore, Goldberg was acting as Akman's designee in choosing the Subcommittee's membership. Plaintiff argues that Akman's e-mail shows that Akman did not approve the Subcommittee membership until April 25, 2007, and thus did not make this approval before Goldberg contacted Plaintiff about the Subcommittee's make-up. Pl.'s Opp'n at 46-47. Reviewing this evidence, the Court finds that even if there was a violation of the regulations here, it was minor. Indeed, in the related context of tenure decisions, "absent a showing of unlawful discrimination – review of academic promotion disputes is ordinarily limited to determining 'whether there has been *substantial compliance* with' the university's own internal rules and procedures . . . ." *Elam v. Bd. of Trs. of Univ. of Dist. of Columbia*, 530 F.Supp.2d 4, 17 (D.D.C. 2007) (quoting *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006)) (emphasis added). Here, because Dr. Akman approved the composition of the Subcommittee prior to its meeting, Defendant has complied with the general purpose of the regulation.

Plaintiff also argues that he objected to the initiation, selection, and formation of the Subcommittee based on the Regulations in his e-mails to Associate Dean of Student Affairs. Pl.'s Opp'n at 47. However, the Regulations do not appear to contemplate Plaintiff's objections to the initiation and formation of the Subcommittee. In addition, reviewing the e-mails sent by Plaintiff to Dean Goldberg, the Court finds that he does not actually timely object to the names provided by Dean Goldberg, as she invites him to do.[7] Def.'s Ex. 12 at 77, 81. Plaintiff states

---

[7] Plaintiff also states at various points that "GW was using the Virginia Tech tragedy as an opportunity to form this illegitimate and wrongful committee." Pl.'s Facts ¶ 89. *See also* Pl.'s Opp'n at 47. The Court does not understand this objection, as Plaintiff somehow appears to

that Defendant failed to honor his objections to certain members of the Subcommittee. Pl.'s Opp'n at 47. However, these objections were received more than ten calendar days after Plaintiff was informed of each member of the Subcommittee. Def.'s Ex. 12 at 93-94. The Regulations state that "[t]he student will be allowed ten calendar days from the mailing of . . . notice [of the Subcommittee's membership] to object to any person's appointment to the Subcommittee." Def.'s Ex. 3, Ex. 16 at 32-33. Accordingly, GW was within the Regulations to appoint the membership of the Subcommittee without consideration of Plaintiff's untimely request for the appointment of different members.

Plaintiff next objects to GW's failure to allow him to ask questions of and cross-examine witnesses at the Subcommittee information gathering sessions. Pl.'s Facts ¶ 96. On this point, the Court notes that the Regulations do not clearly provide for such rights. The Regulations state that although "[t]he student under review and/or the student's attorney or advisor may attend the information-gathering sessions," "[t]hese sessions are not in the nature of an adversarial proceeding . . . ." Def.'s Ex. 3, Ex. 16 at 33. Accordingly, while "the student and/or his or her attorney or advisor may submit questions to be answered by persons interviewed by the Subcommittee . . . the procedure regarding [any witnesses'] questioning is left to the sole discretion of the Subcommittee." *Id.* Here, the Subcommittee interviewed witnesses, including Hajjar-Nejad, who was present with his legal representative, reviewed the case file, including Plaintiff's submissions, and invited Plaintiff to submit written questions for any individuals that

---

be arguing that the timing of the Subcommittee meeting was somehow related to the Virginia Tech shootings of April 16, 2007. In any case, the Court notes there is no competent and admissible evidence in the record suggesting a relationship between these events. Further, Plaintiff appears to allege at various points that Defendant viewed him as a "security concern." But his only citation to the record on this point consists of the DCOHR opinion repeating Plaintiff's allegation without comment. *See* Pl.'s Facts ¶ 10 (citing Pl.'s Ex. 21 at 82). This is akin to Plaintiff citing the allegations of own complaint, and is insufficient to create a genuine issue of material fact.

would help to clarify the events pertaining to the professional comportment issues. Def.'s Ex. 3, Ex. 13. In response, Plaintiff proposed twenty-one questions. Def.'s Ex. 12 at 98-99. However, the Subcommittee, apparently in an exercise of its "sole discretion" to determine the procedure of questioning, concluded that these questions were "procedural questions related to the comportment review process, rather than questions that would add further insight into the events in question." Def.'s Ex. 3, Ex. 14. While the Subcommittee's understanding is not the only possible reading of its "sole discretion" to determine the procedure of questioning, the Court notes again that some deference to the Medical School in interpreting its own regulations is appropriate. *See Pride*, 384 A.2d at 35. Therefore, since the Subcommittee's action does not represent an unreasonable reading of its own disciplinary regulations, the Court does not find a procedural irregularity suggesting an arbitrary decision here. In addition, the Court agrees that the proposed questions relate more to process than the specific instances alleged as evidence of Plaintiff's lack of professional comportment.

So too, under this deferential standard, the Court cannot conclude that Defendant violated its regulations when it allegedly denied Plaintiff the opportunity to speak freely at the Subcommittee stage and apparently rejected his suggestions for additional interviewees. Pl.'s Facts ¶ 96. As to the former issue, the Regulations do state that "[t]he student may speak on his/her behalf and may submit other material." Def.'s Ex. 3, Ex. 16 at 33. However, "speak on [one's] behalf" is not defined, and nowhere do the Regulations state that the student has an unfettered right to speak before the Subcommittee. *Id.* Further, the Court notes that Plaintiff was interviewed by the Committee as a witness and thus apparently had the opportunity to "speak on his[] [own] behalf." With respect to the latter issue, the Regulations state that "[t]he student may suggest that the Subcommittee interview additional persons, but the decision to

interview such persons is left to the sole discretion of the Subcommittee." *Id.* In light of the sole discretion vested in the Subcommittee to determine whom to interview, the Court does not conclude that there was procedural error in its failure to interview the additional individuals Plaintiff proposed.

The Court also finds no violation in Plaintiff's allegations that the Subcommittee impermissibly relied on hearsay evidence. Pl.'s Facts ¶ 100. The regulations clearly state that "[t]he legal rules of evidence, including, but not limited to, those rules regarding relevancy and hearsay, are not applicable." Def.'s Ex. 3, Ex. 16 at 33.

Plaintiff also argues that his dismissal effective immediately by the Dean of the Medical School was premature. Pl.'s Facts ¶ 123. The Regulations state that in response to the MSEC's recommendation, "[t]he dean will take whatever action s/he deems appropriate, including dismissal of the student from the M.D. program." Def.'s Ex. 3, Ex. 16 at 34. However, the regulations also state that a student may appeal the decision of the dean to the vice president for academic affairs. *Id.* "The scope of this appeal is for the vice president for academic affairs or his/her designee to determine whether the procedures set forth in these Regulations have been followed." *Id.* The Regulations further state that the decision of the vice president for academic affairs or his/her designee "shall be final." *Id.* In arguing that he should not have been dismissed until this appeal was decided, Plaintiff points to language from the 2006-2007 GW Guide to Student Rights and Responsibilities, which states that "until final disposition of the charges, the status of a student shall not be altered or his or her right to be present on campus and to attend classes suspended." Pl.'s Ex. 23 (Guide to Student Rights and Responsibilities) at 3. However, the Court finds Plaintiff's argument for procedural irregularity unavailing. The Regulations clearly state that "all cases involving alleged misconduct by M.D. candidates will be processed

under these Regulations, unless the School of Medicine and Health Sciences dean or his/her designee (hereinafter 'dean') decides in a particular case to have the case processed under the Guide [to Student Rights and Responsibilities'] Code of Student Conduct." Def.'s Ex. 3, Ex. 16 at 28.   Here, there is no evidence that the Dean decided to have Plaintiff's case processed under the Guide.   Furthermore, the Regulations state, "[i]n the case of any inconsistency or ambiguity between these Regulations and University-wide rules, regulations, and policies, including the Guide, these Regulations shall govern."  *Id.*   Accordingly, Plaintiff may not look to the Guide to Student Rights and Responsibilities to establish procedural irregularity here.

For the same reasons, the Court rejects Plaintiff's objection that the Subcommittee did not act in accordance with the Standards of Fairness and Student Rights in Disciplinary Cases as guaranteed by the Guide to Student Rights and Responsibilities.  Pl.'s Facts ¶ 89 (citing Pl.'s Ex. 23 at 3).   Plaintiff objects that no specific formal charges were brought against Plaintiff and there was insufficient particularity as to the facts.   However, as discussed, the Regulations govern Plaintiff's professional comportment review, not the Guide to Student Rights and Responsibilities.

Plaintiff also argues that the MSEC violated the Regulations by acting via motions and secret ballot.  Pl.'s Facts ¶ 112.  Yet, the Regulations clearly state that the student "cannot be present when the MSEC meets in executive session."  Def.'s Ex. 3, Ex. 16 at 34.  Plaintiff also argues that the Regulations do not allow the MSEC Committee to recommend dismissal.  Pl.'s Facts ¶ 116 n. 129.  However, the Court notes that the Regulations state only that the MSEC "shall submit its recommendations, along with those of the Subcommittee, to the dean."  Def.'s Ex. 3, Ex. 16 at 34.  The fact that the Regulations do not specifically empower the MSEC to recommend dismissal of a student does not mean that it lacks this power.

Finally, Plaintiff objects that the vice president for academic affairs' designee, Dr. Sigelman failed to undertake a thorough review of his dismissal on appeal. Pl.'s Facts ¶ 129. The Court notes that Dr. Sigelman states in her letter sustaining the decision of the Dean that "I have thoroughly reviewed the entire written record of the proceedings . . . Based on the written record of the proceedings, I have reached the conclusion that the procedures set forth in the Regulations for MD Candidates have been followed." Def.'s Ex. 35. Plaintiff argues that Dr. Sigelman's review was improper because in an interview with the DCOHR, she could not recall the document Plaintiff submitted on September 22, 2006, entitled "Motion for Injunctive/Wrong Evaluation and for Development of an Active Task Force Committee." Pl.'s Facts ¶ 95. This document, which the Court discussed above and addresses in the context of Plaintiff's retaliation claim, however, was irrelevant to Dr. Sigelman's responsibility to review for procedural, as opposed to substantive, errors in the professional comportment review process. Def.'s Ex. 3, Ex. 16 at 34. Accordingly, the Court finds no error here. Plaintiff further argues that Dr. Sigelman was a "rubber stamp" who conducted only a cursory review. Pl.'s Facts ¶ 96. As support for this proposition, he points to moments in Dr. Sigelman's March 2012 deposition in which she is unable to recall specific details of her review. *Id.* (citing Pl.'s Ex. 33 (Sigelman Dep.) at 87:7-94:17. That Dr. Siegelman could not recall specific details of the review almost five years later is insufficient to show that she only conducted a cursory review of Plaintiff's appeal. Moreover, because the Court finds no material procedural irregularities, there is insufficient evidence to contradict Dr. Sigelman's certification to this effect.

In sum, Plaintiff has alleged numerous procedural irregularities in his dismissal. However, in light of the deference appropriate to an academic institution in interpreting its own disciplinary regulations, the Court cannot conclude that there were material errors here, or if

there were, that they were masking an arbitrary or capricious motive for dismissing Plaintiff. Defendant has stated a legitimate reason for dismissing Plaintiff that has support in the record before the officials responsible for the decision. Taken as a whole, the arguments proffered by Plaintiff are not "enough to 'establish . . . evidence from which a fact finder 'could conclude that there was no rational basis for the decision.'" *Bain*, 2013 WL 5423101, at *4 (quoting *Alden*, 734 A.2d at 1109). And "[i]n the absence of any 'evidence from which a fact finder could conclude that there was no rational basis for the decision' to dismiss [Plaintiff] or 'that it was motivated by bad faith or ill will unrelated to academic performance', the Court must grant summary judgment to [Defendant]." *Id.* at *6 (quoting *Alden*, 734 A.2d at 1109). Accordingly, Plaintiff's breach of contract claim is dismissed.

## 2. Discrimination Claim

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Here, Plaintiff never specifically alleges that Defendant's Medical School is a "program or activity receiving Federal financial assistance." However, because Defendant does not contest Plaintiff's Title VI claim on these grounds, the Court assumes that Defendant's Medical School is covered by Title VI.

Similarly, Section 1981, as amended by the Civil Rights Act of 1991, prohibits racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981; *see also Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994) ("§ 1981's

prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship . . . .").

Discrimination claims pursuant to Title VI and Section 1981 are analyzed under the same standards as claims brought pursuant to Title VII of the Civil Rights Act. *Richardson v. Loyola College in Maryland*, 167 Fed. Appx. 223, 224 (D.C. Cir. 2005) (Title VI claim requires direct evidence of discrimination or analysis under the *McDonnell Douglas* framework); *Chandamuri v. Georgetown Univ.*, 274 F.Supp.2d 71, 77-78 (D.D.C. 2003) (analyzing Title VI claim pursuant to Title VII framework); *Kidane v. Northwest Airlines, Inc.*, 41 F.Supp.2d 12, 17 (D.D.C. 1999) ("the same standards apply in evaluating claims of discrimination and retaliation under Title VII and § 1981."); *Ramey v. Potomac Electric Power Co.*, 468 F.Supp.2d 51, 58 n. 9 (D.D.C. 2006) (same).

Under this well-established framework, a plaintiff must demonstrate by a preponderance of the evidence that the actions taken by the Defendant were "more likely than not based on the consideration of impermissible factors" such as race, ethnicity, or national origin. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal quotation marks and citation omitted). In so doing, "the plaintiff may prove his claim with direct evidence, and absent direct evidence, he may indirectly prove discrimination" under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Brady v. Livingood*, 456 F.Supp.2d 1, 6 (D.D.C. 2006), *aff'd Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008).

Direct evidence is sufficient alone to defeat a defendant's motion for summary judgment. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) ("The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.") (quoting *Trans

*World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)). *See also Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576-77 (D.C. Cir. 2013); *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000). Here, however, Plaintiff proffers no direct evidence that Defendant discriminated against him on the basis of race, religion, or national origin. Although Plaintiff points to an alleged remark ostensibly relating to his religion made by senior surgery resident Reza Askari, such a remark, if true, is not direct evidence of discrimination. "While courts have not precisely defined what constitutes 'direct evidence,' it is clear that 'at a minimum, direct evidence does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decisionmakers unrelated to the decisional process itself." *Brady*, 456 F.Supp.2d at 6 (internal citations omitted). Indeed, "direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference*." *Lemmons v. Georgetown Univ. Hosp.*, 431 F.Supp.2d 76, 86 (D.D.C. 2006) (emphasis in original). Here, Askari's alleged remark that he does not "dine with [Plaintiff's] kind" is ambiguous and does not clearly refer to Plaintiff's religion. Def.'s Ex. 2 at 272:4-19. Plaintiff provides no evidence, beyond his conclusory allegation (which he himself recognizes as speculation), that Askari is a member of the Baha'i faith, and agrees that Askari is of Iranian descent. *Id.* at 263:22-264:9. Yet even if Plaintiff did have any evidence that Askari was a member of a different religion, the remark still requires the inference that Askari was speaking *about Plaintiff's religion* with the phrase "your kind," rather than some other distinction between himself and Plaintiff. For example, as Defendant argues, Askari could have been indicating that, as a resident, he preferred not to eat with medical students such as Plaintiff. Def.'s MSJ at 7. While Plaintiff states that he saw Askari eat with another medical student who he claims was also of the Baha'i faith, this is merely a conclusory allegation provided without any citation to the record. Pl.'s Facts ¶ 37.

Similarly, two other alleged remarks by University officials are also not direct evidence of disparate treatment. Plaintiff claims that on August 9, 2007, Stephen Trachtenberg, the former President of GW, told Plaintiff that, in light of his dismissal, he should "return back to Iran to complete medical studies" as another medical student had done. Pl.'s Facts ¶ 124. In his deposition, President Trachtenberg did not specifically recall making this remark. *See* Pl.'s Ex. 36 (Trachtenberg Dep.) at 46:2-13 ("[W]e are really here deep into the muddy of speculation."). However, this statement (if true) is not direct evidence of discrimination as it constitutes a "stray remark . . . made by [a] nondecision-maker[]." President Trachtenberg was not a decision-maker in Plaintiff's dismissal from GW's Medical School, and the record provides no evidence to support the conclusion that Trachtenberg was a decision-maker in any of the decisions that Plaintiff alleges were discriminatory. Plaintiff also claims that Trachtenberg made this statement because Dean Scott had told Trachtenberg that Plaintiff hoped to "return" to Iran to teach medicine. Pl.'s Opp'n at 5. However, aside from Plaintiff's deposition testimony, there is no evidence in the record to show that this statement was made. And Plaintiff's deposition testimony, testifying as to what President Trachtenberg said that Dean Scott told Trachtenberg constitutes double hearsay not within any exception. As the D.C. Circuit has made clear, "[s]heer hearsay . . . counts for nothing on summary judgment." *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (internal quotation marks omitted).

In the absence of direct evidence of discrimination based on race, national origin, or religion, the *McDonnell Douglas* framework applies. Pursuant to that framework, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination or retaliation. *Burdine,* 450 U.S. at 252-53. For a claim alleging disparate-treatment discrimination, a plaintiff makes out a prima facie case by showing (1) that he is a

member of a protected group; (2) that he suffered an adverse action; and (3) the unfavorable action gives rise to an inference of discrimination. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). Once a plaintiff makes out a prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the [adverse action].'" *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas,* 411 U.S. at 802). If the defendant is successful, then "the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted).

In *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008), the D.C. Circuit simplified the analysis for disparate treatment suits. Under *Brady*, once an employer has proffered a nondiscriminatory reason, the *McDonnell Douglas* burden-shifting framework disappears, and the court must simply determine whether the plaintiff has put forward enough evidence to defeat the defendant's proffer of a legitimate, non-discriminatory reason and support a finding of discrimination. *See Brady,* 520 F.3d at 494 ("[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas.*") (emphasis in original). Consequently, at the summary judgment stage, a district court is left with "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* "In other words, the Court must determine if the plaintiff has produced enough evidence such that a reasonable jury would find that the [defendant's] non-discriminatory reasons are mere

pretext for underlying unlawful discrimination." *Perry v. Donovan*, 733 F.Supp.2d 114, 118 (D.D.C. 2010).

In its January 4, 2012 opinion, the Court limited Plaintiff's Title VI claim to alleged discriminatory action occurring *after* April 9, 2007. *See Hajjar-Nejad*, 873 F.Supp.2d at 16. Similarly the Court limited Plaintiff's Section 1981 claim to alleged discriminatory action occurring after April 9, 2006. *Id.* Accordingly, alleged discriminatory action occurring between April 9, 2006 and April 9, 2007 is only assessed under Section 1981. Alleged discriminatory action occurring after April 9, 2007 is considered under both provisions.

As set out in the Court's prior opinion, Plaintiff alleges the following discriminatory actions taken between April 9, 2006 and April 9, 2007: "(1) [Dean Schroth] violated GW's confidentiality policy on or about August 23, 2006; (2) [Dean] Schroth directed a professor to give Hajjar-Nejad a below passing grade on or about September 22, 2006; (3) GW generated "false and contrived" student evaluations in or about September and October 2006; (4) Schroth directed Hajjar-Nejad to discontinue his ongoing medical research on or about October 23, 2006; (5) Schroth indicated that he would not permit Hajjar-Nejad to transfer to another school on or about October 23, 2006; (6) Schroth and Scott removed Hajjar-Nejad from GW's honors program on or about October 23, 2006; (7) Scott stated that Hajjar-Nejad was "angering" him on or about October 23, 2006; (8) Scott stated that he did not want Hajjar-Nejad to pursue surgery as a profession on or about October 23, 2006; (9) GW included false allegations in Hajjar-Nejad's performance evaluations in late 2006 and early 2007; (10) GW decided to initiate a review of Hajjar-Nejad's professional comportment in December 2006; and (11) GW decided to form a committee to evaluate Hajjar-Nejad's progress in or about February 2007." *Id.* at 16-17. The Court addresses these actions under Section 1981 below.

In addition, the Court addresses the following alleged discriminatory actions taken after April 9, 2007 under both Title VI and Section 1981: (1) GW's holding a Subcommittee hearing to investigate Plaintiff; (2) the Subcommittee recommending that Plaintiff re-take several classes, including obstetrics and gynecology; (3) the MSEC meeting and recommendation to Dean Scott that Plaintiff be dismissed from the Medical School; (4) Dean Scott dismissing Plaintiff from the Medical School; (5) Associate Vice President Sigelman's decision sustaining Plaintiff's dismissal; (6) GW's Registrar placing a hold on Plaintiff's transcript; (7) Defendant's informing the NBME that Plaintiff had been dismissed from the Medical School. See TAC ¶¶ 56-80.

As an initial matter, the Court notes that Plaintiff purports to prove discrimination generally in his treatment by Defendant through evidence of students of other races, religions, and national origins who were treated more favorably by the administration. Pl.'s Opp'n at 6-7. Certainly, evidence of different treatment of similarly situated individuals outside plaintiff's protected class can be extremely probative on the issue of discrimination. *See, e.g., Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008). However, Plaintiff cites to no competent evidence to support this claim of differential treatment. Rather, he merely cites to his brief before the DCOHR. *See* Pl.'s Facts ¶ 41 (citing Pl.'s Ex. 6 (Plaintiff's DCOHR Reply Brief) at 20-21). Although this DCOHR brief cites to an exhibit on this point, Plaintiff has failed to provide the exhibit in the record. Furthermore, the DCOHR found "no evidence to establish that the White American students [Plaintiff] cites were actually similarly situated to him." Pl.'s Ex. 21 at 72. Accordingly, Plaintiff provides the Court with no basis other than his conclusory allegation to support this proposition. Similarly, Plaintiff's argument that Defendant has shown hostility to Muslim students generally is unavailing. Pl.'s Facts ¶ 68. On this point, Plaintiff cites only to his DCOHR Complaint, which states that "three Muslim students left after their first year of

medical school." Pl.'s Ex. 20 at 25. Although Plaintiff admits that he is "not aware of the specifics" of these departures, *id.*, there is the larger problem that Plaintiff's DCOHR Complaint does not constitute competent evidence on which a reasonable jury could infer discrimination in Defendant's treatment of Plaintiff. Plaintiff's citation is tantamount to citing to his own Complaint in this litigation. And a Plaintiff is not entitled to rely on the allegations in his Complaint to create a genuine issue of material fact at the summary judgment stage. *See Liberty Lobby*, 477 U.S. at 249 (1986) ("[T]he plaintiff could not rest on his allegations of a conspiracy to get to a jury without 'any significant probative evidence tending to support the complaint.'") (quoting *First National Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 290 (1968)); *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 887 (1990) ("The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Accordingly, Plaintiff's argument that he was treated less favorably than students of different races, religions, and national origins is not probative on the issue of discriminatory animus.

In addition, with respect to several of these allegations, the Court finds that Plaintiff has not established the necessary adverse action. These allegations all relate to activity prior to April 9, 2007 and accordingly, the Court analyzes them under Section 1981. Under this provision, "[a] prima facie case of discrimination requires that the plaintiff suffer an adverse action that gives rise to an inference of discrimination." *Middlebrooks v. Bonner Kiernan Trebach & Crociata*, 671 F.Supp.2d 61, 63 (D.D.C. 2009). *See also Ransom v. Center for Nonprofit Advancement*, 514 F.Supp.2d 18, 24 (D.D.C. 2007) ("[I]n order to demonstrate a claim . . . under § 1981, a plaintiff must show that . . . she suffered an adverse employment action."). Although this is not a Title VII case, as discussed, Title VII jurisprudence provides guidance in interpreting Section 1981. *See Carney v. Am. Univ.*, 151 F.3d 1090, 1092-93 (D.C. Cir. 1998). And in the Title VII

context, the D.C. Circuit's "standard for an adverse employment action is well-established: '[A]n employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Czekalski v. LaHood*, 589 F.3d 449, 454 (D.C. Cir. 2009) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)) (alteration in original). "While plaintiff need not allege a 'readily quantifiable loss' in order to claim she suffered an adverse employment action, 'not everything that makes an employee unhappy is an actionable adverse action.'" *Hutchinson v. Holder*, 668 F.Supp.2d 201, 215 (D.D.C. 2009) (quoting *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001)). "Events that merely have an *effect* on plaintiff's work environment are legally insufficient." *Brantley v. Kempthorne*, No. 06-1137, 2008 WL 2073913, at *5 (D.D.C. May 13, 2008) (emphasis in original). Furthermore, "[p]urely subjective injuries, such as . . . public humiliation or loss of reputation are not adverse actions." *Forkkio*, 306 F.3d at 1130-31 (internal citations and quotation marks omitted).

Defendant argues that the following alleged actions are not adverse: (1) Dean Schroth telling the Director of Medicine that Plaintiff had criticized the Clerkship Director; (2) Dean Scott stating that Plaintiff was angering him, (3) Dean Schroth allegedly stating that he would not permit Plaintiff to transfer to another medical school, and (4) Dean Schroth allegedly stating that he did not want Plaintiff to become a surgeon. Def.'s MSJ at 36-38. The Court agrees. While Dean Schroth allegedly telling the Director of Medicine that Plaintiff had criticized the Clerkship Director "may have been embarrassing or otherwise unpleasant to [Plaintiff]" he does not contend that this disclosure *itself* significantly changed his status as a student or materially altered the terms, conditions, or privileges he enjoyed as a student. *Hutchinson*, 668 F.Supp.2d

at 215. Similarly, the alleged statements by Dean Schroth and Dean Scott cannot be considered adverse actions under Section 1981. These statements, standing alone, did not cause "objectively tangible harm," and indeed caused no harm, other than perhaps humiliation, anger and embarrassment. These are not the sort of harms upon which Plaintiff can claim an adverse action. Accordingly, Plaintiff's Section 1981 claims premised on these events are dismissed. The Court next analyzes the remaining allegations, which Defendant does not contest are adverse actions.

### A. Dean Schroth's Alleged Directive to Dr. Lee

Plaintiff alleges discriminatory treatment in violation of Section 1981 by claiming that Dean Schroth directed Dr. Juliet Lee, the Director of Plaintiff's surgery clerkship, to give Plaintiff a below passing grade in his surgery rotation on or about September 22, 2006. Pl.'s Opp'n at 12-18. As discussed, on September 21, 2006, Dr. Lee sent an e-mail to Dean Schroth regarding Plaintiff in which she states that "[Plaintiff] has really struggled throughout his six weeks and my major concern is that he lacks insight into his own deficiencies and has progressed minimally throughout the rotation in his clinical judgment and understanding." Def.'s Ex. 3, Ex. 19. Dr. Lee further stated that although "[i]n terms of book knowledge, [Plaintiff] is doing fine" she was concerned regarding his progress in "patient care and clinical medicine." *Id.* "I am seriously concerned about him and his ability to function. From the residents['] standpoint, they would not want [Plaintiff] taking care of them. My understanding from them and the attending is that he will likely get a low pass for his clinical rotation in Surgery." *Id.* Lee further stated that "[w]hile I think he might pass overall based on exams, I think his clinical skills are far behind what we expect of third years." *Id.*

In response, Dean Schroth wrote the following message:

[T]his is 100% consistent with the information that we received from his first rotation, the medicine clerkship, who also gave him a low pass (and lots of feedback that he resists). [I] have met with [Plaintiff] repeatedly. [H]e lacks insight into his deficiencies I'm afraid. [I] would urge you and the residents to strongly consider whether his performance is indeed 'passing' or not. [T]echnically, a low pass is still a pass, and he will move on through the curriculum. [I]f you really think that he has serious clinical performance deficiencies, a below passing grade (eg. [sic] conditional or fair) will bring this to a clear 'head' and allow us to work with him on remediation efforts. [H]e is very bright and very 'book' smart, but he has trouble functioning in the clinical environment, difficulty working as part of a team, and lacks insight into these problems. [I] see that he is scheduled to meet with me again next week. [P]robably about this issue [I] suspect.

*Id.* Ultimately, Plaintiff received the below passing grade of "conditional" in his surgery rotation based on the fact that he failed the clerkship's clinical portion. Def.'s Ex. 3, Ex. 20. Plaintiff argues, based on this e-mail, that Dean Schroth acted with a discriminatory motive in directing Dr. Lee to give Plaintiff a below passing grade for the surgery rotation. Pl.'s Opp'n at 12. Defendant counters by arguing that Dean Schroth did not intend his comment as a directive, and even if it were a directive, the evidence establishes that he issued it for legitimate, non-discriminatory reasons. On the issue of whether the comment was a directive, Defendant points to testimony by Dean Schroth stating that he did not intend his comment as a directive to give Plaintiff a below-passing grade, Def.'s Ex. 4 ¶ 17, as well as testimony from Dr. Lee that she did not perceive it as such, Def.'s Ex. 7 ¶ 5. Furthermore, Defendant notes that Dean Schroth did not phrase his comment as a directive, but rather merely "urge[d]" Dr. Lee and the surgery residents to "strongly consider whether his performance is indeed 'passing' or not." Def.'s MSJ at 28-29. Defendant further argues that even if Dean Schroth did issue a directive, he did so for the legitimate, non-discriminatory reason that he sought to engage in remediation efforts with Plaintiff because of concerns regarding his clinical performance. *Id.* at 29.

In response, Plaintiff contests the grounds for Dr. Lee's assessment of his performance in the surgery rotation. Plaintiff argues that the surgery evaluation was inaccurate, untrue, fabricated, and submitted in bad faith and ill will. Pl.'s Opp'n at 13-14. Further, he argues that his clinical skills were not deficient, citing to his performance in the first- and second-year Practice of Medicine course, which incorporated clinical elements, and his subsequent performance in rotations after his surgery and internal medicine rotations. *Id.* Plaintiff also points to his performance on subsequently taken standardized tests measuring clinical skills. *Id.*

However, the accuracy of the surgery rotation evaluation is *not* the issue here. Rather, the questions are whether Dean Schroth issued a directive to Dr. Lee to give Plaintiff a failing grade, and, if he did so, whether it was for reasons related to Plaintiff's race, religion, or national origin. Although the Court would not interpret this e-mail as a directive, it need not make this determination because, even if the e-mail were a directive, there is no factual basis to find that Dean Schroth issued it for discriminatory reasons. Dean Schroth was aware that Plaintiff had received a low pass for the clinical portion of the internal medicine rotation, his only other rotation in the Honor curriculum. Further, Dr. Robert Jablonover, the head of the internal medicine clerkship, had informed Dean Schroth via e-mail of certain concerns regarding Plaintiff's performance in this rotation.[8] Based on similar concerns expressed by Dr. Lee in Plaintiff's next rotation, Dean Schroth, according to Defendant, sought to engage in efforts to improve deficiencies in Plaintiff's clinical performance that had been conveyed to him. While Plaintiff argues that there were no deficiencies in his underlying clinical performance, the issue is whether Dean Schroth reasonably believed such deficiencies existed. *See George v. Leavitt*,

---

[8] Plaintiff also contests the accuracy of his internal medicine evaluation. Pl.'s Opp'n at 25. But again, the accuracy of this evaluation is not the issue with respect to Plaintiff's charge that Dean Schroth's alleged directive was discriminatory.

407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (employer prevails if it "honestly believes in the reasons it offers") (internal citation omitted). Here, based on the e-mails from Dr. Jablonover and Dr. Lee, the Court finds no basis to doubt that Dean Schroth reasonably did believe Plaintiff was experiencing problems in his clinical education and that conclusion is supported by the record.

Plaintiff argues that Dean Schroth did not reasonably believe such deficiencies existed and instead sought to negatively influence Dr. Jablonover's evaluation of Plaintiff such that Dr. Jablonover would give Plaintiff a negative evaluation. However, the record reveals that Dr. Jablonover first reached out to Dean Schroth on August 23, 2006 expressing concerns about Plaintiff's clinical performance. Def.'s Ex. 3, Ex. 4 at 1-2. Plaintiff's claim that Dean Schroth caused Dr. Jablonover's negative assessment of Plaintiff's clinical performance in the internal medicine rotation is not supported by the record. *See* Def.s Ex. 5 (Jablonover Dep.) at 33:12-13 ("Dean Schroth didn't change my mind about you. He didn't bias me against you."); *id.* at 34:4-10 ("Dean Schroth didn't change my view of you. I formed my own view, over time . . . there seemed to be a lack of absolute insight . . . into any concerns that I brought, and to me that's what changed my mind. It's not Dean Schroth."). Further, although Plaintiff claims that Dean Schroth biased Clerkship Directors against him, he does not provide any competent evidence in support of this claim.[9] Pl.'s Facts ¶ 37.

_____

[9] In his DCOHR Complaint, Plaintiff states that the Director of the Primary Care Clerkship, Dr. Matthew Mintz, reported to Plaintiff that he had been pre-informed about him. *See* Pl.'s Ex. 20 at 25. This statement is plainly insufficient to support Plaintiff's claim that Dean Schroth biased clerkship directors against him. As an initial matter, it appears in Plaintiff's DCOHR Complaint, and is akin to a conclusory allegation in Plaintiff's Complaint. *See Liberty*

### B. "False and Contrived" Student Evaluations

Plaintiff next alleges discrimination because GW generated "false and contrived" evaluations of his performance in various medical rotations. Pl.'s Opp'n at 24-27. Based on the parties' briefing, the Court understands Plaintiff to be alleging that the clerkship evaluations received from the internal medicine, surgery, and obstetrics and gynecology rotations were discriminatory. *Id*; Def.'s MSJ at 30.

Defendant argues that Plaintiff received negative evaluations in these three rotations not because of any discriminatory animus, but because of his poor performance. First, with regard to Plaintiff's internal medicine evaluation, Dr. Jablonover, the head of the internal medicine clerkship, stated in his evaluation that Plaintiff (1) did not always seem to complete reading assignments; (2) failed at times to apply his science knowledge clinically to his patients; (3) sometimes had difficulty generating differential diagnoses; (4) did not always focus on or prioritize his clinical duties; (5) was unprepared at times with patients' information; (6) was absent, intermittently, from rounds; (7) did not seem to appreciate opportunities inherent in hands-on learning; (8) was defensive, at times, when given constructive feedback; (9) sometimes seemed uncomfortable when talking with patients, which made therapeutic relationships difficult; and (10) donned a gown and gloves at clinically inappropriate times. Def.'s Ex. 3, Ex. 4 at 1-2.

Second, in his surgery rotation, Plaintiff received a negative evaluation from Dr. Juliet Lee. In explaining her concerns, Dr. Lee stated, "[Plaintiff] has really struggled throughout his six weeks and my major concern is that he lacks insight into his own deficiencies and has

---

*Lobby*, 477 U.S. at 249. Second, the statement is hearsay, not apparently within any exception. Finally, even if true and not hearsay, the statement does not establish that Dean Schroth specifically tried to turn clerkship directors against Plaintiff.

progressed minimally throughout the rotation in his clinical judgment and understanding. . . . In terms of book knowledge, he is doing fine. But none of this information has been translated to patient care or clinical medicine. I am seriously concerned about him and his ability to function." Def.'s Ex. 3, Ex. 19.

Finally, Plaintiff received negative evaluations in his obstetrics and gynecology rotations. Dr. Sherita Gaskins, one of Plaintiff's evaluators, rated Plaintiff unacceptable overall based on concerns regarding unprofessionalism. Def.'s Ex. 3, Ex. 27. "[Plaintiff] is undoubtedly a very intelligent, ambitious student, but we as a group had very serious concerns regarding his very unprofessional behavior. He openly lied to us on more than one occasion and he refused to pull his weight with regard to patient care. Integrity is one of the cornerstones of our profession and the strong lack of it demonstrated at this early stage in [Hajjar-Nejad's] career is very disturbing." *Id.* Dr. Joel Palmer, another evaluator, rated Plaintiff as marginal overall and stated that Plaintiff "needs to be informed that there is a requirement for physicians or physicians in training to be truthful and cooperative with the other physicians he works with." Def.'s Ex. 3, Ex. 28.

In response, Plaintiff argues that all of these non-discriminatory reasons are false and constitute pretext concealing a discriminatory motive. He raises several arguments that apply to all of these evaluations. First, Plaintiff points to his high marks in other clinical components of his education both before and after the Honors curriculum, as well as his success on standardized tests measuring clinical aptitude. Yet the mere fact that Plaintiff performed well in other rotations or in other assessments of his clinical aptitude does not suggest that the evaluations at issue were false, much less pretext for discrimination. *See Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 507 F.Supp.2d 93, 108 (D.D.C. 2007) ("It is nonsensical to suppose that a

plaintiff should be able to demonstrate that an employer's stated reason for its adverse action is pretextual merely because the employer cannot prove that the plaintiff was deficient in *every* aspect of his job performance.") (emphasis in original); *Nurriddin v. Goldin*, 382 F.Supp.2d 79, 101 (D.D.C. 2005) ("[T]he fact that plaintiff may have received letters of commendation or positive ratings is besides the point."). Similar logic undermines Plaintiff's next argument, that he received positive feedback from some doctors at various points in these rotations, including positive comments from Dr. Jablonover. The mere fact that Plaintiff's performance was not universally problematic, and that his conduct did not raise concerns with *all* of the physicians he worked with at *all* times, does not show that the overall negative evaluations he received were untruthful. Further, while Plaintiff objects to the exclusion of certain positive evaluations from his overall assessment, there is no evidence that any of his evaluators consciously sought to exclude or ignore positive evaluations of Plaintiff. Pl.'s Facts ¶ 25. Moreover, the comments of Plaintiff's evaluators do include some positive feedback. As an additional matter, many of the positive comments from other physicians in these rotations that Plaintiff cites are hearsay, representing his own testimony as to the positive feedback he received. *See id.* (citing Pl.'s Ex. 3 (Plaintiff's Brief to President Trachtenberg) at 2-3 (describing positive comments from other doctors)). Other evaluations do not appear to correspond to the time frame at issue, and are thus of dubious weight. For example, Plaintiff points to an evaluation from Dr. Charles Macri that he describes as his summative evaluation for the obstetrics and gynecology rotation. *See* Pl.'s Facts ¶ 52. This evaluation, while very positive, does not specify a course and states that the "dates attended" were April 30 to June 22 of an unspecified year. Pl.'s Ex. 22 at 135. Yet Plaintiff's obstetrics and gynecology clerkship occurred in September and October of 2006. Accordingly,

Dr. Macri's evaluation is not probative on the issue of the validity of Plaintiff's negative obstetrics and gynecology evaluation from a completely different timeframe.

Relatedly, Plaintiff objects to the fact that many of the individuals evaluating him relied on second-hand reports of his performance. Pl.'s Opp'n at 15; Pl.'s Facts ¶ 24. Specifically, Plaintiff notes that both Dr. Jablonover and Dr. Lee collected the comments of residents and compiled these assessments in making their evaluations. *Id.* Plaintiff raises the same concern as to the negative evaluations of Dr. Askari and Dr. Gaskins. Pl.'s Facts ¶¶ 36, 52. Yet Plaintiff provides no reason to believe these doctors believed the evaluations they received and compiled to be false or untruthful. *Fischbach*, 86 F.3d at 1183 (employer prevails if it "honestly believes in the reasons it offers"). And in general, supervisors are entitled to rely on the apparently truthful reports of those working under them. *See Smith v. Chamber of Commerce*, 645 F.Supp. 604, 608 (D.D.C. 1986) ("plaintiff's employers were entitled to rely on reports of plaintiff's performance given by his immediate supervisor . . . and by others familiar with his work."). Accordingly, the Court does not find this reliance on second-hand information as probative of discriminatory intent.[10]

Plaintiff further alleges that these negative evaluations were not the product of honest assessment, but rather the result of Dean Schroth's prejudicial interference. Pl.'s Opp'n at 26-27. Yet, as discussed, the record shows that Dr. Jablonover and Dr. Lee initiated the contact with Dean Schroth to express their assessments of Plaintiff. Further, there is no evidence of Dean

---

[10] Plaintiff also argues that Askari "made contradicting statements to the Subcommittee on Comportment that essentially did not match his written reports." Pl.'s Opp'n at 15. As support for this proposition, Plaintiff cites the Affidavit of one of his former attorneys, Syed H. Zaidi, before the DCOHR, which states that "Dr. Askari's responses to questioning by the subcommittee did not follow along with his written statements." Pl.'s Ex. 24 (Zaidi Affidavit) at 15. However, neither Plaintiff nor Mr. Zaidi ever explain what these inconsistencies were. Without any further explanation, this allegation of inconsistency is insufficient to support an inference of discriminatory purpose.

Schroth seeking to bias Plaintiff's evaluators in the obstetrics and gynecology rotation against Plaintiff.

In addition, with respect to his surgery evaluation, Plaintiff raises two additional arguments for pretext. First, he argues that his negative evaluation from Dr. Askari can be explained by discriminatory animus because Dr. Askari allegedly stated "I don't eat with your kind" when Plaintiff "asked him to have breakfast together as other teams do with students." Pl.'s Facts ¶ 37. Defendant disputes this remark was ever made, and Plaintiff provides no competent evidence for the statement beyond his own deposition testimony. Further, although Plaintiff argues that Askari was stating that as a member of the Baha'i faith he did not want to eat with a Muslim like Plaintiff, there is no evidence in the record that Askari is Baha'i. Plaintiff stated in his deposition that he "belie[ved]" Askari to be Baha'i, but recognized that this assessment "could be taken as speculation." Def.'s Ex. 2 at 263:22-264:9. Moreover, even if there were proof that Askari is Baha'i, the statement "your kind" is inherently ambiguous. As Defendant contends, Askari simply could have been stating that he preferred not to eat with medical students, or been speaking about any other distinction between himself and Plaintiff. In the end, this comment is simply too ambiguous to be probative of pretext. In the absence of greater context as to this statement and its meaning, the Court does not find that it raises a genuine issue of material fact as to Askari's discriminatory motive in negatively evaluating Plaintiff.

Second, Plaintiff argues that his surgery grade was the product of discrimination because Dr. Lee rejected his efforts to appeal the grade, in violation of Medical School Regulations. Pl.'s Facts ¶ 48. Plaintiff alleges that this failure to process his appeal constitutes part of a plot between Dean Schroth and Dr. Lee to discriminate against Plaintiff. *Id.* Yet the Court does not

find the procedural error that Plaintiff claims. On November 17, 2006, Plaintiff e-mailed Dr. Lee stating, "I have spoken with Dr. Bruce Orkin, Team Leader of Team 1 and Director of Colorectal surgery about my grade in surgery. Dr. Orkin informed me that I have passed the surgery clerkship and have learned a lot in rotation. The evaluation of Reza Askari contradicts the team leader and attending." Pl.'s Ex. 22 at 140. Dr. Lee did not respond to this e-mail, or at least no response is contained in the record. Plaintiff alleges that this failure to respond violates a provision of the Regulations stating that "[a]ny student who considers a grade or evaluation to be unjust or inaccurate may, within 14 calendar days of receiving the grade, appeal in writing to the signer of the evaluation with a copy to the dean." Pl.'s Ex. 14 (Regulations for M.D. Students) at 3. Yet Plaintiff does not frame his e-mail to Dr. Lee as an appeal. Indeed, he makes no request of her in the e-mail. Further, Plaintiff did not copy the dean on this e-mail or invoke the Regulation he now cites. Accordingly, the Court does not find that Dr. Lee's failure to respond to this e-mail supports an inference that her negative evaluation of Plaintiff was untrue and that she sought to discriminate against him as part of a scheme with Dean Schroth.

Similarly, Plaintiff argues that Dr. Jablonover failed to process his appeal of his Medical School grade, and that this alleged procedural irregularity suggests discriminatory animus. Pl.'s Facts ¶ 31. On August 30, 2006, Plaintiff e-mailed Dr. Jablonover stating, "This is a follow up of our meeting together on August 23, 2006 at 9:30 am regarding my decision to appeal my clerkship evaluation for Medicine Fall 2006. I have met and spoken with Dean Schroth and have expressed my intent to appeal." Pl.'s Ex. 4 (Brief of Case Findings), Ex. 3 (E-mail from Plaintiff to Jablonover). Yet the Regulations did not require Dr. Jablonover to take any action in response to this e-mail. Rather, the Regulations state that if, after a student files an appeal in writing, "the issue is not resolved to the student's satisfaction within 14 calendar days of receipt of the appeal,

the student may appeal it in writing to the Chair of the responsible department, setting forth the reasons for reconsidering the grade or evaluation." Pl.'s Ex. 14 (Regulations for M.D. Students) at 3. At this point, upon making a decision, the Chair – unlike the signer of the evaluation – is required to "convey a determination to the student *in writing*." *Id.* Here, there is no evidence that Plaintiff appealed any action or inaction by Dr. Jablonover, including silence, to the Chair of the Internal Medicine Department. Accordingly, there is no procedural irregularity.

As an additional note, although it has applied the standard analysis for assessing a Defendant's legitimate, non-discriminatory motive, the Court notes that it is particularly reluctant to intrude on the grading and performance evaluation decisions of Plaintiff's Medical School instructors. The Supreme Court has observed that, "[i]f a 'federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies,' far less is it suited to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions – decisions that require 'an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking.'" *Ewing*, 474 U.S. at 226 (quoting *Bishop v. Wood*, 426 U.S. 341, 349 (1976) and *Horowitz*, 435 U.S. at 89-90). "[D]ecisions concerning academic merit are precisely the kind that should be left to administrators of higher education. If this Court (or a jury) were to engage in an independent assessment of plaintiff's academic qualification, it would hardly show the 'great respect for the faculty's professional judgment' that the Supreme Court has demanded in this setting." *Elam*, 530 F.Supp.2d at 20 (quoting *Ewing*, 474 U.S. at 225).

### C. Plaintiff's Removal from the Honors Program and Cessation of Medical Research

Plaintiff also argues that Defendant discriminated against him when Plaintiff was removed from the Honors curriculum and ordered to discontinue his ongoing medical research on or about October 23, 2006. Pl.'s Opp'n at 18-24. As discussed, on October 18, 2006, in light of Plaintiff's apparent performance in his initial Honors curriculum rotations, Dean Schroth e-mailed Plaintiff requesting that Plaintiff contact him to discuss alternatives. In this e-mail, Dean Schroth stated "[P]lease call the office. [I] have time to meet on Friday both in the morning or the afternoon. [I] know you are at [Holy Cross Hospital] now, so we can do this by phone." Def.'s Ex. 3, Ex. 29. Plaintiff failed to respond to this e-mail. On October 20, 2006, Dean Schroth sent Plaintiff another e-mail stating "[I] sent you a message two days ago, but you have not responded. CALL ME on my cell phone . . . . I'll have it on the rest of the day and most of the time over the weekend." Def.'s Ex. 3, Ex. 30. Plaintiff did not contact Dean Schroth over the weekend in response to this e-mail.

However, on October 23, 2006, Plaintiff did meet with Dean Schroth (as well as Dean Scott). Def.'s Ex. 4 ¶ 25. In this meeting, Plaintiff was told that he would be receiving a below passing grade in the surgery clerkship, that he was being returned to the standard curriculum, and that he needed to focus on improving his clinical performance instead of doing research. *Id.* ¶ 26. Plaintiff now argues that these actions represented discrimination on the basis of his race, religion, and/or national origin.

In response, Defendant argues that Plaintiff was removed from the Honors curriculum for the legitimate, non-discriminatory reason that he had performed poorly in his rotations, specifically the clinical component of this work. Def.'s MSJ at 29-30. Defendant states that because students who made unsatisfactory progress were ineligible to remain in the program, and Plaintiff progressed unsatisfactorily, his removal was appropriate. Similarly, Defendant

contends that Plaintiff was ordered to cease his research in order to focus on improving his clinical performance. *Id.* at 29.

Plaintiff argues that his removal from the Honors curriculum was contrary to Medical School Regulations. However, while Plaintiff quotes several sections of the Regulations, the specific provisions cited by Plaintiff do not purport to limit Dean Schroth's discretion to remove him from the Honors curriculum. *See* Pl.'s Ex. 14 at 3. Indeed, Plaintiff himself states "[t]here was no specific criterion for remaining in Honors." Pl.'s Facts ¶ 67. Plaintiff next argues that because a committee placed him in the Honors curriculum, he should have been removed by committee vote, specifically the MSEC. *Id.* However, although Plaintiff argues he should have been removed by MSEC vote, there is no support for this proposition in Medical School Regulations. *See* Pl.'s Ex. 14 at 3.

As further proof that Dean Schroth did not follow proper procedure, Plaintiff argues that the general university policy for grades limited the Dean's ability to remove him from the Honors curriculum. Pl.'s Facts ¶ 67. However, what Plaintiff describes as "the general university policy for grades" is actually notation on the grading sheets used for student clerkship evaluations. Pl.'s Ex. 3 at E95. This language states that "[a]ll conditional and fail grades must be reported to the Assistant Dean for Student Affairs before any remediation is attempted. Specific recommendations for remediation should accompany the report. The proposed remediation must be approved by the Medical School Evaluation Committee." *Id.* This language, as part of the clerkship evaluation forms, is directed at clerkship evaluators and appears intended to prevent them from engaging in remediation with the student independent of the Medical School Administration. Yet this language does not appear to limit Dean Schroth's ability to remove Plaintiff from the Honors curriculum.

Plaintiff further disputes his alleged clinical deficiencies. However, as discussed, the issue is not the accuracy of these clinical evaluations, but rather whether Dean Schroth reasonably believed that such deficiencies existed. *Fischbach*, 86 F.3d at 1183 (employer prevails if it "honestly believes in the reasons it offers"). Both Dr. Jablonover and Dr. Lee independently contacted Dean Schroth and raised concerns regarding Plaintiff's clinical performance. Accordingly, there is evidence in the record to suggest that the Dean honestly believed Plaintiff was experiencing problems in the Honors curriculum.

Similarly, Plaintiff does not point to any procedures violated by Dean Schroth in halting Plaintiff's research. Instead, Plaintiff argues that his research was not interfering with his time in the hospital or on rotations. Pl.'s Opp'n at 19. However, as discussed, the question was not whether Plaintiff's research was interfering with his clinical performance, but rather whether Dean Schroth reasonably believed that it was. On this point, the Court notes that in Dr. Lee's e-mail to Dean Schroth she states that Plaintiff "also has been noted to wander off from the rotation for a few hours at a time, saying he has medical appointments to one person and then giving another story to another member of the team." Def.'s Ex. 3, Ex. 19. In terms of reasons for his absence, Dr. Lee stated that Plaintiff "mentioned that he had to go do some lab work. If he has some work that he is performing for his project and using surgery clerkship time to do it, I am not going to tolerate it." *Id.* Accordingly, there is evidence from which Dean Schroth reasonably could have concluded that Plaintiff's research was interfering with his clinical performance. In addition, Dr. Askari's letter stated Plaintiff "was often not available when needed or [interns] could not get a hold of him . . . . One weekend he disappeared for several hours during a very busy stretch per the intern on call . . . ." Def.'s Ex. 6, Ex. B at 1.

Accordingly, the Court does not find that Dean Schroth's order that Plaintiff cease his research activities was motivated by discriminatory animus.[11]

**D. Review of Plaintiff's Professional Comportment and Dismissal from Medical School**

Plaintiff next argues that Defendant's decision to initiate a review of Plaintiff's professional comportment in December 2006 was discriminatory. Pl.'s Opp'n at 27-29. Relatedly, he contends that GW's decision to form a committee to evaluate Plaintiff's professional comportment in or about February 2007 was discriminatory.

As discussed, in December 2006, Dean Schroth decided to form a Professional Comportment Subcommittee of the Medical Student Evaluation Committee to investigate Plaintiff's behavior in his third-year rotations. Def.'s Ex. 4, Ex. D. Defendant states that Dean Schroth based this decision on what he perceived to be the alleged unprofessional behavior in Plaintiff's medicine, surgery, and obstetrics and gynecology rotations. Dean Schroth informed Plaintiff of this decision via letter on December 27, 2006, in which he reiterated that the Subcommittee was being formed to "investigate the numerous instances of unprofessional behavior reported in your clinical evaluations from the medicine, surgery, and obstetrics and gynecology clerkships completed earlier this semester." *Id.*

Plaintiff argues that these evaluations were inaccurate, and that there were no actual problems with his professional comportment. Although Plaintiff contests the accuracy of these

---

[11] Plaintiff also argues that Dean Schroth's order that he cease his research activities was part of a plan by Dean Scott to usurp Plaintiff's research project. Pl.'s Facts ¶ 124. The Court notes that this theory, suggesting an ulterior but non-discriminatory motive, undercuts Plaintiff's claim that Defendant was motivated by discriminatory animus. Nevertheless, even if this theory were probative as to pretext, Plaintiff provides no evidence for his claim other than conclusory allegations. His citation to the record on this point consists of Plaintiff's research proposal as part of his application to the Honors curriculum, which makes no mention of Dean Scott taking over and modifying Plaintiff's research project. *Id.* (citing Pl.'s Ex. 8 at 147-52).

evaluations, as discussed *supra*, the Court notes that at least some of these evaluations did raise concerns about Plaintiff's unprofessional behavior, namely his truthfulness. He again argues that these negative evaluations were made at the direction of Dean Schroth, but, as discussed, based on the record before the Court, both Dr. Jablonover and Dr. Lee independently contacted Dean Schroth with concerns regarding Plaintiff's clinical performance. And there is no evidence that Dean Schroth sought to bias members of the obstetrics and gynecology faculty against Plaintiff.

Plaintiff further argues that there were numerous procedural flaws in Dean Schroth's initiation of the subcommittee hearing process. Pl.'s Opp'n at 27-29. A plaintiff can cast doubt on a Defendant's asserted reason by pointing to the Defendant's "failure to follow established procedures or criteria." *Brady*, 520 F.3d at 495 n. 3. However, as discussed in the context of Plaintiff's contract claim, the Court discerns either no procedural irregularities or no material procedural irregularities suggesting discriminatory animus in Dean Schroth's initiation of the Subcommittee review process.

Plaintiff also challenges the formation of the committee as discriminatory. On this point, he points again to alleged procedural irregularities relating to Dean Goldberg's involvement in facilitating the make-up of the committee. Yet, as discussed, *supra*, in Plaintiff's breach of contract claim, Defendant largely complied with the regulations, and any minor non-compliance does not appear to be probative of an ulterior motive. Here, any minor procedural missteps are insufficient to raise a genuine issue of material fact that Defendant discriminated against Plaintiff in forming the Subcommittee and choosing its membership. *See Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) ("the adherence to or departure from internal . . . procedures is a factor that the trier of fact may deem probative and choose to consider in determining the true

motivation behind the . . . decision of the prospective employer. But . . . it is essential that the claimant establish 'discriminatory motive.'").

Similarly, Plaintiff challenges as discriminatory the remainder of the professional comportment review process, including GW's holding of a subcommittee hearing, the MSEC meeting and its recommendation that he be dismissed from the medical school, the Dean's decision to expel him from the medical school, and the office of the Vice President for Academic Affairs upholding this decision. Yet as discussed in the context of Plaintiff's contract claim, Defendant has offered legitimate non-discriminatory reasons for these actions, and each decision was based on evidence placed before the relevant decision-maker. Plaintiff argues that these decision-makers fabricated their reasoning, which operated as a veneer to conceal a discriminatory motive. Pl.'s Opp'n at 29. However, if the evaluator's "stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the [evaluator] is lying about the underlying facts." *Brady*, 520 F.3d at 495. *See also George*, 407 F.3d at 415; *Fischbach*, 86 F.3d at 1183. Here, the Subcommittee had before it Plaintiff's evaluations from his clerkships, the MSEC had Plaintiff's evaluations as well as the recommendations of the Subcommittee, and the Dean had all of this information and the recommendations of the MSEC. Furthermore, although Plaintiff argues that the professional comportment review process was rife with procedural irregularities, the Court finds no material procedural missteps. Accordingly, there is insufficient evidence from which a trier of fact could conclude that these decisions were made with a discriminatory motive.

### E.  Subcommittee's Recommendations that Plaintiff Repeat Courses

Plaintiff also alleges that Defendant discriminated against him when GW "informed [Plaintiff] that he would have to repeat the Obstetrics and Gynecology clerkships" and "the

subcommittee recommended that [Plaintiff] be forced to repeat any clerkship . . . if he were to receive a "Low Pass" grade." TAC ¶¶ 59, 64. With these allegations, the Court understands Plaintiff to be complaining of discrimination in the recommendation of the Subcommittee that he repeat classes in which he received a low pass or lower. Because this issue is arguably distinct from whether Plaintiff's termination and the preceding events were discriminatory, the Court provides separate analysis of the Subcommittee's recommendations that Plaintiff repeat several classes.

The Court notes that the Subcommittee provided several reasons for its recommendations. Based on the evaluations provided from Plaintiff's clinical rotations, the Subcommittee members "ha[d] serious concerns regarding Mr. Hajjar-Nejad's comportment and his ability to function as a physician. We are concerned that he may do well in classroom, standardized tests, and one-on-one interactions, but he appears to need work in synthesizing information into valid differential diagnoses and treatment plans, and he has displayed difficulties in working as a team member focused on patient care rather than on individual performance." Def.'s Ex. 3, Ex. 14. The Subcommittee concluded that it "believe[d] [Plaintiff] should expend a great deal of effort in trying to understand his own interpersonal interaction modes and how that relates to becoming an effective physician." *Id.* To this end, the Subcommittee recommended, *inter alia*, that Plaintiff "must repeat any clerkship for which he receives a grade of low pass or below." *Id.*

Plaintiff argues that this recommendation, along with the other recommendations of the Subcommittee, was motivated by discriminatory animus. Pl.'s Opp'n at 49. However, he points to no evidence that Defendant's explanation is pretextual and that the Subcommittee was discriminating against him on the basis of his race, religion, or national origin. Although

Plaintiff purports to identify procedural irregularities in the Subcommittee's review, as discussed, the Subcommittee appears to have complied fully (or at least substantially) with Medical School Regulations. Further, any minor procedural missteps are not probative of discrimination in light of the body of evidence before the Subcommittee.

### F. Hold Placed on Plaintiff's Transcript

Plaintiff next contests the decision to place a hold on his transcript. The Court notes that there is no evidence of communication between the Dean's office and the Registrar regarding placing a hold on Plaintiff's account. Rather, there is only a letter from Dean Goldberg requesting that Plaintiff's "transcript be updated to reflect the change in status" "Dismissed for Reasons of Professional Comportment on July 26, 2007." Def.'s Ex. 15, Ex. 1. The Assistant Registrar Larry Fillian has testified that he did not act at the direction of the Dean's office in placing a hold on Plaintiff's transcript. *See id.* at 15:16-19 ("The dean's office did not tell me to place a hold on your account. The dean's office told me that – to place a notation on your transcript saying that you were dismissed from the university."). Mr. Fillian further stated that this action was a clerical error. *See id.* at 39:5-10 ("All that I can say is that I placed a hold on your record to prevent you from registering for classes for further semesters. It was not intended to prevent your transcript production and in fact was intended to protect you from not incurring additional debt at the university. It was a mistake."); *id* at 10:23-11:6 ("I then, as part of our practice, placed a hold on your account . . . and that hold was intended to prevent you from doing any online registration into classes. I then heard, a couple of months later, I suppose, that this hold erroneously prevented your transcript production. When I heard that and was notified by the Registrar that this was in fact occurring, I immediately removed the hold and contacted you directly and apologized for the unwitting results of this."). At Plaintiff's request, Defendant sent

him a letter certifying that the hold preventing him "from obtaining his transcript was erroneously placed." *Id.*, Ex. 3. The letter states that "[t]he hold was intended to prevent future registration, but unwittingly additionally prevented transcript production." *Id.*

In response, Plaintiff provides the following arguments for why Defendant's legitimate, non-discriminatory explanation is false. First, Plaintiff argues that medical students were not responsible for registering themselves. In support of this proposition, he points to an e-mail from the Coordinator for Student Records and Services to Plaintiff's Medical School class which states "I will be registering you in GWEB next week" and advising students to eliminate any holds on their accounts. Pl.'s Ex. 46 (E-mail from Coordinator for Student Records and Services). Based on this e-mail, Plaintiff challenges the Registrar's explanation that the hold was intended to keep him from registering. Second, Plaintiff points to the text of the letter alerting him to the hold on his transcript, which states "[t]he hold was placed by the Dean of the School of Medicine and Health Sciences and reads 'Dismissed per SMHS'". Pl.'s Ex. 41. Based on this letter, Plaintiff argues that the hold was the product of the *Dean's* discriminatory animus, not clerical error. In support of this proposition, Plaintiff offers the testimony of former President Trachtenberg. When asked why Dean Scott would place a hold on Plaintiff's account, President Trachtenberg admitted that he did not know if Scott actually placed the hold, Pl.'s Ex. 36 at 117:8-16, but offered his speculation that Dean Scott may have "wanted to stop [Plaintiff] from getting transcripts so that you couldn't go to another medical school, because he felt that it was inappropriate for you to be a physician. And he had a duty to do that if he believed that it was inappropriate for you to be a physician." *Id.* at 119:5-9. *See also id.* at 111:4-9 ("[I]f you don't think somebody is fit to be a physician, you would be neglecting your responsibilities to allow them to simply put the experience behind them and go to another school, graduate, and practice

medicine, in which they hold people's lives in their hands.")  Plaintiff argues that together, this evidence undermines Defendant's explanation that the hold on his transcript was the product of a clerical error.

Yet, taken as a whole, the Court finds that Plaintiff's evidence does not suffice to preclude summary judgment.  To be sure, the Supreme Court has held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.  However, "[t]his is not to say that such a showing by the plaintiff will *always* be adequate to sustain a . . . finding of liability.  Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* (emphasis in original).  Plaintiff's claim that the hold on his transcript was discriminatory falls into this category.   Indeed, the Supreme Court recognized the appropriateness of judgment for the defendant where "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* (citing *Aka v. Washington Hospital* Center, 156 F.3d 1284, 1291-92 (D.C. Cir. 1998)).  Here, in order to show that the hold on his transcript was not a mistake, Plaintiff puts forth evidence that the hold was placed by the Dean and was the product of the Dean's desire to keep him from transferring to another medical school.  On this point, he cites to President Trachtenberg's speculation that the Dean wanted to prevent Plaintiff from transferring based on a concern that Plaintiff was unsuited for the medical profession.  Accordingly, even if accepted, Plaintiff's evidence demonstrates

another, nondiscriminatory reason for the Dean's decision – the Dean's concerns about Plaintiff's professional comportment. Furthermore, Plaintiff has only created a weak issue of fact as to the falsity of Defendant's explanation. Although Plaintiff claims he never registered himself for classes and points to evidence that Student Records and Services had registered him in the past, this does not mean he *could not* have self-registered. Furthermore, the hold could have been placed on Plaintiff's transcript as a flag to prevent him from *being* registered automatically by Student Records and Services for future semesters. Moreover, the fact that the letter advising Plaintiff of the hold states "[t]he hold was placed by the Dean of the School of Medicine and Health Sciences and reads 'Dismissed per SMHS'" arguably shows nothing more than that the hold was placed due to the Dean's dismissal of Plaintiff from the Medical School pursuant to a professional comportment proceeding. In the end, the Court does not find "sufficient evidence for a reasonable jury to find that [Defendant's] asserted non-discriminatory reason was not the actual reason and that [Defendant] intentionally discriminated against [Plaintiff] on the basis of race, color, religion, sex, or national origin" in placing the hold on his transcript. *Brady,* 520 F.3d at 494. Accordingly, summary judgment is granted as to this claim.

### G. Defendant's Communication with the NBME

Finally, Plaintiff challenges GW's Communication with the National Board of Medical Examiners on November 19, 2007 after Plaintiff's dismissal. Pl.'s Opp'n at 30. Defendant states that the NBME routinely asks GW to verify student enrollment before they sit for the USMLE. Def.'s Ex. 8 ¶ 7. Accordingly, Defendant states that in keeping with this normal practice, on November 19, 2007, GW notified the NBME via e-mail that it had dismissed Plaintiff. *Id.* ¶¶ 8-9. This notification was provided by Harolyn Johnson, an administrative assistant in the School of Medicine and Health Sciences' Office of the Dean, who served as a

liaison between the School of Medicine and the NBME. *Id.* ¶ 2, 9. The e-mail read "Please accept this e-mail as official notification that Mohammad Javad Hajjar-Nejad has been dismissed from the George Washington University School of Medicine and Health Sciences effective July 28, 2007. This change in status has also been noted on the NBME Request for Verification of Student Enrollment. Please contact us if any further information is required." *Id.*, Ex. A.

In response, Plaintiff argues that GW's communication with the NBME "was part of a larger plot to prevent Plaintiff from becoming a physician." Pl.'s Opp'n at 36. Further, in his statement of facts, Plaintiff states that as part of this plot GW "informed the NBME that [Plaintiff] was no longer enrolled to stop Plaintiff from taking required licensing exams." Pl.'s Facts ¶ 138. Yet Plaintiff provides no citations to the record to rebut Defendant's legitimate non-discriminatory reason that the communication with the NBME was part of normal practice. To the extent Plaintiff cites to Appendix F to his brief in support of this position, Pl.'s Opp'n at 30; Pl.'s Facts ¶ 138, the Court does not consider this additional briefing, which has been stricken as "a transparent attempt to subvert the briefing page limits previously ordered by the Court." Min. Order (June 12, 2013). Accordingly, Plaintiff's claims that Defendant discriminated against him by communicating his dismissal to the NBME are dismissed.

Accordingly, all of Plaintiff's claims of discrimination in violation of Title VI and Section 1981 fail. In attempting to show pretext, Plaintiff relies primarily on alleged procedural missteps by Defendant. However, the Court's review has revealed no procedural irregularities or at least not any material procedural irregularities suggesting pretext and reflecting discriminatory animus. Absent alleged direct evidence of discrimination that is ambiguous or hearsay, Plaintiff provides no statements or conduct that otherwise supports his claims of discriminatory treatment by Defendant. Therefore, because the Court does not find "sufficient evidence for a reasonable

jury to find that [Defendant's] asserted non-discriminatory reason[s] w[ere] not the actual reason[s] and that [Defendant] intentionally discriminated against [Plaintiff] on the basis of race, color, religion, sex, or national origin", *Brady,* 520 F.3d at 494, Plaintiff's discrimination claims are dismissed.

### 3. Retaliation Claim

Plaintiff next alleges that his treatment by Defendant constitutes retaliation for protected activity. Pl.'s Opp'n at 30-37. The Supreme Court has held that Section 1981 encompasses claims of retaliation. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008). Similarly, "[w]hile neither the Supreme Court nor the D.C. Circuit has considered whether [Title VI's] private cause of action includes a claim for retaliation," *Kimmel v. Gallaudet Univ.*, 639 F.Supp.2d 34, 42 (D.D.C. 2009), other courts of this district have concluded that "an action against retaliation is implicitly within the scope of Title VI's prohibition on intentional discrimination." *Chandamuri*, 274 F.Supp.2d at 83. *See also Kimmel*, 639 F.Supp.2d at 43 (concluding that Plaintiff could allege a retaliation claim under Title VI); *Peters v. Jenney*, 327 F.3d 307, 318-20 (4th Cir. 2003) (same).

Here, Plaintiff predicates his retaliation claim on three documents. First, on July 25, 2006, Plaintiff sent an e-mail to Dr. Jablonover, reporting an alleged "recent difficulty" Plaintiff was experiencing with a resident. Def.'s Ex. 3, Ex. 4. Second, on September 22, 2006, Plaintiff submitted to Dean Schroth a document entitled "Motion for Injunctive/Wrong Evaluation and for Development of an Active Task Force Committee." Def.'s Ex. 3, Ex. 5. Finally, in April 2007, Plaintiff submitted to GW Dean of Students Linda Donnels a document entitled "Brief of Case Findings." Def.'s Ex. 3, Ex. 6.

Plaintiff argues in his Opposition that Defendant improperly characterizes his retaliation claim as restricted to three documents. Pl.'s Opp'n at 31-32. The Court disagrees. As an initial matter, Plaintiff's Third Amended Complaint limits his alleged protected activity to the three documents discussed above, TAC at 15-17, and Plaintiff appears to recognize that his Complaint only alleges this set of protected activity in his deposition, Def.'s Ex. at 109:3-110:12. However, in his Opposition, Plaintiff argues that additional protected activity exists, but does not specifically mention any additional alleged protected activity in this fifty page filing. Similarly, descriptions of this additional alleged protected activity are not included anywhere in Plaintiff's seventy-five page Responsive Statement of Facts. Instead, in both of these documents, Plaintiff refers the Court to Appendix G of his Opposition. Pl.'s Opp'n at 32; Pl.'s Facts ¶ 144. As discussed, the Court struck the fifty-two page set of Appendices to Plaintiff's Opposition, which it recognized as a "transparent attempt to subvert the briefing page limits previously ordered by the Court." *See* Min. Order (June 12, 2013). Based on this past order, this additional briefing is not properly before the Court. Furthermore, even if it were, Plaintiff is not entitled to amend his complaint through an opposition to a motion for summary judgment. "It is well established that a party may not amend its complaint or broaden its claims through summary judgment briefing." *District of Columbia v. Barrie*, 741 F.Supp.2d 250, 263 (D.D.C. 2010). *See also DSMC, Inc. v. Convera Corp.*, 479 F.Supp.2d 68, 84 (D.D.C. 2007) (rejecting plaintiff's attempt to broaden claims and thereby amend its complaint in opposition to defendant's motion for summary judgment). Accordingly, the Court finds Plaintiff's retaliation claim to be restricted to the three documents discussed.

In assessing Plaintiff's retaliation claim, the Court must initially address whether Plaintiff engaged in activity protected by Section 1981 and Title VI. Here, the Court does not find that

any of the documents identified by Plaintiff constitute protected activity, which dooms Plaintiff's retaliation claim. In the analogous context of Title VII, the D.C. Circuit has made clear that "[n]ot every complaint garners its author protection under Title VII." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). *See also Pope v. ESA Servs., Inc.*, 506 F.3d 1001, 1010 (8th Cir. 2005) (stating that commenting about absence of black employees, without alleging discrimination, was insufficient to qualify as protected activity); *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727-28 (7th Cir. 2003) (stating that complaining about being "picked on," without mentioning discrimination or otherwise indicating that gender was an issue, does not constitute protected activity, even if the employee honestly believes she is the subject of sex discrimination). "While no 'magic words' are required, the complaint must in some way allege *unlawful discrimination*, not just frustrated ambition." *Broderick*, 437 F.3d at 1232 (emphasis added). *See also Francis v. Perez*, No. 12-0964, 2013 WL 5522440, at *13 n. 10 (D.D.C. Oct. 7, 2013) ("Here plaintiff's two alleged 'protected activities' . . . fall short of the *Broderick* standard because there is no evidence that in either complaint plaintiff alleged discrimination on the basis of religion."). Consequently, "to be actionable under § 1981, the retaliation must have been in response to the claimant's assertion of rights that were protected by § 1981." *Perkins v. Fort Lincoln II Condo. Ass'n,* No. 09-466, 2011 WL 2133614, at *9 n. 4 (D.D.C. May 27, 2011) (quoting *Jones v. Wash. Times*, 668 F.Supp.2d 53, 59 (D.D.C. 2009)). *See also Middlebrooks v. Godwin Corp.*, 722 F.Supp.2d 82, 89 (D.D.C. 2010), *aff'd* 424 Fed. App'x. 10 (D.C. Cir. 2011) (holding that in the Section 1981 context, "[t]he complaint must in some way allege unlawful discrimination – that is, discrimination on the basis of a protected characteristic") (internal quotation marks omitted).

Here, none of the three documents identified by Plaintiff mention unlawful discrimination in violation of Section 1981 or Title VII. First, Plaintiff points to his June 25, 2006 e-mail to Dr. Jablonover. In this e-mail Plaintiff complains of difficulty with a new resident, alleging that "[h]er tone, manner and actions are very unprofessional and coercive." Def.'s Ex. 3, Ex. 4. Plaintiff proceeds to list specific problems with this resident and concludes "a learning environment should be positive and conducive to student learning. This resident has become an obstacle to this." *Id.* At no point in the e-mail, however, does Plaintiff allege any sort of discrimination on a basis prohibited by Title VI or Section 1981. Accordingly, this e-mail does not constitute protected activity for purposes of his retaliation claim. *Peters v. Dist. of Columbia*, 873 F.Supp.2d 158, 204-05 (D.D.C. 2012) (complaints about supervisor conduct and "poor evaluations" did not constitute protected activity absent an allegation of unlawful discrimination). Plaintiff states that, with respect to this document and the other purported bases for protected activity, there was a clear understanding, apparently based on meetings surrounding these written complaints, that in this document he was complaining of improper treatment on the basis of race, religion, or national origin. Pl.'s Opp'n at 32 n. 11. However, Plaintiff provides no citation to the record or competent evidence to support this contention. *Beyene v. Hilton Hotels Corp.*, 815 F.Supp.2d 235, 247-48 (D.D.C. 2011) ("[plaintiff] has put forward no evidence that his complaint to Hilton management alleged unlawful discrimination based on his membership in a protected class. Accordingly, [plaintiff] has not established that he engaged in statutorily protected activity."). Therefore, the Court finds no reason to question its conclusion that Plaintiff's June 25, 2006 e-mail does not constitute protected activity.

The same can be said of Plaintiff's September 22, 2006 Motion for Injunctive Relief/Wrong Evaluation and For Development of an Active Task Force Committee. In this

document, Plaintiff "requests the overturning of the evaluation by the Department of Medicine and, more importantly and essentially, for the creation of an active task force committee composed of students, administrators, deans, and hospital officials for the coordination and implementation of our goals and objectives as spelled out so explicitly in the University strategic plan." Def.'s Ex. 3, Ex. 5 at 1. However, Plaintiff makes no mention of discrimination on a basis prohibited by Title VI or Section 1981 anywhere in this document. Rather, the document appears to represent Plaintiff's complaints regarding mistreatment of medical students by residents at GW. *See id.* at 5 ("Residents delegate extra work to interns, interns overwhelmed or just plain lazy and bossy utilize medical students as extra house officers, and even residents give additional house chore work to medical students."). This document, containing no mention of unlawful discrimination, is clearly not protected activity upon which Plaintiff can found his retaliation claim. *See Middlebrooks*, 722 F.Supp.2d at 89-90 (allegations of "rude and condescending" conduct unrelated to purported discrimination not protected activity).

Finally, Plaintiff points the Court to his Brief of Case Findings submitted on April 21, 2007. Def.'s Ex. 3, Ex. 6. While this document uses the words "discrimination" and "retaliation", *see, e.g., id.* at 4-5, it never mentions discrimination or retaliation on a basis protected by Title VI or Section 1981. Rather, the substance of the document appears to discuss Plaintiff's claims of procedural errors in his dismissal from the Medical School. Admittedly, Plaintiff attaches to this document as an exhibit a full copy of GW's Guide to Student Rights and Responsibilities for the academic year 2006-2007. *Id.* at 42-63. This twenty-one page document includes, in addition to other policies, rules and regulations, GW's policy against discrimination, which states:

> The University will not permit discrimination on grounds of sex, race, color, religion, national origin, disability, sexual orientation or identity, or any other

illegal basis in any University-recognized area of student life. Additionally, all areas of student life are subject to the provisions of the District of Columbia Human Rights Law. However, those campus organizations that are essentially and avowedly social fraternal groups may limit membership on the basis of sex; those campus organizations that are essentially and avowedly sectarian may limit membership on the basis of religion.

*Id.* at 43. In his Brief of Case Findings, Plaintiff states generally that almost every provision of the Guide, including this provision "have not been followed as necessary." *Id.* at 13. Yet Plaintiff never explains how this provision was not followed, or even alludes to discrimination against him on the basis of race, religion, or national origin. *See Williams v. Spencer*, No. 08-0847, 2012 WL 3264569, at *8-9 (D.D.C. Aug. 13, 2012) (plaintiff's vague concern voiced to her employer that her supervisor's harassment might be based on her race or color was not protected activity). Indeed, even under a generous reading of the Brief of Case Findings, the discrimination and retaliation Plaintiff appears to allege in his Brief of Case Findings does not concern any of these prohibited bases for discrimination, but rather reflects his concerns regarding mistreatment of medical students and his belief that his dismissal represents retaliation for these complaints.

In similar cases, other courts of this district have concluded that mere use of the word "discrimination", divorced from any discussion of a protected basis, is insufficient to constitute protected activity. For example, in *Hunter v. Dist. of Columbia*, 905 F.Supp.2d 364, 379 (D.D.C. 2012), *aff'd Hunter v. Dist. of Columbia Gov't*, No. 13-7003, 2013 WL 5610262 (D.C. Cir. Sept. 27, 2013), the court found that Plaintiff's complaint letter which included the word "discriminatory practices" but did not allege discrimination on the basis of a protected activity, did not constitute a protected activity. "[E]ven though [plaintiff] uses the word "discriminatory," the substance of the letter does not allege any discrimination on the basis of race, color, religion, or national origin. Instead it alleges discrimination on the basis of cronyism – a category that is

not protected by Title VII." *Id.* "Since [plaintiff] does not even allude to discrimination on the basis of categories protected by Title VII, this Court cannot find that the letter constitutes a 'protected activity' under that statute." *Id.* at 380. So too here, although Plaintiff uses the word discrimination, he never alludes to discrimination on the basis of his race, religion, or national origin. Although no magic words are required, there must be some evidence from the document that Plaintiff was actually claiming discrimination in violation of Title VI or Section 1981. And here, based on the Court's review of the document, there is no evidence that Plaintiff was actually claiming discrimination on the basis of his race, religion, or national origin. Indeed, considering the logic of anti-retaliation provisions, such a document could hardly have placed Defendant on notice that Plaintiff was complaining of discrimination on the basis of his race, religion, or national origin such that they could retaliate against him *for* the complaint. *See Chandamuri*, 274 F.Supp.2d at 84 ("Although he need not have used 'magic words' in his Fall 2000 complaint about Dr. Roepe, [plaintiff] was required to make Georgetown *aware* of the protected activity . . . .") (emphasis added).

In making this determination that Plaintiff has failed to engage in protected activity, the Court is aware that it reaches a different conclusion than the DCOHR, which found these three documents to constitute protected activity. Pl.'s Ex. 21 at 78-79. Having reviewed these documents, the Court respectfully disagrees with the DCOHR and is not persuaded by its reasoning in finding that these filings constitute protected activity. *See Zenian v. Dist. of Columbia*, 283 F.Supp.2d 36, 40 (D.D.C. 2003) (court has independent obligation to assess the trustworthiness of agency findings in discrimination action). Rather, in light of the precedent of this court and the D.C. Circuit, the Court concludes that Plaintiff has failed to establish the necessary protected activity to support a retaliation claim. Furthermore, the DCOHR's decision

is not *res judicata* binding this Court. No court ever reviewed the DCOHR's probable cause determination, nor was there even a full evidentiary agency hearing. Rather, after conducting a review of documents and interviews, at Plaintiff's request, the Commission dismissed his administrative proceeding. *See Hajjar-Nejad*, 873 F.Supp.2d at 13. Accordingly, the DCOHR's conclusion regarding Plaintiff's alleged protected activity has no preclusive effect here. *See Univ. of Tenn. v. Elliott*, 478 U.S. 788, 796 (1986) ("Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims."); *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 470 n. 7 (1982) ("Since it is settled that decisions by the EEOC do not preclude a trial *de novo* in federal court, it is clear that unreviewed administrative determinations by state agencies also should not preclude such review even if such a decision were to be afforded preclusive effect in a State's own courts."); *Davis v. Joseph J. Magnolia, Inc.*, 815 F.Supp.2d 270, 274 (D.D.C. 2011) ("Although the Supreme Court has made it clear that a state administrative determination can preclude Title VII claims if it was affirmed by the state court, the same is not true if the agency determination was not reviewed by a state court."). In light of these determinations, Plaintiff's retaliation claim is dismissed.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's [154] Motion for Summary Judgment. Accordingly, this action is DISMISSED WITH PREJUDICE in its entirety. An appropriate Order accompanies this Memorandum Opinion.


Dated: March 31, 2014

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
